Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT

for the

**Northern** District of **Texas**

**Fort Worth** Division

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAY 20 2021

CLERK, U.S. DISTRICT COURT

By_____
Deputy

**4: 21 CV - 669 - P**

**Alexis C. Norman and others Similarly situated**

Plaintiff(s)

(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)

-v-

**Michael Carr, Warden FMC Carswell**

Defendant(s)

(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names. Do not include addresses here.)

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

*(to be filled in by the Clerk's Office)*

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Prisoner Complaint)

**AND JURY DEMAND**

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## I.  The Parties to This Complaint

### A.  The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

Name  **Alexis C. Norman**

All other names by which you have been known:

ID Number  **49210-177**

Current Institution  **FMC Carswell**

Address  **P.O. Box 27137**

**Fort Worth**   **Texas**   **76127**
City       State       Zip Code

### B.  The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

Name  **Michael Carr**

Job or Title (if known)  **Warden FMC Carswell**

Shield Number

Employer  **The Federal Bureau of Prisons**

Address  **P.O. Box 27137**

**Fort Worth**   **Texas**   **76127**
City       State       Zip Code

☑ Individual capacity   ☑ Official capacity

Defendant No. 2

Name  **Dr. Charles Langham**

Job or Title (if known)  **Medical Director FMC Carswell**

Shield Number

Employer  **The Federal Bureau of Prisons**

Address

**Fort Worth**   **Texas**   **76127**
City       State       Zip Code

☑ Individual capacity   ☑ Official capacity

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

Defendant No. 3

    Name

    Job or Title *(if known)*

    Shield Number

    Employer

    Address

*BoP COVID-19 Review Team & Medical Director*
*BoP Medical Director and Review Team*

*The Federal Bureau of Prisons*
*320 First Street NW*
*Washington          D.C.          20534*
          *City*         *State*      *Zip Code*

[✓] Individual capacity    [✓] Official capacity

Defendant No. 4

    Name

    Job or Title *(if known)*

    Shield Number

    Employer

    Address

*Michael Carvajal*
*Director of The Federal Bureau of Prisons*

*The Federal Bureau of Prisons*
*320 First Street NW*
*Washington          D.C.          20534*
          *City*         *State*      *Zip Code*

[✓] Individual capacity    [✓] Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

    [✓] Federal officials (a *Bivens* claim)

    [ ] State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

*Constitutional Rights, First and Eighth Amendments*
*See attached document*

Page 3 of 11

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

*Section 504 of the Rehabilitation Act and the Eighth Amendment*

D.      Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

## III.    Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

☐ Pretrial detainee

☐ Civilly committed detainee

☐ Immigration detainee

☐ Convicted and sentenced state prisoner

☑ Convicted and sentenced federal prisoner

☐ Other *(explain)* _____

## IV.    Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.      If the events giving rise to your claim arose outside an institution, describe where and when they arose.

*See attached document*

B.      If the events giving rise to your claim arose in an institution, describe where and when they arose.

*See attached document*

Page 4 of 11

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

C.     What date and approximate time did the events giving rise to your claim(s) occur?

*April 2, 2020 through current date*

D.     What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

*See attached document*

## V.     Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

*See attached document*

## VI.     Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

*See attached document*

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

**VII.   Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures.  Your case may be dismissed if you have not exhausted your administrative remedies.

A.      Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

## FMC Carswell  Tarrant County, Texas 76127

B.      Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑ Yes

☐ No

☐ Do not know

C.      Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☑ Yes

☐ No

☐ Do not know

If yes, which claim(s)?

Page 6 of  11

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.      Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☑ Yes

☐ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☐ No

E.      If you did file a grievance:

1.      Where did you file the grievance?

_FMC Carswell, FBOP Regional Office, FBOP Central Office, DOJ, EEO Office_

2.      What did you claim in your grievance?

_see attached document_

3.      What was the result, if any?

_see attached document_

4.      What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not. *(Describe all efforts to appeal to the highest level of the grievance process.)*

_grievance process was completed_

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

F.    If you did not file a grievance:

   1.   If there are any reasons why you did not file a grievance, state them here:

   _N/A_____

   2.   If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

   _N/A_____

G.    Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

   _See attached document_____

   *(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII.  Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☑ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

_N/A_____

A.    Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☑ No

B.    If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.    Parties to the previous lawsuit

Plaintiff(s)    _____

Defendant(s)   _____

2.    Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.    Docket or index number

_____

4.    Name of Judge assigned to your case

_____

5.    Approximate date of filing lawsuit

_____

6.    Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition.    _____

7.    What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

_____

C.    Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

☐ Yes

☑ No

D.    If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit

Plaintiff(s) _____

Defendant(s) _____

2.   Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.   Docket or index number

_____

4.   Name of Judge assigned to your case

_____

5.   Approximate date of filing lawsuit

_____

6.   Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition  _____

7.   What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

_____

Page 10 of 11

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## IX. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _May 18, 2021_

Signature of Plaintiff _Alex C._

Printed Name of Plaintiff _Alexis C. Norman and others similarly situated_

Prison Identification # _49210-177_

Prison Address _P.O. Box 27137_

_Fort Worth_ _Texas_ _76127_
City    State    Zip Code

### B. For Attorneys

Date of signing: _____

Signature of Attorney _____

Printed Name of Attorney _____

Bar Number _____

Name of Law Firm _____

Address _____

_____
City    State    Zip Code

Telephone Number _____

E-mail Address _____

Page 11 of 11

## Jury Demand

The Seventh Amendment to the United States Constitution guarantees the right to a jury trial in federal court civil rights law suits for money damages against prison officials or other government employees.

The amount of damages requested in this case is as follows;
1.) payment of all court fees
2.) payment of all attorney fees
3.) $369.00 to each inmate for funds spent for health care expenses

## Introduction

I. The Federal Bureau of Prisons ("BOP") is the largest correctional agency in the United States. Presently roughly 165,000 inmates are in the custody of the BOP and thousands of correctional staff members are employed. As of May 10, 2021 the BOP has reported a total of 6,500 staff members tested positive for COVID-19, and a total of 6 staff deaths. A total of 50,000 inmates have tested positive for COVID-19, and a total of 266 inmates have died from COVID-19 infection while in BOP custody. The BOP claims to have taken extraordinary steps to help keep staff, inmates, and communities safe. But the facts demonstrate that the BOP is mismanaging the COVID-19 Pandemic. The BOP has had more prisoners infected than any other correctional system in the United States. At FMC (Federal Medical Center Carswell) "Carswell", 732 inmates have tested positive for COVID-19 and seven inmates have died. With a population of roughly 1300 inmates, Carswell's COVID infection rate is roughly 60% of the inmate population and the virus is still not contained.

The Director of the BOP, Michael Carvajal, FMC Carswell Warden Michael Carr, FMC Carswell Medical Director Charles Langham, The BOP Medical Director and The BOP COVID-19 Compliance Review Team, as well as others known and unknown, have knowingly and willingly created, implemented and directed staff to attemp to execute and enforce policies, plans and procedures that were not and can not be feasible within minimum and low security facilities. Particulary facilities with open dorm style units with open bays. The deliberate indifference exhibited through the creation, attempted implementation and enforcement of these policies, plans and procedures have resulted in multiple violations of the Section 504 Rehabilitation Act, unconstitutional

confinement conditions, irreparable harm to the present and future health of inmates, and the unnecessary deaths of 7 women confined at FMC Carswell.

Plaintiff and others similarly situated, are forced to bring this class action complaint seeking court intervention to prevent the unconstitutional conditions of confinement from continuing, reduce the risk of repeated exposure to COVID-19 infection, reduce the irreparable harm to inmates future and present health and provide the relief requested to ensure that violations to section 504 Rehabilitation Act will cease and properly treat and monitor those who are sick with "long COVID", and most importantly, to request mandatory monthly testing of staff in order to prevent the virus from entering the facility in order to limit exposure to prisoners. The failure to implement monthly mandatory testing of staff exacerbates the spread of COVID-19 at FMC Carswell

Complaint - Section 504 of the Rehabilitation Act

1. FMC Carswell is the only medical center for females incarcerated in the BOP. Carswell is located in Tarrant County, Texas. Carswell operates a minimum security satellite camp, a secured low security facility that houses sick inmates (Care levels 3 and 4) in units within a hospital building, a four level high rise building that is divided into four seperate two level open dorm style units, and a secured maximum security facility. The secured low security facility is the central facility on the Carswell compound and houses the majority of the inmates, roughly twelve hundred (1200). The satellite camp is located across from the

pg. 2

central facility, and the maximum custody building is located behind the high rise building in the central facility. FMC Carswell houses a total of roughly (1300) thirteen hundred female prisoners. More than (50%) fifthy percent of the inmate population is age 45 and over.

2. As a federal correctional facility operated and managed by The Federal Bureau of Prisons (BOP), a division of the Department of Justice, all funding received for housing, services, programming, health care and employment are all financed with federal funds.

3. Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States, shall, soley by reason of his/her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by any Executive agency.

4. Federal Prisons are subject to the Rehabilitation Act

5. Persons with infectious diseases are considered "handicapped" under the Rehabilitation Act. Nearly the entire inmate population at FMC Carswell has tested positive for COVID-19.

pg.3

6. The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as obesity, cardiovascular disease, respiratory disease, diabetes, and immune compromise. If contracted COVID-19 can cause severe complications, long term damage, unknown irreparable harm and death.

7. As reported by the Mayo Clinic and the CDC, the long term effects of COVID-19 effect patients who are asymptomatic, have mild symptoms, and severe symptoms. Current studies conducted by the World Health Organization (WHO), show evidence of myocardial damage, cardiomyopathy arrhythmias, decreased ejection fractions, pulmonary scarring and strokes. In more acute phase, extending out for a year or more.

8. In July of 2020, Norman and others similarly situated tested positive for COVID-19.

9. Norman and others similarly situated, at all times relevant herein, has been in the custody of the BOP at Federal Medical Center (FMC) Carswell, and is currently housed in the low security facility within the four story high rise building, in units 2 North and 2 South, 1 South, open dorm style units that house roughly 300 women in each unit. Each unit composed of multiple 65 sqft cells, each

pg. 4

occupied by four women. During medical isolation, housed in units designated as medical isolation units, M-2 and SA (formerly M-3).

10. BOP medical records indicate that Norman and others similarly situated are diagnosed with various mental health care disorders, mood disorders, personality disorders, depression, sleep disorders, obesity, diabetes, high blood pressure, sickle cell anemia, HIV, Respiratory disorder, high blood pressure, Kidney disease, heart disease, chronic sinusitis, Addison's disease, rhuematoid arthritis, asthma and COPD.

11. Norman and others similarly situated, as COVID-19 infected prisoners, in addition to their other health conditions, are "qualified handicapped" individuals within the meaning of the federal Rehabilitation Act, and under that statute they may not be excluded from programs and services for which they are "otherwise qualified".

12. Norman and others similarly situated assert that being infected with COVID-19 resulted in having an impairment that substantially limits multiple major life activities, which resulted in an inability to care for oneself, stand, work, sleep, eat, think and concentrate. Also causing severe neurological (smell, taste), digestive, bowel, brain, severe headaches, circulatory and gastric problems.

pg.5

13. Norman and others similarly situated, soley because they contracted COVID-19 at FMC Carswell, were denied access to laundry service, commissary services, outside recreational services, legal services, law library services, educational services, grooming services, psychiatric services, religious services, mail delivery and service, meaningful access to all outside communication (telephone, email, video visits and in person visitation) were all denied.

14. Norman and others similarly situated, were assigned to "medical isolation" when tested positive for COVID-19 and their symptoms were deemed "severe". "Medical isolation" is a unit in the hospital building, classified as "medical isolation" and called "5A".

15. Medical isolation, 5A, is a "medical Keeplock" unit, with multiple cells that house six (6) to eight (8) inmates per cell. The door stays locked at all times. All COVID-19 patients sharing the same toilet, which (for security reasons) can only be flushed three (3) times within an hour. But due to diarrhea being a symptom of COVID-19, this caused a severely unsanitary conditions, Resulting in urine and fecal matter sitting stagnant in the toilet for an hour at a time. Patients were denied the basic right to privacy while using the restroom. Forced to violate the Prison Rape Elimination Act (PREA) by committing unconsented exposure of their bodies to others in the

pg. 6

cell in order to use the restroom. The cells are not equipped with showers. Therefore, per BOP Policy COVID-19 inmates were only allowed to shower once every three (3) days. Medical staff did not enter the cell to provide medical services. Medical services were provided at the cell door via a slot (Bean shoot) in the cell door. Therefore, if the COVID-19 inmate is too sick to get out of bed and walk to the door, she was DENIED medical services. This policy resulted in the death of Marie Neba. One pair of green pants is provided for clothing, no undergarments are provided, and no change of clothes is provided, and all access to laundry services is DENIED. The COVID-19 inmate is left in the same clothes and undergarments during the entire period of "medical isolation", which lasted between 14 to 21 days or more depending on symptoms. COVID-19 inmates are denied access to email services, commissary services, grooming services, religious services, recreational services (outside & inside), educational services, video visit services, laundry services, meaningful access to telephone services and basic amenities. Access to mail delivery services and telephone services was severely restricted to one call a day depending on staff availability and mail delivery was sporadic. All conditions resulting in a sick inmate left fearing for her life while being denied meaningful access to her support system (family) and/or services and amenities that would have provided needed comfort.

pg. 7

16. Norman and others similarly situated, after testing positive for COVID-19, was assigned to M-2, a unit designated for COVID-19 "isolation". M-2, is designated as a "medical keeplock" unit. At all times the door is locked. Resulting in a denial of out of cell activities and a denial of access to all amenities. One pair of green pants are provided, no undergarments are provided A change of clothes are not provided and access to laundry services is denied. Therefore, COVID-19 inmates are left in the same undergarments and clothes during the entire period of isolation, which lasted between 10-21 days or more depending on the inmates symptoms. COVID-19 inmates are restricted to one ten minute phone call a day, and one 10 minute time slot for emails. Grooming services, recreational services, educational services, legal services, law library services, administrative remedy services, religious services and video visit services. were all denied. Access to commissary services and ability to watch and/or listen to the news was restricted. Mail delivery service was also restricted to twice weekly as opposed to daily delivery. Access to legal mail service was denied. All resulting in a sick inmate left fearing for her life while being denied meaningful access to her support system (family) and/or amenities that would have provided comfort.

17. Norman and others similarly situated, after testing for COVID-1 was quarantined and isolated in units 2 north and 2 South. During quarantine and isolation were locked

pg. 8

inside the unit 24 hours a day and restricted to their cell for 24 hours a day. Leaving the cell for bathroom breaks and shower breaks only. Recreational services (outside and inside) were denied. Educational and Religious services were denied. Grooming services and video visit services were denied. Access to showers was initially restricted to one shower every three (3) days. Later showers were restricted to one ten (10) minute shower a day. Phone and email access was restricted to one (1) five minute phone call a day, and five (5) minutes once a day, to use email. Access to laundry service was restricted to one wash per week. All meaning full access to amenities was denied. Access to commissary was initially denied, after a month access to commissary was restricted to once every two weeks as opposed to weekly. Access to legal mail services was initially denied. After 6 weeks of no legal mail service, the unit counselor collected the legal in a trash bag once a day and delivered it to the mailroom. Which denied access to documenting sending legal mail as required by law. Due to being restricted to a 65 sqft cell, that is shared ~~by~~ with three (3) additional women, COVID-19 inmates are denied the right to practice social distancing as required by the CDC. Which denied each inmate the basic right to keep herself safe from contracting an infectious disease. Four women in a 65 sqft cell are at all times less than 2 feet apart from eachother. The quarantine and/or isolation of units 2 North and 2 South

pg.9

lasted between July 2020 through September 2020. The quarantine and/or isolation of units 1 North and 1 South lasted between January through March 2021. Unit 2 North was quarantined/isolated again January 2021 through February 2021. Unit 2 South was exposed by multiple inmates that tested positive, but the unit was not mass tested, and placed on quarantine for 48 hours during January 2021.

18. The CDC recommends that correctional facilities isolate and treat inmates with airborne diseases in negative pressure isolation rooms (NPIR). Non of the units used to isolate inmates infected with COVID-19 were NPIR. Therefore, COVID-19 inmates were denied services required per BOP's Infectious Disease Policy.

19. Norman and others similarly situated suffered the following symptoms after testing positive for COVID-19. Extreme fatigue, loss of smell, loss of taste, ongoing and reoccuring headaches, diarrhea, body aches, body chills, hot flashes, chest pains, difficulty breath, heart palpitations, muscle pain, shortness of breath, and brain fog (difficulty thinking and concentrating), sleep issues.

20. Norman and others similarly situated have never tested negative for COVID-19 and continue to suffer from the following symptoms; chronic fatigue, daily headaches, diarrhea, severe gastric distress, regurgitation, chest pain, depression, insomnia, anxiety, shortness of breath when walking, numbness in hands and legs, hair loss and loss of smell

pg.10

21. Norman and others similarly situated have been told that "sick call" (triage services) is the Post COVID-19 Care Plan offered by FMC Carswell. However, access to daily triage services is denied. Inmates must place a sick call request form in a drop box and wait to be scheduled for an appointment. Furthermore, any changes to how triage will be offered is learned by "word of mouth" FMC Carswell does not post notice for any changes in triage services.

22. Norman and others similarly situated are denied a Post COVID-19 Plan that addresses the need for ongoing care by properly categorizing her care level as "medically necessary - Non-emergent". Giving needed recognition to the fact that without care COVID-19 inmates could not be maintained without significant risk of serious deterioration leading to premature death, significant reduction in the possibility of repair later without present treatment, significant pain or discomfort which impairs the inmate's participati in activities of daily living.

23. FMC Carswells policy of testing inmates once every 12 months (Infectiou Disease Policy) is a facially neutral policy that disregards the year roun presence of COVID-19, a highly infectious disease easily transmitted during all seasons of the year. Inmates are being infected with COVID-19 more than once a year, and when sick and inmates request to be tested for COVID-19, if it has been less than 12 months since last the inmate was last tested, the request to be tested will be denied. Denying an inmate the right to know if she is infected again with COVID-19 and denying other inmates the right to know if they have been exposed to an infectious disease.

pg. 11

24. Norman and others similarly situated are denied accurate documentation of their medical records. Norman's medical records state that she tested negative for COVID-19 on August 11, 2020 (her release date from "isolation"). Norman was isolated and released on the same date with Joyce Godwin and Waquita Wallace. None of them were tested prior to leaving isolation. but all three medical records state that they tested negative for COVID-19 on August 11, 2020. Medical records for inmates assigned to 2 North between July 2020 and August 2020 state that the inmates tested negative for COVID-19 on August 20, 2020. This information is false and all attempts for administrative remedy regarding this matter have not been answered.

25. Norman and others similarly situated were denied meaningful access to Administrative Remedy Services. Administrative remedies filed requesting the removal of false information from medical records, specifically documentation stating that Norman and others tested negative for COVID-19 on August 11, 2020 and/or August 20, 2020.

26 Norman and others similarly situated are denied the right to practice social distancing. Inmates are forced to share a 65 sqft cell, designed for single occupancy per BOP Policy, with three (3) additional people. Inmates are forced to sit shoulder to shoulder to eat during breakfast and lunch meal service. Inmates sit shoulder to shoulder during

pg.12

medical appointments at the clinic, the lab, the dentist, and in radiology.

27. Norman and others similarly situated are denied meaningful access to outside and inside recreational services. From April 2020 through September 2020, no access to outside or inside recreational services was offered. From September 2020 to present, access to outside recreational services is limited to two through four hours a week depending on weather and staff availability.

28. Norman and others similarly situated are denied meaningful access to all programming services. From April 2020 - September 2020 no access to programs was offered. (Education, religious, psychology or recreation). From October 2020 to present, one (1) class a quater is offered for 10-15 inmates by the recreation department. Education offers 10 spaces in the GED program per class and 10 spaces for the apprenceship program, other classes have not resumed. Religious services offers (2) two programs, Threshold and the Life Connections Program (LCP), No physical recreational classes are offered, no arts and crafts classes and no access to work out equipment is offered. The Psychology department is operating only (4) programs, Residential Drug Rehabilatition Program (RDAP), non-residential Drug Rehabilatation Program (NRDAP), Drug Education, and Trauma For Life (RESOLVE). All restricted to a small limited number of people and offered once a quarter. There are over twelve hundred (1200) inmates at FMC Carswell.

pg.13

29. Norman and others similarly situated were and continue to be intentionally discriminated against and treated in a hostile manner soley because they contracted COVID-19

30. At FMC Carswell the application of facially neutral standards have had and continue to have an unlawful discriminatory effect upon otherwise qualified handicapped individuals, inmates infected with COVID-19.

31. FMC Carswell's isolation policy is facially neutral in practice because the policy makes no distinction between inmates isolated for disciplinary measures or security measures and inmates isolated due to contracting an infectious disease.

32. At FMC Carswell inmates that contract COVID-19 and are assigned to "quarantine", "isolation" or "medical isolation" are treated worse than inmates assigned to isolation (the special housing unit) for disciplinary measures. Obvious disparate treatment resulting in denial of daily showers, laundry services, access to programs and amenitres and in some cases, access to medical care.

33. The impact of this disparate treatment has resulted in inmates developing a fear of being assigned to "quarantine", "isolation" or "medical isolation", which results in inmates not reporting that they are sick. Choosing instead to

pg. 14

remain in the housing unit and self medicate, Thus exposing and infecting others. Creating an environment with a continious cycle of infection and reinfection,

34  FMC Carswell's "Emergency lockdown" policy, "modified" or not, makes no distinction between an emergency lockdown to prevent security threats and emergency lockdowns for the health and safety of inmates and staff. Therefore, the BOP and FMC Carswell identifies sick inmates, specifically inmates infected with COVID-19, as a threat to "the security and good order of the institution" and thus treat them accordingly

35  The long term effects of COVID-19 effects patients who are asymptomatic, have mild symptoms, and severe symptom. The World Health Organization has conducted studies that show evidence of myocardial damage, cardiomyopathy, arrhythmias, decreased ejection fractions, pulmonary scarring and strokes. In more acute phases, extending out for a month or two. Evidence has shown coagulation abnormalities, which have been responsible for both small blood vessels and large blood vessels

36  The WHO, Mayo Clinic and the CDC are now reporting that a large percentage of people that contract COVID-19 test positive for months and continue to have lingering symptoms for an unknown length of time.

pg. 15

People that experience those long term effects of being infected by COVID-19 are now identified as "COVID-19 long haulers".

37. The CDC reports that COVID-19 long haulers suffer from the following symptoms; difficulty thinking and concentrating (referred to as brain fog), depression, muscle pain, headaches, inflammation of the heart muscle (cardio vascular), lung function abnormalities (Respiratory), Renal (acute Kidney injury), Dermatologic (rash, hair loss), smell and taste problems, sleep issues, difficulty with concentration, memory problems (Neurological), depression, anxiety, changes in mood (Psychiatric). The long-term significance of these effects is not yet known. CDC will continue active investigation and provide updates as new data emerges.

38. John Hopkins Medicine reports that COVID-19 Pneumonia is what leads to difficulty. Some people that have breathing problems may become severe enough to require treatment at the hospital with oxygen or even a ventilator. COVID-19 pneumonia takes hold in both lungs. Air sacs in the lungs fill with fluid, limiting the ability to take in oxygen and causing shortness of breath, cough and other symptoms. Most people, even those with mild symptoms, have lasting lung damage and could be severe lung damage. Even after the disease has passed, lung injury may result in breathing difficulties that may take a year or more to improve.

pg.16

39. John Hopkins Medicine also reports that Acute Respiratory Distress Syndrome (ARDS) sometimes occurs as COVID-19 progresses, more of the air sacs become filled with fluid leaking from the tiny blood vessels in the lungs. Eventually, shortness of breath sets in, and can lead to ARDS, a form of lung failure. Patients with ARDS are often unable to breath on their own and may require ventilator support to help circulate oxygen in the body. Whether it occurs at home or at the hospital, ARDS can be fatal. People who survive ARDS and recover from COVID-19 may have lasting pulmonary scarring.

40. The BOP states that it has "COVID-19 Compliance Review Teams that conducted a thorough review, evaluating compliance measures, monitoring response techniques, and developing further COVID-19 mitigation strategies. Such a team also visited FMC Carswell in August 2020, and the COVID-19 Compliance Review Board conducted a review of all of the institution's mitigation practices for preventing and reducing COVID-19 transmission."

41. FMC Carswell claims to share a partnership with the local medical community and cites Tarrant County Health Department (Vinnie Taneja-Director) as a local stake holder that is involved in the COVID-19 collaboration efforts at the institution.

pg. 17

42. The BOP has been very transparent in their COVID Policies and Plans, and consistent with CDC Guidance, makes them publicly available on their website at www.bop.gov.

43. The BOP's COVID Policies and Plans are just many theories. In reality the implementation of those policies and plans are simply not feasible, and the BOP is well aware of this fact. The configuration of facilities like FMC Carswell and the massive over crowding of the facility (i.e. 4 people sharing a 65 sq ft cell) makes in impossible to actually implement BOP's COVID Policies and Plans.

44. FMC Carswell is located on a United States Naval Base in Fort Worth, Texas and FMC Carswell and the BOP are NOT transparent regarding onsite inspection of the facility. In particular inspections that involve interaction and observation of the inmate population.

45. FMC Carswell has experienced two (2) major COVID-19 outbreaks, six (6) months apart. Both outbreaks resulted in the gross under reporting of inmates infected with COVID-19 (as reported by The Marshall Project and the ACLU). During both outbreaks, the exact same procedures were followed. Therefore, the BOP's COVID-19 Compliance Review Board approved of FMC Carswell's disparate treatment of inmates that contracted COVID-19 at the facility.

pg. 18

46. FMC Carswell is a unique BOP facility. It is the only Federal Medical Center for females remanded to the custody of the BOP. FMC Carswell has a Medical Director, Dr. Charles Langham, onsite along with a host of Doctors, nurses and other qualified medical staff. All educated and some licensed and oath bound to "Do no harm", yet under the direction of Dr. Charles Langham, these horrible policies are implemented and practiced. Six women have died at FMC Carswell as a direct result of FMC Carswell's medical isolation policy. Specifically, Marie Neba was denied medical care due to her inability to get out of bed to receive medical care through the door in "medical isolation". Andrea Circle-Bear, a pregnant inmate, lost her life as a result of the same policy. Hundreds of inmates are COVID-19 long haulers, including Norman. All continue to suffer from shortness of breath, chest pain, depression, insomnia, muscle aches, heart palpatations and a host of other symptoms. But the medical professionals at FMC Carswell, although fully aware of the long term effects and damage caused by COVID-19, have done nothing to update it's policies to reflect threat and need for care for the inmate population.

47. Norman and others similarly situated were denied meaningful access to medical care. Although continuing to suffer from ongoing symptoms of COVID-19, the right to be prescribed medication is denied. Hundreds of inmates suffer from

pg. 19

gastric reflux disease (a lingering symptom of COVID-19 reported by the Mayo Clinic). Instead of prescribing the medication needed, because of the hundreds of complaints received, the medication (                    ) was removed from the medication list available for staff to prescribe, making it impossible for the medication to be prescribed. Commissary then began to offer a new, cheaper Heartburn medication with a higher quantity count (30). So, inmates were referred to Commissary to purchase the medication needed. Which makes inmates responsible for bearing the cost of their Post COVID-19 Health care needs.

48. Norman and others similarly situated are denied meaningful access to medical care. FMC Carswell's Post COVID-19 care plan is to refer inmates to sick call for care. Inmates are charged a ($2) two dollar fee for each visit to sick call. Inmates that can not work, due to modified operations, and do not have financial support from home, are not able to go to sick call or purchase medication from Commissary. Leaving inmates suffering with long haul COVID-19 symptoms without medical care

49. Norman and others similarly situated, after testing positive for COVID-19 suffers from various impairments that substantially limited multiple major life activities. Inmates were too sick to care for themselves, resulting to receiving help from other sick inmates assigned to the same cell. Some inmates

pg.20

suffered from severe shortness of breath, resulting in difficulty walking and breathing. Some inmates lost the ability to smell and taste, a neurological function, and some still have not regained their sense of smell after almost a year. Inmates suffered from diarrhea and stomach pain, and developed severe cases of gastric reflux. Inmates suffer from increased depression and various mental health problems and insomnia, chronic fatigue, memory loss, and problems concentrating and thinking.

50. Norman and others similarly situated, after testing positive for COVID-19 was denied access to the elevator in the facility. Forcing inmates suffering from long haul COVID-19 to walk up and down six (6) flights of stairs each time she leaves and returns to the unit from meal service, class, and/or medical appointments

51. FMC Carswell has failed to accommodate Norman and others similary situated, multiple requests for prison officials to implement and enforce the practice of social distancing inside of the units and during meal service

52. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, to be housed their 65sqft cell alone, consistent with BOP Policy, a 65sqft cell is for single occupancy only and per CDC Guidance inmates should be house one person to each cell.

pg.21

53. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, to be allowed to pick up meals from the cafeteria, as allowed by inmate essential workers, and be allowed to return to the unit to eat in her assigned cell, which consistent with CDC Guidelines is the lowest risk of exposure to COVID-19

54. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, to be allowed to sit at a private table to eat, in order to practice social distancing and reduce her exposure to COVID-19

55. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, to test sick inmates for COVID-19 when requested by the inmate, not just when BOP deems it is necessary, which is only once every 12 months.

56. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, to have meaningful access to outdoor recreational activities.

57. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, to have meaningful access to all programs and classes, by utilizing rooms inside of the units to conduct classes and using the facility T.V. station to allow viewing of various educational programs

pg. 22

58. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, to have meaningful access to programs, services and amenties while in quarantine, isolation and medical isolation.

59. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, to provide meaningful access to medical care while in "medical isolation" (SA) by discontinuing the policy of isolating inmates sick with an infectious disease, specifically COVID-19, in a "medical Keeplock" unit. Doctors need to enter the room to provide medical care to inmates that are too sick to get out of bed. This policy resulted in the death of Mane Neba and others.

60. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, for meaningful access to medical care by providing free visits to sick call and prescription medication as needed for lingering symptoms caused from contracting COVID-19 at FMC Carswell

61. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, for meaningful access to mental health care services, ~~during~~ provided by the Psychiatric Department, during quarantine, isolation, and medical isolation.

pg.23

62. FMC Carswell has failed to accommodate the requests of Norman and others similarly situated, for meaningful access to the law library services, by providing a copy machine, type writer and supplies in each unit

63. FMC Carswell is a low custody facility. Under normal circumstances inmates move freely throughout the facility (within ten minute timeframes) unescorted, to participate in various outside and indoor recreational activities and classes, programs and work. The units are open dorm style without doors on the cells. While inside of units inmates are always free to move around the unit at all times, except during count time. The only time an inmate at FMC Carswell is housed in a unit with doors that stay locked, prohibiting out of cell movement, is for discipline measures. The "modified operations" that FMC Carswell is operating under for more than a year has not only resulted in a prolonged restriction of movement, programs and services. It is creating a mental health care emergency in a class that is supposed to be protected.

64 All medical staff at FMC Carswell follow the policies, procedures, directed and implemented by FMC Carswell Medical Director, Dr. Charles Langham. All correctional staff at FMC Carswell follow the policies, procedures directed and implemented by FMC Carswell Warden, Michael Carr. Warden Carr and Director Langham follow the policies, procedures and plans directed and implemented by The BOP COVID-19 Compliance Review Team, The BOP Medical Director, and the Director of BOP

pg.24

Michael Carvajal.

This complaint is submitted by Alexis C. Norman on behalf of herself and others similarly situated. Inmates at FMC Carswell have endured these conditions for over a year. With the addition of COVID-19, the conditions at FMC Carswell places my health and the health of others similarly situated in extreme danger. Our country is in the midst of a National Health Crisis and at FMC Carswell inmates in the high rise building are denied access to hot water to wash our clothes, the ventilation system is not maintained, and the ceiling in the hospital building is overrun with asbestos. These are serious health care risks, especially when added to the threat and damage that COVID-19 brings to the body. This prison, inside my unit is a microcosm of society. We can see the real reality of COVID-19 because we're stuck in the same place, with the same people, and we see is this cycle repeating every three to six months, and we fear the next COVID-19 outbreak at FMC Carswell, which we expect in July 2021. We are desperately reaching out for help now, in an effort change these horrible policies before the cycle starts for us again. Studies are just beginning to show what inmates at FMC Carswell knew six months ago. The Emergency Use Vaccines will only keep people from dying and becoming severely ill from COVID-19 for six months, and I'm sure in another six month studies will show that the level of protection will only last for three months. Our little

microcosm has already revealed the truth. Inmates at Carswell were given the vaccine in December 2020 and January 2021. We do not have a vaccine that keeps the public from contracting COVID-19, it just keeps people from getting sick enough to go to the hospital and from death. The only chance that inmates have is to be given an opportunity to protect ourselves from being infected with COVID-19 over and over again. That will require some changes to be made to accommodate the new inmate population. COVID-19 has turned almost all members of the inmate population at Carswell into qualified handicapped individuals within the meaning of Section 504 of the Rehabilitation Act, and we believe that the requested treatment, medical care and accommodations are essential to our health and safety. The Courts attention to this complaint is our sincere prayer.

Notice To The Court

A copy of this complaint was submitted to the following, per BOP Policy; On April 13, 2021 via inmate priority mail.

United States Department of Justice
Director for EEO
10th and Pennsylvania Avenue, NW
Room 1232
Washington, D.C. 20530

As of today's date, May 18, 2021, no response has been received.

Complaint
Eighth Amendment Violations

1.) Respondents, collectively are referred to "prison officials" in this Complaint

2.) Prison officials knew COVID-19 was a serious threat to the health of inmates.

3.) The "inmates" or "women" referred to in this complaint are housed in the "highrise" building at FMC Carswell

4.) The highrise is divided into 4 housing units; 1 North, 2 North, 1 South (RDAP), 2 South

5.) Prison officials were deliberately indifferent to the medical needs of the women in the highrise

6.) The first group testing for COVID cases happened in the 2 North and 2 South units and yielded over 500 women positive for COVID in June 2020, this is referred to the "1st wave".

7.) The second group that was tested in 1 North yielded over 200 women positive for COVID - this is referred to the "2nd wave".

8.) 1 South was used for negative COVID tested inmates at times, and positive at times.

9.) Plaintiffs claim that this complaint will reveal how Carswell prison officials failed to follow their own policies and failed to protect inmates from an infectious disease.

10.) Respondents failed to correct or even identify deficiencies that rendered inmates exposed to an infectious disease making unnecessary suffering inevitable constituting deliberate indifference.

11.) The sheer disorganization and dysfunction during the COVID outbreak prevented inmates receiving medical care that in some cases led to death, and long term unknown irrepairable harm

12.) Testing procedures for COVID was strategically administered to hide the true number of infections.

13.) Testing procedures was used as a false sense of controlling the outbreak needs of extra staff and medical attention to sick inmates.

14.) During unit quarantines untested staff proceeded from infected units to un-ineffected units

15.) Plaintiffs only have population reports from Dec 2020 through May 2021, but these reports show that there was a steady increase in population during a time when prisons were under direct order to depopulate

16.) In August 2020, Unit team manager stated that no one or nobody was being released on the CARES Act See LaTrisha Love Declaration

17.) Prison officials took unreasonable actions risking damage to the health and possible (in some cases actual) death of inmates and the allegations set forth will highlight some of these actions.

18.) The allegations set forth are violations of Eighth Amendment violations, deliberate indifference to serious medical needs and other possible unspecified constitutional rights of prisoners.

19.) These allegations will show how the staff under the supervison of Prison Officials become complacent when pandemic plan strategies were not working and failed to take corrective action,

20) Prison officials could have, but failed to cohort the most vulnerable inmates and/or devise a plan specific to the needs of "health facility".

21.) Prison officials knew that FMC-Carswell is the only female medical facility in the Federal Burea of Prisons

22.) Prison officials knew that the highest risk of female inmates from severe complications, long term unknown irrepainable or death from COVID-19 would be the females housed at FMC-CARSWell

23) Prison officials did nothing to correct, enhance, or alter a generic pandemic plan for the known high risk group of sick women at the FMC Carswell prison.

24.) The first women to die in Federal Prison was a young pregnant women in March of 2020.

25) Prison officials failed to test the high rise until almost four months after the first documented covid-19 infection, which yielded over 500 women infected and the spread out of control and the prison in chaos.

2012 Pandemic Plan

26. The 2012 Pandemic Plan implemented by prison officials was not consistant with the characteristics of how COVID-19 spread. The plan was made in respects for easily identifying "symptomatic" people "When can a person tresmit flu" See Module 1 pg1 Exhibit M

27. The thresholds for mass testing were for "symptomatic" people. When Caronell set the threshold of 30 symptomatic people becoming infected before testing the entire unit, the infection rate was 90% of the unit. This happened during the first wave in 2 North housing unit and the second wave.

28. Once 50% of the population is infected or 500 out of a thousand according to the prison officials pandemic plan testing is abandoned. Due to the characteristics of COVID-19 this threshold disregards prison officials legal obligation to protect each and every inmate. from an infectious disease, especially a deadly virus with unknown long term irrepairable harm.

29. Prison officials used defunct infection thresholds not to protect the health of inmates but because there was no way to run the operations and administer medical help to a grossly disporportionate inmate to staff/medical staff ratio.

30. Due to lack of staff for the ratio of staff to sick inmates caused medical deliberate indifference to infected inmates including those placed in punitive segregation which resulted in death and unknown irrepairable harm due to the inability to treat inmates adequately.

31. Prison officials failed to: implement a corrective action plan after the disaster of the first 300 women getting infected, which quickly led to another 200 more becoming infected during the first wave, which caused another 200 women to become infected during the second wave.

32. Prison officials have abandoned inmate testing put inmates at risk of re-infection and physical harm

33. Prison officials only quaratine if room is available

in the hospital, due to overcrowding.

34. An inmate from 2south was taken out for surgery during May 2021 without being quarantined afterwards. She was not vaccinated.

35. Currently no one is being tested. Inmates are only being tested if they are hospitalized. Hospitalization levels of infection are only when iminent risk of death is probable. Such proof of that is Angela Circle Bear, Maria Neba, Ms. Kincaid, and Veronica Carrera-Perez (see Delisa Williams Declaration. Others have perished, most recently Martha Evanoff was refused medical care for months which resulted in her hernia bursting. Ms Evanoff was housed inside the hospital where BOP reportadly claims health care is available 24 hours a day.

36. Prisons officials aggressive lockdown, suspended religious, education, recreation, legal and other services, facial masks and sanitizing did nothing to stop the spread of the virus.

37. The 2012 Pandemic Plan did not address asymptomatic spread and therefore was deliberately indifferent to the serious threat of inmates becoming infected with a deadly disease.

38. Due to the lack of mass testing of all inmates at the same time asymptomatic spread was not identified putting hundreds of inmates at serious risk of becoming infected

39. Prison officials did not correct the failure to mass test during the second wave, and allowed untested inmates to be moved after an entire unit had been locked down when 200 of those ('1 North) inmates had become infected, into another unit.

40. It is impossible to know the true infection and re-infection cases due to the prison officials refusing to mass test the inmates. This puts all inmates at risk of severe health problems or possible death.

41 February 2021 Prison officials posted on the electronic bulletin board re-infection was possible

42. Not only did Prison Officials fail to address asymptomatic testing, essential inmate workers were sporadically screened in direct contrast to prison officials policy of daily temperature checks. Prison officials blatenly disregarded the serious threat to the inmates abandoning their legal obligation to protect inmates from an infectious disease. See Exhibit B & C.

43. Quarantining inmates is only "when available" Inmate Chapman went out on Surgery medical leave and was placed back into the 2 South housing unit without quarantine and had not been vacinated. According to the BOP Policy and their pandemic plan "Isolation" Rooms should have been made to accomodate up to 50% of the Population. SEE Exhibit M Module 3 pg 4 No. 6

## Medical Care

44. Women died while being refused medical care in quarantine. Veronica Carrera-Perez's pleas for help where ignored which resulted in death. See declarations

45. Maria Neba's pleas were also ignored which resulted in death. see declaration Polly Hopper

46. After the 1st wave and stricter lockdowns to 24 hours a day on your bunk was implemented there was no way numerically that prison officials had enough staff to care for over 500 sick women.

47. Recovery was based on CDC guidelines not the actual health of the inmate. Based on 5 or 10 medical staff there is no way to medically deem or evaluate over 500 inmates at the end of 14 days to classify them as recovered.

48. Medical records were falisfied stating inmates tested negative when they actually had not been tested.

49. By abandoning cell occupancy policy the ability to social distance, quarantine and isolate so that adequate medical care could be given, caused the virus to spread uncontrollably, and caused the death from medically neglected and abandoned sicks inmates.

50. Women who were isolated or quarantined and were to sick to get out of bed were medically not treated and left unable to reach the toilet or pick their food off the floor. See Polly Hoppers Declaration

51. Prison Officials failed to communicate sick-call hours from March 2020 - March 2021. The electronic bulletin board is the standard means for prison officials to post electronic communications. No postings were made.

52. Post covid care is through sick-call which is $2.00 per complaint. One complaint per visit. This policy renders adequate post-covid care impossible due to the sheer number of infected inmates

53. Due to lack of communication inmates wander up to the sick call clinic during breakfast and is so crowded social distancing is impossible and unkown positive Covid inmates

54.    May be present, and not adhering to social distancing making healthcare a risk of re-infection.

Post covid Medication is almost entirely placed on the burden of the inmate to pay.

55.    "Prison officials placed a common "post covid" complaint medications on commissary. Heartburn is wide spread from post covid and was placed on commissary for 14.95 per 2 week supply. Heartburn is an ongoing problem. If you add up the cost of sick call and commissary medication (23.95) and offset the average pay (15.00 a month), inmates cannot afford to pay for their own aftercare.

56.    Due to the overwhelming burden of post covid health care, Chronic care patients are left to die. Martha Evanoff was a chronic care patient left untreated.

57.    Carswell population has increased from

NOV 1045, DEC 1054, JAN 1071, FEB 1072, MAR 25, 1110, May 1160
(2020) (2020) (2021) (2021) (2021) (2021)

when social distancing was paramount.

## Repeated Failures and Patterns of Neglect

58. Prison officials did not have enough room to isolate and quarantine effectively due to overcrowding (violating their own policy). SEE Exhibit A

59. Prison officials moved sick women up to six times during their sickness due to their inability to follow their own pandemic plan.

60. Prison officials moved negative tested inmates into units that housed positive tested inmates. The 1 South RDAP unit was a negative unit, then positive unit, then negative unit and finally almost all of the last negative Covid inmates eventually after staying in lockdown became positive.

61. Prison officials stopped trying to prevent inmates from the virus during the second wave. Prison officials locked down inmates "in place" and only tested 1 North during the second wave, placing countless of inmates with unknown re-infections.

62. Prison officials have increased the population during the pandemic. Exhibits _____ show that there has been a steady increase in the inmate population. November 2020 has 1045 inmates, (Dec. 2020, 1054), (Jan 2021, 1071) (Feb 2021, 1072)(Mar 25, 1110) May 2021, 1160) Further risking the possibility of wide spread re-infection and violating their own occupancy policy.

63. Prison officials failed to render medical care to women who were to sick to get out of bed. see Polly Hopper Declaration. Women are placed in punitive isolation housing and neglected.

64 Once isolation units are full, women are left in their housing units in the highrise and too sick to get to the hospital or afraid to notify staff due to the punitive treatment.

65. Veronica Carrera-Perez and Maria Neba's death were due to medical deliberate indifference. See Declarations of Polly Hopper and Delisa Williams

66. Over 700 women became infected with COVID. After 14 days from infection they were all deemed recovered. These woman are at Carswell because most of them have serious underlying health conditions. For prison officials to claim these women were recovered because the CDC guidelines states that a person stops shedding the virus after 14 days is and was a violation of the 8th amendment and is and was deliberately indifferent to the medical needs of a serious infectous disease and the unknown harm it had and is continuing to have on inmates.

66a. Regina Warren, President of American Federations of Government Employees Council of Prisons Locals-33 FMC CARSWELL Local 1006 wrote to Senator Cornyn of Texas under the Whistleblower Protection Act outlining the total gross mismanagement of Prison Officials for the safety of health to inmates and staff.
See Exhibit N

Services

73. Failure to implement First Step Act programming violates inmates rights for less incarceration time credits

74. One First Step Act programming class was available in May 2021 for general population to sign up for attendence. Staff notified that over 800 inmates had signed up for the class and another class for FSA would not be available until all 800 inmates had a chance to attend the first FSA class(es) offered.

75. Recreation has been open up to 4 hours a week per unit in April 2021. Workers are not excused from work if hours conflict. Recreation is a basic need. Administrative remedies requesting relief was ignored.

76. Social distancing is not possible in the dining area and "Grab & Go" meal options are not available. Inmates have to choose between a hot meal or a serious health risk of infection from COVID or possible death.

## Administrative Remedies

67. Prison officials are being deliberately indifferent to inmates due process.

68. Administrative remedies are completely ignored

69. Administrative remedies are excessively lengthy.

70. Administrative remedies are answered ridiculously. An administrative remedy was initiated due to restricting religious materials and was answered because the Book Store sold other items then books, it wasn't really a bookstore, therefore the book was rejected.

71. Administrative remedies are unavailable. Due to understaffed Unit Team in 2North and 2 South. Disputes and discrepencies in which staff handles which inmates has created administrative remedy forms unavailable. See declaration Iatisha Love Declaration and Hopper vs. Carr.

72. Administrative Remedy process has purposely been thwarted by either staff shortages, misrepresentations, intimidation or refusal to give BP 8.5 forms to start the process.

## Mental Health Services

77. In July of 2020, during the first wave of the breakout, mental health services distributed a handout that recommended a series of activities to alleviate the stress of being lockdown 24 hours a day and the fear of becoming hospitalized or dying of covid

78. The handout was completely deliberate indifferent to the mental health of the inmates because the handout listed activites that the inmates could not do.

79. The list of activities that staff had recommended the inmates do included but not limited to:
Go outside, ride a bike, watch TV, cook, read the comics, do a jigsaw, build a website, surf the internet, get a message, Go to a sporting event, take a trip, drive a car, eat your favorite ice cream, go to a local playground, go for a swim, play with your pet, have sex with a friend, turn on loud music and dance, go to the movies and more inappropriate activities See Exhibit D pgs 1 and 2

80. Mental health services were suspended during the 1st and 2nd wave. Psychologist did walk the units, often times in the morning while inmates were asleep. However psychology sessions, changes in psychiatric medications and psychiatric appointments were unavailable during the immediate psychological trauma and fear of death from Covid-19.

This complaint includes a request for a jury demand pursuant to

Belief Requested

1. Order FMC Carswell to comply with section 504 of the Rehabilitation Act by treating inmates positive for COVID-19 as qualified handicapped individuals.

2. Order FMC Carswell to discontinue use of policy that requires inmates sick with an infectious disease, specifically COVID-19 to be housed in a unit the locks the inmate into a cell and/or room denying access to services and medical care

3. Order FMC Carswell to discontinue use of policy that denies inmates sick with an infectious disease, specifically COVID-19, access to laundry services, hygiene products and sanitation supplies as needed

4. Order FMC Carswell to repair and/or replace the airconditioning unit that provides service to the medical isolation units, M2 and SA

5. Order FMC Carswell to allow access to all elevators for inmates positive and "recovered" from COVID-19 as needed

6. Order FMC Carswell to discontinue housing inmates sick with an infectious disease on a top bunk bed

7. Order FMC Carswell to follow CDC Guidance (COVID-19) for Correctional Facilities

8. Order BOP/FMC Carswell to comply with BOP housing policy and house 1 or 2 inmates to a 65 square foot cell

9. Order FMC Carswell to Quarterly test all inmates, vaccinated and nonvaccinated, using a commercial PCR test that are sent to Quest Diagnostic for resolve

10. Order FMC Carswell to immediately Stop falsification of inmate medical records

11. Order FMC Carswell to complete surveillance testing of 10% of the inmate population Per unit on a monthly basis.

12. Order FMC Carswell to immediately implement monthly mandatory testing of all staff, vaccinated and non-vaccinated to mitigate COVID-19 entrance into the facility

13. Order FMC Carswell to provide inmates sick with COVID-19 access to shower facilities on a daily basis.

14. Order FMC Carswell to provide hot water to wash clothes to inmates sick with COVID-19 and "recovered" from COVID-19

15. Order FMC Carswell to provide Hot water for showers in the medical isolation units, specifically 5A, to inmates positive or exposed to COVID-19

16. Order FMC Carswell to update, repair or replace the ventilation system in order to comply with industry standards

17. Order FMC Carswell to provide meaningful access to phones, emails and video visit services to inmates positive, exposed and recovered from COVID-19

18. Order FMC Carswell to increase the care level of all inmates "recovered" from COVID-19 to Care level 3

## Relief Requested

81. Screen all inmates who tested positive for COVID-19 to identify and document levels of damages. Including long term health care needs at no cost to inmates.

82. Provide all medication free to inmates who are in need of those medications due to COVID-19's long lasting effects.

83. Reduce cell occupancy to BOP policy

84. Require Carswell to fix staff shortages so they can meet the needs of inmates as required by law to accomodate health needs, counseling needs, team needs and administrative remedy needs.

85. Provide lifetime health insurance for those who got infected with COVID and Social Security Disability if applicable

86. Award three days of credit for each day served during modified operations due to Carswell being material effected and unable full access to normal programming

87. Initiate Grab & Go meals until the compound is fully open, operational and off modified lockdown.

88. Require monthly mandatory COVID testing to staff

89. Require infected staff to quarantine under the C.D.C. guidelines

90. Require quarterly mandatory testing of ALL inmates to mitigate spread of COVID

91. Provide hassle free access to administrative remedy forms as required by BOP Policy

92. Provide medical records within 30 days of request.

93. Provide daily exercise of 1 hour of outside exercise or two hours indoor as required by BOP Policy for disciplinary inmates during modified operations.

94. Provide full access to indoor and outdoor exercise as schedule once modified operations is discontinued.

95. Establish inmate property storage policy for inmates that must be assigned to a medical isolation unit during COVID or any other time medical isolation is required

96. Require staff assistance in moving inmate property per storage policy created in Id 95 when inmate tests positive for COVID

97. Require FIPUT and SP to include storage of inmate property outside of inmates assigned cell to allow for social distancing within each cell

98. Any other relief the Court deems appropriate

99. This complaint is filed on behalf of those women who are assigned to the housing units inside the highrise currently and during the beginning of the 2019 COVID-19 Global Pandemic and lived under the modified operations and is currently and will be in the future living under these conditions at FMC Carswell, Ft. Worth Texas.

Exhibits

Exhibit A - Administrative Remedies
Exhibit B - Picture inmate cells at FMC Carswell
Exhibit C - Regina Warren Letter to Senator Cornyn
Exhibit D - BOP Response to Congressman Marc Veasy
Exhibit E - Polly Hopper Declaration
Exhibit F - Delisa Williams - Declaration
Exhibit G - Latrisha Love - Declaration
Exhibit H - Judith Resnik - Declaration
Exhibit I - CDC Guidance For Correctional Facilities
Exhibit J - Amber Rice - Employment Screening
Exhibit K - Psychology Mental Health Handout
Exhibit L - BOP Pandemic Plan - Module 1
Exhibit M - BOP Pandemic Plan - Module 2
Exhibit N - BOP Pandemic Plan - Module 3
Exhibit O - BOP Pandemic Plan - Module 4
Exhibit P - BOP COVID-19 Plan - Phase Eight

Exhibit A

Administrative Remedies
submitted by Alexis C. Norman

## Administrative Remedies

1. 1034341 - Social Distancing - Complete
2. 1048200 - COVID-19 Care Plan - Complete
3. 1046288 - Mental Health - Completel
4. 1034326 - FSA Credits - Complete - 1033765
5. 1040525 - Home Confinement - Complete
6. 1064507 - Meal Service - Futile
7. 1061756 - Meal Service - Futile
8. 1034320 - Social Distancing - Futile
9. 1061416 - Falsification of Medical Records - Futile (No Response)

10. 1072260 - Social Distancing - Futile
11. 1072224 - RIS - Due 6-4-21
12. 1072220 - Single Cell Request - Due 6-4-21
13. 1072510 - Testing Procedures - Due 6-4-21
14. - Outside Recreation - Futile (No Response)
15. 1074570 - FSA Class Assignment - Futile (No Response)
16. 1074795 - Water System - Futile (No Response

Exhibit B

FMC Carswell
65 Square Foot Cell
shared by 4 women

# Inmate's

# er Room Appearance

## *CELLS*



heets or blankets that are folded, will be at the foot of the bed.
ould be no wider than 15" and go from edge to edge of the mattress.
*Shoes will be lined up neatly under the bed against the wall.
a laundry bag with dirty clothes may also be under the bed where it is not visible.
    *Nothing is to be taped or nailed to walls or furnishings.
the bulletin board will be appropriate and within the boarders of the board.

## *CKERS*                              *BEDS*

Case 4:21-cv-00669-P   Document 1   Filed 05/20/21   Page 70 of 259   PageID 70

# Inmate's
# Proper Room Appearan
## *CELLS*



*Sheets or blankets that are folded, will be at the foot of the bed.
*They should be no wider than 15" and go from edge to edge of the mattress.
*Shoes will be lined up neatly under the bed against the wall.
*One water jug and a laundry bag with dirty clothes may also be under the bed where it is
*Nothing is to be taped or nailed to walls or furnishings.
*All pictures on the bulletin board will be appropriate and within the boarders of the

Exhibit C

Regina Warren, President FMC Carswell Officer Union
Letter to Senator John Cornyn

-----------------------------------------------------------------------------------------------

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
COUNCIL OF PRISON LOCALS - 33
FMC CARSWELL LOCAL 1006
Regina Warren, President
AMERICA* lllll AtlON * * * *.t* * * * IMAMS ** ******

Date: April 7, 2020
The Honorable John Cornyn
Senior Unit States Senator of Texas
5001 Spring Valley Road
Suite 1125 East
Dallas TX. 75244
Dear Senator Cornyn,
A.F.G.E. Local 1006, is the sole and exclusive representative of the bargaining unit staff at FMC Carswell, in accordance with the Master Agreement Article 6 Section o. Any employee covered by this Agreement may, without fear of penalty or reprisal, exercise their rights under the Whistleblower Protection Act, which includes the right to disclose gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. This act is codified in 5 USC, Section 1213. As the President of Local 1006, I am exercising this right.
Now that FMC Carswell has had its first positive case of COVID19 there is a growing concern amongst staff in regard to health and safety amongst staff, the public, as well as the inmates. According to the Master Agreement Article 27 Health and Safety Section a. There are essentially two (2) distinct areas of concern

regarding the safety and health of employees in the Federal Bureau of Prisons:
1. The first, which affects the safety and well-being of employees, involves the inherent hazards of a correctional environment; and
2. The second, which affects the safety and health of employees, involves the inherent hazards associated with the normal industrial operations found throughout the Federal Bureau of Prisons.
With respect to the first, the Employer agrees to lower those inherent hazards to the lowest possible level, without relinquishing its rights under 5 USC 7106. The Union recognizes that by the very nature of the duties associated with supervising and controlling inmates, these hazards can never be completely eliminated.
With respect to the second, the Employer agrees to furnish to employees places and conditions of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm, in accordance with all applicable federal laws, standards, codes, regulations, and executive orders
On March 31, 2020, the Bureau of Prison issued a public statement informing the public the following "for a 14-day period, inmates in every institution will be secured in their assigned cells/ quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior." On the same day, a Memorandum for all CEO was sent from the Correctional Programs Division and Health Services Vision out of Central office directing the CEO's the following: "Effective Wednesday, April 1, 2020, the Bureau will enact a fourteen-day (140 nationwide actions to minimize movement to decrease the spread of the virus". The Agency issued a nationwide (public statement) meant to assure the public that the agency was taking every necessary precaution to protect the staff, inmates, and public from the further spreading of the global pandemic.
The Union believes the Agency was providing a false perception to the American people by stating all institutions will lockdown while sending internal memorandum suggesting CEO's enact minimize movement.
The agency knowing misleads the American public particularly at FMC Carswell.
All Warden's has the vicarious responsibility to carry out the Bureau of Prisons' mission and provide public safety. According to the CDC individuals with underlying health issues are highly susceptible to contracting this virus. With FMC Carswell being the only female medical facility this institution would experience a catastrophic catastrophe by not taking extraordinary measures in this extraordinary situation.
( 2 )
There has not been any guidance given to all staff as far as processes and procedures in maintaining health and safety. The last guidance given to all staff within the institution was on April 1, 2020, with an attached modified operation schedule. Because we work in a line of work of confine space and close quarters there is no such thing of social distancing which makes it imperative to communicate with all staff in what PPE is available, the process of getting them, and when/how to use them. In correctional facility we are subject to work in various units at various times each area has had different procedures that have

---

caused staff and inmates to be at risk.

As of now, FMC Carswell has not issued a complete lockdown we are still operating on a modified operation. In "THE CReW" weekly updates the Warden informed staff of the changes that have been implemented thus far. The Executive Assistant D. Lux, Camp administrator stated the Camp inmates will be restricted to their rooms the majority of the day. Inmates were still allowed to move around the compound for various reasons to include pill line, commissary, TV rooms, and food service. After Phase V was enacted Camp inmates were seen playing volleyball on the compound as well as congregating in small confine TV rooms.

Also, the Newsletter indicated Foodservice will do a partial satellite feeding system. Meaning some of the inmates will be fed on the unit while others would be allowed to do grab and go feeding. Grab and go feeding consist of calling each unit one at of time to go to the foodservice area to pick up their food.

Saturday, April 4, 2020, we received the results of our first positive case. The Agency was aware of this inmate being a suspected symptomatic case on Saturday, March 28th when she went out to the local hospital. She was sent back to the institution to be placed in isolation. The inmate symptoms progress which caused her to go back to the hospital for admission on Tuesday, March 31st. Wednesday staff who had direct contact with this inmate began having concerns and started emailing and calling the Agency on guidance regarding the suspected symptomatic case who has now been admitted to the hospital. The response the Agency was given to the staff was to continue to come to work because she has not tested positive as of yet. There were a total number of 6 officers and 1 Nurse who treated this inmate during that time and they continued to come to work daily until the inmate test result came back positive on April 4th. Since then all staff mentioned has been sent home to self-quarantine with the exception of the nurse. According to the CDC guidelines, those staff should have self-quarantine at the time they were exposed the first time with the symptomatic inmate.

As of today, Carswell has isolated 7 inmates, 3 of the inmates worked on a sanitarian detail which allowed them excess to numerous areas throughout the

3 )

institution to clean. The sanitarian workers lived in a unit that houses over 300 inmates. Because of the potential exposure that unit is the only unit that has been completely locked down.

In closing, the fact that a lockdown has not accrued and as a result seven inmates have been placed in isolation awaiting test results due to symptoms after phase V was enacted. The agencies cavalier approach led to these presumptive cases by refusing to practice social distancing as recommended by the CDC.

Sadly, FMC Carswell knowingly and willingly misled the public placing the staff, inmates, and community at risk to the most lethal pandemic since 1920.

As the representative of more than 400 correctional workers, we are requesting your assistance in this matter.

Signed by Regina Warren

Exhibit D

BOP Response to Congressional Investigation
initiated by Alexis C. Norman

**Ward, Jennifer**

Subject:                                     FW: RESPONSE  - CONGRESSIONAL INQUIRY - NORMAN, Alexis 49210-177
                                            (Congressman Marc Veasey)


Ms. Norman,

Please see the below reply received from the Federal Bureau of Prisons in response to the Congressman's inquiry on your behalf.

Jennifer L. Ward
Director of Constituent Services
Office of Congressman Marc Veasey-33CD-TX
6707 Brentwood Stair Rd., Suite 200
Fort Worth, Texas 76112
817-920-9086
817-920-9324 fax


**From:** BOP-CONG
**Sent:** Friday, March 19, 2021 1:26 PM
**To:** Ward, Jennifer <Jennifer.Ward@mail.house.gov>
**Subject:** RESPONSE - CONGRESSIONAL INQUIRY - NORMAN, Alexis 49210-177 (Congressman Marc Veasey)

Good Afternoon Ms. Ward,

We received the congressional inquiry from your office concerning Ms. Alexis Norman, dated March 9, 2021.  In her supporting letter dated February 14, 2021, Ms. Norman states that the institution was without heat or water.  She also expresses her concerns about the institution's COVID-19 protocols, and requests a congressional investigation and assistance concerning the institution.  Ms. Norman writes in part:  "Please use your authority to request that representatives from the CDC come to FMC Carswell and assist prison officials with correctly implementing a plan to decrease inmate exposure to repeated exposure to COVID-19 reinfection."

A review has been conducted of this inquiry.  Due to adverse weather and freezing temperatures beginning on Friday, February 12, 2021, FMC Carswell experienced minor issues with heat and hot water.  Institution's Facilities Department staff, who are responsible for all building maintenance and construction matters, were able to fix the minor issues within two hours, without prolonged interruption.  Later, on February 15, 2021, a water pipe burst in one of the housing units, which was immediately repaired within two hours.  During repairs, inmates had access to running water and were able to flush toilets.  At no time were inmates without running water or the ability to flush toilets.
Currently, the heat is being sustained by boilers, and adjustments to equipment have been made to meet the demand of usage.  The institution's heat and hot water are fully functional.
In regards to the COVID-19 issues, all inmates entering and releasing from the institution are placed in quarantine for a minimum of 14 days.  All new intakes to an institution are screened by medical staff. Inmates are tested utilizing the PCR test (either an Abbott ID NOW point-of-care [POC] test or a commercial PCR test) when placed in and removed from quarantine.  All PCR tests are sent to Quest Diagnostic for resolve.  Additionally, we continue surveillance testing of 10% of our population per unit.  For more information on our modified operations, please view our public website at https://www.bop.gov/coronavirus/covid19 status.jsp.
To ensure that all institutions were in compliance with Centers for Disease Control and Prevention (CDC) and Bureau of Prisons (BOP) guidance and directives related to the management of COVID-19 and the mitigation of disease transmission, the BOP's COVID-19 Compliance Review Teams were established in August, 2020, as a component of our Program Review Division.  These teams have reviewed institutions throughout the pandemic to conduct a thorough review, evaluating compliance measures, monitoring response techniques, and developing further COVID-19 mitigation

1

strategies. Recommendations and best practices are shared with and implemented at all of our facilities as deemed appropriate. Such a team also visited FMC Carswell in August 2020, and the COVID-19 Compliance Review Board conducted a review of all of the institution's mitigation practices for preventing and reducing COVID-19 transmission. Since the pandemic, weekly reviews are held as indicated with the BOP's COVID-19 Task Force to discuss mitigations and strategies. In addition, FMC Carswell shares that a partnership with the local medical community has also been accomplished in this matter. The institution advises that the Tarrant County Health Department is also a local stakeholder, and it is involved in the COVID-19 collaboration efforts at the institution.

We are carefully monitoring the spread of the COVID-19 virus. As with any type of emergency situation, we carefully assess how to best ensure the safety of staff, inmates and the public. In accordance with COVID-19 guidance and protocols, all BOP institutions have modified operations in order to mitigate the spread of COVID-19. Likewise, FMC Carswell has also followed this guidance, and the institution will continue to strictly adhere to guidelines rendered from the BOP and CDC.

The COVID-19 pandemic that is impacting our entire country has had a significant impact on our BOP operations. The Bureau has been very transparent in our COVID policies and plans, and consistent with CDC guidance makes them publicly available on our website at www.bop.gov. This site is updated daily and is readily available to anyone in the public. We invite you to view our public website for additional information on our COVID-19 policies and plans at https://www.bop.gov/coronavirus/.

Additionally, Ms. Norman has the right to use the Administrative Remedy Procedures to challenge any decision(s) regarding her period of incarceration under Program Statement 1330.18, Administrative Remedy Program, in accordance with 28 C.F.R. §542, Administrative Remedy.

I trust this response addresses your concerns.

Office of Legislative Affairs
Federal Bureau of Prisons
320 First Street, NW
Washington, DC 20534

Exhibit E

Declaration of Polly Hopper

Declaration of Polly Hopper

1. I am in inmate at Carswell Federal Prison for Women, Ft. Worth Texas

2. I am 65 years old with high blood pressure, asthma, 2 heart stents a hernia and other ailments that consist of 14 different kinds of medication.

3. I tested positive for COVID and was moved from 2 North to Med-Surg on July 6, 2020

7. On July 7th I broke out in a blistery rash and was taken to JPS,

8. While I was put in isolation for COVID I was not given a change of clothes for a month, did not take a shower for a month, and before I was taken to the hospital for the second time I was left in fecal matter because they refused to let me go to the bathroom while I was sick. They took me to the hospital in a backless gown without panties in shackles and handcuffs.

9. While I was sick and naked in my cell with fever and in agony they refused to check on my vitals or bring food to my bedside. I could not get up to eat or use the restroom

10. I was housed with Maria Neba twice before she passed away.

11. The first time I was housed with Maria Neba she was very sick and complained of being unable to breathe, she was vomitting, and couldn't eat.

12. On or about August 5th, I was with Maria Neba who was is distress coughing, couldn't breathe, had chest pains and vomiting. Medical would not assist her. I had to inform staff on 8 different occassions that Maria was in serious condition. Finally they took her out and she passed away.

Under penalty of perjury I declare this is a true and accurate account to the best of my ability.

Polly Hopper
# 77629-051
FMC Carswell - PO Box 27137
Fort Worth, Texas 76127

Date  9/15/2020  P.H.

Exhibit F

Declaration of Delisa Williams

# Declaration of Delisa Williams

1. I am an inmate at FMC-Carswell.

2. On or about July 5th Veronica Carrera and I were put in isolation for the Corona Virus on the "M2" Unit.

3. I knew Veronica Carrera fairly well because we were in county together.

4. Veronica became very sick in isolation with symptoms of shivering and blue finger nails and teeth chattering

5. Nurse Granthem checked on us, checked her oxygen which was 82

6. When Nurse Granthem was confronted by me and Veronica about her nails nurse Granthem said it was no big deal

7. The next morning during a routine check Dr. Brennan had Veronica removed from the cell

8. Veronica Carrera died sometime later

99950051

8/24/20

Exhibit G

Declaration of Latrisha Love

TRULINCS 18656480 - LOVE, LATRISHA - Unit: CRW-I-N

--------------------------------------------------------------------------------

FROM: 18656480
TO: AW Programs
SUBJECT: ***Request to Staff*** LOVE, LATRISHA, Reg# 18656480, CRW-I-N
DATE: 08/19/2020 09:51:40 AM

To:
Inmate Work Assignment: Unit orderly

I am send this to you instructions of Ms. Gardner

On 5/18/2020 My Unit team Officer Cole Rowls notified me that I qualified for the Covid-19 release and she would start my paperwork. At that time I gave her my Home confinement address and phone number.

Between 5/18/2020 and 6/17/2020 Mr. Blair called me down and told me that he needed my Home confinement address and phone number because Ms. Cole-Rowls asked him to start my verification process. So at that time I gave it to him.

6/17/2020 I filled out a Cop out and gave to Ms. Cowl-Rowls with address of home confinement address and phone number. Just because my family had heard nothing yet and I wanted to make sure everything was in order.

On 6/24/2020 Ms. Cowl-Rowls called me back to Unit team and asked for my Home confinment address, stating that I never gave it to her. I filled out another Cop out with the address and phone number on it.

On 6/25/2020 Ms. Washington called me back to Unit team asked me for Home Confinment address and Phone number, said that she was going to start verification paperwork for my Covid Release. I gave it to her and signed paperwork.

On 7/1/2020 I tested Negative for Covid

On 7/4/2020 I tested Negative for Covid

A few days letter they did the mass testing for Covid

7/8/2020 I Called my lawyer and there was nothing she could do to get me out through the courts because I was approved through Carswell for Covid release. The only way for her to fill a motion for me to get out through compationate release was if I was denied release.

7/10/2020 I tested positive for Covid and was taken to M2

7/20/2020 Was moved back to N2 with all positve inmates

7/28/2020 Sent Cop-out to Unit team asking why nothing was being done about my release

8/3/2020 Recieved Cop-out back from Ms.Peterson stating that I would have to contact Ms. Washington because in the system my papers was already start, she did not know what the hold up was.

8/3/2020 Evening... Ms. Washington called me back to sign rules and procedures for probation and release. When I asked what the hold up was she stated that the papers was never sent. that she just sent them...

6/

I declare this is a true and accurat, under penalty of perjury.
18217 Topsail St
Manor, Tx 78653

*Latrisha Love*
8/28/2020

*Declaration of Latrisha Love*

TRULINCS 18656480 - LOVE, LATRISHA - Unit: CRW-I-N

------------------------------------------------------------------------------------

FROM: 18656480
TO: AW Programs
SUBJECT: ***Request to Staff*** LOVE, LATRISHA, Reg# 18656480, CRW-I-N
DATE: 08/19/2020 10:41:23 AM

To:
Inmate Work Assignment: Unit Orderly

Sorry it cut me off so this is the remainder of my email

8/15/2020 Sent 2 Cop-Outs to Ms. Washington one for a Copy of my Computation sheet and One to ask her the update on our last visit.

8/18/2020 Turned in a 8.5, stating that I was told in May that I was getting released on the Covid and asking when this was going to happen..

8/18/2020 Ms. Cole-Rowls called me back to Unit team with Ms. Gardner. Ms. Cole-Rowls told me that she has had all my paper work done and that it is setting on the Warden's desk and had been since May. She also stating that she don't have to let me out till December so stop asking. When I told her what my lawyer told me she waved it off, and said that nobody was being released on the Cares act. The only way anyone was being released from here since March was through court orders from the judge. So why would she tell me I was approved for the Covid release in May? I asked her for my Computation sheet and she told me to ask Ms. Washington she was not going to do that for me. Then said she had nothing else to say to me, I at that time asked me Gardner as she was talking me to the door for a 9. She stated that I don't need a 9, what I need is to email the AW of Programs. So that is what I am doing.

3/19/2020 Ms. Washington had open house at 7am this morning. I asked her for my Computation sheet, she printed and then Ms. Cole-Rowls came in her room and told me to get out, she already talked to me. In short Ms. Cole-rowls and Ms. Washington said they had nothing else to say to me, to talk to the Warden that my papers have been on his desk since May.

If they Warden has had my papers since May can he please either approve or deny me, so that I can do what I need to. Please..
I know that as of 2 weeks ago when they finally sent my paperwork in to Probation that my Home Confinement address was approved and my Home Confinement release date was yesterday. This don't even take into consideration that I was approved for Covid release.

I have Afib and have had 2 heart ablations done, also have Hypothyroidism, and My trimmers have gotten so much worse since I contracted Covid and I have asked to see doctors on may occasions with no response.

Thank you so much and I am sorry to bother you but this seems my last chance to get anything done.

*I declare this is true and accurate under penalty of perjury.*

*18217 Topsail St*
*Manor, TX 78653*

*Latrisha Love*
*8/28/2020*

Exhibit H

Declaration of Professor Judith Resnik
Regarding Enlargement and use of Provisional
Remedies For Detained Individuals

1



COPY

## DECLARATION OF PROFESSOR JUDITH RESNIK REGARDING ENLARGEMENT AND THE USE OF PROVISIONAL REMEDIES FOR DETAINED INDIVIDUALS

I have been asked to make this declaration to explain my understanding of the remedies, both provisional and permanent, that federal judges can provide to people who are incarcerated and facing the threat of COVID-19. Because I have practiced in the federal courts for decades and represented prisoners in federal court, I have had personal experience with the use of enlargement in habeas corpus cases. Given that this provisional remedy is not regularly discussed in reported decisions or in academic analyses, I believe that my experiences and knowledge can be useful to the Court. This opinion is mine and is not that of the institutions with which I am affiliated. I declare that the following is a true and accurate account of my own work as a lawyer, of the pertinent legal principles as I understand them, and of how these precepts can apply in this unprecedented context.

### My Background

1. I have worked on occasion as a lawyer, including in the clinical programs at Yale Law School and at the University of Southern California Law Center (USC), where I taught for more than a decade before returning to Yale Law School. I have appeared before the United States Supreme Court and in federal district and appellate courts. I have also been appointed by federal judges to assist in issues arising in large-scale litigation. Below, I provide a few aspects of my work particularly relevant to this declaration. I attach my resume as Exhibit A to this Declaration.

2. From 1977 until 1980, I was a supervising attorney at Yale Law School's clinical program, which then provided legal services to federal prisoners housed at F.C.I. Danbury. From 1980 to 1996, I taught at USC in both traditional classroom and clinical settings.

3. I am now the Arthur Liman Professor of Law at Yale Law School where I teach courses, including on federal and state

Case 2:20-cv-04450 Document 1 Filed 05/16/20 Page 120 of 189 Page ID #:120
Case 4:21-cv-00669-P Document 1 Filed 05/20/21 Page 86 of 259 PageID 86

2

courts; procedure; large-scale litigation; federalism; and incarceration.

4. I have taught law for decades. Much of my focus has been on the role and function of courts, and the relationship of governments to their populations. I regularly teach the class entitled Federal and State Courts in the Federal System. Readings for students include materials on habeas corpus and on civil rights litigation.

5. In 2018, I was awarded an Andrew Carnegie Fellowship to work on a book, tentatively entitled *Impermissible Punishments*, which explores the impact of the 1960s civil rights revolution on the kinds of punishments that governments can impose on people convicted of crimes. Central to this book is the role that access to courts played for people held in detention.

6. I am the Founding Director of the Arthur Liman Center for Public Interest Law. The Liman Center teaches classes yearly, convenes colloquia, does research projects, supports graduates of Yale Law School to work for one year in public interest organizations, and is an umbrella for undergraduate fellowships at eight institutions of higher education.

7. I write about the federal courts; adjudication and alternatives such as arbitration; habeas corpus and incarceration; class actions and multi-district litigation; the judicial role and courts' remedies; gender and equality; and about transnational aspects of these issues. In recent years, I have spent a good deal of time doing research related to prisons. I have helped to develop a series of reports that provide information nation-wide on the use of solitary confinement.

8. In February of 2019, I testified before the U.S. Commission on Civil Rights at its hearing on women in prison and co-authored a statement related to the isolation of many facilities for women, their needs for education and work training, and the discipline to which they are subjected. *See* Statement submitted for the record, *Women in Prison: Seeking Justice Behind Bars*, before the U.S. Commission on Civil Rights, March 22, 2019. The report, published a few months ago, references this testimony. See U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* (February 2020), available at https://www.usccr.gov/pubs/2020/02-26-Women-in-Prison.pdf.

3

## Remedies Available in the Federal Courts:
### Habeas Corpus, Civil Rights Litigation, and Enlargement

9.    In light of my knowledge of the federal law of habeas corpus, state and federal court relations, procedure, and remedies, I have been asked by counsel for the petitioners/plaintiffs to address the range of responses available to judges presiding in cases that raise claims related to COVID-19. I have submitted a declaration akin to this one in a few other cases.

10.    As I understand from public materials on the health risks of this disease, COVID-19 poses a deadly threat to the well-being and lives of people who contract this disease. To reduce the risk and spread of this disease, our governments have instructed us to stay distant from others and to take measures that are extraordinary departures from our daily lives and routines.

11.    Applying these urgent medical directives to prisons poses challenges in every jurisdiction. Governing legal principles about prisoners' access to courts were not framed to address COVID-19's reality: that being inside prisons that are densely populated can put large numbers of people (prisoners and staff) at risk of immediate serious illness and potential death.

12.    These unprecedented risks from and harms of COVID-19 in prison raise a new legal question: whether COVID-19 has turned sentences which, when imposed, were (or may have been) constitutional into unconstitutional sentences during the pendency of this crisis.

13.    When sentencing people to a term of years of incarceration, judges had no authority to impose putting a person at grave risk of serious illness and death as part of the punishment for the offense. Now, such grave risks and harms can arise from the fact of incarceration.

14.    A recent Supreme Court case, *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016), provides an analogous situation of sentence that was constitutional at sentencing but unconstitutional now. The Court determined that, in light of new understandings of the limits of brain development in juveniles, sentences of life without parole (LWOP) imposed on individuals who had committed crimes when under the age of eighteen were lawful when issued but became unconstitutional. As a consequence, parole boards or courts had to reconsider whether LWOP remained appropriate. COVID-19 raises a parallel question, as it requires courts to address whether

sentences lawful at imposition can (at least temporarily) no longer be served in prisons because otherwise, the sentence would become an unconstitutional form of punishment. In these abnormal times, the speed at which decisions are made is critical. Therefore, as I discuss below, provisional remedies (enabling enlargement and release for some individuals and de-densifying for others) are necessary.

15. The classic and longstanding remedy for relief from unconstitutional detention, conviction, and sentences is habeas corpus. The Constitution enshrined the remedy of habeas corpus, which has a substantial common law history and is codified in federal statutes. *See generally* Paul D. Halliday, *Habeas Corpus* (Harvard U. Press, 2012); Amanda L. Tyler, *Habeas Corpus in Wartime* (Oxford U. Press, 2017); Randy Hertz and James Liebman, *Federal Habeas Corpus Practice and Procedure* (2 volumes, 2019); Hart & Wechsler, *The Federal Courts and the Federal System*, Chapter X1, 1193-1164 (Richard H. Fallon, Jr, John F. Manning, Daniel J. Meltzer & David Shapiro, 7th ed., 2015). These citations are the tip of a vast and substantial literature that aims to understand the history and law of habeas corpus.

**The Legal Thicket**

16. As is familiar, in federal courts, federal petitioners file under 28 U.S.C. §2255 (post-conviction motions) and under §2241 (the general habeas statute), both of which are civil actions.

17. For example, when I worked at Yale Law School in its clinical program in the late 1970s, we filed lawsuits for federal prisoners predicated on 28 U.S.C. §2241 as well as (in appropriate situations) on 28 U.S.C. §1331 (general question jurisdiction) and 28 U.S.C. §1361 (mandamus), and in several instances, we filed cases as class actions. In the mid-1970s, the Supreme Court provided rules and forms for §2254 and §2255 filings. The Federal Rules of Civil Procedure supplement those rules, as recognized in F.R.Civ.Pro. 81(a)(4).

18. Congress has recognized that federal judges are authorized under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require." *See* 28 U.S.C. §2243. In addition to this statutory authority, federal judicial power is predicated on the constitutional protection of the writ and on the common law.

3649600.1 Declaration enlargement judith Resnik May 14, 2020

Case 2:20-cv-04450    Document 1    Filed 05/16/20    Page 123 of 189    Page ID #:123

5

19.  Congress has channeled and circumscribed some of federal judicial authority through the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and, relatedly, under the Prison Litigation Reform Act (PLRA) of 1996.

20.  Moreover, the Supreme Court has issued many decisions interpreting the prior habeas statutes, the 1996 revisions in AEDPA, and the intersection of habeas and civil rights claims brought under 42 U.S.C. §1983. The result is a dense arena of law and doctrine that can be daunting for litigants and jurists alike.

21.  Some Supreme Court decisions, written to address claims by state prisoners, have delineated litigation focused on the fact or duration of confinement, for which release is the remedy and habeas is the preferred route, from challenges to conditions of confinement, for which the Court has required use of 42 U.S.C. §1983. *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475 (1978); *Heck v. Humphrey*, 512 U.S. 477 (1994). Yet that distinction is hard to apply, and many opinions have identified that the overlap, as exemplified by *Mohammad v. Close*, 540 U.S. 744 (2004), *Wilkinson v. Dotson*, 544 U.S. 74 (2005), and by other Supreme Court and lower court decisions.

22.  COVID-19 poses a new and painful context in which to undertake that analysis. Some reported decisions addressing the constitutional right of prisoners that officials not be "deliberately indifferent to serious medical needs" consider those Eighth Amendment claims to be appropriate for §1983 because they relate to conditions. But this deadly disease turns ordinary conditions into potentially lethal threats of illness for which the remedy to consider is release of at least some prisoners because density puts people at medical risk.

23.  Because COVID-19 can end people's lives unexpectedly and abruptly, COVID-19 claims turn the condition of being incarcerated into a practice that affects the fact or duration of confinement. In my view, COVID-19 claims, therefore, collapse the utility and purpose of drawing distinctions between what once could more coherently be distinguished.

24.  Courts need also to consider how COVID-19 fits (or not) with provisions of AEDPA and the parameters of the PLRA. Again, new problems have emerged. For example, in some contexts for state and federal prisoners, a question of exhaustion of remedies arises. Often one issue is the ability of the executive branch to respond

quickly. In the COVID context, day by day, the risk of illness increases for prisoners and staff, which endanger health care resources. Exhaustion would be "futile" if other branches of government are not prompt in response and if people become sick, risks skyrocket, and deaths occur.

25.  "Futility" thus needs to be analyzed in terms not only of the capacity of institutions but in terms of the likelihood that the people seeking relief will be well enough to have the capacity to do so, and that the remedy provided will be effective given the alleged harm.

26.  Other legal issues include when class actions or other forms of multi-party treatment are appropriate and if so, whether the criteria such as those of Rule 23 are met; the merits of arguments about unconstitutional sentences and conditions; and the range of remedies. Furthermore, circuit case law varies somewhat on the use and application of the Federal Rules of Civil Procedure in habeas filings and on the scope and the interpretation of 28 U.S.C. §2241.

## The Availability of Provisional Remedies

27.  The reason to flag some of the many issues that litigation of both habeas petitions and civil rights cases entail is to underscore the importance of considering provisional remedies when cases are pending. In general, time is required for lawyers to brief and for judges to interpret and apply the law. But waiting days in a world of COVID infections can result in the loss of life.

28.  While courts have not faced COVID before, they have faced urgent situations, which is why provisional legal remedies exist. Courts have two ways to preserve the *status quo* – which here means protecting to the extent possible the health of prisoners, staff, and providers of medical services. One route is the use of temporary restraining orders and preliminary injunctions. These remedies require no explanation because they are familiar procedures. *See* Fed. R. Civ. Pro. 65.

29.  Another option is an aspect of federal judicial power that is less well known. District courts have authority when habeas petitions are pending to "enlarge" the custody of petitioners. "Enlargement" is a term that, as far as I am aware, is used only in the context of habeas. (More familiar terms for individuals permitted to leave detention are "release" and "bail," and some

3649600.1 Declaration enlargement judith Resnik May 14, 2020

Case 2:20-cv-04450 Document 1 Filed 05/16/20 Page 125 of 189 PageID #:125
Case 4:21-cv-00669-P Document 1 Filed 05/20/21 Page 91 of 259 PageID 91

7

decision that "enlarge" petitioners use those words rather than enlargement).

30. The distinction is that enlargement is not release. The person remains *in custody* – even as the place of custody is changed and thus "enlarged" from a particular prison to a hospital, half-way house, a person's home, or other setting. Enlargement is a provisional remedy that modifies custody by expanding the site in which it takes place.

31. Enlargement has special relevance when the PLRA has application. As I understand the PLRA's rules on the "release" of prisoners, enlargement would not apply, as enlargement is not a release order. And, of course, interpreting the many directives of the PLRA in light of COVID entails more elaboration that my comments here.

32. The need to work through that statute and case law is another reason why the availability of provisional remedies is so important. Enlargement provides an opportunity for increasing the safety of prisoners, staff, and their communities while judges consider a myriad of complex legal questions.

33. I first encountered the provisional remedy of enlargement in the 1970s, when I represented a prisoner – Robert Drayton – who was confined at F.C.I. Danbury and who filed a habeas petition alleging that the U.S. Parole Commission had unconstitutionally rescinded his parole.

34. The Honorable T.F. Gilroy Daly, a federal judge sitting in the District of Connecticut, granted Mr. Drayton's request for enlargement while the decision on the merits was pending. Mr. Drayton returned to his home in Philadelphia and came back to Connecticut for the merits hearing. Judge Daly thereafter ruled in his favor; that decision was upheld in part and reversed in part. *See Drayton v. U.S. Parole Commission*, 445 F. Supp. 305 (D. Conn. 1978), *affirmed in part, Drayton v. McCall*, 584 F.2d 1208 (2d Cir. 1978).

35. Judge Daly did not write a decision explaining the enlargement. Given that I knew that the use of enlargement was not always recorded in published decisions and that enlargement had special relevance here, I decided I should learn more about other courts' discussion of this provisional remedy.

36. The provisional district court remedy of enlargement is not mentioned directly in in federal rules governing the lower

8

federal courts. In contrast, at the appellate level, Federal Rule of Appellate Procedure (FRAP) 23 provides in part that:

> While a decision not to release a prisoner is under review, the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court, may order that the prisoner be: (1) detained in the custody from which release is sought; (2) detained in other appropriate custody; or (3) released on personal recognizance, with or without surety. While a decision ordering the release of a prisoner is under review, the prisoner must – unless the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court orders otherwise – be released on personal recognizance, with or without surety.

As that excerpt reflects, the Rule uses language familiar in the context of bail and provides that appellate courts may also determine that a petitioner be detained in "other appropriate custody."

37. Federal courts at all level are authorized by Congress to decide habeas cases "as law and justice requires." 28 U.S.C. §2243. The case law also references that, at the district court level, the authority to release a habeas petitioner pending a ruling on the merits stems from courts' inherent powers. *See, e.g.*, *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). And, as I noted, in these reported decisions, the terms "bail" or "release" are sometimes used instead of or in addition to "enlargement."

38. In the last weeks, the saliency of enlargement has prompted me to review more of the law surrounding it. To gather materials and opinions on enlargement, I asked two law students, Kelsey Stimson of Yale Law School and Ally Daniels of Stanford Law School, to help me research what judges have said about enlargement and what others have written. Below I detail some of the governing case law. The Hertz & Liebman *Treatise on Habeas* also has a section (§14.2) devoted to this issue.

39. Some of the decisions involve requests for release when habeas petitions were pending from state prisoners, and others from federal prisoners, or from people in immigration detention. Further, several appellate cases address the issue of whether a district court order on enlargement was appealable as of right or subject to mandamus.

3649600.1 Declaration enlargement judith Resnik May 14, 2020

40. My central point is that, amidst these various debates about appealability and the test for enlargement/release, most circuits have recognized that district courts have the authority to order release pending final disposition of a habeas petition. *See e.g., Woodcock v. Donnelly*, 470 F.2d 93, 43 (1st Cir. 1972); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992); *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974); *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990); *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985); *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986); *Pfaff v. Wells*, 648 F.2d 689, 693 (10th Cir. 1981): *Baker v. Sard*, 420 F.2d 1342, 1342-44 (D.C. Cir. 1969).

41. The Fourth and Eleventh Circuits appear, albeit less directly, to recognize enlargement authority. *See Gomez v. United States*, 899 F.2d 1124, 1125 (11th Cir. 1990); *United States v. Perkins*, 53 F. App'x 667, 669 (4th Cir. 2002). A Ninth Circuit opinion from 1989 likewise appears to recognize the power of district courts to grant release pending a habeas decision where there are "special circumstances or a high probability of success." *See Land v. Deeds*, 878 F.2d 318 (9th Cir. 1989). Thereafter, another decision, *In re Roe*, described the Circuit as not having ruled on the issue in terms of state prisoners. *See* 257 F.3d 1077 (9th Cir. 2001).[1]

42. A discrete question is the standard for enlarging petitioners. To obtain an order for release pending the merits of habeas decision, the petitioner must demonstrate "extraordinary circumstances" and that the underlying claim raises "substantial claims." *See e.g. Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). Courts have also discussed that release is appropriate when "necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226; *see also Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992). As that Third Circuit decision explained, release was "available 'only when the petitioner has raised substantial constitutional claims upon which he has a high probability of success, and also when extraordinary or exceptional circumstances

---

[1] Subsequent lower court cases debated whether district courts do possess such authority. *See, e.g., Hall v. San Francisco Sup. Ct.*, 2010 WL 890044, at *2 (N.D. Cal. Mar. 8, 2010) ("Based on the overwhelming authority [of other circuit courts] in support, the court concludes for purposes of the instant motion that it has the authority to release Hall pending a decision on the merits."); *United*

("[T]his Court declines to address the merits of Petitioner's bail requests in the absence of definitive guidance from the Ninth Circuit regarding the scope of this Court's bail authority.").

Case 2:20-cv-04450 Document 1 Filed 05/16/20 Page 128 of 189 Page ID #:128
Case 4:21-cv-00669-P Document 1 Filed 05/20/21 Page 94 of 259 PageID 94

10

exist which make the grant of bail necessary to make the habeas remedy effective.'"

43. Some judges have interpreted the "substantial questions" prong to require the underlying claim to have a "high probability of success." *See Hall v. San Francisco Superior Court*, No. C 09-5299 PJH, 2010 WL 890044, *1 (N.D. Cal. Mar. 8, 2010); *In re Souels*, 688 F. App'x 134, 135 (3d Cir. 2017). That test resembles standards for preliminary injunctive relief and for stays, which include an assessment of the likelihood of success on the merits and of whether the balance of hardships tips in favor of altering the status quo. (And, of course, more can be said about the nuances of these bodies of law as well.)

44. A few cases focus on the health of a petitioner as central to the conclusion that "extraordinary circumstances" exist. For example, in *Johnston v. Marsh*, the petitioner, Alfred Ackerman, brought a habeas claim alleging that he was convicted in Pennsylvania through a trial that lacked "due process." 227 F.2d 528 (3d Cir. 1955). Ackerman asked for release pending a decision on the merits of his habeas petition; he argued that he had advanced diabetes and was "rapidly progressing towards total blindness." *Id.* at 529. The district court authorized Ackerman to be released to a private hospital. The prison warden (Frank Johnston) went to the Third Circuit invoking sought writs of prohibition and mandamus to order the district court (Judge Marsh) to change his ruling. Rejecting the petitions, the Third Circuit affirmed that district courts possessed the authority to order relocation while the habeas petition was pending. *Johnson v. Marsh* has been cited in more recent cases to illustrate that findings of extraordinary circumstances may "be limited to situations involving poor health or the impending completion of the prisoner's sentence." *Landano*, 970 F.2d at 1239.

45. The court in *In re Souels* addressed what showing of health problems constituted extraordinary circumstances. *See* 688 F. App'x at 135-36. Sean Souels, who was serving a 46-month federal prison sentence, petitioned for a writ of mandamus directing the court to rule on his writ of habeas corpus and sought release pending the decision. *Id.* at 134. The court denied Souels bail because "he [did] not describe his medical conditions in any detail or explain how he cannot manage his health issues while he is in prison." *Id.*

46. Health is not the only extraordinary circumstance that has been the basis for enlargement. For example, in *United States v. Josiah*, William Josiah brought a writ of habeas corpus after

Case 2:20-cv-04450 Document 1 Filed 05/16/20 Page 129 of 189 Page ID #:129
Case 4:21-cv-00669-P Document 1 Filed 05/20/21 Page 95 of 259 PageID 95

11

the Supreme Court invalidated the residual clause of the Armed Career Criminal Act (ACCA) and altered the method for determining whether prior convictions qualify as violent felonies under the ACCA. 2016 WL 1328101, at *2 (D. Haw. Apr. 5, 2016). Josiah, who was serving a federal prison sentence argued that his prior convictions did not qualify as violent felonies and that he should not be subject to the fifteen-year mandatory minimum. The district court concluded that because the issue of retroactivity was pending before the Supreme Court and Josiah would have served his full sentence if the Court held its prior ruling retroactive, release pending the higher court's ruling was appropriate. *Id.* at *4-6.

47. In circumstances similar to *Josiah*, a district judge sitting in the Central District of Illinois issued three orders granting release, termed bail, to petitioners pending resolution of their habeas claims. See *Zollicoffer v. United States*, No. 15-03337, 2017 WL 79636 (C.D. Ill. Jan. 9, 2017); *United States v. Jordan*, No. 04-20008, 2016 WL 6634852 (C.D. Ill. Nov. 9, 2016); *Swanson v. United States*, No. 15-03262, 2016 WL 5422048 (C.D. Ill. Sept. 28, 2016).

48. Another case involved enlargement in the context of the military. *See Gengler v. U.S. through its Dep't of Def. & Navy*, 2006 WL 3210020, at *6 (E.D. Cal. Nov. 3, 2006). As that court explained, a "district court has the inherent power to enlarge a petitioner on bond pending hearing and decision on his petition for writ of habeas corpus." *Id.* at *5. The judge also noted that a "greater showing must be made by a petitioner seeking bail in a criminal conviction habeas 'than would be required in a case where applicant had sought to attack by writ of habeas corpus an incarceration not resulting from a judicial determination of guilt.'" The court used the test of "exceptional circumstances and, at a minimum, substantial questions as to the merits." *Id.* at 13. The court found "exceptional circumstances" based on the fact that the petitioner had been admitted to business school, had been granted permission by his commanding officer to attend, and would be forced to drop out if his custody were not enlarged. The court also ruled that "substantial questions as to the merits" existed because of alleged government errors in drafting the petitioner's service agreement. *Id.* at *6.

49. As of this writing, a few reported cases discuss COVID-based requests for enlargement while a habeas corpus proceeding is pending. In addition, many decisions address requests for release under federal statutes as well as other remedies.

50. Given the fast pace of litigation and the many concerns about people's well-being, UCLA has created a website that is regularly updated and compiles materials and decisions related to COVID. See UCLA Law Covid-19 Behind Bars Data Project, *available at* https://docs.google.com/spreadsheets/d/1X6uJkXXS-O6eePLxw2e4JeRtM41uPZ2eRcOA_HkPVTk/edit#gid=708926660.

51. Below I provide a few illustrations of decisions since April that are related to COVID and enlargement.

52. On April 7, the Honorable Jesse Furman, sitting in the Southern District of New York, granted on consent a motion styled "for bail" (the term used in the Second Circuit *Mapp* decision). Judge Furman ordered immediate release under specified conditions, pending the adjudication of the Section 2255 Motion. *See United States v. Nkanga,* No. 18-CR-00730 (S.D.N.Y., Apr. 7, 2020).

53. A second case involves a class action filed by Craig Wilson and others. *See Wilson v. Williams*, No. 4:20-cv-00794-JG, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020). Seeking to represent a class of all current and future prisoners of the Elkton Federal Correctional Institution (FCI) and a subclass of the medically vulnerable population, they sought relief because their continued incarceration subjected all FCI prisoners to substantial risk of harm in violation of the Eighth Amendment.

54. On April 22, 2020, the federal district court granted in part the request by the *Wilson* class for emergency relief, which included enlargement of a subclass of prisoners challenging the manner in which the sentence was served and hence cognizable as a habeas petition. *See Wilson v. Williams,* No. 4:20-cv-00794-JG, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020). The Sixth Circuit denied a stay soon thereafter. *See Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 2308441, at *1 (6th Cir. May 8, 2020).

55. The *Wilson* case also cited to *Money v. Pritzker*, No. 1-20 CV 02094, 2020 WL 1920660, at *1 (N.D. Ill. April 10, 2020), a class action seeking relief on behalf of state prisoners, and the *Wilson* court referenced that I had also submitted a declaration similar to this one in that action. In *Money*, I discussed enlargement as well as the interaction between civil rights litigation and habeas corpus. *Id.* at *8-9. The Honorable Robert M. Dow, Jr. invoked my discussion, and the court determined not to grant the emergency relief sought by the plaintiff class. *Id.*

56. On May 12, 2020, the Honorable Michael Shea issued another decision responding to a petition challenging treatment of

Case 2:20-cv-04450 Document 1 Filed 05/16/20 Page 131 of 189 Page ID #:131
Case 4:21-cv-00669-P Document 1 Filed 05/20/21 Page 97 of 259 PageID 97

13

prisoners at three facilities that compromise FCI Danbury. In *Martinez-Brooks v. Easter*, 3-20-cv-00569-MPS, 2020 WL 2405350 (D. Conn., May 12, 2020). Judge Shea granted in part the request for a temporary restraining order and required "the Warden at FCI Danbury to adopt a process for evaluating inmates with COVID-19 risk factors for home confinement and other forms of release that is both far more accelerated and more clearly focused on the critical issues of inmate and public safety than the current process." *Id.* at *1. He also ordered expedited discovery and scheduled a June hearing on the request for a preliminary injunction. *Id.* In that opinion, Judge Shea discussed enlargement as he analyzed the relief sought by the petitioners. *Id.* at *2

57. Another case has less relevance as it was brought by an unrepresented litigant, Richard Peterson, who had originally sought habeas corpus relief on a claim about education credits and then filed an emergency request for release from a California state prison due to COVID-19. *Peterson v. Diaz*, No. 2:19-CV-01480, 2020 WL 1640008, at *1 (E.D. Cal. Apr. 2, 2020). The district court noted that a class action raising COVID claims was pending in another federal court in California and that, while the court had the authority to release a person while a habeas petition was pending, Mr. Peterson had not provided evidence sufficient to meet the test to do so. *Id.*

### Conclusion

58. In sum, COVID-19 is an unprecedented event that, in my view, raises the legal question of whether, in light of the government mandates for social distancing, sentences (that had been lawful when they were imposed) cannot lawfully be served when the setting puts an individual in a position of untenable risk. Thus, habeas corpus – which addresses the constitutionality of sentences and offers the possibility of release and enlargement – properly provides a jurisdictional basis and remedies for this situation.

59. I need also to note that, in recent years, the Supreme Court has raised questions in many contexts about the remedial powers of federal judges. Whether the topic is nationwide injunctions or commercial contracts, debates have occurred within the Court about the authority of federal judges.

60. Those cases do not address the extraordinary and painful moment in which we are all living. Ordinary life has been up-ended in an effort to keep as many people as possible alive and not

debilitated by serious illness. Moreover, the Supreme Court opinions have not focused on the relevance of those remedial debates to situations were confinement can put entire staffs and detained populations at mortal risk. Therefore, judges have the obligation and the authority to interpret statutes and the Constitution to preserve the lives of people living in and working in prisons. It is my hope that this account of habeas enlargement and the dense account of case law and doctrine will be of service to this Court and to the parties in understanding the meaning and import of American law.


Dated:     May 14, 2020


_____

Judith Resnik

# Judith Resnik

**Address**

Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, CT 06520-8215

Tel: (203) 432-1447
Fax: (203) 432-1719
Email: judith.resnik@yale.edu

## Employment

Arthur Liman Professor of Law, Yale Law School, 1997-present
    Founding Director, Arthur Liman Center for Public Interest Law
    Honorary Visiting Professor, University College London
        Faculty of Law, 2009-2021
    Visiting Professor, Dauphine Université Paris, March 2016
    Visiting Professor, Université Panthéon-Assas Paris II, May 2015
    Convening Professor, Constituting Federalism, a seminar for the Institute for
        Constitutional History in conjunction with the New York Historical
        Society, February 2014
    Scholar in Residence, Columbia Law School, Spring 2011; 2012
    Distinguished Visiting Professor, University of Toronto School of Law, 2005
    Parsons Visitor, Sydney University School of Law, 2004

Visiting Professor, New York University School of Law, 1996-1997
Visiting Professor, Harvard Law School, Fall 1989
Visiting Professor, Yale Law School, Spring 1989
Visiting Professor, University of Chicago Law School, Fall 1988

Orrin B. Evans Professor of Law, University of Southern California, 1989-1997;
    Professor of Law: 1985-1989; Associate Professor: 1982-1985;
    Assistant Professor: 1980-1982
    Member, Faculty, The Salzburg Seminar on U.S. Legal Institutions, July 1988

Acting Director, Daniel and Florence Guggenheim Program in Criminal Justice,
    Yale Law School, 1979-1980

Lecturer in Law and Supervising Attorney, Yale Law School, 1977-1979

Instructor, New York University School of Law, 1976-1977

Law Clerk, Honorable Charles E. Stewart, United States District Court,
    Southern District of New York, 1975-1976

## Selected Professional Activities

Chair of Fellows Selection Committee and Founding Director, Arthur Liman Center for
    Public Interest Law, Yale Law School, 1997-present

Exhibit I

CDC Guidance on Management of COVID-19
in Correctional and Detention Facilities

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of **March 23, 2020**.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the following CDC website periodically for updated interim guidance: https://www.cdc.gov/coronavirus/2019-ncov/index.html.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

## In this guidance

- Who is the intended audience for this guidance?
- Why is this guidance being issued?
- What topics does this guidance include?
- Definitions of Commonly Used Terms
- Facilities with Limited Onsite Healthcare Services
- COVID-19 Guidance for Correctional Facilities
- Operational Preparedness
- Prevention
- Management
- Infection Control
- Clinical Care of COVID-19 Cases
- Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons
- Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

## Who is the intended audience for this guidance?



This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.



**cdc.gov/coronavirus**

CS316182-A    03/27/2020

## Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of specific preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- In most cases, incarcerated/detained persons are not permitted to leave the facility.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care of COVID-19 cases as well as close contacts of cases in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. **At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.**

## What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

√  Operational and communications preparations for COVID-19

√  Enhanced cleaning/disinfecting and hygiene practices

√  Social distancing strategies to increase space between individuals in the facility

√  How to limit transmission from visitors

√  Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

√  Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

√  Medical isolation of confirmed and suspected cases and quarantine of contacts, including considerations for cohorting when individual spaces are limited

√  Healthcare evaluation for suspected cases, including testing for COVID-19

√  Clinical care for confirmed and suspected cases

√  Considerations for persons at higher risk of severe disease from COVID-19

## Definitions of Commonly Used Terms

**Close contact of a COVID-19 case**—In the context of COVID-19, an individual is considered a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on). Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

**Cohorting**—Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group. Ideally, cases should be isolated individually, and close contacts should be quarantined individually. However, some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19**—Community transmission of COVID-19 occurs when individuals acquire the disease through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing cases inside their walls. Facilities should consult with local public health departments if assistance is needed in determining how to define "local community" in the context of COVID-19 spread. However, because all states have reported cases, all facilities should be vigilant for introduction into their populations.

3

**Confirmed vs. Suspected COVID-19 case**—A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms. A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results. If test results are positive, a suspected case becomes a confirmed case.

**Incarcerated/detained persons**—For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting where these guidelines are generally applicable. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e, detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facil-

**Medical Isolation**—Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials (detailed in guidance below). In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion.

**Quarantine**—Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19. If symptoms do not develop, movement restrictions can be lifted, and the individual can return to their previous residency status within the facility.

**Social Distancing**—Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication.

**Staff**—In this document, "staff" refers to all public sector employees as well as those working for a private contractor within a correctional facility (e.g., private healthcare or food service). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff including private facility operators.

**Symptoms**—Symptoms of COVID-19 include fever, cough, and shortness of breath. Like other respiratory infections, COVID-19 can vary in severity from mild to severe. When severe, pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations most at risk for disease and complications are not yet fully understood. Monitor the CDC website for updates on these topics.

## Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails usually employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

4

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of confirmed and suspected COVID-19 cases and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with confirmed and suspected COVID-19 cases. Facilities should make contingency plans for the likely event of PPE shortages during the COVID-19 pandemic.

## COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections can be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness**. This guidance is intended to help facilities prepare for potential COVID-19 transmission in the facility. Strategies focus on operational and communications planning and personnel practices.
- **Prevention.** This guidance is intended to help facilities prevent spread of COVID-19 from outside the facility to inside. Strategies focus on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals).
- **Management.** This guidance is intended to help facilities clinically manage confirmed and suspected COVID-19 cases inside the facility and prevent further transmission. Strategies include medical isolation and care of incarcerated/detained persons with symptoms (including considerations for cohorting), quarantine of cases' close contacts, restricting movement in and out of the facility, infection control practices for individuals interacting with cases and quarantined contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas visited by cases.

## Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

### Communication & Coordination

√ **Develop information-sharing systems with partners.**

- ○ Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before cases develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.
- ○ Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.

5

Hygiene

√ **Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).**

√ **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signage throughout the facility, and communicate this information verbally on a regular basis.** Sample signage and other communications materials **are available on the CDC website.** Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

  o **Practice good cough etiquette:** Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.

  o **Practice good** hand hygiene: Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

  o **Avoid touching your eyes, nose, or mouth without cleaning your hands first.**

  o **Avoid sharing eating utensils, dishes, and cups.**

  o **Avoid non-essential physical contact.**

√ **Provide incarcerated/detained persons and staff no-cost access to:**

  o **Soap**—Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing.

  o **Running water, and hand drying machines or disposable paper towels for hand washing**

  o **Tissues** and no-touch trash receptacles for disposal

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

√ **Communicate that sharing drugs and drug preparation equipment can spread COVID-19 due to potential contamination of shared items and close contact between individuals.**

## Prevention Practices for Incarcerated/Detained Persons

√ **Perform pre-intake screening and temperature checks for all new entrants. Screening should take place in the sallyport, before beginning the intake process,** in order to identify and immediately place individuals with symptoms under medical isolation. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).

  o **If an individual has symptoms of COVID-19** (fever, cough, shortness of breath):

    ▪ Require the individual to wear a face mask.

    ▪ Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.

    ▪ Place the individual under medical isolation (ideally in a room near the screening location, rather than transporting the ill individual through the facility), and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)

    ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care.

○ **If an individual is a** close contact **of a known COVID-19 case (but has no COVID-19 symptoms):**

- Quarantine the individual and monitor for symptoms two times per day for 14 days. (See Quarantine section below.)
- Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.

√ **Implement** social distancing **strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

○ **Common areas:**
- Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)

○ **Recreation:**
- Choose recreation spaces where individuals can spread out
- Stagger time in recreation spaces
- Restrict recreation space usage to a single housing unit per space (where feasible)

○ **Meals:**
- Stagger meals
- Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
- Provide meals inside housing units or cells

○ **Group activities:**
- Limit the size of group activities
- Increase space between individuals during group activities
- Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
- Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out

○ **Housing:**
- If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
- Arrange bunks so that individuals sleep head to foot to increase the distance between them
- Rearrange scheduled movements to minimize mixing of individuals from different housing areas

○ **Medical:**
- If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering sick call.
- Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

- Communicate clearly and frequently with incarcerated/detained persons about changes to th daily routine and how they can contribute to risk reduction.

- Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.

- Consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility.

- Provide up-to-date information about COVID-19 to incarcerated/detained persons on a regular basis, including:
    - Symptoms of COVID-19 and its health risks
    - Reminders to report COVID-19 symptoms to staff at the first sign of illness

- Consider having healthcare staff perform rounds on a regular basis to answer questions about COVID-19.

## Prevention Practices for Staff

- **Remind staff to stay at home if they are sick.** Ensure that staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.

- **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.
    - In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).
    - Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

- **Provide staff with up-to-date information about COVID-19 and about facility policies on a regular basis, including:**
    - Symptoms of COVID-19 and its health risks
    - Employers' sick leave policy
    - **If staff develop a fever, cough, or shortness of breath while at work:** immediately put on a face mask, inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.
    - **If staff test positive for COVID-19:** inform workplace and personal contacts immediately, and do not return to work until a decision to discontinue home medical isolation precautions is made. Monitor CDC guidance on discontinuing home isolation regularly as circumstances evolve rapidly.
    - **If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community):** self-quarantine at home for 14 days and return to work if symptoms do not develop. If symptoms do develop, follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

- **If a staff member has a confirmed COVID-19 infection, the relevant employers should inform other staff about their possible exposure to COVID-19 in the workplace, but should maintain confidentiality as required by the Americans with Disabilities Act.**
    - Employees who are close contacts of the case should then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).

12

√ When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.

√ Ask staff to keep interactions with individuals with respiratory symptoms as brief as possible.

## Prevention Practices for Visitors

√ If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.

√ Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all visitors and volunteers on entry. See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

    ○ Staff performing temperature checks should wear recommended PPE.

    ○ Exclude visitors and volunteers who do not clear the screening process or who decline screening.

√ Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.

√ Provide visitors and volunteers with information to prepare them for screening.

    ○ Instruct visitors to postpone their visit if they have symptoms of respiratory illness.

    ○ If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

    ○ Display signage outside visiting areas explaining the COVID-19 screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.

√ Promote non-contact visits:

    ○ Encourage incarcerated/detained persons to limit contact visits in the interest of their own health and the health of their visitors.

    ○ Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.

    ○ Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.

√ Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.

    ○ If moving to virtual visitation, clean electronic surfaces regularly. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)

    ○ Inform potential visitors of changes to, or suspension of, visitation programs.

    ○ Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).

    ○ If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation would be done in the interest of incarcerated/detained persons' physical health and the health of the general public. However, visitation is important to maintain mental health.

13

If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them. See above suggestions for promoting non-contact visits.

√ **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

## Management

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

### Operations

√ **Implement alternate work arrangements deemed feasible in the** Operational Preparedness **section.**

√ **Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.**

  ○ If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to appropriately isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case).** Subsequently in this document, this practice is referred to as **routine intake quarantine**.

√ **When possible, arrange lawful alternatives to in-person court appearances.**

√ **Incorporate screening for COVID-19 symptoms and a temperature check into release planning.**

  ○ Screen all releasing individuals for COVID-19 symptoms and perform a temperature check. (See Screening section below.)

  ▪ If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

  ▪ If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

  ▪ Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

14

√ Coordinate with state, local, tribal, and/or territorial health departments.

  ○ When a COVID-19 case is suspected, work with public health to determine action. See Medical Isolation section below.

  ○ When a COVID-19 case is suspected or confirmed, work with public health to identify close contacts who should be placed under quarantine. See Quarantine section below.

  ○ Facilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed. See Facilities with Limited Onsite Healthcare Services section.

## Hygiene

√ **Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility.** (See above.)

√ **Continue to emphasize practicing good hand hygiene and cough etiquette.** (See above.)

## Cleaning and Disinfecting Practices

√ **Continue adhering to recommended cleaning and disinfection procedures for the facility at large.** (See above.)

√ **Reference specific cleaning and disinfection procedures for areas where a COVID-19 case has spent time (below).**

## Medical Isolation of Confirmed or Suspected COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities with Limited Onsite Healthcare Services, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that COVID-19 cases will be appropriately isolated, evaluated, tested (if indicated), and given care.**

√ **As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.**

√ **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

  ○ Provide medical care to cases inside the medical isolation space. See Infection Control and Clinical Care sections for additional details.

  ○ Serve meals to cases inside the medical isolation space.

  ○ Exclude the individual from all group activities.

  ○ Assign the isolated individual a dedicated bathroom when possible.

√ **Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters.** Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.

√ **Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.** Cohorting should only be practiced if there are no other available options.

15

◦ If cohorting is necessary:

- **Only individuals who are laboratory confirmed COVID-19 cases should be place[d] medical isolation as a cohort. Do not cohort confirmed cases with suspected ca[ses] case contacts.**
- Unless no other options exist, do not house COVID-19 cases with individuals who have an undiagnosed respiratory infection.
- Ensure that cohorted cases wear face masks at all times.

**In order of preference, individuals under medical isolation should be housed:**

○ Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

○ Separately, in single cells with solid walls but without solid doors

○ As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.

○ As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.

○ As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

○ As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.

○ Safely transfer individual(s) to another facility with available medical isolation capacity in one of the above arrangements
(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative.

√ **If the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable, make all possible accommodations to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)

○ Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

○ Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.

√ **Custody staff should be designated to monitor these individuals exclusively where possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility to the extent possible.

√ **Minimize transfer of COVID-19 cases between spaces within the healthcare unit.**

16

**Provide individuals under medical isolation with tissues and, if permissible, a lined no-t‹ trash receptacle.** Instruct them to:

- ○ **Cover** their mouth and nose with a tissue when they cough or sneeze
- ○ **Dispose** of used tissues immediately in the lined trash receptacle
- ○ **Wash hands** immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.



**website for updates to these criteria.**

**For individuals who will be tested to determine if they are still contagious:**

- The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**
- The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**
- The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart

**For individuals who will NOT be tested to determine if they are still contagious:**

- The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**
- The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**
- At least 7 days have passed since the first symptoms appeared

**For individuals who had a confirmed positive COVID-19 test but never showed symptoms:**

- ○ At least 7 days have passed since the date of the individual's first positive COVID-19 test **AND**
- ○ The individual has had no subsequent illness

√ **Restrict cases from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns.**

- ○ If an incarcerated/detained individual who is a COVID-19 case is released from custody during their medical isolation period, contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning.

## Cleaning Spaces where COVID-19 Cases Spent Time

**Thoroughly clean and disinfect all areas where the confirmed or suspected COVID-19 case spent time. Note—these protocols apply to suspected cases as well as confirmed cases, to ensure adequate disinfection in the event that the suspected case does, in fact, have COVID-19. Refer to the Definitions section for the distinction between confirmed and suspected cases.**

- ○ Close off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.
- ○ Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).

**Hard (non-porous) surface cleaning and disinfection**

- If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

- For disinfection, most common EPA-registered household disinfectants should be effective. Choose cleaning products based on security requirements within the facility.

  - Consult a list of products that are EPA-approved for use against the virus that causes COVID-19. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

  - Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:

    - 5 tablespoons (1/3rd cup) bleach per gallon of water or

    - 4 teaspoons bleach per quart of water

√ **Soft (porous) surface cleaning and disinfection**

- For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

  - If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

  - Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and are suitable for porous surfaces.

√ **Electronics cleaning and disinfection**

- For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.

  - Follow the manufacturer's instructions for all cleaning and disinfection products.

  - Consider use of wipeable covers for electronics.

  - If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

√ **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

√ **Food service items.** Cases under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ Laundry from a COVID-19 cases **can be washed with other individuals' laundry.**

- Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after.

- Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

- Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

18

- o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

√ **Consult** cleaning recommendations above **to ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.**

## Quarantining Close Contacts of COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective** ~~quarantine, should confer with local public health officials to ensure that the contacts of~~ **COVID-19 cases will be effectively quarantined and medically monitored.**

√ **Incarcerated/detained persons who are close contacts of a** confirmed or suspected COVID-19 case **(whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (see CDC guidelines).**

- o If an individual is quarantined due to contact with a suspected case who is subsequently tested for COVID-19 and receives a negative result, the quarantined individual should be released from quarantine restrictions.

√ **In the context of COVID-19, an individual (incarcerated/detained person or staff) is considered a close contact if they:**

- o Have been within approximately 6 feet of a COVID-19 case for a prolonged period of time OR
- o Have had direct contact with infectious secretions of a COVID-19 case (e.g., have been coughed on)

Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

√ **Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.**

- o Provide medical evaluation and care inside or near the quarantine space when possible.
- o Serve meals inside the quarantine space.
- o Exclude the quarantined individual from all group activities.
- o Assign the quarantined individual a dedicated bathroom when possible.

√ **Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually.** Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.

- o If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 should be placed under medical isolation immediately.
- o If an entire housing unit is under quarantine due to contact with a case from the same housing unit, the entire housing unit may need to be treated as a cohort and quarantine in place.
- o Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to a COVID-19 case). Under this scenario, avoid mixing individuals quarantined due to exposure to a COVID-19 case with individuals undergoing routine intake quarantine.

19

- If at all possible, do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.

√ **If the number of quarantined individuals exceeds the number of individual quarantine spaces available in the facility, be especially mindful of those who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the higher-risk individuals. (For example, intensify social distancing strategies for higher-risk individuals.)

√ **In order of preference, multiple quarantined individuals should be housed:**

- Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
- Separately, in single cells with solid walls but without solid doors
- As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions
- As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door
- As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
- As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.
- As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.
- Safely transfer to another facility with capacity to quarantine in one of the above arrangements

(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

√ **Quarantined individuals should wear face masks if feasible based on local supply, as source control, under the following circumstances** (see PPE section and Table 1):

- If cohorted, quarantined individuals should wear face masks at all times (to prevent transmission from infected to uninfected individuals).
- If quarantined separately, individuals should wear face masks whenever a non-quarantined individual enters the quarantine space.
- All quarantined individuals should wear a face mask if they must leave the quarantine space for any reason.
- Asymptomatic individuals under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear face masks.

√ **Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties** (see PPE section and Table 1).

- Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear PPE.

20

**Quarantined individuals should be monitored for COVID-19 symptoms twice per day, includ**
**temperature checks.**

  o If an individual develops symptoms, they should be moved to medical isolation immediately and further evaluated. (See Medical Isolation section above.)

  o See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of COVID-19 cases.

√ **If an individual who is part of a quarantined cohort becomes symptomatic:**

  o **If the individual is tested for COVID-19 and tests positive:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

  o **If the individual is tested for COVID-19 and tests negative:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period.

  o **If the individual is not tested for COVID-19:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

√ **Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.**

√ **Quarantined individuals can be released from quarantine restrictions if they have not developed symptoms during the 14-day quarantine period.**

√ **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ **Laundry from quarantined individuals can be washed with other individuals' laundry.**

  o Individuals handling laundry from quarantined persons should wear disposable gloves, discard after each use, and clean their hands after.

  o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

  o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

  o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

## Management of Incarcerated/Detained Persons with COVID-19 Symptoms

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that suspected COVID-19 cases will be effectively isolated, evaluated, tested (if indicated), and given care.**

√ **If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.**

√ **Incarcerated/detained individuals with COVID-19 symptoms should wear a face mask and should be placed under medical isolation immediately. Discontinue the use of a face mask if it inhibits breathing. See** Medical Isolation **section above.**

21

√ **Medical staff should evaluate symptomatic individuals to determine whether COVID-19 test is indicated.** Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well.

√ **If testing is indicated (or if medical staff need clarification on when testing is indicated), contact the state, local, tribal, and/or territorial health department. Work with public health or private labs as available to access testing supplies or services.**

  ○ If the COVID-19 test is positive, continue medical isolation. (See Medical Isolation section above.)

  ○ If the COVID-19 test is negative, return the individual to their prior housing assignment unless they require further medical assessment or care.

## Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

√ **Provide clear information to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions.**

  ○ Consider having healthcare staff perform regular rounds to answer questions about COVID-19.

  ○ Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

√ **Implement daily temperature checks in housing units where COVID-19 cases have been identified, especially if there is concern that incarcerated/detained individuals are not notifying staff of symptoms.** See Screening section for a procedure to safely perform a temperature check.

√ **Consider additional options to intensify** social distancing within the facility.

## Management Strategies for Staff

√ **Provide clear information to staff about the presence of COVID-19 cases within the facility, and the need to enforce social distancing and encourage hygiene precautions.**

  ○ Consider having healthcare staff perform regular rounds to answer questions about COVID-19 from staff.

√ **Staff identified as close contacts of a COVID-19 case should self-quarantine at home for 14 days and may return to work if symptoms do not develop.**

  ○ See above for definition of a close contact.

  ○ Refer to CDC guidelines for further recommendations regarding home quarantine for staff.

# Infection Control

**Infection control guidance below is applicable to all types of correctional facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with confirmed or suspected COVID-19 cases.**

√ **All individuals who have the potential for direct or indirect exposure to COVID-19 cases or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.**

○ Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.

○ Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).

√ **Staff should exercise caution when in contact with individuals showing symptoms of a** is wearing a face mask. If COVID-19 is suspected, staff should wear recommended PPE (see PPE section).

√ **Refer to PPE section to determine recommended PPE for individuals persons in contact with confirmed COVID-19 cases, contacts, and potentially contaminated items.**

## Clinical Care of COVID-19 Cases

√ **Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.**

○ If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.

○ The initial medical evaluation should determine whether a symptomatic individual is at higher risk for severe illness from COVID-19. Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

√ **Staff evaluating and providing care for confirmed or suspected COVID-19 cases should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.**

√ **Healthcare staff should evaluate persons with respiratory symptoms or contact with a COVID-19 case in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the suspected case is wearing a face mask.**

○ If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.

√ **Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza).**

√ **The facility should have a plan in place to safely transfer persons with severe illness from COVID-19 to a local hospital if they require care beyond what the facility is able to provide.**

√ **When evaluating and treating persons with symptoms of COVID-19 who do not speak English, using a language line or provide a trained interpreter when possible.**

## Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

√ **Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with confirmed and suspected COVID-19 cases.**

○ Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95s) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program.

○ For PPE training materials and posters, please visit the CDC website on Protecting Healthcare Personnel.

√ **Ensure that all staff are trained to perform hand hygiene after removing PPE.**

√ **If administrators anticipate that incarcerated/detained persons will request unnecessary PPE, consider providing training on the different types of PPE that are needed for differing degrees of contact with COVID-19 cases and contacts, and the reasons for those differences (see Table 1). Monitor linked CDC guidelines in Table 1 for updates to recommended PPE.**

√ **Keep recommended PPE near the spaces in the facility where it could be needed, to facilitate quick access in an emergency.**

√ **Recommended PPE for incarcerated/detained individuals and staff in a correctional facility** will vary based on the type of contact they have with COVID-19 cases and their contacts (see Table 1). Each type of recommended PPE is defined below. **As above, note that PPE shortages are anticipated in every category during the COVID-19 response.**

○ **N95 respirator**

See below for guidance on when face masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols from a COVID-19 case.

○ **Face mask**

○ **Eye protection**—goggles or disposable face shield that fully covers the front and sides of the face

○ **A single pair of disposable patient examination gloves**

Gloves should be changed if they become torn or heavily contaminated.

○ **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**

  ▪ If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with the individual. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.

  ▪ If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, care activities where splashes and sprays are anticipated, and high-contact patient care activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.

√ **Note that shortages of all PPE categories are anticipated during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category can be found on CDC's website:**

○ **Guidance in the event of a shortage of N95 respirators**

  ▪ Based on local and regional situational analysis of PPE supplies, **face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.

○ **Guidance in the event of a shortage of face masks**

○ **Guidance in the event of a shortage of eye protection**

○ **Guidance in the event of a shortage of gowns/coveralls**

24

Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case*) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| suspected COVID-19 cases, or showing symptoms of COVID-19 | – | ✓ | – | – | – |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case* (but not performing temperature checks or providing medical care) | – | Face mask, eye protection, and gloves as local supply and scope of duties allow. | | | – |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | – | ✓ | ✓ | ✓ | ✓ |
| Staff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases (see CDC infection control guidelines) | ✓** | ✓ | ✓ | ✓ | ✓ |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols (see CDC infection control guidelines) | ✓ | – | ✓ | ✓ | ✓ |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Staff cleaning an area where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |

\* If a facility chooses to routinely quarantine all new intakes (without symptoms or known exposure to a COVID-19 case) before integrating into the facility's general population, face masks are not necessary.

\*\* A NIOSH-approved N95 is preferred. However, based on local and regional situational analysis of PPE supplies, face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

√ **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**

- *Today or in the past 24 hours, have you had any of the following symptoms?*
  - *Fever, felt feverish, or had chills?*
  - *Cough?*
  - *Difficulty breathing?*
- *In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?*

√ **The following is a protocol to safely check an individual's temperature:**

- Perform hand hygiene
- Put on a face mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves
- Check individual's temperature
- **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned routinely as recommended by CDC for infection control.
- Remove and discard PPE
- Perform hand hygiene

26

Exhibit J

Inmate Amber Rice
Inmate Screening Tool

P-S324 052 WORK PERFORMANCE RATING - INMATE
ct 98
S. DEPARTMENT OF JUSTICE                                                    FEDERAL BUREAU OF PRISONS

| Name: AMBER RICE | Register No. 10961-028 | Unit: 1-NORTH |
|---|---|---|
| Evaluation Period: APRIL | Work Assignment: EDUCATION CULINARY ARTS | |

Bonus Justification *Works everywhere she needed to help in the Education dept.*

Signature and Date of Dept. Head Approval

Route to Dept. Head for Review, then to Unit Team

Instructions: Circle the best statement in each area  Base your rating on the inmates overall performance for the rating period(neither the inmate's best day nor worst day) as compared to what is expected of a satisfactory worker in the assignment.

A. QUALITY OF WORK
1. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
2. Fair. Careless: makes mistakes and does not check work. Should do better work.
3. Satisfactory. Makes some mistakes but no more than expected at this level of work.
4. Good. Makes fewer mistakes than most inmates at this level of training. Does journeyman level work.
5. Outstanding. Does superior work.

B. QUANTITY OF WORK
1. Unsatisfactory. Lazy, wastes time, goofs off.
2. Fair. Does just enough to get by. Has to be prodded occasionally.
3. Satisfactory. Works steadily but does not push self.
4. Good. Willing worker. Does a full day's work and wastes little time.
5. Outstanding. Drives self exceptionally hard all the time.

C. INITIATIVE
1. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
2. Fair. Usually relies on others to say what needs to be done.
3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
4. Good. Can plan own work well. Acts on own in most things. Doesn't wait to be told what to do.
5. Outstanding. Has good ideas on better ways of doing things.

D. INTEREST: EAGERNESS TO LEARN
1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
2. Fair. Shows minimal interest and not very eager to learn.
3. Satisfactory. Shows average amount of interest in job. Wants to learn own job but does not put forth extra effort.
4. Good. Above - average interest in job. asks questions about own work and related work. May do extra work to improve skills.
5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May read up on own time or volunteer to do things that will improve knowledge.

E. ABILITY TO LEARN
1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instructions unable to learn, no matter how hard trying.
2. Fair. Slow but if tries eventually will pick up skills. Needs more instructions than most.
3. Average. No slower and no faster to learn than most inmates. Requires average amount of instruction.
4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes same mistake twice.

F. NEED FOR SUPERVISION; DEPENDABILITY; SAFETY; CARE OF EQUIPMENT
1. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
2. Needs closer supervision than most. Not very dependable.
3. Average. Can be relied on for certain things but must be supervised on others. Usually prompt and dependable.
4. Needs little supervision. Good record of dependability and promptness.
5. No supervision required. Completely dependable in all things.

G. RESPONSE TO SUPERVISION AND INSTRUCTION
1. Poor. Resentful an hostile. May argue with supervisor.
2. Fair. Resists or ignores suggestions.
3. Satisfactory. Generally does what is told without any fuss.
4. Good. No hostility or resentment. Tries to improve.
5. Outstanding. Makes a real effort to please the instructor. Does exactly as told.

PRICE, AMBER
15961-028

*done*

ABILITY TO GET ALONG WITH CO-WORKERS
1. Poor. Negative, hostile, annoying to others.
2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
3. Satisfactory. Gets along ok with most co-workers and is accepted by them.
4. Good. Friendly, congenial, helpful: others like to work with.
⑤ Outstanding. Gets along well with everyone. Very popular.

OVERALL JOB PROFICIENCY
Based on this inmates overall performance during this work period, if this inmate was an employee of yours in the community would you :
1. Fire or lay off that individual?
2. Transfer the person to a less demanding job at a lower pay scale?
③ Continue to employ the person but without a raise or promotion this time?
4. Raise the person's pay but keep the person at the same job?
5. Promote the person to a more demanding job at a higher pay rate?

GRADES AND PAY
1. Performance pay-grade class (Circle One) ① - 2 - 3 - 4 - M

2. Hours of satisfactory work ___ 63.5 ___          ⑩⑩

3. Regular Pay ___ 25.40 ___          +12.90          *Special Bonus*

4. Bonus recommended: Yes _X_ No ___          50.40 Special Bonus          *note: only able to Bonus on Special Bonus gave a Special Bonus 25⁰⁰*

5. Total Pay ___ 38.10 / #58.15          $20.00          25.00

| | |
|---|---|
| Supervisors Signature _____ | Date |
| Inmates Signature _Amber Rice_ | Date 5-19-20 |

Inmate _____ was requested to sign this rating, but refused, citing the following reason:

| | |
|---|---|
| Staff Witness's Signature | Date |

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | TOTAL |
|---|---|---|---|---|---|---|---|
| | | | 1 730-1115 | 2 | 3 | 4 | |
| | | | 3 | | | | |
| 5 | 6 | 7 | 8 7-2 | 9 7-330 | 10 | 11 | |
| 12 | 13 | 14 | 15 7 7-2 | 16 8.5 7-330 | 17 | 18 | |
| 19 | 20 | 21 | 22 7 7:00-2 | 23 8.5 7-330 | 24 | 25 | |
| 26 | 27 | 28 | 29 7 :00-2:00 | 30 8.5 7-2:00 | | | |
| | | | 7 | 7 | | | |

Total Hours ___ 25.40

*Exhibit C*

97.3

# CORONAVIRUS DISEASE 2019 (COVID-19) INMATE SCREENING TOOL

## 1. Assess the Risk Of Exposure

| ☐ Yes ☒No | Traveled from, or through, any of the locations identified by the CDC as increasing epidemiologic risk within the last 14 days? <u>Link to CDC Criteria</u> |
| ☐ Yes ☒No | Had close contact with anyone diagnosed with the COVID-19 illness within the last 14 days? |

*If the answer to ALL the above risk of exposure questions is NO, then STOP here and proceed with normal intake.*
*If the answer to ANY of the above risk of exposure questions is YES, then immediately assess symptoms.*

| 2. Assess Symptoms | | Date of Onset: |
|---|---|---|
| ☐ Yes ☒No | Fever (*Fever may not be present in some patients, such as elderly, immunosuppressed, or taking certain medications. Fever may be subjective or objective*). | |
| ☐ Yes ☒No | Cough | |
| ☐ Yes ☒No | Shortness of Breath (SOB) | |

## 3. Implement Infection Prevention Control Measures *if YES to the above questions in (2).*

### 3a. The Symptomatic Patient

**If the patient has any symptoms, implement Standard, Contact, and Airborne Precautions with Eye Protection**

- ☐ Report case promptly to facility leadership, infection prevention and control (IPC), public health and Regional and Central Office QIIPC Consultants.
- ☐ Place a surgical mask on the patient and minimize proximity to staff and inmates
- ☐ All staff escorting, evaluating, or in close contact (6 ft.) with the patient should perform hand hygiene, put on gloves, gown, fit-tested respirator (N-95), goggles or face shield and gloves before room entry or inmate contact. Inmate will wear a surgical mask. Doffing: gloves, gown, exit room, doff face shield then N-95 and wash hands.
- ☐ Escort patient to a *certified* Airborne Infection Isolation (AII) room.
- ☐ If no AII room is available, isolate in room with door closed and *preferably* air is exhausted outside.
- ☐ Prepare for transport to a designated referral healthcare facility in coordination with the local public health authority (do not call for transport service without prior notification and escort in place to move inmate).
- ☐ Minimize and keep a log of all persons interacting with (6ft.) or caring for, the inmate.
- ☐ Once the AII room is empty for two hours, it can be cleaned and disinfected with an EPA registered disinfectant (Emerging viral pathogens claim), by a person in proper PPE.
- ☐ Waste disposal: Double bag trash as hazardous waste. Linens: Double bag in linen hazard bag for washing in central laundry

### 3b. The Asymptomatic Patient

**If the patient has no symptoms house in a single cell, and implement Standard, Contact and Droplet Precautions with Eye Protection**

- ☐ Report case to facility leadership, QIICP, public health and Regional and Central Office QIIPC Consultants.
- ☐ House patient in a single cell. The preferred location is within Health Services. If unable to house patient in a single cell contact Regional and Central Office Infection Prevention and Control Consultants.
- ☐ Limit # of persons interacting with inmate. Utilize social distancing (6 ft.).
- ☐ Document a daily symptom assessment and temperature (Inmate can self-monitor with disposable thermometer or use non-contact thermometer. Utilize disposable food trays. Have inmate clean and disinfect room daily with disposable towels, if possible. Trash will be double bagged out of room.
- ☐ Staff entering room will perform hand hygiene, wear a gown, surgical mask, goggles or face shield and gloves. Inmate will wear a surgical mask. Remove PPE, except face shield and mask at exit. Outside room, remove mask and wash hands.
- ☐ Continue modified housing and observation procedures until 14 days after the last possible exposure date.
- ☐ If at any time the patient becomes symptomatic, implement the steps in 3a – The Symptomatic Patient.

Inmate Name (Last, First): **RICE Amber**    Registration # **10961028**

Institution: **FMC Carswell**

Provider Name/Signature: **J. Bradley, PT, MSPT, GCS**    Date: **4-22-20**
Chief Therapist
FMC- Carswell, Fort Worth, TX

*February 2020, Version 2.0*

96.5

# CORONAVIRUS DISEASE 2019 (COVID-19) INMATE SCREENING TOOL

## 1. Assess the Risk Of Exposure

| | |
|---|---|
| ☐ Yes  ☒ No | Traveled from, or through, any of the locations identified by the CDC as increasing epidemiologic risk within the last 14 days? Link to CDC Criteria |
| ☐ Yes  ☒ No | Had close contact with anyone diagnosed with the COVID-19 illness within the last 14 days? |

*If the answer to ALL the above risk of exposure questions is NO, then STOP here and proceed with normal intake.*
*If the answer to ANY of the above risk of exposure questions is YES, then immediately assess symptoms.*

## 2. Assess Symptoms

Date of Onset:

| | | |
|---|---|---|
| ☐ Yes  ☒ No | Fever (Fever may not be present in some patients, such as elderly, immunosuppressed, or taking certain medications. Fever may be subjective or objective). | |
| ☐ Yes  ☒ No | Cough | |
| ☐ Yes  ☒ No | Shortness of Breath (SOB) | |

## 3. Implement Infection Prevention Control Measures *if YES to the above questions in (2).*

### 3a. The Symptomatic Patient

If the patient has any symptoms, implement Standard, Contact, and Airborne Precautions with Eye Protection
- ☐ Report case promptly to facility leadership, infection prevention and control (IPC), public health and Regional and Central Office QIIPC Consultants.
- ☐ Place a surgical mask on the patient and minimize proximity to staff and inmates
- ☐ All staff escorting, evaluating, or in close contact (6 ft.) with the patient should perform hand hygiene, put on gloves, gown, fit-tested respirator (N-95), goggles or face shield and gloves before room entry or inmate contact. Inmate will wear a surgical mask. Doffing: gloves, gown, exit room, doff face shield then N-95 and wash hands.
- ☐ Escort patient to a *certified* Airborne Infection Isolation (AII) room.
- ☐ If no AII room is available, isolate in room with door closed and *preferably* air is exhausted outside.
- ☐ Prepare for transport to a designated referral healthcare facility in coordination with the local public health authority (do not call for transport service without prior notification and escort in place to move inmate).
- ☐ Minimize and keep a log of all persons interacting with (6ft.) or caring for, the inmate.
- ☐ Once the AII room is empty for two hours, it can be cleaned and disinfected with an EPA registered disinfectant (Emerging viral pathogens claim), by a person in proper PPE.
- ☐ Waste disposal: Double bag trash as hazardous waste. Linens: Double bag in linen hazard bag for washing in central laundry

### 3b. The Asymptomatic Patient

If the patient has no symptoms house in a single cell, and implement Standard, Contact and Droplet Precautions with Eye Protection
- ☐ Report case to facility leadership, QIICP, public health and Regional and Central Office QIIPC Consultants.
- ☐ House patient in a single cell. The preferred location is within Health Services. If unable to house patient in a single cell contact Regional and Central Office Infection Prevention and Control Consultants.
- ☐ Limit # of persons interacting with inmate. Utilize social distancing (6 ft.).
- ☐ Document a daily symptom assessment and temperature (Inmate can self-monitor with disposable thermometer or use non-contact thermometer. Utilize disposable food trays. Have inmate clean and disinfect room daily with disposable towels, if possible. Trash will be double bagged out of room.
- ☐ Staff entering room will perform hand hygiene, wear a gown, surgical mask, goggles or face shield and gloves. Inmate will wear a surgical mask. Remove PPE, except face shield and mask at exit. Outside room, remove mask and wash hands.
- ☐ Continue modified housing and observation procedures until 14 days after the last possible exposure date.
- ☐ If at any time the patient becomes symptomatic, implement the steps in 3a – The Symptomatic Patient.

Inmate Name (Last, First): RICE Amber    Registration # 10961-028

Institution: ___FMC Carswell___

Provider Name/Signature: _____ J. Bradley, PT, MSPT, GCS _____    Date: 4-29-2020
Chief Therapist
FMC- Carswell, Fort Worth, TX

*February 2020, Version 2.0*

Exhibit B

Exhibit K

Psychology mental Handout to Inmates



Received 7-30-20
FMC-CARSWell
COVID-19
Stress Relief

# INTRODUCTION

# Dialectical Behavior Therapy:

# An Overview of the Treatment

Dialectical behavior therapy, developed by Marsha Linehan (1993a, 1993b), is extraordinarily effective at helping people manage overwhelming emotions. Research shows that dialectical behavior therapy strengthens a person's ability to handle distress without losing control or acting destructively.

A lot of people struggle with overwhelming emotions. It's as if the knob is turned to maximum volume on much of what they feel. When they get angry or sad or scared, it shows up as a big, powerful wave that can sweep them off their feet.

If you've faced overwhelming emotions in your life, you know what we're talking about. There are days when your feelings hit you with the force of a tsunami. And when that happens, it makes you—understandably—afraid to feel things because you don't want to get swept away by your emotions. The trouble is, the more you try to suppress or put a lid on your emotions, the more overwhelming they can get. We'll talk about that in chapters 6 and 7 on emotional regulation. What's important to know right now is that trying to stop your feelings doesn't work.

There's a fair amount of research to suggest that the likelihood of developing intense, overwhelming emotions may be hardwired from birth. But it can also be greatly affected by trauma or neglect during childhood. Trauma at critical points in our development can literally alter our brain structure in ways that make us more vulnerable to intense, negative emotions. However, the fact that a propensity to intense emotions is often rooted in genetics or trauma doesn't mean the problem can't be overcome. Thousands of people have used the skills you'll learn in this book to achieve better emotional control. They have changed their lives—and you can too.

So what are these skills, and how will they help you? Dialectical behavior therapy teaches four critically important skills that can both reduce the size of emotional waves and help you keep your balance when those emotions overwhelm you.

1. *Distress tolerance* will help you cope better with painful events by building up your resiliency and giving you new ways to soften the effects of upsetting circumstances.

2. *Mindfulness* will help you experience more fully the present moment while focusing less on painful experiences from the past or frightening possibilities in the future. Mindfulness will also give you tools to overcome habitual, negative judgments about yourself and others.

3. *Emotion regulation* skills help you to recognize more clearly what you feel and then to observe each emotion without getting overwhelmed by it. The goal is to modulate your feelings without behaving in reactive, destructive ways.

4. *Interpersonal effectiveness* gives you new tools to express your beliefs and needs, set limits, and negotiate solutions to problems—all while protecting your relationships and treating others with respect.

This book is structured to make learning easier. Each of the key skills is covered in two chapters—basic and advanced—except mindfulness, which has a third, more advanced chapter. The basic skills chapters teach necessary concepts, identify the components of the new skill, and lead you through initial steps for acquiring the skill. The advanced skills chapters take you through the remaining components of the skill, building level by level. There will be examples to make each step clear as well as assessments, exercises, and worksheets to help you practice each thing you learn. Then in the final chapter, Putting It All Together, you'll learn how to integrate all those skills, in order to make them a regular part of your life.

*The Dialectical Behavior Therapy Skills Workbook* is written to make learning easy. The hard part will be making the commitment to *do* the exercises and put your new skills into practice. Nothing will change by just reading. The words on these pages will have no impact on your life unless you implement—behaviorally—the new techniques and strategies you will learn here. So now is a good time to think about why you are reading this book and what you want to change. Right here, on this page, write down three ways you currently react to your emotions that you want to change. In other words, what three things do you do when upset or overwhelmed that are damaging—and that you are committed to replace with better ways to cope?

1. _____

2. _____

3. _____

## WHO THIS BOOK IS FOR

There are two intended audiences for *The Dialectical Behavior Therapy Skills Workbook*. The first is people who are in dialectical behavior therapy (either group or individual) and need a workbook to help learn the four key skills. We also wrote this book so it could be used independently by *anyone* who struggles with overwhelming feelings. All the tools are here to achieve significant changes in your ability to control emotion. With that said, if you are reading this workbook on your own and are having a hard time implementing the new skills, we strongly recommend seeking the services of a qualified dialectical behavior therapist.

## THERE IS HOPE

Life is hard. You already know that. But you are not stuck or helpless in your struggle with your emotions. You can expect, if you really do the work to implement these skills, that how you react to feelings will change. That's because—regardless of genetics or early pain—the key skills you'll learn here can affect the outcome of every conflict and every upset and can literally alter the course of your relationships. There is every reason to hope. All you have to do is turn the page and begin. Then keep working at it.

# CHAPTER 1

# Basic Distress Tolerance Skills

## DISTRESS TOLERANCE SKILLS: WHAT ARE THEY?

At some point in our lives, we all have to cope with distress and pain. Either it can be physical, like a bee sting or a broken arm, or it can be emotional, like sadness or anger. In both cases, the pain is often unavoidable and unpredictable. You can't always anticipate when the bee will sting you or when something will make you sad. Often, the best you can do is to use the coping skills that you have and hope that they work.

But for some people, emotional and physical pain feels more intense and occurs more frequently than it does for other people. Their distress comes on more quickly and feels like an overwhelming tidal wave. Often, these situations feel like they'll never end, and the people experiencing them don't know how to cope with the severity of their pain. For the purposes of this book, we'll call this problem *overwhelming emotions*. (But remember, emotional and physical pain often occur together.)

People struggling with overwhelming emotions often deal with their pain in very unhealthy, very unsuccessful ways because they don't know what else to do. This is understandable. When a person is in emotional pain, it's hard to be rational and to think of a good solution. Nevertheless, many of the coping strategies used by people with overwhelming emotions only serve to make their problems worse.

Here's a list of some common coping strategies used by people dealing with this problem. Check (✓) the ones that you use to cope with your stressful situations:

_____ You spend a great deal of time thinking about past pains, mistakes, and problems.

_____ You get anxious worrying about possible future pains, mistakes, and problems.

_____ You isolate yourself from other people to avoid distressing situations.

_____ You make yourself feel numb with alcohol or drugs.

_____ You take your feelings out on other people by getting excessively angry at trying to control them.

_____ You engage in dangerous behaviors, such as cutting, hitting, picking at, or bu: yourself or pulling out your own hair.

_____ You engage in unsafe sexual activities, such as having sex with strangers or h: frequent unprotected sex.

_____ You avoid dealing with the causes of your problems, such as an abusiv dysfunctional relationship.

_____ You use food to punish or control yourself by eating too much, not eating at a by throwing up what you do eat.

_____ You attempt suicide or engage in high-risk activities, like reckless driving or ta dangerous amounts of alcohol and drugs.

_____ You avoid pleasant activities, such as social events and exercise, maybe because don't think that you deserve to feel better.

_____ You surrender to your pain and resign yourself to living a miserable and unfulfi life.

All of these strategies are paths to even deeper emotional pain, because even th gies that offer temporary relief will only cause you more suffering in the future. Use the ⌐o Self-Destructive Coping Strategies worksheet to see how. Note the strategies that you use as as their costs, and then include any additional costs that you can think of. At the end of worksheet, feel free to add any of your own strategies that aren't included as well as their cos

## THE COST OF SELF-DESTRUCTIVE COPING STRATEGIES

| Self-Destructive Coping Strategy | Possible Costs |
|---|---|
| 1.  You spend a great deal of time thinking about past pain, mistakes, and problems. | Miss good things that might be happening now and then regret missing those things, too; depression about the past<br>Other: _____<br>_____ |
| 2.  You get anxious worrying about possible future pain, mistakes, and problems. | Miss good things that might be happening now; anxiety about the future<br>Other: _____<br>_____ |
| 3.  You isolate yourself to avoid possible pain. | Spend more time alone and, as a result, feel even more depressed<br>Other: _____<br>_____ |
| 4.  You use alcohol and drugs to numb yourself. | Addiction; loss of money; work problems; legal problems; relationship problems; health consequences<br>Other: _____<br>_____ |
| 5.  You take your painful feelings out on others. | Loss of friendships, romantic relationships, and family members; other people avoid you; loneliness; feel bad about hurting other people; legal consequences of your actions<br>Other: _____<br>_____ |
| 6.  You engage in dangerous behaviors, like cutting, pulling out hair, and self-mutilation. | Possible death; infection; scarring; disfigurement; shame; physical pain<br>Other: _____<br>_____ |

| # | | |
|---|---|---|
| 7. | You engage in unsafe sexual activity, like unprotected sex or frequent sex with strangers. | Sexually transmitted diseases, some life threatening; pregnancy; shame; embarrassment<br>Other: _____<br>_____ |
| 8. | You avoid dealing with the causes of your problems. | Put up with destructive relationships; get burned-out doing things for other people; don't get any of your own needs met; depression<br>Other: _____<br>_____ |
| 9. | You eat too much, restrict what you eat, or throw up what you eat. | Weight gain; anorexia; bulimia; health consequences; medical treatment; embarrassment; shame; depression<br>Other: _____<br>_____ |
| 10. | You have attempted suicide or engaged in other nearly fatal activities. | Possible death; hospitalization; embarrassment; shame; depression; long-term medical complications<br>Other: _____<br>_____ |
| 11. | You avoid pleasant activities, like social events and exercise. | Lack of enjoyment; lack of exercise; depression; shame; isolation<br>Other: _____<br>_____ |
| 12. | You surrender to your pain and live an unfulfilling life. | Lots of pain and distress; regrets about your life; depression<br>Other: _____<br>_____ |
| 13. | | _____<br>_____<br>_____<br>_____ |
| 14. | | _____<br>_____<br>_____<br>_____ |

The costs of these self-destructive coping strategies are clear. All of them lead to your pain being prolonged into long-term suffering. Remember, sometimes pain can't be avoided, but many times suffering can.

Take, for example, an argument between friends Maria and Sandra. For Maria, who doesn't have overwhelming emotions, the argument was initially painful. But after a few hours, she began to realize that she and Sandra were both to blame for the argument. So by the next day, Maria was no longer upset or mad at Sandra. But for Sandra, who struggles with overwhelming emotions, the argument was replayed in her memory over and over again for three days. Each word and gesture was remembered as an insult from Maria. So the next time Sandra saw Maria, three days later, Sandra was still angry and she restarted the argument just where it had ended. Both women experienced the initial pain of the argument, but only Sandra was suffering. Clearly, Sandra carried her emotional pain with her for days, and it made her life more of a struggle. While we can't always control the pain in our lives, we can control the amount of suffering we have in response to that pain.

To avoid this type of long-term suffering, chapters 1 and 2 will teach you *distress tolerance skills*. These skills will help you endure and cope with your pain in a new, healthier way so that it doesn't lead to suffering. The new plan outlined in these two chapters will teach you to "distract, relax, and cope."

## ABOUT THIS CHAPTER

The first distress tolerance skills you'll learn in this chapter will help you distract yourself from the situations that are causing you emotional pain. Distraction skills are important because (1) they can temporarily stop you from thinking about your pain and, as a result, (2) they give you time to find an appropriate coping response. Remember how Sandra carried her pain with her for three days? She couldn't stop thinking about her argument with Maria. Distraction can help you let go of the pain by helping you think about something else. Distraction also buys you time so that your emotions can settle down before you take action to deal with a distressing situation.

However, do not confuse distraction with avoidance. When you avoid a distressing situation, you choose not to deal with it. But when you distract yourself from a distressing situation, you still intend to deal with it in the future, when your emotions have calmed down to a tolerable level.

The second group of distress tolerance skills you'll learn in this chapter are self-soothing skills (Johnson, 1985; Linehan, 1993b). It's often necessary to soothe yourself before you face the cause of your distress because your emotions might be too "hot." Many people with overwhelming emotions panic when faced with an argument, rejection, failure, or other painful events. Before you can address these problems with your new emotion regulation skills (chapters 6 and 7) or your new interpersonal effectiveness skills (chapters 8 and 9), it's often necessary to soothe yourself to regain your strength. In situations like these, distress tolerance skills are similar to refilling the gas in your car so that you can keep going. Self-soothing is meant to bring you some amount of peace and relief from your pain so that you can figure out what you're going to do next.

Self-soothing skills also serve another purpose. They'll help you learn to treat yourself passionately. Many people with overwhelming emotions have been abused or neglected as chil As a result, they were taught more about how to hurt than to help themselves. The second of the self-soothing skills, therefore, is to teach you how to treat yourself kindly and lovingly

## HOW TO USE THIS CHAPTER

As you read the following groups of skills, mark the ones that are helpful to you. This will it easier to create a distraction plan for emergencies when you get to the end of this chapter. also be shown how to create a list of relaxation skills to help soothe yourself, both at home when you're away. Then, in the next chapter, you'll learn more advanced distress tolerance s

## RADICAL ACCEPTANCE

Increasing your ability to tolerate distress starts with a change in your attitude. You're going to something called *radical acceptance* (Linehan, 1993a). This is a new way of looking at your lif the next chapter, you'll be given some key questions to help you examine your experiences i radical acceptance. But for now, it will be sufficient to cover this concept briefly.

Often, when a person is in pain, his or her first reaction is to get angry or upset or to bl someone for causing the pain in the first place. But unfortunately, no matter who you blame your distress, your pain still exists and you continue to suffer. In fact, in some cases, the you get, the worse your pain will feel (Greenwood, Thurston, Rumble, Waters, & Keef, Kerns, Rosenberg, & Jacob, 1994).

Getting angry or upset over a situation also stops you from seeing what is really happen Have you ever heard the expression "being blinded by rage"? This often happens to people overwhelming emotions. Criticizing yourself all the time or being overly judgmental of a situatio like wearing dark sunglasses indoors. By doing this, you're missing the details and not seeing ev thing as it really is. By getting angry and thinking that a situation should never have happe you're missing the point that it *did* happen and that you have to deal with it.

Being overly critical about a situation prevents you from taking steps to change that si tion. You can't change the past. And if you spend your time fighting the past—wishfully thin that your anger will change the outcome of an event that has already happened—you'll bec paralyzed and helpless. Then, nothing will improve.

So, to review—being overly judgmental of a situation or overly critical of yourself often l to more pain, missed details, and paralysis. Obviously, getting angry, upset, or critical do improve a situation. So what else can you do?

The other option, which radical acceptance suggests, is to acknowledge your present situat whatever it is, without judging the events or criticizing yourself. Instead, try to recognize that present situation exists because of a long chain of events that began far in the past. For exam

**10**　The Dialectical Behavior Therapy Skills Workbook

some time ago, you (or someone else) thought you needed help for the emotional pain you were experiencing. So, a few days later, you went to the bookstore and bought this book. Then today you thought about reading this chapter, and eventually you sat down, opened the book, and began reading. Now, you are up to the words you see here. Denying this chain of events does nothing to change what has already happened. Trying to fight this moment or say that it shouldn't be only leads to more suffering for you. Radical acceptance means looking at yourself and the situation and seeing it as it really is.

Keep in mind that radical acceptance does *not* mean that you condone or agree with bad behavior in others. But it does mean that you stop trying to change what's happened by getting angry and blaming the situation. For example, if you're in an abusive relationship and you need to get out, then get out. Don't waste your time and continue to suffer by blaming yourself or the other person. That won't help you. Refocus your attention on what you can do now. This will allow you to think more clearly and figure out a better way to cope with your suffering.

## Radical Acceptance Coping Statements

To help you begin using radical acceptance, it's often helpful to use a coping statement to remind yourself. Below are a few examples and spaces to create your own. Check (✓) the statements that you would be willing to use to remind yourself that you should accept the present moment and the chain of events that created it. Then, in the next exercise, you'll begin using the statements that you chose.

_____    "This is the way it has to be."

_____    "All the events have led up to now."

_____    "I can't change what's already happened."

_____    "It's no use fighting the past."

_____    "Fighting the past only blinds me to my present."

_____    "The present is the only moment I have control over."

_____    "It's a waste of time to fight what's already occurred."

_____    "The present moment is perfect, even if I don't like what's happening."

_____    "This moment is exactly as it should be, given what's happened before it."

_____    "This moment is the result of over a million other decisions."

_____    Other ideas: _____

_____

**Exercise:** Radical Acceptance

Now, using the coping statements that you checked, begin radically accepting different mo[ments] in your life without judging them. Naturally, it will be difficult to accept very painful situa[tions], so start with smaller events. Here are some suggestions. Check (✓) the ones you're willing [to do] and add any of your own ideas. Then use your coping statements to radically accept the situ[ation] without being judgmental or critical.

_____ Read a controversial story in the newspaper without being judgmental about wha[t] occurred.

_____ The next time you get caught in heavy traffic, wait without being critical.

_____ Watch the world news on television without being critical of what's happening.

_____ Listen to a news story or a political commentary on the radio without [being] judgmental.

_____ Review a nonupsetting event that happened in your life many years ago, and [use] radical acceptance to remember the event without judging it.

_____ Other ideas: _____

_____

# DISTRACT YOURSELF FROM SELF-DESTRUCTIVE BEHAVIORS

One of the most important purposes of dialectical behavior therapy is to help you stop engagi[ng in] self-destructive behaviors, such as cutting, burning, scratching, and mutilating yourself (Line[han] 1993a). No one can deny the amount of pain you are in when you engage in one of these beha[viors]. Some people with overwhelming emotions say that self-injury temporarily relieves them of so[me of] the pain they're feeling. This might be true, but it's also true that these actions can cause se[rious] permanent damage and even death if taken to an extreme.

Think about all the pain you've already been through in your life. Think about all the p[eople] who have hurt you physically, sexually, emotionally, and verbally. Does it make sense to con[tinue] hurting yourself even more in the present? Doesn't it make more sense to start healing yo[urself] and your wounds? If you really want to recover from the pain you've already experienced, sto[pping] these self-destructive behaviors is the first step you should take. This can be very hard to do[. You] might be addicted to the rush of natural painkillers called *endorphins* that are released when [you] hurt yourself. However, these types of self-destructive actions are highly dangerous and cert[ainly] deserve your best efforts to control them.

## Exercise: Distract Yourself from Self-Destructive Behaviors

Here are some safer actions that you can use to distract yourself from your self-destructive emotions and thoughts. Check (✓) the ones you're willing to do, and then add any healthy, nonharming activities that you can think of:

_____ Instead of hurting yourself, hold an ice cube in one hand and squeeze it. The sensation from the cold ice is numbing and very distracting.

_____ Write on yourself with a red felt-tip marker instead of cutting. Draw exactly where you would cut. Use red paint or nail polish to make it look like you're bleeding. Then draw stitches with a black marker. If you need to make it even more distracting, squeeze an ice cube in the other hand at the same time.

_____ Snap a rubber band on your wrist each time you feel like hurting yourself. This is very painful, but it causes less permanent damage than cutting, burning, or mutilating yourself.

_____ Dig your fingernails into your arm without breaking the skin.

_____ Draw faces of people you hate on balloons and then pop them.

_____ Write letters to people you hate or to people who have hurt you. Tell them what they did to you and tell them why you hate them. Then throw the letters away or save them to read later.

_____ Throw foam balls, rolled-up socks, or pillows against the wall as hard as you can.

_____ Scream as loud as you can into a pillow or scream some place where you won't draw the attention of other people, like at a loud concert or in your car.

_____ Stick pins in a voodoo doll instead of hurting yourself. You can make a voodoo doll with some rolled-up socks or a foam ball and some markers. Or you can buy a doll in a store for the specific purpose of sticking pins in it. Buy one that's soft and easy to stick.

_____ Cry. Sometimes people do other things instead of crying because they're afraid that if they start to cry they'll never stop. This never happens. In fact, the truth is that crying can make you feel better because it releases stress hormones.

_____ Other healthy, nonharming ideas: _____

_____

_____

Here's an example of using alternative actions to distract your self-destructive emoti often cut herself when she felt upset or angry. She had dozens of scars on her wrists : She wore long-sleeve shirts even in the hot summer because she was embarrassed wh people saw what she had done to herself. But after getting some ideas from this work made a distraction plan. So the next time she got angry with herself and felt like cu looked at her plan for alternative actions. She had written down the idea of drawing o with a red marker. She drew a line exactly where she would have cut herself. She even paint to make it look like she was bleeding. She carried the mark on her arm for the re day to remind herself how sad and overwhelmed she felt. But then, before she went to s was able to erase the "scar" and "blood" from her arm, unlike the rest of the marks { permanent injuries.

## DISTRACT YOURSELF WITH PLEASURABLE ACTIVITIES

Sometimes doing something that makes you feel good is the best way to distract yours painful emotions. But remember, you don't have to wait until you feel overwhelmed by emotions in order to do one of these activities. It's also helpful to engage in these types of a on a regular basis. In fact, you should try to do something pleasurable every day. Exercise especially important because not only is it good for your overall physical health but it's al shown to be an effective treatment for depression in some cases (Babyak et al., 2000). Plu cise makes you feel good almost immediately by releasing natural painkillers in your body endorphins (the same painkillers that are released when you cut yourself).

Following is a list of over one hundred pleasurable activities you can use to distra. y

# THE BIG LIST OF PLEASURABLE ACTIVITIES

Check (✓) the ones you're willing to do, and then add any activities that you can think of:

____ Talk to a friend on the telephone.

____ Go out and visit a friend.

____ Invite a friend to come to your home.

____ Text message your friends.

____ Organize a party.

____ Exercise.

____ Lift weights.

____ Do yoga, tai chi, or Pilates, or take classes to learn.

____ Stretch your muscles.

____ Go for a long walk in a park or someplace else that's peaceful.

____ Go outside and watch the clouds.

____ Go jog.

____ Ride your bike.

____ Go for a swim.

____ Go hiking.

____ Do something exciting, like surfing, rock climbing, skiing, skydiving, motorcycle riding, or kayaking, or go learn how to do one of these things.

____ Go to your local playground and join a game being played or watch a game.

____ Go play something you can do by yourself if no one else is around, like basketball, bowling, handball, miniature golf, billiards, or hitting a tennis ball against the wall.

____ Get a massage; this can also help soothe your emotions.

____ Get out of your house, even if you just sit outside.

____ Go for a drive in your car or go for a ride on public transportation.

____ Plan a trip to a place you've never been before.

____ Sleep or take a nap.

____ Eat chocolate (it's good for you!) or eat something else you really like.

____ Eat your favorite ice cream.

____ Cook your favorite dish or meal.

____ Cook a recipe that you've never tried before.

____ Take a cooking class.

____ Go out for something to eat.

____ Go outside and play with your pet.

____ Go borrow a friend's dog and take it to the park.

____ Give your pet a bath.

____ Go outside and watch the birds and other animals.

____ Find something funny to do, like reading the Sunday comics.

____ Watch a funny movie (start collecting funny movies to watch when you're feeling overwhelmed with pain).

____ Go to the movie theater and watch whatever's playing.

____ Watch television.

____ Listen to the radio.

____ Go to a sporting event, like a baseball or football game.

____ Play a game with a friend.

____ Play solitaire.

____ Play video games.

____ Go online to chat.

____ Visit your favorite Web sites.

____ Visit crazy Web sites and start keeping a list of them.

____ Create your own Web site.

____ Create your own online blog.

____ Join an Internet dating service.

____ Sell something you don't want on the Internet.

____ Buy something on the Internet.

____ Do a puzzle with a lot of pieces.

____ Call a crisis or suicide hotline and talk to someone.

____ Go shopping.

____ Go get a haircut.

____ Go to a spa.

____ Go to a library.

____ Go to a bookstore and read.

____ Go to your favorite café for coffee or tea.

____ Visit a museum or local art gallery.

____ Go to the mall or the park and watch other people; try to imagine what they're thinking.

____ Pray or meditate.

____ Go to your church, synagogue, temple, or other place of worship.

____ Join a group at your place of worship.

____ Write a letter to God.

____ Call a family member you haven't spoken to in a long time.

____ Learn a new language.

____ Sing or learn how to sing.

____ Play a musical instrument or learn how to play one.

____ Write a song.

____ Listen to some upbeat, happy music (start collecting happy songs for times when you're feeling overwhelmed).

____ Turn on some loud music and dance in your room.

____ Memorize lines from your favorite movie, play, or song.

____ Make a movie or video with your camcorder.

____ Take photographs.

____ Join a public-speaking group and write a speech.

____ Participate in a local theater group.

____ Sing in a local choir.

____ Join a club.

____ Plant a garden.

____ Work outside.

____ Knit, crochet, or sew—or learn how to.

____ Make a scrapbook with pictures.

____ Paint your nails.

____ Change your hair color.

____ Take a bubble bath or shower.

____ Work on your car, truck, motorcycle, or bicycle.

____ Sign up for a class that excites you at a college, adult school, or online.

____ Read your favorite book, magazine, paper, poem.

____ Read a trashy celebrity magazine.

____ Write a letter to a friend or family member.

____ Write things you like about yourself on picture of your body or draw them on a photograph of yourself.

____ Write a poem, story, movie, or play about your life or someone else's life.

____ Write in your journal or diary about what happened to you today.

____ Write a loving letter to yourself when you're feeling good and keep it with you to read when you're feeling upset.

____ Make a list of ten things you're good at, that you like about yourself when you're feeling good, and keep it with you to read when you're feeling upset.

____ Draw a picture.

____ Paint a picture with a brush or your fingers.

____ Masturbate.

____ Have sex with someone you care about.

____ Make a list of the people you admire and want to be like—it can be anyone real or fictional throughout history. Describe what you admire about these people.

____ Write a story about the craziest, funniest, sexiest thing that has ever happened to you.

____ Make a list of ten things you would like to do before you die.

____ Make a list of ten celebrities you would like to be friends with and describe why.

____ Make a list of ten celebrities you would like to have sex with and describe why.

____ Write a letter to someone who has made your life better and tell them why. (You don't have to send the letter if you don't want to.)

____ Create your own list of pleasurable activities.

____ Other ideas: _____

_____

_____

Here's an example of using pleasurable activities to distract yourself. Karen was feeling lonely and had nothing to do. As she sat alone at home, she began to think about how lonely she'd been her whole life and how she was hurt by her father when she was growing up. Very quickly, Karen was overwhelmed with very painful emotions. In fact, the memories also triggered physical pain in her shoulder. Karen began to cry and didn't know what to do. Luckily, she remembered the distraction plan she had created. Exercise had always been a powerful tool for Karen, so she went for a long walk in the park while she listened to some of her favorite music. The activity didn't erase her memories or remove her pain completely, but the long walk did soothe her and prevent her from being overwhelmed with sadness.

## DISTRACT YOURSELF BY PAYING ATTENTION TO SOMEONE ELSE

Another great way to distract yourself from pain is to put your attention on someone else. Here are some examples. Check (✓) the ones you're willing to do, and then add any activities that you can think of:

_____ *Do something for someone else.* Call your friends and ask if they need help doing something, such as a chore, grocery shopping, or housecleaning. Ask your parents, grandparents, or siblings if you can help them with something. Tell them you're feeling bored and you're looking for something to do. Call up someone you know and offer to take them out to lunch. Go outside and give money to the first needy person you see. If you can plan ahead for moments like these when you're overwhelmed with pain, call your local soup kitchen, homeless shelter, or volunteer organization. Plan to participate in activities that help other people. Join a local political activities group, environmental group, or other organization, and get involved helping other people.

_____ *Take your attention off yourself.* Go to a local store, shopping center, bookstore, or park. Just sit and watch other people or walk around among them. Watch what they do. Observe how they dress. Listen to their conversations. Count the number of buttons they're wearing on their shirts. Observe as many details about these other people as you can. Count the number of people with blue eyes versus the number of people with brown eyes. When your thinking returns to your own pain, refocus on the details of the people you're watching.

_____ *Think of someone you care about.* Keep a picture of them in your wallet or in your purse. This could be your husband, wife, parent, boyfriend, girlfriend, children, or friend, or it could be someone else you admire, such as Mother Teresa, Gandhi, Jesus, the Dalai Lama, Ganesha, and so on. It could even be a movie star, an athlete, or someone you've never met. Then, when you're feeling distressed, take out the picture and imagine a healing, peaceful conversation you would have with that person if you

could talk to them at that moment when you're feeling hurt. What would they [...] you that would help make you feel better? Imagine them saying those words [...]

_____ Other ideas: _____

_____

_____

Here's an example of distracting yourself by paying attention to someone else. Louis go[...] by a fight he had with his boyfriend, Roger. Very quickly, Louis became overwhelmed by [...] as he started to remember all the other fights he and Roger had had in the past. Louis wen[t] desk, where he kept a picture of his mother. He sat down and started to talk to his moth[er] she were there with him. He asked for strength and guidance to handle the situation with [...] Then he imagined what she would say to him, and he started to feel better. Later, when [...] able to think more clearly, he returned to what he needed to do that day.

## DISTRACT YOUR THOUGHTS

The human brain is a wonderful thought-producing machine. It turns out millions of th[...] every day. Most of the time, this makes our lives much easier. But unfortunately, we can[...] control what our brain thinks about. Here's an example. Imagine a picture of your favorite c[...] character, such as Bugs Bunny, Snoopy, Superman, or whomever. Close your eyes an[d] character in vivid detail in your mind's eye. Remember exactly what it looks like. Thi[...] the character for about fifteen seconds. Got it? Now, for the next thirty seconds do your b[...] to think about the character. Try to block the character from your thoughts. But be hon[...] yourself and notice how often the character pops into your thoughts. It's impossible not t[o] about the character. In fact, the harder you try not to think about it, the more power you[...] the image and the more your brain keeps bringing it into your thoughts. It's almost as if the [...] you try to forget something, the harder your brain tries to remember it. This is why forcing y[...] to forget about something that happened to you is impossible. It's also why you can't simp[ly] yourself to get rid of emotions that you don't want.

So, instead of trying to force yourself to forget a memory or thought, try to distra[ct] thoughts with other memories or creative images. Here are some examples. Check (✓) t[...] you're willing to do, and then add any activities that you can think of:

_____ Remember events from your past that were pleasant, fun, or exciting. Try to re[...] as many details as possible about these happy memories. What did you do? W[ho were] you with? What happened?

_____ Imagine sexual thoughts that make you excited. Create sexual fantasies involving you and someone you know or someone you would like to know. Try to think of as many details as possible. What happens that's so exciting?

_____ Look outside at the natural world around you. Observe the flowers, trees, sky, and landscape as closely as you can. Observe any animals that are around. Listen to the sounds that they make. Or if you live in a city without much nature around you, either do your best to observe what you can or close your eyes and imagine a scene you've observed in the past.

_____ Imagine yourself as a hero or heroine correcting some past or future event in your life. How would you do it? What would people say to you?

_____ Imagine yourself getting praise from someone whose opinion matters to you. What did you do? What does this person say to you? Why does this person's opinion matter to you?

_____ Imagine your wildest fantasy coming true. What would it be? Who else would be involved? What would you do afterwards?

_____ Keep a copy of your favorite prayer or favorite saying with you. Then, when you feel distressed, pull it out and read it to yourself. Imagine the words calming and soothing you. Use imagery (such as a white light coming down from heaven or the universe) that soothes you as you read the words.

_____ Other ideas: _____

_____

_____

Here's an example of using distracting thoughts. Joel was in a bad relationship that often reminded him of the way he was treated by his mother. She was always criticizing him and telling him he was wrong. When these memories overwhelmed him, Joel never knew what to do. Sometimes he would just scream at his friends or whoever else was around. But after creating a distraction plan, Joel thought of other ideas. The next time he had memories of his mother berating him, he went to his bedroom to lie down. Then he started to imagine himself as a child confronting his mother about her abusive language. He told her all the things he wished he could have said to her years ago. He told her she was wrong and that she should stop criticizing him. Joel controlled the details of the fantasy in the way he wished it could have happened years ago. Afterwards, he slowly felt better. He had escaped the cycle of letting his painful emotions overwhelm him.

## DISTRACT YOURSELF BY LEAVING

Sometimes the best thing that you can do is leave. If you're in a very painful situation with someone and you recognize that your emotions are going to overwhelm you and possibly make the situation worse than it is already, then often it's best to just leave. Remember, if you're already overwhelmed by your emotions, it will be harder for you to think of a healthy resolution to your problem, so it's best to put some distance between you and the situation in order to give yourself time to identify your emotions and think of what to do next. Just walk away if that's the best you can do. It might be better than adding fuel to the emotional fire.

Here's an example of leaving to distract yourself. Anna was in a large department store shopping for a blouse. She wanted one of the clerks to help her find her size, but the store clerk was busy with other customers. Anna waited as long as she could and kept trying to get the clerk's attention, but nothing worked. Anna recognized that she was getting angry very quickly. She was ready to tear the blouse in half. She didn't know what else to do. In the past, she would have stayed in the store and gotten angrier, but this time she remembered to leave. She walked out of the store, did some shopping elsewhere, and returned to get the blouse later, when the store was less crowded and when she was feeling more in control of her behaviors.

## DISTRACT YOURSELF WITH TASKS AND CHORES

Strangely, many people don't schedule enough time to take care of themselves or their living environments. As a result, tasks and chores go uncompleted. Here, then, is the perfect opportunity to do something to take care of yourself and your environment. The next time you're in a situation in which your emotions become too painful, temporarily distract yourself by engaging in the following activities. Check (✓) the ones you're willing to do, and then add any activities you can think of:

_____ Wash the dishes.

_____ Make phone calls to people you haven't spoken to recently but not someone you're angry with.

_____ Clean your room or house, or go help a friend with their cleaning or gardening project.

_____ Clean out your closet and donate your old clothes.

_____ Redecorate a room or at least the walls.

_____ Organize your books, CDs, computer desktop, and so forth.

_____ Make a plan for getting a job if you don't already have one, or make a plan for getting a better job.

____ Go get a haircut.

____ Go get a manicure or pedicure, or both.

____ Go get a massage.

____ Wash your or someone else's car.

____ Mow the lawn.

____ Clean your garage.

____ Wash the laundry.

____ Do your homework.

____ Do work that you've brought home from your job.

____ Polish your shoes.

____ Polish your jewelry.

____ Clean the bathtub and then take a bath.

____ Water your plants or work in the garden.

____ Cook dinner for yourself and some friends.

____ Pay the bills.

____ Go to a support meeting, like Narcotics Anonymous, Alcoholics Anonymous, or Overeaters Anonymous.

____ Other ideas: _____

_____

_____

Here's an example of using tasks and chores to distract yourself. Mike called his girlfriend Michelle to go to a movie. Michelle had already made plans with her friends to do something else. Mike felt incredibly rejected and abandoned. He started yelling at Michelle, who hung up on him. This made Mike feel worse. He didn't know what to do. Quickly, he began to feel light-headed and confused, and his emotions became very angry. But this time, instead of calling Michelle back and arguing, he opened his wallet and pulled out the distraction plan he had made (which you'll also create at the end of this chapter). He had written down "get a haircut," so he walked a half mile to his barber. Getting out of his house helped soothe his anger, and when he returned home, he had cooled down enough to call Michelle back to see if she was busy the next day.

## DISTRACT YOURSELF BY COUNTING

Counting is a simple skill that can really keep your mind busy and help you focus on so[me] other than your pain. Here are some examples. Check (✓) the ones you're willing to do, a[nd] add any activities that you can think of:

_____ *Count your breaths.* Sit in a comfortable chair, put one hand on your belly, a[nd] slow, long breaths. Imagine breathing into your stomach instead of your lun[gs] your belly expand like a balloon with each inhalation. Start counting your[...] When you inevitably start thinking about whatever it is that's causing you pain your focus to counting.

_____ *Count anything else.* If you're too distracted by your emotions, simply count th[e] that you're hearing. This will take your attention outside of yourself. Or try coun[ting] number of cars that are passing by, the number of sensations that you're feeling thing else you can put a number on, such as the branches of a tree you're look[ing]

_____ *Count or subtract by increments of seven.* For example, start with one hund[red] subtract seven. Now take that answer and subtract seven more. Keep goi[ng] activity will really distract you from your emotions because it requires extra a[ttention] and concentration.

_____ Other counting ideas: _____

_____

_____

Here's an example of using counting to distract yourself. Dawn became upset when he[r] told her to help set the table for dinner. "She's always telling me what to do," Dawn thou[ght] could feel her anger getting worse, so she went to her room and remembered that the last t[ime] happened, counting her breaths had helped soothe her emotions. She sat down and did [...] After ten minutes, she felt calmer, so she went back to the dining room.

## CREATE YOUR DISTRACTION PLAN

Now identify those distraction skills that you're willing to use the next time you're in a[...] that's causing you pain and discomfort. These chosen skills will make up your distracti[on] Remember, these are the first steps you will use in your plan to distract, relax, and cope. W[...] chosen distraction techniques below. When you're done, write them down again on a 3 [...] note card or a sticky note to carry around with you in your wallet or purse. Then the n[ext] you're in a distressing situation, you can pull out the card to remind yourself of your di[...] plan.

MY DISTRACTION PLAN

1. _____

2. _____

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

---

# RELAX AND SOOTHE YOURSELF

Now that you've learned some healthy and effective ways to distract yourself when you become overwhelmed by painful emotions, you'll need to learn new ways to help soothe yourself (Johnson, 1985; Linehan, 1993b). Remember, these next skills will give you the second step in your plan to distract, relax, and cope. The activities in this section will help you relax. Then, later in this book, you'll learn specific skills to cope with problematic situations. These will include emotion regulation skills, mindfulness skills, and interpersonal effectiveness skills.

Learning to relax and soothe yourself is very important for many reasons. When you're relaxed, your body feels better. It also functions in a healthier way. In a state of relaxation, your heart beats more slowly and your blood pressure is reduced. Your body is no longer in a state of constant emergency, preparing to either confront a stressful situation or run away from it. As a result, it's easier for your brain to think of healthier ways to cope with your problems.

Included here are some simple relaxation and soothing activities that utilize your five senses of smell, sight, hearing, taste, and touch. These activities are meant to bring you a small amount of peace in your life. So if one of these activities doesn't help you feel relaxed, or makes you feel worse, don't do it. Try something else. And remember, each one of us is different. For example, some people will become more relaxed by listening to music and others will find that taking a hot bubble bath works for them. As you explore this list, think about what works best for you and be willing to try something new if it sounds exciting.

**Basic Distress Tolerance Skills    23**

## Self-Soothing Using Your Sense of Smell

Smell is a very powerful sense that can often trigger memories and make you feel [...] way. Therefore, it's very important that you identify smells that make you feel good, not [...] are some ideas. Check (✓) the ones you're willing to do, and then add any activities tha[t] think of:

_____ Burn scented candles or incense in your room or house. Find a scent that's [...] to you.

_____ Wear scented oils, perfume, or cologne that makes you feel happy, conf[...] sexy.

_____ Cut out perfumed cards from magazines and carry them with you in your [...] or wallet.

_____ Go someplace where the scent is pleasing to you, like a bakery or restaurant[.]

_____ Bake your own food that has a pleasing smell, like chocolate chip cookies.

_____ Lie down in your local park and smell the grass and outdoor smells.

_____ Buy fresh-cut flowers or seek out flowers in your neighborhood.

_____ Hug someone whose smell makes you feel calm.

_____ Other ideas: _____

_____

_____

## Self-Soothing Using Your Sense of Vision

Vision is very important to humans. In fact, a large portion of our brain is devoted [...] our sense of sight. The things you look at can often have very powerful effects on you, fo[...] or for worse. That's why it's important to find images that have a very soothing effect on y[...] again, for each person, it comes down to individual taste and preference. Here are som[e] Check (✓) the ones you're willing to do, and then add any activities that you can think [...]

_____ Go through magazines and books to cut out pictures that you like. Make a c[...] them to hang on your wall or keep some of them with you in your handbag [...] to look at when you're away from home.

_____ Find a place that's soothing for you to look at, like a park or a museum. O[...] picture of a place that's soothing for you to look at, like the Grand Canyon.

_____ Go to the bookstore and find a collection of photographs or paintings that you find relaxing, such as the nature photographs of Ansel Adams.

_____ Draw or paint your own picture that's pleasing to you.

_____ Carry a picture or photograph of someone you love, someone you find attractive, or someone you admire.

_____ Other ideas: _____

_____

_____

## Self-Soothing Using Your Sense of Hearing

Certain sounds can soothe us. Listening to gentle music, for example, may be relaxing. In fact, this entire chapter was written while listening to classical music. However, each one of us has our own tastes. You have to find what works best for you. Use these examples to identify the sounds that help you relax. Check (✓) the ones you're willing to do, and then add any activities that you can think of:

_____ Listen to soothing music. This can be classical, opera, oldies, new age, Motown, jazz, Celtic, African, or anything else that works for you. It might be music with singing or without. Go to a music store that lets you listen to music before you buy it, and listen to a wide variety of genres to determine what helps you relax. If you have a portable radio or an MP3 player, carry it with you to listen to music when you're away from home.

_____ Listen to books on tape or compact discs. Many public libraries will let you borrow books on tape. Take some out to see if it helps you relax. You don't even have to pay attention to the story line. Sometimes just listening to the sound of someone talking can be very relaxing. Again, keep some of these recordings with you in your car or loaded in your portable stereo.

_____ Turn on the television and just listen. Find a show that's boring or sedate, not something like Jerry Springer that's just going to get you angry. Sit in a comfortable chair or lie down, and then close your eyes and just listen. Make sure you turn the volume down to a level that's not too loud. Years ago there was a show on public television featuring a painter named Bob Ross. His voice was so soothing and relaxing that many people reported falling asleep while watching him. Find a show like this that will help you relax.

_____ Listen to a gentle talk show on the radio. Remember—a gentle talk show, not something that's going to make you upset or angry. Stay away from political talk shows

Basic Distress Tolerance Skills    25

and the news. Find something neutral in discussion, like *Car Talk* on Natio[...]
Radio or a gardening show. Again, sometimes just listening to someone els[...]
be relaxing. Carry a portable radio with you to listen to when you're feeling[...]
angry.

_____ Open your window and listen to the peaceful sounds outside. Or, if you[...]
place without relaxing sounds outside, go visit a place with relaxing sounds[...]
a park.

_____ Listen to a recording of nature sounds, such as birds and other wildlife. You c[...]
buy these in a music store and then take them with you to listen to on your[...]
compact disc player, cassette player, or MP3 device.

_____ Listen to a white-noise machine. *White noise* is a sound that blocks out other[...]
ing sounds. You can buy a machine that makes white noise with circulatin[...]
you can turn on a fan to block out distracting sounds. Other white-noise m[...]
have recorded sounds on them, such as the sounds of birds, waterfalls, and rai[...]
Many people find these machines very relaxing.

_____ Listen to the sound of a personal water fountain. These small electronic founta[...]
be bought in most department stores, and many people find the sound of the t[...]
water in their homes to be very soothing.

_____ Listen to a recording of a relaxation exercise. Exercises such as these will h[...]
imagine yourself relaxing in many different ways. Other recorded exercises c[...]
teach you self-hypnosis techniques to help you relax. Recordings like these[...]
bought at some bookstores and online at self-help publishers, such as New H[...]
Publications. Go to www.newharbinger.com and look under "Audio Programs[...]
you can take the programs with you to listen to when you're feeling overwhel[...]

_____ Listen to the sound of rushing or trickling water. Maybe your local park has a[...]
fall, or the nearby mall has a fountain. Or maybe just sit in your bathroom w[...]
water running.

_____ Other ideas: _____

_____

_____

## Self-Soothing Using Your Sense of Taste

Taste is also a very powerful sense. Our tongue has distinct regions of taste buds o[...]
differentiate flavors and tastes of food. These sensations can also trigger memories and f[...]
so again, it's important that you find the tastes that are pleasing to you. However, if eati[...]

problem for you, such as eating too much, bingeing, purging, or restricting what you eat, talk to a professional counselor about getting help for yourself. If the process of eating can make you upset or nervous, use your other senses to calm yourself. But if food soothes you, use some of these suggestions. Check (✓) the ones you're willing to do, and then add any activities you can think of:

_____ Enjoy your favorite meal, whatever it is. Eat it slowly so you can enjoy the way it tastes.

_____ Carry lollipops, gum, or other candy with you to eat when you're feeling upset.

_____ Eat a soothing food, like ice cream, chocolate, pudding, or something else that makes you feel good.

_____ Drink something soothing, such as tea, coffee, or hot chocolate. Practice drinking it slowly so you can enjoy the way it tastes.

_____ Suck on an ice cube or an ice pop, especially if you're feeling warm, and enjoy the taste as it melts in your mouth.

_____ Buy a piece of ripe and juicy fresh fruit and then eat it slowly.

_____ Other ideas: _____

_____

_____

## Self-Soothing Using Your Sense of Touch

We often forget about our sense of touch, and yet we're always touching something, such as the clothes we're wearing or the chair we're sitting in. Our skin is our largest organ, and it's completely covered with nerves that carry feelings to our brain. Certain tactile sensations can be pleasing, like petting a soft dog, while other sensations are shocking or painful in order to communicate danger, like touching a hot stove. Again, each of us prefers different sensations. You have to find the ones that are most pleasing for you. Here are some suggestions. Check (✓) the ones you're willing to do, and then add any activities that you can think of:

_____ Carry something soft or velvety in your pocket to touch when you need to, like a piece of cloth.

_____ Take a hot or cold shower and enjoy the feelings of the water falling on your skin.

_____ Take a warm bubble bath or a bath with scented oils and enjoy the soothing sensations on your skin.

____ Get a massage. Many people who have survived physical and sexual abuse don't want to be touched by anyone. This is understandable. But not all types of massage require you to take off your clothes. Some techniques, such as traditional shiatsu massage, simply require you to wear loose-fitting clothes. A shoulder massage, received while seated in a massage chair, can also be done without removing any clothes. If this is a concern for you, just ask the massage therapist what type of massage would be best to have while wearing your clothes.

____ Massage yourself. Sometimes just rubbing your own sore muscles is very pleasing.

____ Play with your pet. Owning a pet can have many health benefits. Pet owners have lower blood pressure, lower cholesterol levels, and reduced risk for heart disease (Anderson, Reid, & Jennings, 1992), and they experience other general health improvements (Serpell, 1991). In addition, playing with your pet and stroking the animal's fur or skin can provide you with a soothing tactile experience. If you don't have a pet, consider getting one. Or if you can't afford one, visit a friend who has one, or volunteer at your local animal shelter where you can play with the rescued animals.

____ Wear your most comfortable clothes, like your favorite worn-in T-shirt, baggy sweat suit, or old jeans.

____ Other ideas: _____

_____

_____

# CREATE A RELAXATION PLAN

Now that you've read the suggestions to help you relax and soothe yourself using your five senses, construct a list of techniques you're willing to use. For ideas, review the activities that you checked off. Be specific about what you're going to do. Make a list of ideas to try at home and a list of ideas that you can take with you when you're away from home.

### RELAXATION AND SOOTHING SKILLS TO USE AT HOME

1. _____

2. _____

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

Keep this list in a convenient place that's easy to remember. You might even want to copy this list and put it in places where you see it all the time, such as on your refrigerator, above your desk, on the mirror in your bathroom, or next to your bed. This way you'll remind yourself to relax and soothe yourself as often as possible. It will also make it easier to soothe yourself when your painful emotions overwhelm you and prevent you from thinking clearly.

Now create a similar list to use when you're away from home. Again, review the soothing skills you checked in the last few pages to give you ideas. But make sure that it's possible to use these skills when you're away from home. For example, don't list "take a hot bath" because, most likely, there won't be a hot bath available to you when you're not at home.

## RELAXATION AND SOOTHING SKILLS TO USE AWAY FROM HOME

1. _____

2. _____

3. _____

4. _____

5. _____

6. _____

7. _____

8. _____

9. _____

10. _____

Now copy these last ten ideas on an index card to remind you what to do when you're away from home. Keep this list with you, in your car, in your wallet, or in your handbag. Then make

sure you have whatever's needed with you, such as candy, a portable radio, pictures, and s. This way you can practice relaxing when you're not at home, especially when your painful e overwhelm you and prevent you from thinking clearly.

## CONCLUSION

You've now learned some basic distraction and relaxation skills. You should begin using the immediately when you become overwhelmed with painful emotions. The next chapter wil on these skills and teach you more advanced distraction and relaxation skills.

# THE BIG LIST OF PLEASURABLE ACTIVITIES

Check (✓) the ones you're willing to do, and then add any activities that you can think of:

\_\_\_\_ Talk to a friend on the telephone.

\_\_\_\_ ~~[illegible]~~

\_\_\_\_ ~~Invite a friend to come to your home.~~

\_\_\_\_ Text message your friends.

\_\_\_\_ Organize a party.

\_\_\_\_ Exercise.

\_\_\_\_ Lift weights.

\_\_\_\_ Do yoga, tai chi, or Pilates, or take classes to learn.

\_\_\_\_ Stretch your muscles.

\_\_\_\_ Go for a long walk in a park or someplace else that's peaceful.

\_\_\_\_ Go outside and watch the clouds.

\_\_\_\_ Go jog.

\_\_\_\_ Ride your bike.

\_\_\_\_ Go for a swim.

\_\_\_\_ Go hiking.

\_\_\_\_ Do something exciting, like surfing, rock climbing, skiing, skydiving, motorcycle riding, or kayaking, or go learn how to do one of these things.

\_\_\_\_ Go to your local playground and join a game being played or watch a game.

\_\_\_\_ Go play something you can do by yourself if no one else is around, like basketball, bowling, handball, miniature golf, billiards, or hitting a tennis ball against the wall.

\_\_\_\_ Get a massage; this can also help soothe your emotions.

\_\_\_\_ Get out of your house, even if you just sit outside.

\_\_\_\_ Go for a drive in your car or go for a ride on public transportation.

\_\_\_\_ Plan a trip to a place you've never been before.

\_\_\_\_ Sleep or take a nap.

\_\_\_\_ Eat chocolate (it's good for you!) or eat something else you really like.

\_\_\_\_ Eat your favorite ice cream.

\_\_\_\_ Cook your favorite dish or meal.

\_\_\_\_ Cook a recipe that you've never tried before.

\_\_\_\_ Take a cooking class.

\_\_\_\_ Go out for something to eat.

\_\_\_\_ Go outside and play with your pet.

\_\_\_\_ Go borrow a friend's dog and take it to the park.

\_\_\_\_ Give your pet a bath.

\_\_\_\_ Go outside and watch the birds and other animals.

\_\_\_\_ Find something funny to do, like reading the Sunday comics.

\_\_\_\_ Watch a funny movie (start collecting funny movies to watch when you're feeling overwhelmed with pain).

\_\_\_\_ Go to the movie theater and watch whatever's playing.

\_\_\_\_ Watch television.

\_\_\_\_ Listen to the radio.

\_\_\_\_ Go to a sporting event, like a baseball or football game.

\_\_\_\_ Play a game with a friend.

\_\_\_\_ Play solitaire.

\_\_\_\_ Play video games.

\_\_\_\_ Go online to chat.

\_\_\_\_ Visit your favorite Web sites.

\_\_\_\_ Visit crazy Web sites and start keeping a list of them.

\_\_\_\_ Create your own Web site.

\_\_\_\_ Create your own online blog.

\_\_\_\_ Join an Internet dating service.

\_\_\_\_ Sell something you don't want on the Internet.

\_\_\_\_ Buy something on the Internet.

\_\_\_\_ Do a puzzle with a lot of pieces.

\_\_\_\_ Call a crisis or suicide hotline and talk to someone.

\_\_\_\_ Go shopping.

\_\_\_\_ Go get a haircut.

Exhibit D 01

____ Go to a spa.

____ Go to a library.

____ Go to a bookstore and read.

____ Go to your favorite café for coffee or tea.

____ Visit a museum or local art gallery.

____ Go to the mall or the park and watch other people; try to imagine what they're thinking.

____ Pray or meditate.

____ Go to your church, synagogue, temple, or other place of worship.

____ Join a group at your place of worship.

____ Write a letter to God.

____ Call a family member you haven't spoken to in a long time.

____ Learn a new language.

____ Sing or learn how to sing.

____ Play a musical instrument or learn how to play one.

____ Write a song.

____ Listen to some upbeat, happy music (start collecting happy songs for times when you're feeling overwhelmed).

____ Turn on some loud music and dance in your room.

____ Memorize lines from your favorite movie, play, or song.

____ Make a movie or video with your camcorder.

____ Take photographs.

____ Join a public-speaking group and write a speech.

____ Participate in a local theater group.

____ Sing in a local choir.

____ Join a club.

____ Plant a garden.

____ Work outside.

____ Knit, crochet, or sew—or learn how to.

____ Make a scrapbook with pictures.

____ Paint your nails.

____ Change your hair color.

____ Take a bubble bath or shower.

____ Work on your car, truck, motorcycle, or bicycle.

____ Sign up for a class that excites you a[t] college, adult school, or online.

____ Read your favorite book, magazine, pa[per,] poem.

____ Read a trashy celebrity magazine.

____ Write a letter to a friend or family me[mber.]

____ Write things you like about yourself on [a] picture of your body or draw them on [a] photograph of yourself.

____ Write a poem, story, movie, or play ab[out] your life or someone else's life.

____ Write in your journal or diary about wh[at] happened to you today.

____ Write a loving letter to yourself when y[ou're] feeling good and keep it with you to rea[d] when you're feeling upset.

____ Make a list of ten things you're good at [and] that you like about yourself when you're feeling good, and keep it with you to re[ad] when you're feeling upset.

____ Draw a picture.

____ Paint a picture with a brush or your fing[ers.]

____ ~~Masturbate.~~

____ ~~Have sex with someone you care [about.]~~

____ Make a list of the people you admire an[d] want to be like—it can be anyone real [or] fictional throughout history. Describe w[hat] you admire about these people.

____ Write a story about the craziest, funnies[t,] sexiest thing that has ever happened to [you.]

____ Make a list of ten things you would like [to do] before you die.

____ Make a list of ten celebrities you would [like to] be friends with and describe why.

____ Make a list of ten celebrities you would [like to] have sex with and describe why.

____ Write a letter to someone who has made [your] life better and tell them why. (You don't [have] to send the letter if you don't want to.)

____ Create your own list of pleasurable activi[ties.]

____ Other ideas: _____

_____

_____

Exhibit D pg 2

Exhibit L

BOP Pandemic Plan
Module 1

**Federal Bureau of Prisons**
**Health Services Division**

# Pandemic Influenza Plan

# Module 1:
# Surveillance and Infection Control

**October 2012**

Exhibit M - cover

# BOP Pandemic Influenza Response Stages

The BOP *Pandemic Influenza Plan* is divided into the three stages that are used for standard BOP contingency plans; in this plan, the three stages are designed to correlate with the Federal Government Response Stages for pandemic influenza.

**The BOP Pandemic Influenza Response Stages are as follows:**

- **PREPARATION** (Federal Response Stages 0–1). Most of the detail in this plan involves the preparation phase.

- **RESPONSE** (Federal Response Stages 2–5). This phase, which begins when it is announced that there are confirmed human outbreaks overseas, involves both making last-minute preparations and actually responding to pandemic flu.

- **RECOVERY** (Federal Response Stage 6). This phase involves recovering from the pandemic, evaluating actions taken during the pandemic, and preparing for more flu. Based on what we know from previous pandemics, subsequent waves of flu are likely to follow once the pandemic flu has subsided.

| Federal Government Response Stages* | | BOP Influenza Plan | |
| --- | --- | --- | --- |
| | | **Federal Stages** | **BOP Stage** |
| **0** | New domestic animal outbreak in at-risk country | **0-1** | **PREPARATION** |
| **1** | Suspected human outbreak overseas | | |
| **2** | Confirmed human outbreak overseas | **2-5** | **RESPONSE** |
| **3** | Widespread human outbreaks in multiple locations overseas | | |
| **4** | First human case in North America | | |
| **5** | Spread throughout United States | | |
| **6** | Recovery & preparation for subsequent waves | **6** | **RECOVERY** |
| *The Federal Government Response Stages should not be confused with the World Health Organization phases of pandemic influenza.* | | | |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

# Table of Contents

OVERVIEW ................................................................................................................................ 1

    **Surveillance** ....................................................................................................................... 2

    **Infection Control** .............................................................................................................. 2

        1. Promote good health habits among employees and inmates. ......................................... 3
        2. Conduct frequent environmental cleaning of "high-touch" surfaces. ............................ 3
        3. Separate the sick from the well. ..................................................................................... 3
        4. Create "social distance" between people. ...................................................................... 6
        5. Use personal protective equipment for close contact with flu cases. ............................ 6
        6. If widespread flu transmission, consider targeted distribution of face masks. .............. 7
        7. Provide ongoing infection control education. ................................................................ 7

    **Influenza Outbreak Scenarios and Control Measures** ................................................. 8

ACTION STEPS BY PANDEMIC STAGE ..................................................................................... 9

STANDARD OPERATING PROCEDURES FOR PREPARATION STAGE ......................................... 12

ATTACHMENTS

    **Attachment 1.1.** BOP Pandemic Influenza Outbreak Scenarios
        and Control Measures ...................................................................... 18

    **Attachment 1.2.** Use of BEMR to Track Influenza-Like Illness (ILI) ..................................... 19

    **Attachment 1.3.** Influenza-Like-Illness (ILI) Screening Form ............................................... 20

    **Attachment 1.4.** Correctional Standard Precautions – General Population .......................... 21

    **Attachment 1.5.** Correctional Standard Precautions – Health Care Settings ........................ 22

    **Attachment 1.6.** Influenza Infection Control – General Population ....................................... 23

    **Attachment 1.7.** Pandemic Influenza Precautions – Health Care Settings ............................ 24

    **Attachment 1.8.** Pandemic Flu Contact Investigation/Quarantine Procedures ..................... 26

    **Attachment 1.9.** Pandemic Flu Contact Investigation/Quarantine Line List ......................... 27

    **Attachment 1.9.** (Instructions) ............................................................................................ 28

    **Attachment 1.10.** Precaution Signs for Influenza Isolation and Quarantine Units ............... 29

TABLES

    **Table 1.** Pandemic Flu Infection Control Measures ............................................................. 2

    **Table 2.** Definitions of "Isolation" and "Quarantine" .......................................................... 3

    **Table 3.** Updated Definitions of "Face Masks" and "Respirators" (CDC-2009) ..................... 6

# Overview

> *Starting now, every BOP institution should creatively and aggressively promote three health habits that interrupt flu transmission: regular hand hygiene, respiratory etiquette (coughing or sneezing into a sleeve or tissue); and avoiding touching one's mouth, nose or eyes).*

This guidance provides general information about pandemic influenza. In the event of a pandemic, specific guidance related to that event will be issued by the Medical Director.

During the 1918–19 pandemic influenza ("flu"), certain cities fared better than others. Those U.S. cities that both acted promptly to control the flu *and* implemented multiple layers of protective measures had fewer flu cases and lower overall mortality. The procedures for surveillance and infection control outlined in this plan include multiple layers of protection. With the onset of pandemic flu, the BOP Medical Director will guide implementation of infection control measures based on the severity of the flu outbreak. The key to protection of both employees and inmates is swift, decisive, coordinated action based upon advance planning.

## How is flu transmitted?

When people who are sick with the flu either cough or sneeze, they release infectious droplets that can enter another person's body through their eyes, nose, or mouth. Flu germs can spread through the air, up to six feet away from the sick person. Flu virus particles do not remain suspended in the air. However, if a person who is sick with the flu touches surfaces, such as telephones and door knobs, the surface can become contaminated with the flu virus. Other people then can become infected with the virus by touching the surface and then touching their eyes, nose, or mouth.

## When can a person transmit flu?

For the purposes of this guidance, the *infectious period* for influenza is generally defined as: one day before fever starts until 24 hours after fever ends. Some people may shed virus for a while longer; however, studies have shown that after fever resolves there is a significant reduction in the ability to transmit infection.

## How long does it take for symptoms develop?

The estimated *incubation period* (the time between acquiring influenza and becoming ill) is generally 1–4 days (average: 2 days).

Exhibit M pg 1

# Surveillance

Surveillance refers to the process of detecting and tracking diseases. Surveillance for flu involves screening for influenza symptoms (to rapidly identify flu patients and isolate them); and collecting, analyzing, and reporting data on individuals who are diagnosed with influenza-like illness. The BOP utilizes the following definition of influenza-like illness:

> ***Influenza-like illness (ILI):*** *Fever (temperature of 100° F [37.8° C]) plus either cough or sore throat—in the absence of a known cause other than influenza.*

During a pandemic of influenza, ILI will be tracked utilizing BEMR. On a daily basis, enter into BEMR the occurrence of: ILI, complicated ILI (requiring prescription medication or intravenous fluids), ILI related hospitalization, and ILI related deaths. This will allow local facilities and the central and regional offices to closely track the occurrence of ILI within BOP. *See Attachment 1.2* for specific BEMR codes and definitions.

# Infection Control

Infection control consists of practices that interrupt the spread of disease. A variety of measures to interrupt flu transmission are listed in *Table 1* below and discussed on the following pages.

---

**Table 1. Pandemic Flu Infection Control Measures**

1. Promote good health habits among employees and inmates:
    a. Regular hand hygiene
    b. Respiratory etiquette (coughing or sneezing into a sleeve or tissue)
    c. Avoiding touching one's eyes, nose, or mouth

2. Conduct frequent environmental cleaning of "high touch" surfaces.

3. Separate the sick from the well.
    a. Advise employees to stay home from work if they are sick.
    b. Promptly identify and contain inmates with influenza-like illness (ILI).
    c. Isolate or cohort inmates who are sick with pandemic influenza.
    d. Conduct contact investigations for flu cases and quarantine contacts.

4. Create "social distance" between people.

5. Use personal protective equipment (PPE) for close contact with flu cases.

6. If widespread flu transmission, consider targeted distribution of face masks (only with permission of BOP Medical Director or designee).

7. Provide ongoing infection control education.

---

---

## 1. Promote good health habits among employees and inmates.

Critical to preventing flu transmission is a triad of good health habits, including:

 a. *Regular hand hygiene*
 b. *Respiratory etiquette (coughing or sneezing into a sleeve or tissue)*
 c. *Avoiding touching one's eyes, nose, or mouth*

Preparing for pandemic flu involves improving compliance with these basic infection control measures, *beginning now*. Each facility should assure that adequate supplies and facilities are available for hand washing for both inmates and employees.

Health care workers should have access to alcohol-based hand rub provided in accordance with fire and safety rules. CDC has made no recommendations regarding the use of non-alcohol based hand rub, but use of these products is presumably better than no hand hygiene at all. Provision of non-alcohol based hand rub via dispensers should be considered in key areas that lack facilities for hand washing, i.e., outside the dining hall, in the visitor area, etc.

Provisions should be made for employees and visitors to wash their hands before and after they enter the facility. The triad of good health habits should be promoted in various ways, i.e., educational programs, posters, campaigns, assessing adherence with hand hygiene, etc. Relevant educational tools are available on Sallyport on the Health Services Division page.

---

## 2. Conduct frequent environmental cleaning of "high-touch" surfaces.

Another general infection control measure is to routinely clean surfaces that are frequently touched and therefore can become contaminated with germs. These can include door knobs, keys, hand rails, telephones, computer keyboards, elevator buttons, inmate cell bars, etc. Increasing the frequency of environmental cleaning of these surfaces is something that also can be started now, thereby preventing transmission of infections such as the common cold, seasonal flu and MRSA. Some facilities have increased environmental cleaning of high-touch surfaces by increasing the number of inmate workers assigned to this duty.

---

## 3. Separate the sick from the well.

Transmission of pandemic flu can be prevented by separating those who are ill from those who have not been infected. In the event of pandemic flu, several measures should be implemented to separate the sick from the well. Below in *Table 2* are definitions of two important terms related to separating the sick from the well and that are frequently confused with each other.

| Table 2. Definitions of "Isolation" and "Quarantine" |
| --- |
| **Isolation:** Confining individuals who are **sick with influenza** (ILI cases) either to single rooms or by cohorting them with other influenza patients. |
| **Quarantine:** Confining asymptomatic persons who are **contacts of influenza cases**, while they are in the incubation period (until 4 days after exposure ended). |

3

**The following measures are recommended to separate the sick from the well.**

| a. Advise employees to stay home from work if they are sick. |
|---|

 The most likely way that pandemic flu will gain entrance to a facility is via infected employees. In the event of pandemic flu, staff should be educated to stay home if they have influenza symptoms. If employees become sick at work, they should be advised to promptly report this to their supervisor and go home. In general, the timetable for returning to work is 24 hours after a person's temperature returns to normal.

| b. Promptly identify and contain inmates with influenza-like illness (ILI). |
|---|

Prompt identification and isolation of inmates with ILI is critical. During the course of pandemic influenza, *all* inmates should be screened at intake, based upon guidance from the Medical Director. If ILI is circulating within the institution, inmates should be screened at triage/sick-call and prior to transfer or daily transport. In addition, all staff should be advised to report if any inmates are symptomatic.

❄ Immediately place a face mask on all individuals who are identified as having ILI symptoms (if it can be tolerated). They should be isolated or cohorted with other sick inmates (see below).

*Screening at intake:* The screening of inmates upon arrival should be adapted to the particular situation at each facility, with the goal of keeping new arrivals segregated from other inmates, until the screening process has been completed. Screening should be conducted utilizing the revised *Influenza-Like Illness Screening Form (Attachment 1.3)*.

*Screening at triage/sick-call:* If ILI is circulating within the institution, inmates at sick-call should be asked about ILI symptoms; if symptoms are present, these inmates should be asked to wear a face mask and be physically separated from inmates presenting to sick-call for other reasons.

*Screening of transfers and daily transports:* If ILI is circulating within the facility, inmates should be screened for ILI prior to transport. If ILI is identified in an inmate, in general, their transfer or transport should be postponed until the inmate has been fever-free for 24 hours (without fever-reducing medication).

| c. Isolate or cohort inmates who are sick with pandemic influenza. |
|---|

A critical infection control measure for pandemic influenza is to promptly separate inmates who are sick with flu symptoms away from other inmates in the general population. Inmates can be *isolated* in private rooms. Alternatively, groups of sick inmates can be *cohorted* together in a separate unit.

Rooms where inmates with ILI are either housed alone or cohorted should be designated "Influenza Isolation Units" (see *Attachment 1.7*). In general, no special air handling is

needed. Depending on how ill the inmates are, bunk beds may or may not be suitable. Ideally, the unit should have a bathroom attached. If not, inmates will have to wear a face mask to go to the bathroom outside the room. The door to the Influenza Isolation Unit should remain closed. A sign should be placed on the door of the room indicating that it is an Influenza Isolation Unit and listing recommended personal protective equipment (PPE) (see *Attachment 1.10*).

Within Influenza Isolation Units, Standard Precautions should be followed. The type or respiratory protection required (i.e., face mask vs. respirator) will be based on guidance from the Medical Director during the pandemic. Healthcare personnel caring for patients should wear gloves for all interactions that may involve contact with the patient or potentially contaminated areas in the patient's environment.

If the inmate with ILI must be taken out of isolation, a face mask should be placed on the sick inmate to reduce the risk of spray through cough or sneeze.

If the inmate with ILI must undergo a procedure that is likely to generate aerosols (e.g., suctioning, administering nebulized medications), then an airborne infection isolation (AII) room with negative pressure and 6 to 12 air changes per hour, is indicated. A respirator, eye protection (goggles or face shield), and a gown should be worn during patient care activities that are likely to generate splashes and sprays of blood, body fluids, secretions, or excretions, e.g., suctioning or nebulizer treatments.

*[handwritten margin note: Isolation not possible]*

In large dorm settings or camps, isolation may not be a possibility. If isolation is not feasible, attempt to place the beds of sick inmates at a distance of at least 6 feet from other inmates. It is recognized that if there is widespread flu transmission within a facility, isolation as a strategy may not be feasible.

See *Attachment 1.7* for more information about infection control procedures for Influenza Isolation Units. Personal protective equipment in isolation units is discussed on the next page.

*[handwritten margin note: not followed]*

---

**d. Conduct contact investigations for flu cases and quarantine contacts.**

---

It may be appropriate to identify close contacts to pandemic flu cases and quarantine them in a separate unit. The purpose of quarantine is to assure that inmates who are known to have been exposed to the flu virus are kept separate from other inmates to assess whether they develop flu symptoms. For the purposes of this document, exposure is defined as having been in a setting where there was a high likelihood of contact with respiratory droplets and/or body fluids of a person with ILI. Examples of close contact include sharing eating or drinking utensils, or any other contact between persons likely to result in exposure to respiratory droplets. Close contact typically does not include activities such as walking by an infected person or sitting across from a symptomatic patient in a waiting room or office.

Within the BOP, the duration of quarantine during pandemic influenza is 4 days. As feasible, the beds/cots of quarantined inmates should be placed at least 3-6 feet apart. Quarantined inmates should be restricted from being transferred, having visits, or mixing with the general

Case 4:21-cv-00669-P    Document 1    Filed 05/20/21    Page 171 of 259    PageID 171
Federal Bureau of Prisons                                    Module 1: Surveillance and Infection Control
Pandemic Influenza Plan                                                                        October 2012

population. See *Attachments 1.8* and *1.9* for procedures and forms related to contact investigation and quarantine. A face mask is recommended for staff who are in direct, close contact (within 6 feet) of quarantined inmates.

> *Note: Once multiple flu cases occur within multiple housing units, a decision may be made to abandon contact investigation and the subsequent quarantine of contacts. In this case, everyone in the facility has become a "contact," and contact investigation and quarantine are no longer useful or appropriate control strategies.*

---

### 4. Create "social distance" between people.

In the general community, an important method for preventing pandemic flu transmission will be to increase the distance between people by instituting various "social distancing" measures, e.g., closing schools, theaters, and churches; staggering work schedules; discouraging use of public transportation, etc. While "social distancing" is more difficult to accomplish in a correctional setting, there are possible interventions.

Social distancing measures in BOP facilities could include: limiting gatherings (group meals, religious services, work, classes, recreation, common areas); ending visitation; halting entrance to volunteers and contractors; discouraging shaking of hands, etc. Individual units can be taken separately to recreation and the dining hall with thorough environmental cleaning in between. Each local pandemic flu planning committee should identify ways to accomplish social distancing within their facility.

*[handwritten margin note: Lockdown approved by Regional Medical Director]*

With the occurrence of multiple cases of flu, lock-down—of individual dormitories, buildings, and entire institutions—should be considered on a case-by-case basis, in consultation with the Regional Medical Director.

---

### 5. Use personal protective equipment for close contact with flu cases.

Anyone who is working in close contact with pandemic flu cases should be provided personal protective equipment.

**a. Respiratory Protection:** Face masks (not respirators) are recommended for use with *seasonal* flu patients because the primary mode of flu transmission is droplet spread (not airborne). Respirators are generally utilized to protect against small airborne particles, e.g., with tuberculosis patients.

| Table 3. Updated Definitions of "Face Masks" and "Respirators" (CDC-2009) |
| --- |
| **Face Masks:** Disposable FDA-approved masks, which come in various shapes and types (e.g., flat with nose bridge and ties, duck billed, flat and pleated, pre-molded with elastic bands). They include the following categories of masks: surgical, dental, medical procedure, and laser. |
| **Respirators:** N-95 or higher filtering, face-piece respirators that are certified by CDC/NIOSH. |

6

In the event of a pandemic flu, the use of respirators may be indicated, based on guidance from the CDC and the BOP Medical Director. Respirators should be worn in situations in which the virus may be aerosolized, including aerosol-generating procedures (such as endotracheal intubation, nebulizer treatments), resuscitation of a patient, or when providing direct care to a patient with confirmed or suspected influenza-related pneumonia.

b. **Gloves:** Healthcare personnel caring for patients should wear gloves for all interactions that may involve contact with the patient or potentially contaminated areas in the patient's environment. If gloves are worn, perform hand hygiene before donning and after removing gloves.

c. **Eye protection and gowns** should be worn by health care personnel when spray or splash or body fluids, secretions, or excretions is anticipated, e.g., suctioning, administering nebulized medication. Eye glasses are *not* sufficient for eye protection. Appropriately fitted, indirectly-vented goggles with a manufacturer's anti-fog coating provide the most reliable, practical eye protection from respiratory droplets, and they come in styles that can be fitted over eye glasses. Face shields can be used as an infection control alternative to goggles.

d. **Face masks** are the recommended personal protective equipment when in close contact (within 6 feet) of quarantined inmates (housing of asymptomatic contacts who have been exposed to ILI). Face masks do not require fit-testing. Face masks also should be placed on persons with ILI to prevent droplet spread, i.e., during transport.

---

### 6. If widespread flu transmission, consider targeted distribution of face masks.

It is unknown whether the targeted distribution and use of face masks during a pandemic flu outbreak will interrupt the spread of flu. Because of the close contact between people in BOP facilities, face masks have been stockpiled for distribution to employees and inmates in the event of pandemic influenza. Permission must be obtained from the BOP medical director prior to targeted distribution of face masks.

---

### 7. Provide ongoing infection control education.

Successful response to pandemic flu will depend greatly on strong education efforts prior to and during an actual event. The education for pandemic flu infection control is closely related to other important infection control education for BOP facilities. Education about hand hygiene, respiratory etiquette, and environmental cleaning provides benefits to inmates and employees with regard to a variety of infectious diseases. Infection control education should be ongoing—the more the better. Using a variety of media (posters, newsletters, video) increases the likelihood that employees and inmates will comply with infection control recommendations. The Central Office Health Services Division provides educational tools on Sallyport and will offer periodic Centra programs related to pandemic flu.

# Influenza Outbreak Scenarios and Control Measures

Three influenza outbreak scenarios and associated infection control measures have been developed, based on the number of ILI cases occurring and their distribution within a facility (see *Attachment 1.1*).

**The three scenarios include:**

- *Isolation Scenario* – single cases of ILI with minimal to no transmission
- *Quarantine Scenario* – ILI confined to single housing unit(s) or building
- *Widespread Transmission Scenario* – ILI occurring throughout the institution

For each scenario, general recommendations are made about the appropriate infection control measures to implement. The control measures listed for each scenario are provided for general reference only. Consult the Regional Office for guidance on management of specific outbreak situations.



Federal Bureau of Prisons                          Module 1: Surveillance and Infection Control
Pandemic Influenza Plan                                                    October 2012

# Action Steps by Pandemic Stage

---

> ## Preparation (Federal Response Stages 0–1)
> (See *Standard Operating Procedures*, which are provided for the Preparation stage only.)

---

1. Identify a staff person to be responsible for influenza surveillance and infection control.

2. Increase emphasis on good health habits to stop flu transmission, especially hand washing, respiratory etiquette, and avoiding touching the eyes, nose, and mouth.
   a. Make soap dispensers or hand soap available in all employee and inmate restrooms.
   b. Institute a plan to assure that soap dispensers are refilled regularly .
   c. Assure that inmates have an adequate supply of bar soap.
   d. Provide education to employees and inmates on hand hygiene, respiratory etiquette, and avoiding touching the eyes, nose, and mouth.
   e. Maximize access to alcohol-based hand rub dispensers in the Medical Unit (only if authorized by the warden).
   f. Regularly assess the hand hygiene practices of employees and inmates, and design measures to improve hand hygiene.
   g. Assure that employees and visitors can wash their hands when entering and leaving the facility.

3. Emphasize frequent cleaning and disinfection of high-touch areas, i.e., door knobs, keys, telephones.

4. Identify resources for influenza surveillance and control.
   a. Track international, national, regional, and local influenza trends.
   b. Identify public health department contacts for influenza (including 24/7 contact information).
   c. Communicate with your local health department and discuss collaboration on pandemic influenza preparedness.
   d. Identify any local or state reporting requirements for influenza/pandemic influenza.
   e. Identify laboratories capable of processing influenza cultures and cultures for novel (pandemic) influenza.

5. Begin tracking influenza trends by conducting surveillance for *seasonal* flu.

6. Establish procedures for influenza screening to be utilized with pandemic flu.

7. Identify administrative measures to accomplish "social distancing."

8. Identify areas within the facility that can be used for isolation and quarantine.

9. Develop plans for stockpiling and distributing infection-control supplies.

10. Provide routine training about flu transmission and prevention and control measures.

11. Conduct mock exercises related to surveillance and infection control in pandemic flu.

*(continued on next page)*

---

### **Response** (Federal Response Stages 2-5)

---

*Begin when there are confirmed human outbreaks of pandemic flu anywhere in the world:*

1. Reinforce education regarding influenza infection control. Emphasize the triad of good health habits: hand hygiene, respiratory etiquette, and not touching the eyes, nose, and mouth.

2. Consider placement of dispensers of non-alcohol hand rub in key areas that lack facilities for hand washing, i.e., outside the dining hall, in the visitor area, etc.

3. Increase environmental cleaning of "high-touch" surfaces, e.g., door knobs, keys, telephones.

4. Educate employees and visitors not to come to the facility if they have flu symptoms.

5. Assess adequacy of infection-control supplies (including face masks, respirators, and gloves) and review distribution plan.

6. If indicated by the Medical Director, provide respirator fit-testing, medical evaluation, and training to any employees who may be assigned to have contact with inmates with flu—in Influenza Isolation Units or for transport.

7. Initiate screening for influenza-like illness at intake and in triage/sick-call according to those outlined in the Standard Operating Procedures (see *Attachment 1.3*).

8. Conduct active surveillance to look for influenza cases (i.e., review temperature logs, triage/sick call, hospitalizations, staff absences, unexplained deaths, etc.).

9. On a daily basis, enter into BEMR: cases of ILI, complicated ILI, ILI-related hospitalizations, and ILI-related deaths. Produce regular reports on the status of ILI within the institution for institution leadership.

10. Review possible measures to increase "social distancing."

11. Review/revise the list of designated influenza isolation and quarantine units, and develop options for expanding bed-space as needed.

12. Advise health care workers to report any unprotected close contact with persons with ILI (either at work or at home).

*Begin after a suspected pandemic influenza case is diagnosed in the facility:*

13. Immediately isolate (or cohort) inmates with influenza-like illness in "Influenza Isolation Units", using the influenza precautions outlined in *Attachment 1.7*.
    a. Reinforce education of staff on infection control procedures to follow when caring for flu patients.
    b. Assure that adequate infection-control supplies and personal protective equipment, i.e., face masks, respirators, and gloves, are available.
    c. Place precaution signs (*Appendix 1.10)* on the doors of Influenza Isolation Units.

14. If there is flu transmission in the facility, begin screening all transfers and daily transports for ILI (see *Attachment 1.3*).

10

15. Perform triage at sick-call to rapidly identify inmates with flu symptoms and implement procedures for separating the sick from the well.

16. Conduct contact investigations of the initial flu cases that have been identified, and quarantine contacts according to procedures outlined in *Attachment 1.8*. Place quarantine precaution sign (*Attachment 1.10*) on the doors and assure an adequate supply of face masks. Implement daily temperature and signs and symptoms check. Immediately isolate any inmates that develop ILI symptoms.

    *Note: If there are multiple pandemic flu cases in multiple housing units, implementing contact investigations and quarantine may be inappropriate and abandoned as a strategy.*

17. Implement measures to increase social distancing.

18. Review Influenza Outbreak Scenarios and Control Measures (*Attachment 1.1*) to assess the current status of an outbreak in the institution and identify appropriate control measures.

19. Continue staff and inmate training on infection control.

20. Monitor adherence to infection control guidelines.

21. Monitor daily use of infection control supplies and conduct daily inventory control.

---

## Recovery (Federal Response Stage 6)

*Previous flu pandemics have been associated with subsequent "waves" of flu after an initial wave resolves. After an initial pandemic flu outbreak, subsequent outbreaks are likely. The recovery period will involve both recovering from the pandemic emergency, evaluating the BOP response to it, and preparing for subsequent waves of pandemic flu.*

1. Maintain surveillance for influenza (to detect subsequent waves of pandemic influenza).

2. Evaluate the effectiveness of surveillance and infection-control measures during the pandemic flu and summarize observations.

3. Evaluate the adequacy of infection control supplies and the need for restocking.

4. Restock infection control supplies.

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Module 1: Surveillance and Infection Control
# Standard Operating Procedures for Preparation Stage
### (Federal Response Stages 0–1)

| |
|---|
| During the Preparation stage, adapt this Standard Operating Procedure template to the unique circumstances of your facility. A modifiable Word version is posted on: *www.bop.gov/news/medresources.jsp*. |
| **1. Identify staff persons responsible for planning for and directing health care delivery during pandemic influenza.** |
| In this facility, the following individual is assigned responsibility: |
| **2. Increase emphasis on the triad of good health habits to stop flu transmission:  hand washing, respiratory etiquette, and not touching the eyes, nose and mouth.** |
| **a.  Make soap dispensers or hand soap available in all employee and inmate restrooms,** as follows: |
| **b.  Institute a plan to assure that soap dispensers are refilled regularly,** as follows: |
| **c.  Assure that inmates have an adequate supply of bar soap,** as follows: |
| **d.  Provide education to employees and inmates on hand hygiene, respiratory etiquette, and avoiding touching the eyes, nose, and mouth.** |
| Employees will be provided regular education as follows: |
| Inmates will be provided regular education as follows: |
| Posters on hand hygiene and respiratory etiquette will be placed in the following locations: |
| **e.  Maximize access to alcohol-based hand rub dispensers in the Medical Unit** (only if authorized by the warden) as follows: |
| **f.  Regularly assess the hand hygiene practices of employees and inmates, and design measures to improve hand hygiene.**  Implement systems for assessing adherence to hand hygiene as follows: |
| For health care workers: |
| For other correctional workers: |
| For inmates: |

12

| | |
|---|---|
| g. | **Assure that employees and visitors can wash their hands when entering and leaving the facility,** as follows: |
| **3.** | **Emphasize frequent cleaning and disinfection of high touch areas.** |
| a. | Identify "high-touch" surfaces in this facility (i.e., door knobs, keys, telephones): |
| b. | The following plan will be implemented to increase frequency and the extent of cleaning and disinfection of high-touch surfaces in this facility: |
| **4.** | **Identify resources for influenza surveillance.** |
| a. | **Track international, national, regional, and local influenza trends, utilizing the following resources.** Increase frequency of monitoring when pandemic flu is reported outside North America.<br><br>Federal Bureau of Prisons Intranet: *http://sallyport.bop.gov*<br>Federal Web sites on pandemic influenza: *http://www.flu.gov/*<br>Centers for Disease Control and Prevention: *www.cdc.gov/flu/weekly/fluactivity.htm* |
| b. | **Identify public health department contacts for influenza (include 24/7 contact info.)** |
| | **Local County/Community Public Health Contact:** |
| | Address: |
| | Phone/email: |
| | **State Health Department Contact:** |
| | Address: |
| | Phone/email: |
| c. | **Communicate with your local health department and discuss collaboration on pandemic influenza preparedness.** Document the plans discussed. |
| d. | **Identify any local or state reporting requirements for influenza/pandemic influenza.**<br>☐ No reporting requirements<br>☐ Influenza reporting requirements for _____ <jurisdiction> are:<br>(Also attach required reporting forms.) |
| e. | **Identify laboratories capable of processing influenza specimens and specimens for novel (pandemic) influenza.** |
| | ☐ Attach copy of procedures for obtaining influenza specimens for your lab. |

|  | Reference Lab | State Lab |
|---|---|---|
| **Laboratory Name** |  |  |
| **Contact Person** |  |  |
| **Address** |  |  |
| **Telephone** |  |  |
| **FAX** |  |  |
| **email** |  |  |

**5.   Begin tracking influenza trends by conducting surveillance for *seasonal* flu.**

**a.   Initiate routine data collection on inmates with identified influenza-like illness (ILI).**  Enter data on occurrence of ILI in the BOP Electronic Medical Record.

*Note:  Influenza-like illness (ILI) is defined as "fever (temperature of 100° F [37.8° C]) plus either cough or sore throat—in the absence of a known cause other than influenza."*

In this facility, surveillance for influenza-like illness (ILI) will be accomplished as follows:

**b.   Obtain influenza specimens** when there is atypical clinical presentation of flu or when an individual is hospitalized for severe respiratory illness during flu season.

*Note: There is no need to collect specimens during an ongoing influenza outbreak.*

**c.   Compile annual summary reports on seasonal influenza cases (Oct. 1 – Apr. 30).**  Review annual ILI statistics with the Infection Control Committee. .

**6.   Establish procedures for influenza screening to be utilized with pandemic flu.**

**a.   New Inmate Arrivals:**   Employees shall be assigned to screen all new arrivals, using the *Influenza-Like Illness Screening Form (Attachment 1.3)*.  This screening will include taking the inmate's temperature and asking questions about symptoms.  If the inmate's condition meets the clinical definition of influenza-like illness, then further questions shall be asked to identify risk factors for pandemic influenza.  Ideally, screening will take place individually as the inmates are departing the bus, prior to entering the holding area.  Depending on weather conditions and physical layout, this may not be feasible.  Plans for screening should be adapted to the particular situation at each facility, with the goal of keeping the new arrivals segregated from other inmates, until the screening process has been completed.

The plan for screening new inmate arrivals in this facility is:

If ILI is identified in an arriving inmate the following should occur:
  • Place a face mask on the inmate.
  • Walk the inmate to the designated influenza isolation area.
  • Quarantine all inmates arriving on the same bus in one area of the facility, for 4 days.

b.  **Triage/Sick-Call:** During the Response stage, inmates who come to sick-call/triage will be screened for flu symptoms as follows:

Any inmate who has flu-like symptoms will be asked to wear a mask and will be separated from other waiting inmates. If there is any evidence of epidemiologic risk for flu, the inmate should be isolated. (For more detail on infection control, isolation, and quarantine, see *Attachment 1.7.*)

c.  **General Inmate Screening:** After cases of pandemic flu are reported, more intensive screening of the general population may be warranted. This may include obtaining screening temperatures and conducting symptom screens, as well as advising correctional officers to report any symptomatic inmates. Strategies for general screening for flu symptoms will include:

d.  **Employee Screening:** Employees will be asked to stay home from work if they become sick with flu symptoms and to voluntarily report flu symptoms if they occur on the job.

The following system will be utilized to track and report employee illness during a pandemic flu outbreak:

7.  **Identify administrative measures to accomplish "social distancing."**

Discuss use of various administrative measures to accomplish social distancing to prevent pandemic flu transmission in this facility.

a.  **Identify general "social distancing" measures.** The following are possible measures:
    *   limit gatherings (group meals, religious services, work, classes, recreation, common areas)
    *   no handshaking
    *   stop visitation, volunteers, contractors
    *   limit contact between the well and the ill
    *   lock-downs
    *   providing recreation and dining separately by unit (with disinfection in-between)

The following additional social distancing measures could be utilized in this facility:

b.  **Separate the sick from the well in triage/sick-call.** During pandemic flu, the following methods will be used to separate inmates with the flu from inmates with other health problems:

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

| 8. Identify areas within the facility that can be used for isolation and quarantine. |
|---|

Identify places within your facility where inmates who have pandemic flu, or who have been in contact with flu patients, can be appropriately housed, e.g., wards, gymnasium, cafeteria.

**Definitions:**

- **Isolation:** Confining influenza cases (either to a single room or by cohorting them with other influenza patients) to decrease the likelihood of influenza transmission.
- **Quarantine:** Confining persons who are contacts of influenza cases, while they are in the incubation period (usually 4 days after exposure ended).

Depending on how ill the inmates are, bunk beds may not be suitable. Isolation and quarantine units do not require special air handling. Ideally, these units have an attached bathroom. (If not, inmates must wear a mask while outside the isolation or quarantine unit.) If feasible, beds/cots in quarantine units should be placed at 3–6 feet apart to decrease the likelihood of flu transmission. List possible locations for isolation and quarantine in the chart below.

| Type of Room | Location(s) | Capacity (# of inmates) |
|---|---|---|
| Isolation (Single) | | |
| Isolation (Cohort) | | |
| Quarantine (Contacts) | | |

☐ Review procedures for pandemic influenza precautions in *Attachment 1.7* and *1.8* and be prepared to implement them.

☐ Review procedures and forms for contact investigation and quarantine in *Attachment 1.8* and *1.9* and be prepared to implement them.

| 9. Develop plans for stockpiling and distributing infection control supplies. |
|---|

a. Assure that stockpiling of hand hygiene supplies and masks is consistent with guidance from the Central Office. Develop plans for storage of supplies. *For security reasons, do not record the storage location in this document.*

b. Indicate the quota for supplies based on Central Office guidance:

- Liquid or foam hand soap    Quota: ____
- Alcohol-based hand rub    Quota: ____
- Face masks    Quota: ____
- Bar soap    Quota: ____
- N-95 respirators    Quota: ____
- Gloves    Quota: ____

16

| |
|---|
| **c.** The general plan for overseeing and managing stockpiled supplies is outlined below.<br><br>• The plan for rotating stock of supplies is:<br><br>• The plan for securing supplies is:<br><br>• The plan for distributing hand hygiene supplies during pandemic flu is:<br><br>• The plan for distributing and replacing face masks for inmates and employees during pandemic flu is: |
| **d.** Develop plans for conducting respirator fit-testing for staff who will be assigned responsibility for caring for pandemic flu patients. |
| **10. Provide routine training about flu transmission, and prevention and control measures.** |
| The plan for providing ongoing training about flu transmission, and prevention and control in this facility is: |
| **11. Conduct mock exercises related to surveillance and infection control in pandemic flu.** |
| Mock exercises will be conducted as follows: |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.1. BOP Pandemic Influenza Outbreak Scenarios and Control Measures

The following chart outlines recommendations for infection control measures based on the outbreak scenario, i.e., the number and distribution of cases of ILI in an institution. These recommendations are provided for general reference only. Each outbreak situation is unique. Consult with the Regional Office regarding management of specific outbreaks.

| CONTROL MEASURE | OUTBREAK SCENARIO | | |
| --- | --- | --- | --- |
| | ISOLATION<br>*Single case(s) of ILI with minimal to no transmission* | QUARANTINE<br>*ILI confined to single housing unit(s) or building* | WIDESPREAD TRANSMISSION<br>*Multiple cases of ILI throughout institution* |
| CONTAINMENT GOAL | Prevent spread *into institution.* | Prevent spread throughout *institution/complex.* | Prevent spread *throughout* BOP. |
| ISOLATION OF ILI CASES | Isolate inmates with ILI in Influenza Isolation Units. | Isolate/cohort inmates with ILI, as feasible. | Cohort inmates with ILI (may not be possible). |
| QUARANTINE OF FLU CONTACTS | Not applicable. | Quarantine asymptomatic contacts of flu cases, as feasible. | Quarantine not indicated. Entire institution is, in effect, "quarantined." |
| RESPIRATORY PROTECTION* | Face masks or respirators in Influenza Isolation Units.* | • Face masks or respirators in Influenza Isolation Units.*<br>• Face mask for direct, close contact (within 6 feet) with quarantined inmates. | • Use face masks or respirators when in close contact with symptomatic inmates.*<br>• Consider strategic distribution of face masks.** |
| SCREENING | Screen intakes. | • Screen intakes.<br>• Screen inmates before transfer.<br>• Screen contacts daily.<br>• ILI case-finding throughout facility. | ILI case-finding throughout facility. |
| VISITORS:<br>*Visitors with ILI symptoms restricted* | No visitor restrictions except for flu case(s). | Visitor restrictions for quarantined units/buildings. | No visitors. |
| ANTIVIRAL TREATMENT | For high-risk. | For high-risk. | For high-risk. |
| CARE FOR SICK | • Push fluids.<br>• Observe closely. | • Push fluids.<br>• Observe closely. | • Push fluids.<br>• Observe closely. |
| ANTIVIRAL PROPHYLAXIS | • Pregnant close contacts.<br>• Consider for high-risk close contacts. | • Pregnant close contacts.<br>• Consider for high-risk close contacts. | • Pregnant close contacts.<br>• Consider for high-risk close contacts.<br>• Consider for staff if severe staff shortages.** |
| TRANSFERS | No transfers of flu cases. | No transfers into or out of quarantined units. | No transfers into or out of institution. |

*\* The decision regarding the need for respirators vs. face masks will be based on guidance from the Medical Director.*
*\*\* Only with the permission of the BOP Medical Director or designee.*

## Attachment 1.2.  Use of BEMR to Track Influenza-Like Illness (ILI)

The BOP Electronic Medical Record (BEMR) will permit real-time tracking of the occurrence of influenza-like illness (ILI) during the course of pandemic influenza.  On a daily basis, information about the occurrence of ILI and associated events should be entered into BEMR.

| Pandemic H1N1 Influenza BEMR Codes and Definitions | |
| --- | --- |
| **488.1 A** | **Influenza-Like Illness (ILI)**<br><br>*Definition:*  Fever (temperature of 100°F [37.8°C] or greater)—plus cough or sore throat—in the absence of a known cause for these symptoms other than influenza. |
| **488.1 B** | **Influenza-Like Illness – Complicated**<br><br>*Definition:*  Inmates coded as meeting the definition of ILI (BEMR 488.1 A) who require treatment with prescription medication or intravenous fluids. |
| **488.1 C** | **Influenza-Like Illness Related Hospitalization**<br><br>*Definition:*  Inmates coded as meeting the definition of ILI (488.1A) who are hospitalized during the course of ILI. |
| **488.1 D** | **Influenza-Like Illness Related Death**<br><br>*Definition:* Inmates coded as meeting the definition of ILI (488.1A) who expire during the course of ILI or subsequent complications. |

Do not change codes once they have been entered.   For example, for a person who has been hospitalized, do not delete the code for hospitalization when the person returns to the facility.

## Attachment 1.3. Influenza-Like-Illness (ILI) Screening Form

This form is designed to screen inmates for influenza-like illness. If pandemic influenza is circulating outside the facility, then all intakes should be screened. If pandemic influenza has been identified within the facility then screening should occur at triage/sick-call and prior to all transfers/transports.

Date: ___/___/____    Time: ___:___

---

### SUBJECTIVE/OBJECTIVE

1. **Temperature** _____    Date of onset: ___/___/___

2. **Do you have any of the following symptoms:**
   ☐ Cough
   ☐ Sore Throat
   ☐ None of the above

3. **In last 4 days, have you had close contact with anyone with flu symptoms** (fever, cough, sore throat)?
   ☐ No    ☐ Yes
   Describe: _____

4. **Level of awareness:** ☐ Alert    ☐ Confused    ☐ Lethargic
   **Oriented to:** ☐ Person    ☐ Time    ☐ Place

---

### ASSESSMENT

☐ **Inmate meets criteria for influenza-like illness (ILI).**
   ILI is defined as: *temperature greater than* 100° F (37.8° C) *and presence of cough or sore throat.*

☐ **Asymptomatic inmate with history of close contact with someone with ILI**

☐ **Absence of influenza symptoms**

☐ **Other:** _____

---

### PLAN

☐ No influenza-related restrictions

*If clinical criteria for ILI met (see Assessment above):*
☐ Provide inmate with face mask

☐ Transport inmate to Influenza Isolation Unit

☐ Educate inmate about:    ☐ Use of mask    ☐ Disposal of mask    ☐ Cover cough/sneezes
                            ☐ Hand washing

*If history of recent ILI exposure:*
☐ Quarantine in Influenza Quarantine Unit (for 4 days)

| Date: | Staff Signature & Stamp: |
|---|---|
| Institution: | Patient Identification: |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.4.  Correctional Standard Precautions – General Population

| The following precautions should be observed *routinely* by all correctional workers at all times to prevent spread of disease. *(General population* refers to all correctional settings except *health care settings.)* | | |
|---|---|---|
| **Component** | **Indicated (X)** | **Recommendations** |
| **Hand washing** | X | Wash hands routinely with soap and running water for at least 15 seconds:  before eating, after using the bathroom, when hands are dirty, and after contact with blood or other body fluids. |
| **Respiratory hygiene** | X | Cough/sneeze into sleeve or cover mouth/nose with tissue.  Dispose of used tissues (in regular trash).  Persons who are coughing or sneezing can use a paper mask to prevent spray.  Wash hands after coughing or sneezing. |
| **Safe practices** | X | Avoid touching eyes, nose, and face. Germs are spread by touching your face. |
| **Personal protective equipment (PPE)** | Not routinely | Personal protective equipment is indicated only if contact with blood/body fluids is likely. PPE includes gloves to protect hands from contact; mask, face/eye wear, and gowns to protect from sprays and splashes. |
| **Sharps** | X | Dispose in a leak-proof, puncture-resistant container.  Never recap, bend, break, or otherwise manipulate used needles. |
| **Single cell** | Not routinely | Place potentially infectious inmates in a private room (in consultation with medical staff).  Consider single cells for inmates with poor hygiene practices. |
| **Sanitation** | X | Routinely clean with an EPA registered disinfectant (see (http://www.epa.gov/oppad001/chemregindex.htm).  Use according to the manufacturer's instructions.  All washable (non-porous) surfaces should be cleaned during and after (terminal) cell occupancy.  Correctional workers should conduct sanitation inspections of living and bathroom areas to identify visibly dirty areas.  Emphasize regular cleaning of surfaces that are frequently touched (hand-rails, elevator buttons, door knobs, computer key boards, etc.). |
| **Laundry** | X | Collect at bedside.  If wet or soiled, handle as little as possible; bag in a leakproof bag at the location in which it was used, in accordance with local policy on management of linens.  Machine wash and dry. |
| **Activities (shared equipment)** | X | Weight benches or any other surface exposed to sweat should be *disinfected daily*, and *routinely wiped clean between users* with a clean dry towel.  Inmates should use barriers to bare skin, such as a towel or clean shirt, while using exercise equipment. |
| **Report possible infections** | X | Correctional workers who observe evidence of possible infections should report them promptly to their supervisor.  Inmates with possible skin infections should be sent promptly for a medical evaluation. |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.5.  Correctional Standard Precautions – Health Care Settings

| All workers in health care settings should observe the following precautions *routinely*. | |
|---|---|
| **Components** | **Recommendations** |
| Hand hygiene | *Hand hygiene is the most important measure to reduce transmission of infectious diseases.* Perform hand hygiene after touching blood or body fluids, after removing gloves, and between patient contacts.  Hand hygiene includes handwashing with either plain or antimicrobial soap and water, as well as use of alcohol-based products (if approved by the warden).  If hands are visibly soiled or contaminated, they should be washed with soap and water. |
| Respiratory etiquette | Educate staff, inmates, and visitors on the importance of containing respiratory secretions. Post signs with instruction on reporting  influenza-like illness.  Cough/sneeze into sleeve or cover mouth/nose with a tissue, disposing of used tissues in regular trash.  Have persons who are coughing or sneezing use a paper mask to prevent spray.  Hand hygiene after coughing/sneezing. |
| Personal protective equipment (PPE) | **Gloves:**  For touching blood, body fluids, secretions, excretions, and contaminated items; for touching mucous membranes and nonintact skin.<br>**Gown:**  During procedures and patient-care activities where there is a possibility of contact of clothing/exposed skin with blood/body fluids, secretions, and excretions.<br>**Face/eye protection** (e.g., face mask, goggles, or face shield):  During patient care activities likely to generate splash/spray of blood, body fluids, secretions, or excretions. |
| Safe work practices | Avoid touching eyes, nose, mouth, or exposed skin with contaminated hands (gloved or ungloved); avoid touching surfaces that are not directly related to patient care (e.g., door knobs, keys, light switches) with contaminated gloves and other personal protective equipment. |
| Patient resuscitation | Avoid unnecessary mouth-to-mouth contact.  Use mouth piece, resuscitation, or other ventilation device to prevent contact with mouth and oral secretions. |
| Patient care equipment | Handle in manner that prevents transfer of microorganisms to oneself/others and to environmental surfaces.  Wear gloves if visibly contaminated; perform hand hygiene. |
| Soiled linen & laundry | Handle in a manner that prevents transfer of microorganisms to oneself/others and to environmental surfaces.  Wear gloves (and gown, if necessary) when handling and transporting soiled linen and laundry.  Perform hand hygiene. |
| Needles & other sharps | Use devices with safety features when available; do not recap, bend, break, or manipulate used needles.  If recapping is necessary, use a one-handed scoop technique; place used sharps in a puncture-resistant container. |
| Environmental cleaning & disinfection | Use EPA-registered hospital detergent disinfectant.  Follow standard facility procedures for cleaning and disinfecting environmental surfaces.  Emphasize cleaning/disinfection of frequently touched surfaces (e.g., bed rails, phones, lavatory surfaces).  Change solutions regularly and clean the container to prevent contamination.  Ensure patient care items and potentially contaminated surfaces are cleaned and disinfected after use.  Use barrier-protective coverings, as appropriate, for surfaces that are touched frequently with gloved hands during patient care, that may become contaminated with blood/body fluids, or that are difficult to clean. |
| Disposal of solid waste | Contain and dispose of solid waste (medical and non-medical) in accordance with facility procedures and/or local or state regulations.  Wear gloves when handling waste and when handling waste containers.  Perform hand hygiene. |

## Attachment 1.6.  Influenza Infection Control – General Population

| **The following guidelines are generally recommended *at all times* and should be emphasized during an influenza outbreak.** *(General population* refers to all correctional settings except *health care settings.)* |
| --- |
| **Wash hands regularly and carefully!** |
| • *Hand washing is the most important way to prevent transmission of the flu.*<br>• Wash hands regularly with soap and water (before meals, after using the toilet, and after contact with blood or body fluids).<br>• Wash for at least 15 seconds, in between fingers and on both sides of hands. |
| **Cover mouth and nose when sneezing or coughing.** |
| • Cough into sleeve or tissue.  Dispose of tissues properly.<br>• Wash hands after coughing or sneezing.<br>• Place a face mask on an inmate who is repeatedly coughing or sneezing. |
| **Avoid touching eyes, nose, and mouth.** |
| • Surfaces can be contaminated with the flu virus (for example another person's hand or door knob).  Touching such surfaces and then touching the eyes, nose, or mouth can lead to infection. |
| **Clean environmental surfaces regularly, especially "high touch" surfaces.** |
| • Use EPA approved disinfectants.<br>• Emphasize cleaning frequently touched surfaces, such as door knobs, railings, light switches, and phones.<br>• All washable (nonporous) surfaces should be cleaned during and after (terminal) cell occupancy.  Correctional workers should conduct sanitation inspections of living and bathroom areas. |
| **Handle laundry carefully.** |
| • Wear gloves and protective clothing when handling soiled linen.<br>• Wash hands afterwards.<br>• Machine-wash in hot water and completely dry the laundry. |
| **Wear gloves when touching blood or body fluids.** |
| • Wear gloves whenever contact with blood, body fluids, or contaminated items is likely.  Wash hands after removing gloves. |
| **Report symptoms of the flu.** |
| • Flu symptoms include fever, cough, shortness of breath, and sore throat.<br>• Report to a supervisor if inmates or other employees develop flu symptoms. |
| **Follow these procedures with flu patients.** |
| • Inmates with flu symptoms should be given a face mask to wear.<br>• Flu patients should be housed separately from other inmates. |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.7. Pandemic Influenza Precautions – Health Care Settings

Page 1 of 2

| The following precautions should be used in conjunction with *Standard Precautions* (see *Attachment 1.5*) when in contact with *patients suspected of having pandemic influenza.* | |
|---|---|
| **Components** | **Recommendations** |
| Hand hygiene | • **Hand hygiene is the number one defense.** Wash hands for 15–20 seconds.<br>• Includes using plain or antimicrobial soap and water, or alcohol-based products.<br>• Perform hand hygiene after touching blood/infectious body fluids, secretions, excretions, and contaminated items; after removing gloves; and in-between patients.<br>• Use soap and water if hands are visibly soiled or have touched respiratory secretions.<br>• Wash hands prior to putting on personal protective equipment (e.g., respirator or gloves), and after removing any protective devices. Avoid touching the outside of a contaminated device. |
| Safe work practices | • Avoid touching eyes, nose, mouth, or exposed skin with hands (gloved or ungloved).<br>• Avoid touching surfaces (e.g., door knobs, keys, light switches) with contaminated gloves or other personal protective equipment that is directly related to patient care. |
| Respiratory etiquette | • Promote coughing or sneezing into one's sleeve or crook of elbow (rather than hands).<br>• Provide tissues and no-touch (open) trash container. |
| Patient waiting areas | • Implement system to identify/triage inmates with influenza-like illness (ILI).<br>• Spatially separate inmates with ILI from others. Place face mask on inmates with ILI. |
| Patient placement | • ***Influenza Isolation Units:***<br>  • Isolate inmates with ILI in a private room or *cohort* groups of inmates with ILI in a specifically established, multi-bed unit.<br>  • No special air handling is required. *Exception:* If aerosol-generating procedures are performed, an airborne-infection isolation (negative pressure) room is recommended.<br>  • Post sign indicating "Influenza Isolation Unit" with appropriate PPE (*Attachment 1.10*).<br>  • Depending upon how ill the inmates are, bunk beds may not be suitable.<br>  • Keep the door closed. Ideally, have the bathroom attached to the room.<br>  • Wear fit-tested respirator or face mask (based on Medical Director guidance) and gloves for touching contaminated surfaces. For additional PPE recommendations, see page 2 of this table.<br>  • If feasible, have ILI patients wear a face mask when in close contact with workers.<br>• ***Isolation Duration:*** Isolate until 24 hours after fever resolved. In Medical Referral Centers, isolate for 7 days after symptom onset or until symptoms resolved (whichever is longer).<br>• ***Note:*** See 2nd page for recommendations about quarantine of inmates who are exposed to ILI. |
| Staffing | • Limit the number of caregivers per inmate. Ideally, staff caring for inmates with ILI are not assigned to take care of inmates with other (non-flu-related) health care problems.<br>• Staff with symptoms of influenza-like illness should not come to work.<br>• Asymptomatic health care workers who have had an unprotected exposure to an individual with ILI (at home or at work) should report their exposure to their supervisor. In general, exposed health care workers should not work with patients at high risk for influenza complications—for the 4 day period after exposure ended—unless they receive post-exposure antiviral prophylaxis. |
| Visits/social | • No visitation/social gatherings. Create as much distance as possible between people. |
| Patient transport | • Limit patient movement outside of the Influenza Isolation Unit to medically necessary purposes.<br>• Have the patient wear a face mask (without an exhalation valve) when outside the unit. If mask can't be tolerated, apply most practical measures to contain respiratory secretions, e.g., handkerchief over nose/mouth, etc.<br>• Patients should wash hands before leaving the unit and after a mask is removed. |
| Transport vehicles | • Transporters should wear a face mask or a fit-tested respirator (based on guidance from the Medical Director). Wash hands afterwards.<br>• Optimize vehicle ventilation to increase the volume of air exchange during transport.<br>• Routinely clean the vehicle with an EPA-disinfectant following the transport. |

## Attachment 1.7.  Pandemic Influenza Precautions – Health Care Settings

*Page 2 of 2*

| Components | Recommendations |
|---|---|
| **Personal Protective Equipment (PPE) for Influenza Isolation Units** ||
| *The PPE guidelines listed directly below apply only to Influenza Isolation Units, not Quarantine Units.*<br>➔ Careful placement of PPE *before* patient contact will avoid the need<br>to make adjustments and risk self-contamination during use. ||
| **Respiratory Protection**<br><br>The use of face masks vs. respirators in a pandemic will be based on guidance from the Medical Director. | • *Face masks or respirators (N-95 or higher filtering) should be worn when inside an Influenza Isolation Unit* (based on guidance from the Medical Director).<br>  • Respirators must be worn in the context of an OSHA Respiratory Protection Program (29 CFR 1910.034).<br>  • Medical evaluation, training, and fit-testing of respirators are required prior to initial use.<br>  • Respirators cannot be used with facial hair.<br>  • Respirators are provided at no cost to the employee.<br><br>• *General guidance regarding respirator use:*<br>  • Wash hands prior to donning and after removing mask or respirator.<br>  • To reduce spread of germs, do not leave dangling around the neck.<br>  • Respirators are not needed when using "food slot."<br>  • Respirators should be disposed of if:  the respirator becomes physically damaged; the integrity of the respirator is impaired; or the respirator becomes potentially contaminated during an aerosol generating procedure (e.g., nebulizer treatment or suctioning) or when in close contact with a patient who fails to cover a cough or sneeze.  There is no need to dispose of respirator if merely walking through Influenza Isolation Unit, e.g., for census count.<br>  • Respirators should be individually stored in a clean and dry container or plastic bag, stored to prevent damage to the respirator, and labeled with the name of the staff person to whom it is assigned.  Otherwise the respirator should be disposed of at the end of a shift.<br><br>• *If respirators are in short supply*, they should be prioritized for situations associated with higher risk for transmission, e.g., aerosol-generating procedures (e.g., suctioning, nebulizer treatments); resuscitation of a patient; providing direct care to a patient with confirmed or suspected pneumonia who might produce larger-than-normal amounts of secretions when coughing.<br><br>• *If there is a significant shortage of respirators*, CDC indicates that face masks may be considered an alternative to respirators. |
| **Gloves** | Gloves should be worn for all interactions that may involve contact with the patient or potentially contaminated areas in the patient's environment.  Gloves should be worn when picking up meal trays used by ill inmates.  Wash hands after removing gloves. |
| **Gowns & Eye Protection** | Gowns and eye protection should be worn if spray or splash of body fluids (including respiratory secretions) is anticipated, i.e., suctioning or nebulizer treatments.<br>Eye protection consists of appropriately fitted, indirectly vented goggles or a face shield. Eye glasses are not sufficient. |
| **Guidelines for Influenza Quarantine Units** ||
| **Quarantine**<br>**(ILI-exposed inmates with no symptoms)** | • House inmates exposed to a person with suspected pandemic flu (no ILI symptoms) in a designated Influenza Quarantine Unit, with beds/cots 3–6 feet apart, as feasible.<br>• Restrict contact with non-exposed persons.<br>• If asymptomatic, release after 4 days (unless re-exposure occurs).<br>• A face mask—not a respirator—is recommended when in close contact (within 6 feet).<br>• Monitor for temperature and influenza signs and symptoms at least daily.<br>• Quarantine may be unrealistic if pandemic influenza becomes widespread. |

## Attachment 1.8.  Pandemic Flu Contact Investigation/Quarantine Procedures

When a case of influenza is identified, the following steps should be followed in conducting a contact investigation.

1) **Determine the infectious period** (from 24 hours before symptom onset until contact with the influenza case ended--usually the date the case was isolated).

2) **Identify closest contacts (cell mates, work-mates, friends) and other housing unit contacts.**

   For the purposes of this document, exposure is defined has having been in a setting where there was a high likelihood of contact with respiratory droplets and/or body fluids of a person with ILI.  Examples of close contact include sharing eating or drinking utensils, or any other contact between persons likely to result in exposure to respiratory droplets.  Close contact typically does not include activities such as walking by an infected person or sitting across from a symptomatic patient in a waiting room or office.

   Use *Attachment 1.9, Pandemic Flu Contact Investigation/Quarantine Line List* to list names of contacts and the outcome of their exposure.

3) **Screen contacts for temperature and cough or sore throat** recording results on the line-listing. Isolate any contacts who develop ILI symptoms.

4) **Decide which groups of contacts to quarantine.**  There is no simple answer regarding who should be quarantined.  Often the simplest measure is to quarantine the entire housing unit.  If that is impractical, quarantine the inmates with the closest contact.

5) **Quarantine of exposed contacts should be maintained for 4 days after exposure ended (or the case was isolated).**

6) **Screen quarantined contacts daily for temperature and signs and symptoms (S/S), i.e., presence of cough or sore throat**, recording results on the quarantine line list.

7) A face mask should be worn in the quarantine room if close contact (within 6 feet) of quarantined inmates is anticipated.  Face masks do not require fit-testing.

*Note:* If multiple influenza cases occur within multiple housing units, *a decision may be made to abandon contact investigations and quarantine as a control strategy.*  In this case, everyone has become a contact and contact investigation is not a useful strategy.

26

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.9.  Pandemic Flu Contact Investigation/Quarantine Line List

Facility: _____  Staff Contact Name: _____  Phone: _____  ILI Case Reg. No. _____

Index Case:  Quarters: _____  Work: _____  Education: _____
Recent Travel/Movement: _____  Case Symptom Onset Date: ___/___/___
Date ILI Case Isolated: ___/___/___ + 4 Days = ___/___/___ (date to discontinue quarantine)

| # | Bed # | Last Name, First Name / Registration Number | Exposure Site (1–5)* / Quarantine Date | Date:** Time:** | | | | | Anti-viral Prophy? / Start Date | Comments | Cleared (C) or Sick (S) / Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |
| | | | | Temp: | | | | | Y N | | C  S |
| | | | | S/S? | Y N | Y N | Y N | Y N | | | |

* (1) Quarters, (2) Work, (3) Education, (4) Travel, or (5) Other
**At the top of the chart, write the date and time that the contact's temperature and signs/symptoms (S/S) were checked.
  Use that column to record the contact's temperature and whether there were signs/symptoms of cough or sore throat.
*For complete instructions on filling out this form, see page 2 of Attachment 1.9.*

*Note:* This is an optional form that can be used to track the screening of individuals who are identified contacts to influenza case(s).  If multiple influenza cases occur within multiple housing units, a decision may be made to abandon contact investigations and quarantine as a control strategy.  In this case, everyone has become a contact, and contact investigation is not a useful strategy.

Page ___ of ___

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 1: Surveillance and Infection Control
October 2012

## Attachment 1.9. (Instructions)

The purpose of the optional *Attachment 1.9, Pandemic Flu Contact Investigation/Quarantine Line List,* is to track the outcome for contacts exposed to a case of pandemic influenza. The form provides a record of exposure sites for a given index case with pandemic influenza and provides a place to record names of identified contacts. Space is provided to record daily temperatures and signs and symptom checks, as well as the outcome of the quarantine.

**Facility:** Facility code.

**Staff Contact Name/Phone:** Infection Control Officer (ICO) or designee, and phone number.

**ILI Case Reg. No.:** Registration number of the **index case**, the inmate who developed pandemic flu.

**Quarters:** Place(s) where the index case was housed, beginning one day prior to symptom onset until isolated.

**Work:** Index case's work assignment/group. If none, record "none."

**Education:** Index case's education classes/name of group. If none, record "none."

**Recent Travel/Movement:** Indicate locations if index case traveled or moved during infectious period.

**Case Symptom Onset Date:** Date flu symptoms started.

**Date ILI Case Isolated:** Date placed in isolation or cohorted.

**+ 4 days:** Determine the date that is 4 days after the case was isolated (to calculate the date that healthy contacts can be released from quarantine).

**#:** Assign each contact a sequential quarantine number.

**Bed #:** Bed assigned to the contact.

**Last Name, First Name:** Name of the inmate contact.

**Registration Number:** Registration number of the inmate contact.

**Exposure Site:** Use 1–5 to indicate site of exposure as (1) Quarters, (2) Work, (3) Education, (4) Travel, or (5) Other.

**Quarantine Date:** Date contact was quarantined.

**Date** and **Time:** At the top of the chart, record date and time that temperature and signs/symptoms were checked.

**Temp and S/S?:** Temperature and signs/symptoms for each date/time recorded at the top of the chart. Daily, record the inmate's temperature; indicate the presence of any signs or symptoms of cough or sore throat by circling **Y** (yes) or **N** (no). Use the **Comments** column to indicate type of flu symptom.

**Antiviral Proph?:** Antiviral Prophylaxis. Indicate if antiviral prophylaxis was provided to the contact, circling **Y** (yes) or **N** (no). If yes, indicate **Start Date.**

**Comments:** Record any comments about the quarantined inmate.

**Cleared(C) or Sick (S):** Indicate whether the patient is cleared after the 4-day quarantine period or becomes ill, by circling C (cleared) or S (sick). Indicate the **Date** that the person was either released from quarantine or was isolated due to illness.

28

## Attachment 1.10.  Precaution Signs for Influenza Isolation and Quarantine Units

The signs on the following two pages should be posted when utilizing a room for isolation or quarantine:

- **Influenza Isolation Unit** sign should be used for rooms housing one or more inmates with influenza-like illness.

- **Influenza Quarantine Unit** sign should be used for rooms housing asymptomatic inmates who have been exposed to ILI.

# Influenza Isolation Unit

*Housing for inmates with influenza-like illness—*
*to separate sick inmates from inmates who are well*

# PRECAUTIONS:

## 1.  Use: ☐Respirator   or   ☐Face Mask




> ▸ N-95 or better
> ▸ Must be fit-tested

## 2.  Use gloves:

> ▸ For direct patient contact or contact with contaminated items.

## 3.  Use eye protection/gowns:

> ▸ If splash or spray of body fluids is anticipated, e.g., suctioning or nebulizer treatments.
> ▸ Eye protection requires either goggles or face shield.

## 4.  Perform hand hygiene frequently:

> ▸ Always before entering and when leaving room.
> ▸ After removing gloves.

## 5.  Discontinue isolation…

> ▸ 24 hours after temperature remains normal (without fever-reducing medication).
> ▸ ***For Medical Referral Centers only:*** Discontinue isolation 7 days after onset of symptoms or when symptoms are resolved, whichever is longer.

# Influenza Quarantine Unit

*Housing for asymptomatic inmates who have been exposed to influenza-like illness—to separate them from inmates who are either sick or have not been exposed*

# PRECAUTIONS:

## 1. Wear a face mask:
### (not a respirator)



- Only if close contact with quarantined inmates (within 6 feet) is anticipated.
- No fit-testing is required.

## 2. Perform hand hygiene frequently:

- Always before entering and when leaving room.

## 3. Discontinue isolation…

- Isolation can be discontinued 4 days after the exposure to influenza-like illness ended, unless symptoms develop.
- If symptoms develop, isolate inmate in an *Influenza Isolation Unit.*

Exhibit M

BOP Pandemic Plan
Module 2

**Federal Bureau of Prisons**
**Health Services Division**

# Pandemic Influenza Plan

# Module 2:
# Antiviral Medications and Vaccines

**October 2012**

## BOP Pandemic Influenza Response Stages

The BOP *Pandemic Influenza Plan* is divided into the three stages that are used for standard BOP contingency plans; in this plan, the three stages are designed to correlate with the Federal Government Response Stages for pandemic influenza.

**The BOP Pandemic Influenza Response Stages are as follows:**

- **PREPARATION** (Federal Response Stages 0–1). Most of the detail in this plan involves the preparation phase.

- **RESPONSE** (Federal Response Stages 2–5). This phase, which begins when it is announced that there are confirmed human outbreaks overseas, involves both making last-minute preparations and actually responding to pandemic flu.

- **RECOVERY** (Federal Response Stage 6). This phase involves recovering from the pandemic, evaluating actions taken during the pandemic, and preparing for more flu. Based on what we know from previous pandemics, subsequent waves of flu are likely to follow once the pandemic flu has subsided.

| Federal Government Response Stages* | | BOP Influenza Plan | |
|---|---|---|---|
| | | **Federal Stages** | **BOP Stage** |
| **0** | New domestic animal outbreak in at-risk country | **0-1** | **PREPARATION** |
| **1** | Suspected human outbreak overseas | | |
| **2** | Confirmed human outbreak overseas | **2-5** | **RESPONSE** |
| **3** | Widespread human outbreaks in multiple locations overseas | | |
| **4** | First human case in North America | | |
| **5** | Spread throughout United States | | |
| **6** | Recovery & preparation for subsequent waves | **6** | **RECOVERY** |
| *The Federal Government Response Stages should not be confused with the World Health Organization phases of pandemic influenza.* | | | |

i

# Table of Contents

**Overview** ........................................................................................................................... 1
    **1. Antiviral Medications** ......................................................................................... 2
    **2. Pandemic Vaccine** ............................................................................................. 3
    **3. Seasonal Flu Vaccine** ........................................................................................ 4
    **4. Pneumococcal Vaccine** ..................................................................................... 4

**Action Steps by Pandemic Stage** ................................................................................. 5

**Standard Operating Procedures for Preparation Stage  (Federal Response Stages 0–1)** ...... 7

**Attachments** .................................................................................................................... 9
    **Attachment 2.1.** Prescribing Information for Zanamivir and Oseltamivir ............... 10
    **Attachment 2.2.** Antiviral Medication – Medical Evaluation, Consent, and Prescribing ..... 13
    **Attachment 2.3.** Guidance for Acquisition, Storage, and Use of Antiviral Medication
                          Procurement .................................................................................... 14
    **Attachment 2.4.** Quarterly Pandemic Influenza Medication Certification ............... 15

**Tables**
    **Table 1.** Influenza Antiviral Prophylaxis within the BOP ....................................... 3
    **Table 2.** Risk Factors for Complications from Bacterial Pneumonia ....................... 4

## Overview

*Module 2 covers the following information:*

1. *Antiviral medications—stockpiling, distribution, and use*

2. *Pandemic vaccine—preparing for mass vaccination*

3. *Seasonal flu vaccination—increasing annual vaccination among staff and inmates*

4. *Pneumococcal vaccination—increasing vaccination among eligible staff and inmates*

# 1. Antiviral Medications

Antiviral medications may help decrease the illness and death due to influenza. Should transmission of pandemic influenza become widespread, the most important goals of using antiviral medication are: (1) to prevent serious morbidity and death; and (2) to preserve the delivery of health care and other essential services, through early treatment and limited prophylaxis.

**Antivirals can be used in three ways:**
- **Treatment:** To treat flu cases (ideally should be started within 48 hours of symptom-onset).
- **Post-exposure prophylaxis:** To prevent the flu after exposure to someone sick with flu.
- **Prophylaxis:** To prevent the flu during an ongoing outbreak.

Early treatment is a more efficient use of antiviral medication than widespread prophylaxis. Two brands of antivirals are effective for treating influenza: oseltamivir (Tamiflu®) and zanamivir (Relenza®). BOP is stockpiling both drugs.

## Antiviral Treatment Recommendations

Treatment with oseltamivir or zanamivir is recommended for all persons with suspected or confirmed influenza requiring hospitalization. Treatment may be recommended for persons with suspected or confirmed influenza who are at higher risk for complications. In the event of pandemic influenza, the BOP Medical Director will issue specific guidance regarding high-risk groups to treat with antiviral medication.

The following are general recommendations regarding antiviral treatment. Prescribing information for oseltamivir and zanamivir are provided in *Attachment 2.1*.

- Oseltamivir is the generally recommended antiviral recommended for treatment during pregnancy.
- Zanamivir is contraindicated for inmates with airway disease.
- Treatment should not wait for laboratory confirmation of influenza because laboratory testing can delay treatment and because a negative rapid test for influenza does not rule out influenza.
- Treatment should be initiated as early as possible because studies show that treatment initiated early (i.e., within 48 hours of illness onset) is more likely to provide benefit.
- Clinical judgment is an important factor in antiviral treatment decisions for all patients presenting for medical care who have illnesses consistent with influenza.
- Persons who are not at higher risk for complications or do not have severe influenza requiring hospitalization generally *do not* require antiviral medications for treatment or prophylaxis. However, any suspected influenza patient presenting with warning signs and symptoms for lower respiratory tract illness (e.g., shortness of breath, rapid breathing, unexplained oxygen desaturation) should promptly receive empiric antiviral therapy.
- Clinicians should do the following to reduce delays in initiating antiviral treatment, including:

► Inform inmates at higher risk for influenza complications about the signs and symptoms of influenza and the need for early treatment after the onset of influenza symptoms (i.e., fever, respiratory symptoms).

► Start empiric treatment of patients at higher risk for influenza complications as soon as possible. See prescribing information for additional information.

## Antiviral Post-Exposure Prophylaxis Recommendations

Antiviral post-exposure prophylaxis involves providing medication to prevent development of influenza. Because use of antiviral medications for prophylaxis may contribute to the development of antiviral resistant influenza strains, antiviral prophylaxis will be provided within the BOP only under a limited number of circumstances as discussed in *Table 1* below.

---

**Table 1. Influenza Antiviral Prophylaxis within the BOP**

- **Inmates who are close contacts to persons with ILI who have medical conditions which place them at high risk for influenza complications** may be candidates for antiviral prophylaxis, based upon guidance from the Medical Director. Pregnant inmates are the highest priority.

- **In the event of significant health care shortages, health care workers (HCWs) who are close contacts to ILI cases may be offered antiviral prophylaxis.** The use of antiviral prophylaxis under this circumstance requires approval of the BOP Medical Director. Unless they take antiviral prophylaxis, exposed HCWs should not be assigned to care for inmates who are at high risk for influenza complications for the 4 days following potential exposure, i.e., 24 hours after fever resolves in the close contact(s) with ILI.

- **In the event of significant correctional staff shortages, BOP institutions can consider general antiviral prophylaxis of staff in order to maintain adequate staffing.** The use of antiviral prophylaxis under this circumstance requires the approval of the BOP Medical Director.

---

- For the purposes of assessing possible exposure, the infectious period—the time period when an exposure may have occurred—is one day before ILI symptoms occur until 24 hours after fever ends.

- Two drugs can be used for prophylaxis: oseltamivir and zanamivir. Pregnant women who are close contacts to a person with ILI are high priority for prophylaxis. Oseltamivir is generally recommended for pregnant women.

- Antiviral agents should not be used for post-exposure prophylaxis in healthy inmates.

- Antiviral prophylaxis generally is not recommended if more than 48 hours have elapsed since the last contact with an infectious person. Prophylaxis is not indicated when contact occurred before or after, but not during, the ill person's *infectious period* (as defined in the first bullet above). An emphasis on early treatment is an alternative to prophylaxis after a suspected exposure.

## 2. Pandemic Vaccine

The BOP will utilize CDC-defined priorities for prioritizing administration of a pandemic vaccine once it is developed and released for distribution. In the event of a pandemic, the BOP Medical Director will issue guidance regarding how the vaccine will be obtained and the priority groups for vaccination. Local institutions should have plans in place for mass vaccination.

Guidance on planning mass vaccination clinics is available at:
http:www.cdc.gov/flu/professionals/vaccination/vax_clinic.htm.

## 3.  Seasonal Flu Vaccine

Increasing the number of inmates and employees who are vaccinated for seasonal flu will decrease the occurrence of seasonal flu during a pandemic.  It will also help the institution be prepared logistically for mass vaccination if a pandemic vaccine is available.

## 4.  Pneumococcal Vaccine

It is generally recommended that pneumococcal vaccine be administered to individuals who are at high risk for complications from bacterial pneumonia (see *Table 2* below).  Preparation for pandemic flu includes improving pneumococcal vaccine coverage, thereby reducing the number of high risk individuals who develop bacterial pneumonia after becoming sick with pandemic flu. Inmates with risk factors should be identified and vaccinated.  Employees should be educated to obtain pneumococcal vaccine from their personal health care provider if they have risk factors.

| Table 2.  Risk Factors for Complications from Bacterial Pneumonia | |
|---|---|
| • chronic pulmonary disease (excluding asthma)<br>• cardiovascular diseases<br>• diabetes mellitus<br>• chronic liver diseases<br>• chronic renal failure or nephrotic syndrome<br>• functional or anatomic asplenia (e.g., sickle cell disease or splenectomy) | • immunosuppressive conditions (e.g., congenital immunodeficiency, HIV infection, leukemia, lymphoma, multiple myeloma, Hodgkin's disease, generalized malignancy, or organ transplantation)<br>• chemotherapy with alkylating agents, antimetabolites, or long-term systemic corticosteroids<br>• cochlear implants<br>• cerebrospinal fluid leaks<br>• chronic alcoholism |

# Action Steps by Pandemic Stage

**Preparation** (Federal Response Stages 0–1)
(See *Standard Operating Procedures*, which are provided for the Preparation stage only.)

1. Identify a health care staff person to be responsible for the planning for antiviral medication and vaccines.

2. Increase *seasonal flu* vaccination rates for employees and inmates.

3. Increase *pneumococcal* vaccination coverage rates for employees and inmates who have risk factors for pneumococcal pneumonia. (Employees must obtain via personal health care provider.)

4. Coordinate with local health department partners to ensure inclusion in the Strategic National Stockpile for *pandemic vaccine*.

5. Stockpile medications for community acquired pneumonia per recommendations of the BOP Medical Director.

6. Develop local plan for obtaining antivirals stockpiled in the region (coordinating with the Regional Office, in accordance with the regional distribution plan).

7. Educate employees and inmates regarding the need and rationale for assigning priorities for receiving *antiviral medication* and *pandemic vaccine*.

8. Develop local procedures for providing *antiviral medication* and *pandemic vaccine* to employees and inmates in accordance with federal law as well as BOP policies and procedures.

**Response** (Federal Response Stages 2–5)

*Begin when there are confirmed human outbreaks of pandemic flu anywhere in the world:*

1. Provide seasonal flu vaccine to high priority inmates and staff.

2. Review the priority groups for antiviral medication and criteria for prophylaxis as defined by the Medical Director.

3. Educate staff regarding the need for and rationale for priority groups.

4. All facilities should maintain a recommended stock of antiviral medication per direction of the BOP Medical Director. Facilities that house women should maintain an adequate stock of oseltamivir to provide treatment and prophylaxis to all pregnant inmates.

5. Review plans for accessing the Regional stockpile of antiviral medications (if demand exceeds local supply).

6. Finalize plans for mass vaccination, including arrangements for storage of vaccine.

*(continued on next page)*

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 2: Antiviral Medications and Vaccines
October 2012

***Begin after a suspected pandemic influenza case is diagnosed in the facility:***

7. Dispense antiviral medications and administer vaccinations according to priority groups.

8. Monitor for antiviral adverse events and report them using MEDWATCH Form FDA 3500.

9. Monitor adverse events from pandemic influenza vaccine and report them using the Vaccine Adverse Event Reporting System Form (VAERS-1).

10. Monitor efficacy and resistance patterns of antivirals.

11. Monitor efficacy of the vaccine.

12. Monitor antiviral/vaccine supplies, distribution, and use.

---

**Recovery** (Federal Response Stage 6)

---

*Previous flu pandemics have been associated with subsequent "waves" of flu after an initial wave resolves. After an initial pandemic flu outbreak, subsequent outbreaks are likely. The recovery period will involve both recovering from the pandemic emergency, evaluating the BOP response to it, and preparing for subsequent waves of pandemic flu.*

1. Evaluate efficacy and resistance of antivirals and pandemic influenza vaccine.

2. Evaluate adverse reactions of antiviral medications and pandemic influenza vaccine.

3. Assess whether the supply of antiviral medication and pandemic vaccine, as well as the supplies necessary for their delivery, were adequate.

4. Assess coordination with state and local health partners, as well as access to the Strategic National Stockpile.

5. Evaluate the effectiveness of the system for dispensing antivirals and administering vaccine.

## Module 2: Standard Operating Procedures for Preparation Stage
### (Federal Response Stages 0–1)

During the Preparation stage, adapt this Standard Operating Procedure template to the unique circumstances of your facility.  A modifiable Word version is posted on: www.bop.gov/news/medresources.jsp.

1. **Identify staff persons responsible for planning for the planning for antiviral medication and vaccines.**

In this facility, the following individual is assigned responsibility:


2. **Increase seasonal flu vaccination rates for employees and inmates.**

**Annually review influenza vaccination rates.  Set goals for improvement for the next season.**

a. Outline plan in this facility for improving employee vaccination rates.

b. Outline plan in this facility for improving inmate vaccination rates.


3. **Increase *pneumococcal* vaccination coverage rates for employees and inmates who have risk factors for pneumococcal pneumonia.**

a. **Employees:**  Develop strategies for promoting pneumococcal vaccine for employees with risk factors.  It will not be possible to track employee pneumococcal vaccinations since they are provided by their private practitioners.

In this facility, the following plan will be utilized to promote pneumococcal vaccine for employees:




b. **Inmates:**  Develop a system for identifying inmates with risk factors for pneumococcal pneumonia.

In this facility the following plan will be followed to improve pneumococcal vaccine coverage for inmates:



4. **Coordinate with local health department partners to ensure inclusion in the Strategic National Stockpile for *pandemic vaccine*.**

Contact local health department regarding Strategic National Stockpile.  Advocate that your facility be part of the plan.  Document discussions and attach to the plan.

5. **Stockpile medications for community acquired pneumonia per BOP Medical Director.**

Determine quantity and type of antibiotics to be stockpiled and plans for rotating stock.

7

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 2: Antiviral Medications and Vaccines
October 2012



| | |
|---|---|
| **6. Develop local plan for obtaining antivirals stockpiled in the region (coordinating with the Regional Office, in accordance with the regional distribution plan).** | |
| **a.** | In the event of pandemic flu, plans for obtaining stockpiled antivirals are: |
| **b.** | Identify location for storing antivirals in this facility. (For security reasons, do not record location in this document.) |
| **c.** | Plan for securing antivirals in this facility. The plan is: |
| **7. Educate employees and inmates regarding the need and rationale for assigning priorities for receiving *antiviral medication* and *pandemic vaccine*.** | |
| Indicate how and when education about priorities for antiviral medication and pandemic vaccine will be incorporated into general training about pandemic flu: | |
| **8. Develop local procedures for providing *antiviral medication* and *pandemic vaccine* to employees and inmates.** | |
| Detail separate procedures for providing antiviral medication and administering pandemic vaccine (including identifying needed supplies and plans for obtaining them): | |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 2: Antiviral Medications and Vaccines
October 2012

# Attachments

Attachment 2.1:  Prescribing Information for Zanamivir and Oseltamivir

Attachment 2.2:  Antiviral Medication – Medical Evaluation, Consent, and Prescribing

Attachment 2.3:  Guidance for Acquisition, Storage, and Use of Antiviral Medication Procurement

Attachment 2.4:  Quarterly Pandemic Influenza Medication Certification

## Attachment 2.1. Prescribing Information for Zanamivir and Oseltamivir

---

### Zanamivir (Relenza®)

---

### How Supplied and Storage

**Relenza** (GlaxoSmithKline) **Powder.** Blister for inhalation. Four 5 mg blisters of powder on a ROTADISK® for oral inhalation via DISKHALER®. Packaged in carton containing 5 ROTADISKs (total of 10 doses) and 1 DISKHALER inhalation device.

*Store DISKHALER and blister packs at 77°F (excursions permitted from 59° to 86°F). Do not puncture any blister until just before inhaling a dose.*

### Indications and Administration Dose

Uncomplicated acute illness caused by influenza A and B virus in adults and children 7 yr of age and older who have been symptomatic for no longer than 2 days; prophylaxis of influenza in adults and children 5 yr of age and older. For oral inhalation only (not nasal inhalation).

**Influenza Treatment:** *Adults and children 7 years of age and older:* Oral inhalation: Two 5 mg inhalations (10 mg total) twice per day for 5 days. Treatment generally should begin within 2 days of onset of influenza. Two doses should be taken on the first day of treatment whenever possible, provided there is at least 2 hours between doses. On subsequent days, doses should be about 12 hours apart at approximately the same time each day.

**Influenza Post-Exposure Prophylaxis:** *Adults and children 5 yr of age and older:* Oral inhalation: 2 inhalations (one 5 mg blister per inhalation) once daily for 10 days. Treatment should begin within 2 days of exposure.

**Influenza Prophylaxis Community Outbreak:** *Adults and adolescents:* Oral inhalation: 2 inhalations (one 5 mg blister per inhalation) once daily for 28 days.

### Contraindications

Do not use in patients with history of allergic reactions to any ingredient of Relenza® including lactose (which contains milk proteins).

### Warnings and Precautions

- *Pregnancy:* Category C.
- *Lactation:* Undetermined.
- *Bronchospasm:* Serious, sometimes fatal cases have occurred. *Not recommended in individuals with underlying airway disease* (including asthma and chronic obstructive pulmonary disease). Discontinue Relenza® if bronchospasm or decline in respiratory function develops.
- *Hypersensitivity:* Allergic-like reactions, including oropharyngeal edema, serious skin rashes, and anaphylaxis, have been reported in postmarketing experience, including in patients sensitive to lactose (milk proteins).
- *High-risk patients:* Safety and efficacy not demonstrated in patients with high-risk underlying medical conditions.
- *Neuropsychiatric events:* Delirium and abnormal behavior leading to injury have been reported in postmarketing experience.

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 2: Antiviral Medications and Vaccines
October 2012

*Zanamivir (Relenza®) — continued*

## Adverse Reactions

The most common adverse events reported in >1.5% of patients treated with Relenza® and more commonly than in patients treated with placebo are:

- *Treatment Studies:* dizziness, sinusitis
- *Prophylaxis Studies:* fever and/or chills, arthralgia and articular rheumatism

## Drug Interactions

Live attenuated influenza vaccine, intranasal:

- Do not administer until 48 hours following cessation of Relenza®.
- Do not administer Relenza® until 2 weeks following administration of the live attenuated vaccine, unless medically indicated.

## Pharmacology and Pharmacokinetics

- Inhibition of influenza virus neuraminidase, affecting release of virus particles.
- *Absorption:* About 4% to 17% of orally inhaled dose is systemically absorbed. C max is 17 to 142 ng/mL, and T max is 1 to 2 hours following a 10 mg dose. The AUC is 111 to 1,364 ng$h/mL.
- *Excretion:* Renally excreted as unchanged drug in urine. Serum half-life is 2.5 to 5.1 h. Total Cl is 2.5 to 10.9 L/h. Unabsorbed drug is excreted in feces.

---

# Oseltamivir (Tamiflu®)

---

## How Supplied and Storage

- 30 mg capsules, blister pack of 10 capsules
- 45 mg capsules, blister pack of 10 capsules
- 75 mg capsules, blister pack of 10 capsules.
- Powder for oral suspension (12 mg/ml after reconstitution), 25 ml bottle.

*Store at 77°F (with excursions allowed 59° to 86°) for both capsules and suspension.*

## Indications and Administration Dose

**Influenza Treatment:** For uncomplicated acute illness from influenza viruses type A and B, in patients greater than 12 months old who have been symptomatic for no more than 2 days.

- *Adults and Adolescents ≥ 13 years old:* 75 mg twice daily for 5 days. Begin treatment within 2 days of onset of symptoms.
- *Renal Function Impairment (creatinine clearance between 10–30 ml/min):* 75 mg once daily for 5 days.

**Post-Exposure Prophylaxis:** For adults and adolescents exposed to influenza type A and B in there are two situations in which prophylaxis can be used: (1) after a discrete exposure (one 10-day course); and (2) in the context of ongoing exposure.

- *Adults and Adolescents > 13 years old:* 75 mg once daily for at least 10 days. Therapy should start within 2 days of exposure. Safety and efficacy in a community outbreak setting have been demonstrated for up to 6 weeks in immunocompetent patients and up to 12 weeks in immunocompromised patients.
- *Renal Function Impairment (creatinine clearance between 10–30 ml/min):* 75 mg capsule every other day or 30 mg every day

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 2: Antiviral Medications and Vaccines
October 2012

*Oseltamivir (Tamiflu®) — continued*

## Contraindications

- Hypersensitivity to any component.

## Warnings and Precautions

- Should not affect the evaluation of individuals for annual influenza vaccination.
- **Pregnancy Category C:** Animal studies suggest that fetal risk is possible, but there is no evidence that Oseltamivir is harmful in humans. Benefits should outweigh risks.
- **Lactation:** Excretion through lactation was mild in animal studies, but it is not known whether Oseltamivir is excreted in human milk. Benefits should outweigh risks.
- Cases of anaphylaxis and serious skin reactions including toxic epidermal necrolysis, Stevens-Johnson Syndrome, and erythema multiforme have been reported in postmarketing experience. Treatment should be stopped and appropriate therapy instituted if an allergic-like reaction occurs or is suspected.
- There have been postmarketing reports (mostly from Japan) of delirium and abnormal behavior leading to injury, and in some cases resulting in fatal outcomes, in patients with influenza who were receiving oseltamivir.

## Drug Interactions

Live attenuated influenza vaccine, intranasal:

- Do not administer until 48 hours following cessation of Oseltamivir.
- Do not administer Oseltamivir until 2 weeks following administration of the live attenuated vaccine, unless medically indicated.
- Oseltamivir is not a substrate for, or inhibitor of, cytochrome P450 isoenzymes.
- Clinically significant drug interactions are unlikely.

---

## For more information ...

Antiviral medication information from CDC: http://www.cdc.gov/flu/antivirals/

Relenza® – Full Prescribing Medication Package Insert: http://www.gsk.com/products/prescription-medicines/relenza.htm

Tamilfu® – Full Prescribing Medication Package Insert: http://www.rocheusa.com/products/tamiflu/pi.pdf

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 2: Antiviral Medications and Vaccines
October 2012

## Attachment 2.2.  Antiviral Medication – Medical Evaluation, Consent, and Prescribing

| **What medical problems have you had?** | | |
|---|---|---|
| ☐No | ☐Yes | Do you have allergies to any medications?  List: |
| ☐No | ☐Yes | Do you have a history of kidney disease?  Describe: |
| ☐No | ☐Yes | Are you allergic to Tamiflu® (oseltamivir) or Relenza® (zanamivir)? |
| ☐No | ☐Yes | Are you pregnant? If yes, what is your due date? ___/___/___ |
| ☐No | ☐Yes | Are you planning on becoming pregnant within the next year? |
| ☐No | ☐Yes | Are you nursing (breast feeding)? |
| ☐No | ☐Yes | Do you have asthma or chronic obstructive pulmonary disease? (*Do not use Relenza®.*) |
| ☐No | ☐Yes | Do you have flu symptoms? If yes, check all that apply: <br> ☐ fever   ☐ cough   ☐ shortness of breath   ☐ sore throat <br> When did your symptoms start? ___ hours ago    ___ days ago |
| ☐No | ☐Yes | Have you been in contact with anyone who has flu symptoms? <br> If yes, how long ago? ___ days |
| **List medications that you currently take (medication/dose):** | | |

| **Health Care Provider Only:** | | |
|---|---|---|
| Patient has contraindications to antiviral therapy and is not approved. List reasons: | | |

| | **Prescription for Tamiflu® (oseltamivir)** | **Prescription for Relenza® (zanamivir)** |
|---|---|---|
| **Influenza treatment** | ☐ 75 mg twice daily for 5 days <br> ☐ Renal impairment: once daily for 5 days | ☐ 10 mg (2 puffs) twice daily for 5 days |
| **Influenza post-exposure prophylaxis** | ☐ 75 mg twice daily for 5 days <br> ☐ Renal impairment: once daily for 5 days | ☐ 10 mg (2 puffs) once daily for 10 days |
| **Influenza prophylaxis (ongoing)** | ☐ 75 mg twice daily for ___ days <br> ☐ Renal impairment: 75 mg once daily every other daily for ___ weeks | ☐ 10 mg (2 puffs) once daily for ___ weeks |
| Provider signature and stamp: | | Date: ___/___/___ |

- I have been counseled regarding antiviral medication therapy.  I am aware that in order to be eligible to receive antiviral medication, I must participate in medical evaluation.
- I have been advised to call my personal physician if signs and symptoms of the flu develop.
- I was offered the opportunity to ask questions during the visit.  The medical information I provided above is complete and accurate to the best of my knowledge.
- I am aware that this medication is being prescribed for my personal use only, and that I am not to sell it or give it to anybody else.
- I am also aware that I am to contact my personal physician if any changes to my medical status occur, or if I am experiencing adverse effects from antiviral medication.

Patient signature: _____    Date: ___/___/___

Witness signature: _____    Date: ___/___/___

| Institution | Identification |
|---|---|
| | |

13

## Attachment 2.3.  Guidance for Acquisition, Storage, and Use of Antiviral Medication Procurement

Each regional HSA will maintain a stockpile of Tamiflu® and Relenza® per guidance from the BOP Medical Director.

**Storage:**  Each regional HSA will designate a central storage facility within their respective region. Medication will be properly stored in accordance with the current Pharmacy Program Statement, PS6360.01.  Each storage site will store product in a secured and proper temperature-controlled area, and will segregate pandemic stock from inventory intended for inter-pandemic use.  Verification of proper storage temperature must be maintained on site.

**Verification:**  On a quarterly basis, each regional HSA or designee is to complete the *Quarterly Pandemic Influenza Medication Certification* (*Attachment 2.4*). Certification will verify the quantity on hand, expiration date, and appropriate storage conditions (temperature).  The original is to be maintained on site, with a copy forwarded to the BOP Chief Pharmacist or designee.

**Restricted Use:**  Product cannot be dispensed for inter-pandemic use.   Product may only be dispensed once Phase VI of the World Health Organization (WHO) influenza pandemic phase is declared by the WHO, as referenced in Section 1, Part V, of the *Pandemic Influenza Preparedness and Response Plan* issued by the U.S. Department of Health and Human Services in August 2004.  A national and state-specific pandemic influenza declaration by the U.S. Department of Health and Human Services (ACDC@) will also allow release of product under this agreement.  Only the BOP Medical Director can authorize the use of stockpiled medication.  In the event of a pandemic outbreak, the Medical Director will issue written notice of authorized use.

**Distribution:**  Each regional HSA will develop a plan to distribute medication from the stockpile site to individual institutions in the event of a pandemic outbreak, with staging at the direction of the BOP Medical Director or designee.

**Dispensing:**  The BOP Medical Director will authorize dispensing and distribution of antiviral medication, once a pandemic is declared as defined above.  Dispensing will occur by designated health care staff according to PS6360.01.  A dispensing log will be maintained of all medication dispensed to inmates and staff and documented in BEMR.  Once an influenza outbreak has been resolved, return unused antiviral medication to the Regional Office stockpile within 6 to 8 weeks.

**Record Keeping:**  All records of procurement, storage, distribution, and dispensing must be kept on site for a period of at least five years beyond the purchase agreement terms.  In the event of an audit, copies of all records will be requested to be sent to the Central Office within 10 days of request.  A perpetual inventory will be maintained from procurement, through distribution and dispensing to the patient, documenting the appropriate chain of custody.

## Attachment 2.4.  Quarterly Pandemic Influenza Medication Certification

Region: _____    Storage Facility: _____

Date of Certification: ___/___/___    Date of Last Certification: ___/___/___

| | Oseltamivir | | Zanamivir | |
|---|---|---|---|---|
| | Quantity | Lot and Expiration Date | Quantity | Lot and Expiration Date |
| Beginning balance | | | | |
| Quantity received ( + ) | | | | |
| Quantity distributed, detail below ( − ) | | | | |
| TOTAL ON HAND | | | | |

| Antiviral Distributed | | | |
|---|---|---|---|
| Institution | Date Sent | Quantity of Oseltamivir Sent | Quantity of Zanamivir Sent |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Antiviral Returned | | | |
|---|---|---|---|
| Institution | Date Returned | Quantity of Oseltamivir Returned | Quantity of Zanamivir Returned |
| | | | |
| | | | |
| | | | |
| | | | |

I certify that the above quantities are correct and that all medication has been properly stored and secured, in accordance with manufacturer's recommendations and purchase agreement.

_____    _____    _____
Signature                           Printed Name                        Title

_____    _____    _____
Witness Signature                  Printed Name                        Title

Exhibit N

BOP Pandemic Plan
Module 3

**Federal Bureau of Prisons**
**Health Services Division**

# Pandemic Influenza Plan

# Module 3:
# Health Care Delivery

**October 2012**

# BOP Pandemic Influenza Response Stages

The BOP *Pandemic Influenza Plan* is divided into the three stages that are used for standard BOP contingency plans; in this plan, the three stages are designed to correlate with the Federal Government Response Stages for pandemic influenza.

**The BOP Pandemic Influenza Response Stages are as follows:**

- **PREPARATION** (Federal Response Stages 0–1). Most of the detail in this plan involves the preparation phase.

- **RESPONSE** (Federal Response Stages 2–5). This phase, which begins when it is announced that there are confirmed human outbreaks overseas, involves both making last-minute preparations and actually responding to pandemic flu.

- **RECOVERY** (Federal Response Stage 6). This phase involves recovering from the pandemic, evaluating actions taken during the pandemic, and preparing for more flu. Based on what we know from previous pandemics, subsequent waves of flu are likely to follow once the pandemic flu has subsided.

| Federal Government Response Stages* | | BOP Influenza Plan | |
|---|---|---|---|
| | | **Federal Stages** | **BOP Stage** |
| **0** | New domestic animal outbreak in at-risk country | **0-1** | **PREPARATION** |
| **1** | Suspected human outbreak overseas | | |
| **2** | Confirmed human outbreak overseas | **2-5** | **RESPONSE** |
| **3** | Widespread human outbreaks in multiple locations overseas | | |
| **4** | First human case in North America | | |
| **5** | Spread throughout United States | | |
| **6** | Recovery & preparation for subsequent waves | **6** | **RECOVERY** |
| *The Federal Government Response Stages should not be confused with the World Health Organization phases of pandemic influenza.* | | | |

i

# Table of Contents

OVERVIEW ................................................................................................................ 1

    TABLE A.  Potential Alterations in Health Care Delivery—Based on Degree of
             Disruption Associated with Pandemic Flu ............................................ 1

    TABLE B.  Pandemic Influenza:  Projected Number of Flu Cases and
             Flu-Related Deaths ............................................................................ 2

ACTION STEPS BY PANDEMIC STAGE ..................................................................... 4

STANDARD OPERATING PROCEDURES FOR PREPARATION STAGE .................................. 6

ATTACHMENTS ......................................................................................................... 8

    Attachment 3.1.  BOP Pandemic Influenza Clinical Practice Guidelines .......................... 9

        1.  Clinical Diagnosis ............................................................................................... 9

        2.  Clinical Features of Uncomplicated Influenza ...................................................... 10

                TABLE 1.  Range of Symptoms Associated with Uncomplicated
                        Seasonal Influenza Infection ................................................... 10

        3.  Complications of Influenza ................................................................................ 10

                TABLE 2.  BOP Antiviral Medication Priority Groups:  Persons at
                        High Risk for Influenza Complications ..................................... 10

        4.  Influenza-Related Pneumonia .......................................................................... 11

        5.  Clinical Management of Influenza ...................................................................... 12

                TABLE 3.  Key Patient Education Messages – Pandemic Influenza ...................... 12

                TABLE 4.  Influenza Signs and Symptoms Meriting Clinical Evaluation .............. 13

                TABLE 5.  CRB-65 Severity Scoring Tool (for use with
                        pandemic influenza) ................................................................ 14

                TABLE 6.  Recommendations Based on CRB-65 Scores ..................................... 14

    Attachment 3.2.  Medical Supply List for Pandemic Flu ..................................................... 16

    Attachment 3.3.  Non-Prescription and Prescription Drugs for Pandemic Flu ............... 17

    Attachment 3.4.  Oral Rehydration Solution (ORS) .......................................................... 18



Federal Bureau of Prisons
Pandemic Influenza Plan

Module 3: Health Care Delivery
October 2012

## Overview

During pandemic flu, health care delivery may have to be altered to accommodate an increased number of inmates who are sick with the flu, and for shortages in personnel, equipment, and supplies. Standards of care that apply under normal circumstances may have to be modified. In the event of severe disruption, the allocation of scarce personnel, equipment, and supplies may have to be shifted to focus on saving the most number of lives possible—rather than the traditional focus on saving individual lives. *Each facility should develop plans for health care delivery during pandemic flu, based on the relative degree of disruption to the prison health care system*.

*Table A* below provides a framework for how standards of care may shift during a pandemic, as the demand for health services increases and the ability of health care resources to respond is reduced.

| Table A. Potential Alterations in Health Care Delivery—Based on Degree of Disruption Associated with Pandemic Flu | |
|---|---|
| **NORMAL CONDITIONS** ➡ | **NORMAL STANDARDS OF CARE** |
| • Normal resources and demands | • No change in standards of care |
| **MILD DISRUPTION** ➡ | **NEAR-NORMAL STANDARDS OF CARE** |
| • Slightly reduced health care staffing<br>• Some inmates ill; few severely ill<br>• Community hospitalization available | **Possible adjustments include:**<br>• Altered site of care for flu patients<br>• Rearrange health care staffing/roles<br>• Reduce preventive health care services (continue TB screening and influenza vaccination)<br>• Maintain chronic care clinics<br>• Provide care for minor ailments, as feasible |
| **MODERATE DISRUPTION** ➡ | **REVISED MEDICAL CARE STANDARDS** |
| • Health care staffing somewhat reduced<br>• Some shortages of supplies/medications<br>• Limited laboratory capability<br>• Many inmates ill; some severely ill<br>• Limited community hospitalization available for sickest inmates | **Possible adjustments include:**<br>• Prioritize delivery of chronic care<br>• Minimize pill line; provide 4-6 week supply of chronic care pill line meds to some inmates<br>• Eliminate most preventive health care except TB screening, influenza and pneumococcal vaccination<br>• Focus on key life-saving care<br>• Send severely ill to hospital<br>• Eliminate care for low priority health problems |
| **SEVERE DISRUPTION** ➡ | **TOTAL SYSTEM/STANDARDS ALTERATION** |
| • Health care staffing significantly reduced<br>• Significant shortages supplies/medications<br>• No lab capability; no chest radiography<br>• Numerous inmates ill; many severely ill<br>• No contract health care or subspecialists<br>• No community hospitalization available | **Possible adjustments include:**<br>• Focus on key life-saving care<br>• Cohort sickest inmates/provide palliative care<br>• Deliver care in accordance with priorities established by the BOP Medical Director |

The degree of disruption caused by pandemic flu will be dictated in large part by how *infectious* the virus is (the flu attack rate) and the *virulence* of the virus (the death rate). In preparing for pandemic flu, planners in local facilities should review *Table B* below to assess the possible impact of pandemic flu on their facility: estimating the number of inmates who might become ill, based on *flu attack rates,* and the associated deaths, based on *death rates.*

| Table B. Pandemic Influenza: Projected Number of Flu Cases and Flu-Related Deaths *(per 1000 inmates, based on flu attack rates and flu death rates)* | | | | | | |
|---|---|---|---|---|---|---|
| Flu Attack Rate | Projected Flu Cases *(per 1000 inmates)* | Projected Flu-Related Deaths *(per 1000 inmates)* Death Rate Among Flu Victims: | | | | |
| | | 1% | 2% | 3% | 4% | 5% |
| 30% | 300 | 3 | 6 | 9 | 12 | 15 |
| 40% | 400 | 4 | 8 | 12 | 16 | 20 |
| 50% | 500 | 5 | 10 | 15 | 20 | 25 |

BOP institutions are encouraged to review the issues identified below and start planning for health care delivery with pandemic flu.

## Influenza Clinical Guidelines

*Attachment 3.1* outlines clinical practice guidelines for pandemic flu. Facility clinicians should carefully review these guidelines and assess how they would be applied in this facility. Training should be provided on the clinical practice guidelines for health care staff in preparation for pandemic flu.

## Prioritizing Care for Other Health Problems

With the increased demands posed by flu and the potential for reduction in health care resources, it may be necessary to prioritize health care for health care problems other than flu. In the event of pandemic flu, the Medical Director will issue specific guidance for prioritizing delivery of health care.

In preparation for pandemic flu, facilities should develop a means for rapidly identifying patients who require daily life-sustaining interventions or supervised medication. Included in the highest priority group are insulin dependent diabetics, renal dialysis patients and other seriously ill patients. Priority also should be given to inmates who, if untreated, would provide problems related to security, e.g., treatment of schizophrenics or those with other mental health problems; seizure disorders. It is also important to identify lower priority problems for which treatment or evaluation can be deferred.

## Health Care Staffing

Current (or reduced) health care staffing levels may be inadequate to meet the demand both of routine health care and that created by a surge of flu cases. Alternative staffing plans should be developed to provide 12 to 24-hour coverage. Facilities should plan to supplement highly trained health care staff with non-health care staff.

In the event that 24-hour shifts become necessary, staff should be advised to bring changes of clothes, bedding, medications, etc., so they can be as comfortable as possible. There should be a place for staff to take rest breaks and provide a way for them to shower and do laundry.

## Logistics

A practical approach to delivering care for hundreds of sick inmates must be developed by each facility. Outlined below are considerations when planning for pandemic flu.

- **Location:** Identify appropriate locations to house and care for large numbers of inmates who are sick with flu. Determine how and where sick inmates would be housed based upon different estimates for the percentage of inmates who are ill (i.e., 20%, 30%, 40%, 50%). Ideally these locations would be located adjacent to bathroom facilities. Possible locations include existing dormitories, gymnasium, or chapel. Bunk beds may or may not be suitable depending upon the how sick the inmates become.

- **Mattresses/Cots:** Mattresses can be placed either on cots (ideally) or on the floor. However, it is important to devise some method to elevate the head of the bed to facilitate breathing. Given that flu patients may suffer from vomiting, diarrhea and incontinence, some method should be devised to assure that mattresses are impervious (either existing plastic covers or covering the mattresses with plastic bags).

- **Linens:** At least two sets of sheets will be needed for each sick inmate with plans for laundering them. Towels, wash cloths or rags will be needed for cleaning and drying.

- **Other:** Anticipate the need for bedpans and urinals. Develop plan for disposing of human waste. Plan for something to use as emesis basins, e.g., paper bags lined with plastic bags (for easy disposal of waste). *Attachment 3.2* lists other supplies to consider for stockpiling.

## Organization of Health Care Delivery

Consider methods to most efficiently delivery health care during pandemic flu, including altered roles for staff and how to organize care for large numbers of inmates. During pandemic flu "lock-down" may be utilized for social distancing. Strategies should be developed to overcome the significant obstacles posed by "lock-down" for health care delivery. Pill lines may need to be suspended (except for controlled substances and those likely to destabilize the security of the institution, e.g., quetiapine). To facilitate medication delivery, certain groups of inmates may need to be cohorted, e.g., insulin dependent diabetics.

6. Treat acute influenza cases in ward setting. Reorganize health care delivery to increase efficiency.

   a. Implement clinical guidelines for flu with emphasis on:
      - maintaining adequate hydration
      - treating high priority flu patients with antivirals per CDC priority groups
      - treating suspected secondary pneumonia with antibiotics

   b. Inmates with a CRB-65 Score of 3 to 5 should be hospitalized (if community resource is available). Inmates with a CRB-65 Score of 2 should be considered for hospitalization. See *Attachment 3.1, BOP Pandemic Influenza Clinical Practice Guidelines*.

   c. Assess availability of resources such as community hospitalization, laboratory testing, chest radiography and ventilatory support.

7. If decision is made to lock down:

   a. Consider suspending pill lines and issuing safe and reasonable quantities of pill line medications (except for controlled substances and medications likely to destabilize the security of the institution).

   b. Insulin will still have to be administered because it has to be refrigerated and requires needle and syringe. Consider clustering inmates on insulin.

---

## Recovery (Federal Response Stage 6)

*Previous flu pandemics have been associated with subsequent "waves" of flu after an initial wave resolves. After an initial pandemic flu outbreak, subsequent outbreaks are likely. The recovery period will involve both recovering from the pandemic emergency, evaluating the BOP response to it and preparing for subsequent waves of pandemic flu.*

1. Begin discharge of inmates from isolation wards.

2. Initiate terminal cleaning procedures for quarantine areas.

3. Resume normal operations of the Health Services Unit.

4. Prepare for secondary / tertiary waves of pandemic flu.

5. Return to normal staffing schedules. Provide additional time off, if possible.

6. Evaluate delivery of health services during pandemic flu.

7. Write a summary report, identifying recommendations for future waves of the pandemic for the Regional and Central Office.

## Module 3:  Health Care Delivery
# Standard Operating Procedures for Preparation Stage
### (Federal Response Stages 0–1)

| |
|---|
| During the Preparation stage, adapt this Standard Operating Procedure template to the unique circumstances of your facility.  A modifiable Word version is posted on: *www.bop.gov/news/medresources.jsp*. |
| **1.   Identify staff persons responsible for planning for and directing health care delivery during pandemic influenza.** |
| The staff person assigned is:<br>An alternate staff person is: |
| **2.   Review *Attachment 3.1, BOP Pandemic Influenza Clinical Practice Guidelines*, and assure training of clinical staff.** |
| The following plan will be followed to assure that staff are updated on the *Pandemic Flu Clinical Practice Guidelines*: |
| **3.   Calculate estimates of the number of ill inmates in your facility based on the percentage who become ill.** |

Multiply "multiplier" by the "# inmates in facility" to calculate projected number ill:

| Percent ill | Multiplier | # inmates in facility | Projected # ill |
|---|---|---|---|
| 20% | 0.2 | | |
| 30% | 0.3 | | |
| 40% | 0.4 | | |
| 50% | 0.5 | | |

**4.   Identify high and low priority health care delivery functions.**

**a.**   Identify categories of inmate health problems that will require ongoing care during a pandemic emergency and the current number of inmates who fall into each category.

Indicate the illnesses that are high priority for ongoing health care and the number of inmates who fall into each category:  insulin dependent diabetes (___), renal dialysis (___), ...

The following illnesses are high priority for security reasons:  schizophrenia (___), seizure disorders (___), ...

**b.**   Identify categories of health problems and health services that are low priority and non-essential that could be eliminated with pandemic flu.

**c.**   In a pandemic emergency, inmates with high priority medical problems will be identified rapidly as follows:

6

| |
|---|
| **5.  Develop plans for augmenting health care staffing during pandemic flu.** |
| **a.**  Develop alternative plans for 12- to 24-hour staffing and describe here: |
| **b.**  Develop list of health care functions that can be performed by non-licensed individuals. |
| **c.**  Identify non-health care staff with health care experience who might be utilized during pandemic flu. |
| **6.  Develop plans for "isolation" wards to accommodate up to 20%, 30%, 40%, and 50% of the inmate population.** |
| **a.**  Identify locations where care can be provided to large numbers (ideally adjacent to toilet facilities), e.g., gymnasium, chapel, existing dormitories.  Bunk beds may not be appropriate, depending upon illness severity. |
| **b.**  Identify what will be utilized for beds (cots or mattresses on floor). |
| **c.**  Identify method to elevate the heads of the mattresses. |
| **d.**  Assure that mattresses utilized can have impervious cover, e.g., existing plastic covering, large plastic trash bags. |
| **7.  Develop plan for increasing par levels of medical and related supplies.** |
| Referencing *Attachment 3.2, Medical Supply List for Pandemic Flu,* develop and implement facility-specific plan for increasing par levels of certain medical supplies as follows: |
| **8.  Develop plan for increasing par levels of pharmaceuticals with pandemic flu.** |
| Referencing *Attachment 3.3, Non-Prescription and Prescription Drugs for Pandemic Flu,* develop and implement facility specific plan for increasing par levels of certain over-the-counter and prescription drugs for treating flu and other chronic illnesses as follows: |
| **9.  Develop facility-specific plan for health care delivery during pandemic flu.** |
| Address reassignment of health care roles, flow of health care delivery, clustering of sickest inmates, methods for overcoming inefficiencies posed by "lock-downs," documentation, etc. |

# Attachments

*Attachment 3.1*:  BOP Pandemic Influenza Clinical Practice Guidelines

*Attachment 3.2*:  Medical Supply List for Pandemic Flu

*Attachment 3.3*:  Non-Prescription and Prescription Drugs for Pandemic Flu

*Attachment 3.4*:  Oral Rehydration Solution (ORS)

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 3: Health Care Delivery
October 2012

# Attachment 3.1.  BOP Pandemic Influenza Clinical Practice Guidelines

This *Pandemic Influenza Clinical Practice Guideline* is made available to the public for informational purposes only. The Federal Bureau of Prisons (BOP) does not warrant these guidelines for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof.  Proper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient specific.  Consult the BOP Clinical Practice Guideline Web page to determine the date of the most recent update to this document: *http://www.bop.gov/news/medresources.jsp*.

## References

These guidelines are adapted from:

(1)  Department of Health and Human Services, Pandemic Influenza Plan, Supplement 5 Clinical Guidelines (December 2, 2005).  Available from: *http://www.hhs.gov/pandemicflu/plan/#part2* and

(2)  British Thoracic Society. Guidelines for the clinical management of patients with an influenza-like illness during an influenza pandemic (January 2007).  Available from: *http://www.brit-thoracic.org.uk/Portals/0/Clinical%20Information/Influenza/Guidelines/pandemicflupdf07.pdf*

(3)  Infectious Disease Society of America. Seasonal influenza in adults and children—diagnosis, treatment, chemoprophylaxis, and institutional outbreak management: clinical practice guidelines of the Infectious Diseases Society of America.  CID 2009;48:1003-1032.  Available from: *http://www.idsociety.org/Content.aspx?id=9088*

---

### Contents
1. *Clinical Diagnosis*
2. *Clinical Features of Uncomplicated Influenza*
3. *Complications of Influenza*
4. *Influenza-Related Pneumonia*
5. *Clinical Management of Influenza*
   a. Patient Education and Symptomatic Treatment
   b. Patient Assessment
   c. Triage
   d. Criteria for Hospital Referral
   e. Use of Antiviral Medication
   f.  Use of Antibiotics

---

The following guidelines are based upon experience with seasonal influenza, as well as reports on previous occurrences of pandemic influenza.  The manifestations of pandemic influenza cannot be fully predicted.

## 1.  Clinical Diagnosis

Laboratory testing for influenza is primarily a surveillance tool used to determine whether or not the respiratory illness that is being seen is in fact influenza.  After it has been determined that influenza is circulating, a clinical definition for influenza is generally utilized.  The clinical manifestations of infection by influenza viruses are diverse, ranging from asymptomatic infection to fulminant respiratory distress leading to respiratory failure and death.

The three-fold combination of *fever*, *cough*, and *acute onset of symptoms* are the most predictive clinical features.  Importantly, the predictive value of a clinical definition of influenza-like illness (ILI) increases significantly when they occur in the context of *influenza circulating in the community.*

---

**BOP Influenza-Like Illness (ILI) Clinical Case Definition:**

Fever (temperature of 100° F [37.8° C]) plus either cough or sore throat—
in the absence of a known cause other than influenza.

---

## 2. Clinical Features of Uncomplicated Influenza

The range of symptoms associated with uncomplicated influenza infection are summarized in Table 1. *Fever* is the paramount symptom and may reach 41° C although more usually it ranges between 38-40° C. The peak occurs within 24 hours of onset and lasts typically for 3 days (range 1–5 days). The *cough* is generally dry, but in 40% of cases it may be productive. A productive cough together with chest tightness and substernal soreness is more common in patients with underlying chronic lung disease. *Myalgia* affects mainly the back and limbs.

### Table 1. Range of Symptoms Associated with Uncomplicated Seasonal Influenza Infection

| | | |
|---|---|---|
| Fever (~100%) | Headache (~65%) | Sore throat (~50%) |
| Cough (~85%) | Anorexia (~60%) | Gastrointestinal symptoms (<10%) |
| Malaise (~80%) | Rhinorrhea (~60%) | |
| Chills (~70%) | Myalgia (~53%) | |

Clinical findings include a toxic appearance in the initial stages, hot and moist skin, a flushed face, and injected eyes. Tender cervical lymphadenopathy is found rarely (~10%). In uncomplicated infection, the illness usually resolves in seven days. However, cough, malaise and lassitude may persist for weeks. The spectrum of clinical disease associated with a pandemic strain cannot be predicted.

## 3. Complications of Influenza

Influenza virus infection has been associated with worsening of certain clinical conditions, i.e., heart failure, diabetes, coronary heart disease, asthma, and chronic obstructive pulmonary disease. Individuals in the following risk groups have a higher risk of developing complications to seasonal influenza.

### Table 2. Persons at High Risk for Influenza Complications

- **Pregnant women or post-partum women within 2 weeks of delivery**
- **Adults 65 years of age or older**
- **Persons with the following medical conditions:**
  - Chronic pulmonary disorders (including asthma) (should generally be treated with Tamiflu)
  - Cardiovascular disorders (except hypertension)
  - Renal disorders
  - Hepatic disorders
  - Hematological disorders (including sickle cell anemia)
  - Neurologic disorders (including disorders of the brain, spinal cord, peripheral nerve, and muscles— such as cerebral palsy, epilepsy, stroke, intellectual disability, moderate to severe developmental delay, muscular dystrophy, or spinal cord injury)
  - Cognitive disorders (e.g., serious mental health disorders)
  - Neuromuscular disorders
  - Metabolic disorders (including diabetes mellitus)
  - Immunosuppression, including that caused by medications or HIV
  - Morbid obesity (BMI ≥ 40)

In addition, there are specific complications associated with influenza infection, regardless of existing medical conditions, listed below.

## Respiratory

- **Acute bronchitis** is common, more often occurring in the elderly and those with chronic medical conditions.
- **Primary viral pneumonia** is uncommon in seasonal flu, but was a frequent occurrence in the 1918-19 pandemic flu, particularly among young adults.
- **Secondary bacterial pneumonia** occurs frequently, typically 4–5 days after illness onset.

## Cardiovascular

ECG abnormalities are common, usually with no cardiac symptoms. These include non-specific T wave and rhythm changes and ST segment deviation. Myocarditis and pericarditis both are rare complications.

## Central Nervous System

CNS complications rarely occur. These include encephalitis/ encephalopathy (which generally occurs in the first week of illness) and transverse myelitis and Guillain-Barre syndrome which are both very rare.

**Other complications** include otitis media (common in children). Very rarely toxic shock syndrome and parotitis occur.

## 4. Influenza-Related Pneumonia

The incidence of pneumonia complicating influenza infection varies widely, from 2% to 38%, depending on viral and host factors. Pneumonia generally occurs more frequently and with greater severity in patients with preexisting chronic cardiac and respiratory conditions.

In the context of an influenza pandemic, the presence of an ILI and new or worsening dyspnea should prompt a careful examination for presence of complicating pneumonia. Two main types of influenza-related pneumonia are recognized: primary viral pneumonia and secondary bacterial pneumonia.

### Primary Viral Pneumonia

Primary influenza viral pneumonia has been a prominent feature of previous influenza pandemics, but is a relatively rare outcome of seasonal influenza in adults.

- **Onset:** Typically become breathless within the first 48 hours of the onset of fever. An initially dry cough may become productive of blood-stained sputum. Presence of cyanosis and/or tachypnea.
- **Chest auscultation:** Bilateral crepitations and wheeze are usual.
- **Chest x-ray:** Most commonly bilateral interstitial infiltrates in the mid-zones.
- **Mortality:** Rapid clinical deterioration with respiratory failure may ensue. The mortality rate in hospitalized patients is high (>40%) even with maximum supportive treatment.

### Secondary Bacterial Pneumonia

With *seasonal flu*, bacterial pneumonia occurs approximately 4 times more often than viral pneumonia.

- **Chest auscultation:** rales, rhonchi, diminished breath sounds.
- **Chest x-ray:** usually demonstrates a lobar pattern of consolidation.
- **Common etiologies:** *Streptococcus pneumoniae, Staphylococcus aureus*, group A Streptococcus, and *Haemophilus influenzae*.
- **Mortality:** Mortality rate ranges from 7–24%.

### Mixed Viral-Bacterial Pneumonia

Bacterial and viral pneumonia can occur concurrently. Chest radiograph may demonstrate lobar consolidation superimposed on bilateral diffuse lung infiltrates. Mortality is similar to that for primary viral pneumonia (>40%).

11

## 5. Clinical Management of Influenza

### a. Patient Education and Symptomatic Treatment

All inmates presenting with symptoms suggestive of influenza (except those for whom urgent admission is required) should be given general advice on symptomatic treatment, be provided information about the illness and address individual concerns. Key messages are outlined below in *Table 3*:

| Table 3. Key Patient Education Messages – Pandemic Influenza |
| --- |
| • The incubation period (time period from exposure to development of symptoms) is typically 1–4 days. |
| • Infected adults are presumed to be contagious from one day before symptoms until 24 hours after temperature is normal (without fever-reducing medications). However, patients should be very careful to continue to cover their cough and wash hands frequently for a few days after that. |
| • Fever usually declines after 2–3 days and normally disappears by the sixth day of illness. |
| • Cough, weakness and fatigue can persist for 1–2 weeks and up to 6 weeks. |
| • Antibiotics do not benefit most people with influenza but are sometimes needed to treat secondary infections. |
| • Generally recommended symptomatic treatment for influenza includes:<br>  • Treat fever, myalgias, and headache with acetaminophen or ibuprofen.<br>  • Rest.<br>  • Drink plenty of fluids. |
| • Inmates should promptly report occurrence of shortness of breath and worsening of symptoms after initial improvement. |

### b. Patient Assessment

***General daily assessment of inmates with influenza-like illness (ILI) should include***:

- Observation of level of awareness (presence of lethargy, confusion, disorientation).
- Observation of hydration status (dry, sticky mouth; thirst; decreased {dark} urine output; headache; dizziness). Hydration is critically important. All staff should be alert to signs of dehydration and offer flu patients fluids every hour or two, as needed. A recipe for oral rehydration solution is provided in *Attachment 3.4*.
- Vital signs (temperature, pulse, respirations, blood pressure), if indicated.

***The following groups of inmates with ILI should be considered for closer nursing/clinician observation:***

- Cognitively impaired.
- Mentally ill (particularly those on psychotropic medications).
- Chronically ill inmates (e.g., diabetes, chronic respiratory illness, immunocompromised, etc.).
- Those exhibiting signs and symptoms of deteriorating clinical status (see *Table 4* below).

12

| Table 4. Influenza Signs and Symptoms Meriting Clinical Evaluation |
| --- |
| • **Signs of dehydration**<br>  • Low blood pressure/rapid heart rate<br>  • Orthostatic hypotension (BP that drops when going from lying down to standing)<br>  • Poor skin turgor (skin lacks normal elasticity and sags back into position slowly when pinched up into a fold)<br>  • Delayed capillary refill<br>  • Shock |
| • **Signs of respiratory distress** (perform pulse oximetry, if available)<br>  • Respiratory rate >30/min<br>  • Shortness of breath at rest or while doing very little<br>  • Painful or difficulty breathing<br>  • Blood in sputum |
| • **Changes in level of awareness**<br>  • Drowsiness<br>  • Disorientation<br>  • Confusion |
| • **Fever for 4–5 days which does not improve** (or gets worse) |
| • **Clinical improvement and then develops high fever** and feels poorly again (consider bacterial pneumonia) |
| • **Lack of improvement after two days of antiviral drugs** |

c. **Triage**

In the event of pandemic flu, there is likely to be a significantly increased number of inmates seeking consultation. Barriers to care should be removed, e.g., eliminating co-pays for clinic visits for flu symptoms.

Decisions regarding clinical management of patients with influenza should be based primarily on an assessment of the illness severity; identification of whether or not the person is in an "at risk" group (see *Table 2*); availability of community hospitalization resources, and current recommendations of the CDC and the BOP Medical Director.

d. **Criteria for Hospital Referral**

Most adults with uncomplicated influenza infection do not require hospital referral. Patients who might require hospital admission fall into two main groups: those with worsening of a pre-existing clinical condition and those with an influenza-related complication.

• ***Worsening of pre-existing medical condition:*** Patients with clinical deterioration of a preexisting medical condition should be managed according to best practice for the medical condition in question.

• ***Influenza-related pneumonia:*** The most common influenza-related complication requiring hospital admission is pneumonia. Patients who complain of new or worsening dyspnea should be carefully assessed for signs of pneumonia. If pneumonia is diagnosed, disease severity should be assessed.

For pandemic flu, it is recommended that a validated severity assessment tool be utilized to assess disease severity and need for hospital referral. The CRB-65 score (see *Table 5* below) is a well-validated severity assessment tool developed for patients with community acquired pneumonia. *However, this system has not been validated for influenza-related pneumonia. It should be used as a supplement and not replace the judgment of the individual clinician.*

| Table 5. CRB-65[1] Severity Scoring Tool (for use with pandemic influenza) | |
|---|---|
| **CLINICAL FACTORS** | **POINTS** |
| Confusion | 1 |
| Respiratory Rate >30 per minute | 1 |
| Systolic BP <90 mm Hg *or* Diastolic BP $\leq$69 mm Hg | 1 |
| Age $\geq$65 | 1 |
| **CRB-65 SCORE (TOTAL):** | |

[1] *CRB-65= Confusion, Respiratory Rate, Blood Pressure, 65 years of age or older*

*Table 6* outlines recommendations based on a patient's CRB-65 score.

| Table 6. Recommendations Based on CRB-65 Scores[2] | | |
|---|---|---|
| **CRB-65 SCORE** | **RECOMMENDED ACTION** | **DEATH RATE** |
| 0 | Likely suitable for treatment in facility | 0.9% |
| 1 | Consider hospital referral, particularly with a score of "2" | 5.2% |
| 2 | | 12.0% |
| 3 or 4 | Urgent hospital referral | 31.2% |
| Any score, with bilateral chest signs of pneumonia | Consider hospital referral | |

[2] *Adapted from: British Thoracic Society. Guidelines for the clinical management of patients with an influenza-like illness during an influenza pandemic (January 2007)*

In the event that community hospitalization is unavailable, BOP facilities should develop plans for congregating severely ill inmates for provision of care, including if necessary, palliative care.

**e. Use of Antiviral Medication**

See *Module 2, Antiviral Medication and Vaccines,* for a more thorough discussion of antiviral medications. The following guidelines should be followed when administering antiviral medication.

- *Antiviral medication should be offered as treatment only to inmates with risk factors for influenza complication (see Table 2) who have:*
  - Acute influenza-like illness *and*
  - Fever ($\geq$ 100° F [37.8 C])

In general, antiviral medication is administered only to those with symptom onset occurring in the previous 48 hours. However, antiviral therapy should be administered after 48 hours for pregnant women and anyone with severe illness.

- *Potential benefits of antiviral treatment include:*
  - A reduction of illness duration by 24 hours
  - A possible reduction in hospitalization
  - A reduction in subsequent antibiotic use

14

- ***Recommended antiviral treatment:*** Utilize *Attachment 2.2. Antiviral Medication—Medical Evaluation, Consent, and Prescribing Form* found in *Module 2, Antiviral Medications and Vaccines.*

  Two antiviral medications are options for treating influenza: Oseltamivir (Tamiflu®) and Zanamivir (Relenza®). Zanamivir is an inhaled medication and may be inappropriate for individuals with underlying respiratory disease. Dosing of these medications is as follows:

  - **Oseltamivir:** 75 mg twice daily for five days. For patients with renal function impairment (creatinine clearance between 10–30 ml/min), the dose is 75 mg *once daily* for five days.
  - **Zanamivir:** Two 5 mg inhalations (10 mg total) twice per day for five days.

### f. Use of Antibiotics

The use of antibiotics in adults with influenza not complicated by pneumonia is determined by the presence of any co-morbid illnesses and the timing of symptom onset.

- ***Patients without severe pre-existing illnesses:*** Features of an acute bronchitis, with cough, retrosternal discomfort, wheeze, and sputum production are an integral part of the influenza. In previously well individuals who do not have pneumonia or new focal chest signs, antibiotics are *not* indicated. If the patient is seen later in the course of the illness and the illness is worsening, i.e., reoccurring fever or increasing breathlessness, then a worsening bacterial bronchitis or developing pneumonia is possible and the use of antibiotics should be considered.

- ***Patients with severe pre-existing illness:*** Those at high risk of influenza-related complications of either COPD or other severe co-morbid disease should be strongly considered for antibiotics. If the patient does not begin to improve over the next 48 hours after starting an antibiotic they should be assessed for pneumonia.

- ***Patients with influenza-related pneumonia:*** Patients should be assessed for severity of illness and, if needed, referred for inpatient hospitalization utilizing the CRB-65 Score (see Table 5). All patients with suspected pneumonia should be treated with antibiotics.

Antibiotics should cover the likely bacterial pathogens including *Streptococcus pneumoniae, H. influenzae,* and *Staphylococcus aureus,* including MRSA (in the context of endemic MRSA transmission in a facility).



Federal Bureau of Prisons
Pandemic Influenza Plan

Module 3: Health Care Delivery
October 2012

## Attachment 3.2.  Medical Supply List for Pandemic Flu

> *Each facility should consider the list of supplies below and determine*
> *the degree to which par levels should be increased.*

### Beds, mattresses, and linens

- Cots with mattresses (or mattresses placed on floor)
- Impervious cover for mattresses (if needed), i.e., large plastic bags
- Mechanism to elevate head of bed (e.g., rolled towels, other creative ideas)
- Linens (need enough to change linen on average once or twice a day) with plan for laundering
- Towels, wash cloths, rags

### Medical supplies

- Electronic thermometers
- Thermometer covers
- Automatic blood pressure cuffs
- Extra stethoscopes (to stay in each room)
- Bed pans/urinals
- Emesis basins (or paper bags lined with plastic bags for easy disposal)

### Other supplies

- Plastic cups
- Flexible drinking straws
- Disposable dishes
- Plastic bags of all sizes (always useful)
- Heavy duty rubber bands (to close plastic bags)
- Duct tape (always useful)
- EPA registered disinfectant
- Clipboard, pens, charting forms

### Oral rehydration solution (ORS) ingredients

- Salt
- Sugar
- Baggies — to pre-mix sugar/salt mixture
- One-gallon (new) containers for storing oral rehydration solution

16



Federal Bureau of Prisons
Pandemic Influenza Plan

Module 3: Health Care Delivery
October 2012

## Attachment 3.3.  Non-Prescription and Prescription Drugs for Pandemic Flu

*Each facility should consider the list of drugs below and develop a plan for increasing par levels.*

### Over-the-counter medications (for treating influenza patients)

Each institution pharmacy should attempt to increase stock in the pharmacy to accommodate a prescription distribution based upon a 15% attack rate.  These include:

- Ibuprofen
- Acetaminophen
- Aspirin
- Loperamide

Additionally, it is suggested that the institution health services staff work with their local commissary to look at the possibility of increasing commissary par levels for cough syrup/drops and antihistamines.

### Prescription drugs (for treating influenza patients)

- Oseltamivir (Tamiflu®) — antiviral stockpile quotas communicated by memo
- Zanamivir (Relenza®)  — antiviral stockpile quotas communicated by memo
- Antibiotics:
    - Doxycycline 100 mg
    - Amoxicillin-clavulanate 500mg/125mg
    - Erythromycin 500 mg
    - Clarithromycin 500 mg
- Albuterol or other bronchodilator

### Prescription drugs (critical chronic care medications)

As normal medication supply channels may be disrupted during a pandemic outbreak, institutions should consider increasing stocks of chronic care medications in order to maintain adequate supplies.

17

## Attachment 3.4. Oral Rehydration Solution (ORS)

> *Prevention and treatment of dehydration associated with influenza may be the most important life saving measure available. Oral rehydration solution (ORS) is an effective treatment for all causes of dehydration. It consists of uncontaminated water and specified amounts of salt and sugar.*

**Signs and symptoms of dehydration include:**
- Dry mouth
- Increased pulse (>90/minute),
- Poor skin turgor (doesn't bounce back when pinched),
- Decreased urine output
- Dark urine

**If dehydration is suspected, administer ORS by mouth:**
- Use of a bendable straw may be helpful.
- If the patient is too ill to drink, someone must sit with them and administer the fluids using a teaspoon.
- *Usual treatment consists of 3 quarts (or 13 cups of fluid) per day.*

**Signs of ORS "working" include:**
- Increased alertness of patients
- Increased urination

Continue to push ORS. Once the patient is well-hydrated, the patient can be switched to other clear fluids such as juice, clear soup, or tea; then graduate to crackers, toast; then to other food.

**Oral Rehydration Solution "Recipe":**
The recipe for ORS should be followed closely to get the right proportion of salt and water. The solution can be flavored with sugar-free drink mix.

| Oral Rehydration Solution (ORS) Recipe |
| --- |
| 1  gallon of uncontaminated water |
| 10 tablespoons sugar |
| 4  teaspoons salt |
| **Directions:**   Stir up.  Do not boil.  Can add sugar-free drink mix to flavor.  Use within 24 hours. |
| **Reference:**  Rehydration Project (homepage on the internet): rehydrate.org/solutions/homemade.htm<br>(extrapolated from recipe of 1 liter water, 8 tsp sugar, 1 tsp salt) |

Exhibit O

BOP Pandemic Plan
Module 4

**Federal Bureau of Prisons**
**Health Services Division**

# Pandemic Influenza Plan

# Module 4:
# Care for the Deceased

### October 2012

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 4: Care for the Deceased
October 2012

# BOP Pandemic Influenza Response Stages

The BOP *Pandemic Influenza Plan* is divided into the three stages that are used for standard BOP contingency plans; in this plan, the three stages are designed to correlate with the Federal Government Response Stages for pandemic influenza.

**The BOP Pandemic Influenza Response Stages are as follows:**

- **PREPARATION** (Federal Response Stages 0–1). Most of the detail in this plan involves the preparation phase.

- **RESPONSE** (Federal Response Stages 2–5). This phase, which begins when it is announced that there are confirmed human outbreaks overseas, involves both making last-minute preparations and actually responding to pandemic flu.

- **RECOVERY** (Federal Response Stage 6). This phase involves recovering from the pandemic, evaluating actions taken during the pandemic, and preparing for more flu. Based on what we know from previous pandemics, subsequent waves of flu are likely to follow once the pandemic flu has subsided.

| Federal Government Response Stages* | | BOP Influenza Plan | |
| --- | --- | --- | --- |
| | | Federal Stages | BOP Stage |
| 0 | New domestic animal outbreak in at-risk country | 0-1 | PREPARATION |
| 1 | Suspected human outbreak overseas | | |
| 2 | Confirmed human outbreak overseas | 2-5 | RESPONSE |
| 3 | Widespread human outbreaks in multiple locations overseas | | |
| 4 | First human case in North America | | |
| 5 | Spread throughout United States | | |
| 6 | Recovery & preparation for subsequent waves | 6 | RECOVERY |
| *The Federal Government Response Stages should not be confused with the World Health Organization phases of pandemic influenza.* | | | |

i

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 4: Care for the Deceased
October 2012

# Table of Contents

Overview...........................................................................................................................1

Action Steps by Pandemic Stage........................................................................................2

Standard Operating Procedures for Preparation Stage ........................................................4

Attachment 4.1.  General Guidelines for Handling the Deceased .........................................6

Attachment 4.2.  Procedures for Care for the Deceased......................................................7

Attachment 4.3.  Pandemic Flu Death Record/24-Hour Death Report..................................8

# Overview

In the event of a severe pandemic flu, it is anticipated that the services of community funeral homes and local medical examiners could become temporarily unavailable. In that instance, correctional facilities would have responsibility for the initial processing and storage of bodies of deceased inmates. Thus, the BOP Pandemic Influenza Planning Group decided that it was prudent to provide BOP facilities with detailed procedures for caring for the deceased.

The Department of Health and Human Services (DHHS) estimates that for a severe pandemic flu (akin to the 1918-19 pandemic), the death rate in the general community would be 6 deaths per 1000 persons who become ill. The DHHS estimate assumes that 30% of the population becomes sick with the flu and that 2% of those who become sick with pandemic flu die from it. Because of factors unique to the prison setting, this BOP pandemic flu plan assumes a higher death rate for a severe pandemic than that estimated for the general population. These factors include the close contact of inmates (increasing risk of flu transmission) and their high rates of other chronic, high risk medical conditions (increasing vulnerability to flu). Thus, in a "worst case scenario" for pandemic flu, the BOP estimates a death rate of 10 deaths per thousand inmates (1%).

This plan for "Care for the Deceased" includes the following elements:

- Communication with local health department and medical examiner about pandemic flu planning.

- Procedures for setting up a temporary morgue (if community resources become unavailable).

- Detailed procedures for care for the deceased, including lists of needed supplies.

- Provision of a form for identifying and tracking the deceased.

General guidelines for handling the deceased are provided in *Attachment 4.1*. Specific procedures for care for the deceased are outlined in *Attachment 4.2*, and the *Pandemic Flu Death Record/24-Hour Death Report* is available in *Attachment 4.3*.

This plan for "Care for the Deceased" is not designed to frighten; nor does it make a prediction about what will occur. Implementation of this plan will provide some assurance that if a pandemic flu "worst case scenario" occurs, the Bureau of Prisons will be prepared to handle the situation.

# Action Steps by Pandemic Stage

---

**Preparation** (Federal Response Stages 0–1)
(See *Standard Operating Procedures*, which are provided for the Preparation stage only.)

1. Identify a staff person to be responsible for planning for care for the deceased.
2. Estimate the number of inmate deaths in a pandemic flu "worst case scenario."
3. Communicate with the local health department and medical examiner's office about plans regarding care for the deceased in a pandemic in the local community.
4. Develop local facility plans for care for the deceased. Review *Attachment 4.1*, *General Guidelines for Handling the Deceased.*
   a. Plan for a temporary morgue (including a place for bodies to be processed and a refrigerated place for storage).
   b. Plan for needed supplies.
   c. Review *Attachment 4.2*, *Procedures for Care for the Deceased*, and adapt it to this facility.
   d. Review *Attachment 4.3*, *Pandemic Flu Death Record/24-Hour Death Report*, and adapt it to this facility.
   e. Develop a facility-specific procedure for tracking the location of the deceased.
   f. Discuss possible storage plans in the event that refrigeration is not feasible.

---

**Response** (Federal Response Stages 2-5)

---

*Begin when there are confirmed human outbreaks of pandemic flu anywhere in the world:*

1. Contact local funeral home(s) and the medical examiner to assess potential availability of services.
2. Review plans and procedures, the location for a temporary morgue, the adequacy of refrigerated space, and assure availability of needed supplies.

*After a pandemic death occurs in the facility:*

3. Contact local funeral homes and/or the medical examiner to handle inmate deaths per usual facility procedures.
4. If community resources become unavailable, set up a temporary morgue and implement *Attachment 4.2, Procedures for Care for the Deceased.*

Case 4:21-cv-00669-P    Document 1    Filed 05/20/21    Page 243 of 259    PageID 243

---

**Recovery** (Federal Response Stage 6)

---

*Previous flu pandemics have been associated with subsequent "waves" of flu after an initial wave resolves. After an initial pandemic flu outbreak, subsequent outbreaks are likely. The recovery period will involve both recovering from the pandemic emergency, evaluating the BOP response to it and preparing for subsequent waves of pandemic flu.*

1. Assess adequacy of response to an increased number of the deaths in the facility.
2. Prepare written summary of response.

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 4: Care for the Deceased
October 2012

## Module 4:  Care for the Deceased
# Standard Operating Procedures for Preparation Stage
### (Federal Response Stages 0–1)

| |
|---|
| During the Preparation stage, adapt this Standard Operating Procedure template to the unique circumstances of your facility.  A modifiable Word version is posted on: *www.bop.gov/news/medresources.jsp*. |
| **1.   Identify a staff person to be responsible for planning for care for the deceased.** |
| In this facility, the following individual is assigned responsibility: |
| **2.   Estimate the number of inmate deaths in a pandemic flu "worst case scenario."** |
| **Estimation formula:**  Total number of inmates housed in the facility multiplied by 0.01 (1%).<br>Total # inmates housed in this facility: _____  x  0.01 = _____ =  estimated # inmate deaths |
| **3.   Communicate with the local health department and medical examiner's office about plans regarding care for the deceased in a pandemic in the local community.** |
| **a.   Contact the local health department and/or medical examiner to learn about local pandemic flu plans for care for the deceased.** |
| Medical Examiner: |
|     Address: |
|     Phone: |
| Are there any plans for mass storage of bodies?   ☐ Yes   ☐ No<br>    If yes, what? |
| Are there any local requirements for reporting of pandemic deaths?   ☐ Yes   ☐ No<br>    If yes, what? |
| **b.   Identify funeral home(s) currently utilized and assess their plans for pandemic flu.** |

| Funeral Home: | Funeral Home: |
|---|---|
|     Address: |     Address: |
|     Phone: |     Phone: |

| |
|---|
| Do they have any plans for expanding services in the event of a pandemic?   ☐ Yes   ☐ No<br>    If yes, what? |
|     If yes, is transportation likely to be available?    ☐ Yes   ☐ No<br>Is it likely that the institution will be required to transport bodies?   ☐ Yes   ☐ No |

4



| 4. | Develop facility-specific plans for care for the deceased. Review *Attachment 4.1*, *General Guidelines for Handling the Deceased.* |
|---|---|

| a. | Plan for a temporary morgue. |
|---|---|
| | Identify a place in this facility where bodies could be processed: |

| Identify a refrigerated place in this facility to store human remains: |
|---|
| *Note: The ideal temperature for storing and preserving human remains is between 34–37°F. Ideally, bodies should not be stacked on top of each other to avoid distortion of features and to facilitate moving them.* |

| b. | Plan for needed supplies. |
|---|---|
| | Review the supply list below and identify how much of each item would be needed for your facility based upon estimated number of deceased inmates. Determine if the facility should stockpile these supplies separately or if adequate supplies would be on-hand. |

| Amount | Item |
|---|---|
| | Body bags (number based on 1% of inmate population) |
| | Gloves* |
| | N-95 respirators* |
| | Gowns* |
| | Eye protection* |
| | Hand hygiene supplies* |
| | 8½" x 11" plastic sleeves (2 per deceased) to protect paperwork |
| | Waterproof, clear tape (to seal plastic sleeves) |
| | Wash cloths and towels (for cleaning and padding) |
| | Clear plastic bags (for personal effects) |
| | Strips of material (to tie legs together) |

\* to be stockpiled as part of *Module 1: Surveillance & Infection Control*

In this facility, the following plan will be followed for securing supplies for care for the deceased:

| c. | Review *Attachment 4.2*, *Procedures for Care for the Deceased*, and adapt it to this facility. |
|---|---|
| d. | Review *Attachment 4.3*, *Pandemic Flu Death Record/24-Hour Death Report*, and adapt it to this facility. |
| e. | Develop a facility-specific procedure for tracking the location of the deceased, i.e., a line-listing of deceased inmates and their current location; or a notebook containing Pandemic Flu Death Records—each indicating current location of the deceased inmate's body. In this facility, the following procedure will be utilized to track the location of deceased inmates: |
| f. | Discuss possible storage plans in the event that refrigeration is not feasible, i.e., temporary burial. Document possible strategies: |

Federal Bureau of Prisons
Pandemic Influenza Plan

Module 4: Care for the Deceased
October 2012

## Attachment 4.1.  General Guidelines for Handling the Deceased

### General Facts

Those attending to the deceased are at much greater risk of contracting pandemic flu from exposure in the general community or through contact with someone who is ill with pandemic flu, than from contact with the deceased.

- Dead bodies do not cause epidemics.
- Use *Standard Precautions* when in contact with blood or body fluids, including good hand washing.

### Infection Control Measures

Individuals who are assigned to transport and care for the deceased should be provided the following information and necessary protective equipment.

- Routinely wear single layer gloves and an N-95 respirator.
- Prior to handling the body, place a face mask over the nose and mouth of the deceased  to prevent inhalation of residual air that may be expelled from the lungs when the body is moved. Remove the mask before closing the body bag.
- If risk of splash or spray from blood/body fluids, wear a protective gown and eye/face barrier.
- Do not smoke, eat, or drink when handling the body.
- Avoid wiping your eyes, mouth, or nose with your hands.
- Remove all personal protective equipment after handling each body, and wash hands well.
- Decontaminate all surfaces and any equipment used to transport the dead body with an Environmental Protection Agency (EPA)-registered disinfectant: http://www.epa.gov/oppad001/chemregindex.htm

### Additional Instructions

- Keep movement of the head of the body to a minimum.
- Do not spray or place disinfectant on the body.
- Do not write identifiers on the body or on the body bag, as they may erase.  Use proper labeling technique on the inside and outside of the body bag.
- Carefully place the body in a standard body bag or large plastic bag.  Seal the bag.
- Lay bodies in one layer only (not on top of each other).
- Track all morgue admissions and releases.

### Storage Considerations

Refrigerate between 34–37 degrees F (2–4 degrees C).  If refrigeration is not available, alternative short-term options include:  (1) dry ice (not directly on body), with good ventilation (melted "carbon dioxide" is toxic) and safe handling techniques (to prevent "cold burns"); or (2) temporary burial. Coordinate locally and seek expert guidance.  Establish procedures prior to the pandemic.

### Cultural and Religious Practices

Cultural and religious needs should be respected.  Involve chaplains in the identification and accommodation of religious rituals related to rites of passage (e.g., Islamic ritual of turning the head toward Mecca).


## Attachment 4.2.  Procedures for Care for the Deceased

*The procedures below should be utilized if mortuary services are unavailable.*

1.  **Prepare documentation.**
    a.  **Fill out the information requested in *Attachment 4.3*, Pandemic Flu Death Record/24-Hour Death Report.**
        *Note:   The use of Attachment 4.3 will serve multiple purposes:  provide local BOP facility with a record of the death; provide record of the location where the body is stored; provide documentation to maintain with the body; and serve as the BOP 24-Hour Death Report.*
    b.  **Make 3 copies.  Place 2 copies in plastic sleeves**, sealed with transparent tape.
    c.  **Maintain 1 copy in notebook or file** (optionally, maintain an electronic copy).

2.  **Follow notification procedures** (P5553.07 "9. Death Notification Procedures").

3.  **Verify identity** (PS5800.13.903 (Deaths)).  "ISM staff or designee will verify the inmate's identity by taking a rolled print of the right thumb.  A comparison of the print will be made with the fingerprint card in the Inmate Remand or J&C file."

4.  **Use preliminary infection control measures** (see *Attachment 4.1*).
    a.  **Wash your hands.**
    b.  **Put on personal protective equipment.**  (Routinely wear gloves and an N-95 respirator.  If risk of splash/ spray from blood/body fluids, wear gown and eye/face barrier.)
    c.  **Place a face mask on deceased** (covering mouth and nose) prior to transporting.

5.  **Prepare the body.**
    a.  Straighten the dead person's body and close the eyelids without using any force.
    b.  Close the person's mouth by placing a rolled towel under the chin.
    c.  Remove all IV lines, monitors, and other equipment.
    d.  Bathe any part of the body that is soiled with blood or other body fluids.
    e.  Remove any soiled dressings and replace.
    f.  Remove jewelry and/or glasses.  Ensure dentures are in the person's mouth.
    g.  Document any jewelry or other effects removed.
    h.  Pad the wrist and ankles with a rolled up washcloth and tie them loosely together.

6.  **Attach documentation of identity to the body.**
    a.  Attach BOP identification card to the right toe utilizing plastic twist-tie.
    b.  Attach copy of the Pandemic Flu Record (in plastic sleeve) to the right wrist.
    c.  Attach copy of the Pandemic Flu Record (in plastic sleeve) to the outside of the body bag.

7.  **Place the body inside the body bag.**
    a.  Ensure that the bag is fully sealed and that no body fluids are leaking.
    b.  Ensure that the outside of the bag is clean.
    c.  Put clothing and personal effects in a separate plastic bag.
    d.  Place the bag of personal effects inside the body bag with the body.

8.  **Carry out follow-up infection control measures.**
    a.  Properly dispose of any soiled or used material.
    b.  Remove gloves properly.
    c.  Wash hands thoroughly.

Federal Bureau of Prisons                                          Module 4: Care for the Deceased
Pandemic Influenza Plan                                                            October 2012

## Attachment 4.3.  Pandemic Flu Death Record/24-Hour Death Report

| | |
|---|---|
| **Facility Name:** <br> **Address:** <br> **Phone:** | |

| | | |
|---|---|---|
| **Last Name:** | **First Name:** | **MI:** |

**Reg #:**                    Date of Birth: ___/___/___                    Date of Death: ___/___/___

**Place of Death:**

    □ Institution, in:  □ General Population  □ SHU  □ Medical Unit  □ Behavioral Health Unit

    □ Community Hospital  □ Other

**Type of Death:**

    □ Natural cause  □ Suicide  □ Accidental  □ Homicide  □ Legal Execution  □ Unknown

**DNR Order?**  □ Yes  □ No        **Autopsy?**  □ Yes  □ No

**Preliminary Cause of Death:**

**Clinical Synopsis of Events Leading to the Death (including clinical care provided):**

*(continue on following page if more room needed)*

| | |
|---|---|
| **Location of Body:**  (1) | Date: |
| (2) | Date: |
| (3) | Date: |

| | |
|---|---|
| **Next of Kin:** _____ Notified? □Y  □ N <br> Address: _____ <br> _____ Phone: _____ | **Religion of deceased:** <br> _____ <br> Religious ritual requirements? |

**Personal effects accompanying body (list all):**

**Staff person completing report:**

| | |
|---|---|
| Name (print): | Title: |
| Signature: | Date: |

| | |
|---|---|
| **Note:**  This document serves the following purposes: <br><br> (1) provides local BOP facility with a record of the death; <br><br> (2) provides record of the location where the body is stored; <br><br> (3) provides documentation to maintain with the body; and <br><br> (4) serves as the BOP 24-Hour Death Report. | **Form instructions:**  Make 3 copies, placing 2 in sealed plastic sleeves. Attach 1 sealed copy to right wrist of inmate; secure 1 sealed copy to the outside of body bag; and maintain 1 copy on file. |

Exhibit P

BOP COVID-19 Phase Eight Action Plan

**U.S. Department of Justice**
**Federal Bureau of Prisons**

_Washington, D.C. 20534_

June 30, 2020

**MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS**

**FROM:**          **ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR**
                   **CORRECTIONAL PROGRAMS DIVISION**

                   NICOLE
                   ENGLISH
                   **N. C. ENGLISH, ASSISTANT DIRECTOR**
                   **HEALTH SERVICES DIVISION**

**SUBJECT:**       **CORONAVIRUS (COVID-19) PHASE EIGHT ACTION PLAN**

This memorandum describes the Bureau's (BOP) Coronavirus (COVID-19) Phase Eight Action Plan, which includes an extension of previously disseminated guidance along with new measures to implement in the management of the pandemic.

## EXTENSION OF PHASE SEVEN ACTION PLAN:

Effective Wednesday, July 1, 2020, the BOP will continue its nationwide action as described in the Phase Seven Action Plan. These restrictions will remain in place through July 31, 2020, at which time the plan will be reevaluated.

## COURT TRIPS:

A number of variables affect the risk of COVID-19 transmission during in-person court appearances and will determine some of the specific management strategies that are needed at each location. The U.S. Marshals Service (USMS) takes responsibility for the inmate once they leave the BOP institution until their return. Each USMS district may have their own procedures. Individual courts may also have different COVID mitigation procedures and requirements. Knowing the likelihood of BOP inmates mixing with non-quarantined, Non-BOP inmates while in USMS custody during a court visit is essential to determine the risk of COVID-19 exposure. The frequency of an inmate's court appearance and the number of inmates going to a court at any one time are also important factors to consider. It is recommended that each BOP detention center contact the USMS and the court to ascertain their COVID-19 mitigation procedures and consult with Regional Health Services staff on developing an individualized strategy. The following are general principles to follow:

- Inmates in COVID isolation should not have in-person court appearances unless absolutely necessary. Strongly consider the inmate appearing via telephone hearing. If a VTC is accessible, that can also be used as an alternative.

- Inmates in COVID quarantine (intake/exposure) should delay in-person court appearances until they are COVID tested at the end of quarantine. It is recommended that VTC or telephone appearances be used as alternatives. In general, testing an inmate immediately before or after a court visit would have little utility and is not recommended. However, Abbott ID NOW tests can be used on a case-by-case basis, especially if a visit is required by the court.

- Inmates should wear face coverings and perform hand hygiene just before departure from and upon return to the institution.

- BOP officials should request that BOP inmates be cohorted only within their own housing or quarantine cohort and not be mixed with inmates from other housing units or other institutions, or transported with inmates from other institutions to the extent possible while at court.

- Upon return to the detention center, inmates should be quarantined if they were outside of the institution and were exposed to inmates from other housing units or locations (e.g., county jails). Periodic testing of inmates with frequent court appearances should be considered. The 14-day quarantine period must be restarted for any inmate who is in close contact with other inmates not from their housing unit or location.

## INTAKES:

As we return to a more normalized inmate movement, the quarantine site model will no longer be utilized. All inmates entering an institution will require enhanced intake procedures:

- Institutions are to designate specific quarantine and isolation areas in advance with capacity numbers commensurate with anticipated levels and frequency of incoming inmates. Ideally, inmates should be quarantined or isolated in single-cell, if possible. When cohorting is necessary, the best practice is to keep cohorted inmates together and not add to the cohort when new intakes arrive.

  New intakes should undergo the same previously described intake screening process with symptom and temperature screening. Inmates will be tested on arrival with an approved viral PCR test from a nasopharyngeal swab using either an Abbott ID Now POC test or commercial send out lab test.
    o Inmates that test positive and/or are symptomatic will be placed immediately in isolation. They will remain in isolation until they meet the CDC test-based strategy criteria for isolation release which includes two negative tests at least 24 hours apart, the first may be performed with either Abbott ID POC or commercial lab test, but second must be commercial lab test.

    o Inmates that are asymptomatic and test negative are placed in quarantine. They will remain in quarantine until:

- They become symptomatic during the quarantine period. These inmates should be tested (Abbott or commercial) and placed in Isolation immediately. Depending on the housing circumstances, potential contacts (e.g. cellmate, cohort, housing unit) will need to reset their quarantine. When risk of exposure and/ or spread of transmission is higher, re-testing of potential contacts could be considered. A testing frequency of every 3 to 4 days is preferred whenever feasible in consultation with Regional Infection Prevention and Control Consultant and the Regional Medical Director.

- On or after 14 days. The inmates that have remained asymptomatic will be tested with a commercial lab test. Inmates should remain in quarantine status until test results are complete. If the test is positive, see above bullet. If the test is negative, the Inmate may be released to General Population.

## MOVEMENT:

Movement of inmates between BOP institutions can be a simple, short-distance transfer between two institutions or a complex, multi-day, multi-institution process. When a planned movement involves multiple stops, staff and agencies, and potential mixing with other inmate groups from other BOP facilities or other correctional jurisdictions, the risk of COVID-19 exposure and transmission increases. Refer to the HSD Guidance (6/19/20) for inmates who are transferring or Releasing from a BOP Facility, https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/guidance_for%20_transferring_or%2 0releasing%20inmates_20200619.pdf

- As inmate movement operations move toward "normalizing", the number and complexity of inmate moves will increase. This process of normalizing should be done in a measured approach to allow institutions, regions and the agency develop best practices moving forward.

- Institutions/ Regions should evaluate their space and staffing resources to accommodate increased numbers of the various types of quarantine inmate groups (intake, exposed and pre-release) as well as isolation inmates in various stages of the process. Moving to a test out strategy for discontinuation of isolation may prolong isolation for various groups of inmates longer than 14 days. Various and/or large groups of quarantine and isolation inmates may require a re-distribution of inmates amongst institutions within a region.

- The first step in ensuring safe inmate movement is a full test-in/out, 14-day pre-release quarantine of transferring inmates prior to transport.

  o Planning an inmate move should occur with enough time in advance to allow for a full test in/out 14-day quarantine and turnaround time for test results (21 days).

  o Planning should be coordinated with all the institutions involved from the beginning stages so that setting of dates will allow for the above process to occur for all the potential inmates on that move.

o   Inmates who have tested negative at the completion of their quarantine should stay in quarantine status until they are transferred, preferably within 5 days of the negative result, but may still move within 14 days of the negative result.

o   If an inmate develops symptoms and/or tests positive, they will not be permitted to travel until they have met the CDC test-based criteria for test-based release from isolation.  On rare occasions, there may be exceptions where an inmate must travel prior to the completion of this process or even with a positive result (e.g. court ordered transfer). In these cases, the transfer must be discussed and approved by local executive staff from the institutions and regions involved with input from health services staff, as needed.

o   For inmates who have previously tested positive for COVID-19: (refer to https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/covid19_testing_expanded_inmate_testing_strategies_2020619.pdf)

   ▪   If they cleared isolation using the CDC test-based strategy more than 14 days prior to travel date, they will need one negative commercial viral lab test completed prior to travel and do not need any further testing or quarantine prior to transfer

   ▪   If they cleared isolation using a symptom or time-based strategy, they will need one negative commercial viral lab test completed prior to travel and do not need further testing or quarantine prior to transfer.

   ▪   If the test is positive, they cannot travel and must be placed in isolation until they meet the test-based criteria with two negative tests at least 24 hours apart. The first may be performed with either Abbott ID POC or commercial lab test, but second must be commercial lab test.

•   Planning of inmate movement should be coordinated with close involvement of local Executive Staff, CMC, Unit Team and Health Services staff from all involved institutions/regions and transport agencies.  Communication and accurate information are vital to ensure a proposed inmate movement has minimized any potential risk of COVID-19 exposure/transmission.

•   To the extent possible, manifests should be generated that allow for appropriate social distancing during transport (e.g. loading a bus/ plane at 50% capacity).

•   "Normal" transport routes and schedules will need to be reviewed and reconsidered.  Inmate movement should be coordinated in a manner that:

   o   Has minimal stops/holdovers: e.g. consider institutions meeting at a halfway point to pick-up inmates rather than having multiple stops and holdovers.

- o **Minimizes the amount of time inmates are held in holdover:** the longer an inmate spends in transit, the greater the risk. The frequency of certain drop offs/pick-ups may need to be increased to minimize holdover times.

- o **Avoids mixing of inmate groups** as much as possible:

    - The following inmate group terms will be defined as follows:

        - **BOP group** - inmates who have completed a full test in/out pre-release/ transfer quarantine process prior to transfer from a BOP facility.

        - **Non-BOP group** - inmates from other agency/correctional jurisdiction who have not undergone a full test in/out quarantine.

    - Maximize runs with only BOP groups; make every effort to coordinate runs for Non-BOP groups separately.

    - There are many scenarios where mixing of BOP groups from different BOP institutions is unavoidable. If all BOP-groups have been properly tested in/out of a pre-release/transfer quarantine just prior to transport at their sending institution, this practice is acceptable.

    - Ideally, any Non-BOP group during a transfer will have been tested for COVID-19 prior to transport. However, this is often not possible or verifiable. All Non-BOP group inmates must have a temperature check and symptom screen immediately prior to transport. Anyone with a known positive COVID-19 test or who has fever or symptoms will not be admitted on the transport.

    - If a BOP group is mixed with a Non-BOP group at any point in the transfer process, all the inmates in that group will require intake screening, testing and intake quarantine (asymptomatic) or isolation (symptomatic) at their destination institution.

- During transport, BOP-group inmates should wear at least facial coverings and staff should wear at least facial covering and gloves. For transport of Non-BOP or mixed groups, inmates should wear surgical masks and staff should wear surgical masks and gloves during transport and add gown and eye protection with direct contact.

- Documentation on the BEMR exit summary/transfer paperwork (e.g. In-Transit Form) needs to include results of the same-day symptom screen and temperature check, the most recent COVID-19 test result, and the inmate's COVID-19 history. To ensure proper documentation of negative COVID-19 testing from a commercial lab is displayed on the exit summary, the BOP ICD code of Z03818-c19 will need to be added to the inmate's health problem list. This will then display properly upon the inmate Exit Summary. The BEMR Exit Summary/transfer paperwork

should be provided to the bus LT/USMS to verify that a commercial lab test has been completed with a negative test result.

- **Holdover Sites/Bus Hubs:**

  o Holdover/Bus hub sites should designate specific holdover quarantine areas in advance in numbers commensurate with anticipated levels and frequency of incoming inmates.

  o For BOP group transfers that have not mixed with Non-BOP groups and require holdover at a facility, the BOP groups can generally be placed directly into a holdover unit setting without a test in/out process and do not need to complete a full 14-day quarantine prior to moving on to their next destination.

  o These holdover groups should be housed separately from the new intake, post-exposure and prior to release/transfer* quarantine groups at that institution.
  *Note there is a distinction between inmates coming from another institution in holdover status waiting to "transfer"/continue on to their next destination versus. inmates that are originating from the holdover site and waiting to transfer.

  o The various holdover groups may be housed together, if necessary.

  o If a holdover site/bus hub is known to receive Non-BOP groups, they should consider having designated quarantine/isolation units for them and manage them as new intakes.

    - Those that are symptomatic and/or test positive must be placed in isolation and can be released after meeting CDC test-based criteria for release from isolation into general population or transfer. If transfer is to occur after 14 days from their release from isolation, they will need one negative commercial viral lab test completed prior to travel. They do not need any further quarantine prior to transfer.
    - Those that are asymptomatic and test negative will be placed in quarantine. When they complete quarantine and test-out:

      o For those inmates that are expected to remain at the holdover site for a prolonged period of time, they can be released to General Population. If they are released to General Population, future transfers will require pre-transfer test-in/test-out quarantine.

      o For those inmates expected to transfer within a reasonable period of time, they should remain in quarantine until their transfer date. They should transfer within 14 days of the test-out negative result or be re-tested prior to transfer.

- If a holdover site/bus hub receives a mixed group of BOP and Non-BOP groups or BOP group that has previously mixed with a Non-BOP group, they must now all be managed as a Non-BOP group.

## DESIGNATED (FINAL RECEIVING) INSTITUTIONS:

Transferred inmates will undergo the same process as a new intake, to include intake screen and temperature check, COVID-19 testing and isolation versus new intake quarantine at the final designated facility.

## QUESTIONS:

If staff have questions about COVID-19, they may reach out to the agency at the following email box: COVID19Questions@bop.gov.

We appreciate your assistance as we continue to work collaboratively to mitigate the transmission of COVID-19 within our prisons nationwide, and with all phases of our COVID-19 response.

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Alexis C. Norman and others similarly situated Tarrant

**DEFENDANTS**

Michael Carr, Warden, FMC Carswell Tarrant

**(b)** County of Residence of First Listed Plaintiff    Tarrant
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Tarrant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question *(U.S. Government Not a Party)*

☒ 2  U.S. Government Defendant

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability    ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &    Pharmaceutical Slander    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability    ☐ 368 Asbestos Personal ☐ 340 Marine    Injury Product ☐ 345 Marine Product    Liability | | ☐ 835 Patent - Abbreviated New Drug Application   ☐ 840 Trademark | ☐ 460 Deportation   ☐ 470 Racketeer Influenced Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability    **PERSONAL PROPERTY** ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | Product Liability    ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage | Relations | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 196 Franchise | Injury    ☐ 385 Property Damage ☐ 362 Personal Injury -    Product Liability | ☐ 740 Railway Labor Act   ☐ 751 Family and Medical | ☐ 864 SSID Title XVI   ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions   ☐ 891 Agricultural Acts |
| | Medical Malpractice | Leave Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | | | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party 26 USC 7609 | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | | | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations    ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty Employment    **Other:** | **IMMIGRATION** | | State Statutes |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other Other    ☒ 550 Civil Rights | ☐ 462 Naturalization Application   ☐ 465 Other Immigration | | |
| | ☐ 448 Education    ☐ 555 Prison Condition    ☐ 560 Civil Detainee -    Conditions of    Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 504 of the Rehabilitation Act, Eighth Amendment, Constitutional rights
Brief description of cause:
Disparate treatment, Disparate impact and failure to make reasonable accommodations

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*:    JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____



PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

**UNITED STATES POSTAL SERVICE ®** | **PRIORITY® MAIL**

FROM:

■ Expected delivery date specified for domestic use.

■ Most domestic shipments include up to $50 of insurance (restrictions apply).*

■ USPS Tracking® included for domestic and many international destinations.

■ Limited international insurance.**

■ When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.
** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

# FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

# TRACKED ■ INSURED

To schedule free Package Pickup, scan the QR code.

PS00001000014

EP14F May 2020
OD: 12 1/2 x 9 1/2

USPS.COM/PICKUP

TO:

Northern District of Texas
501 N. Tenth Street Rm 310
Fort Worth, TX 76102