PRISONER'S CIVIL RIGHTS COMPLAINT (Rev. 05/2015)



### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
**Fort Worth**

Alexis C. Norman BOP No. 49210-177
_____
Plaintiff's Name and ID Number

FMC Carswell
_____
Place of Confinement

CASE NO. 4:21cv669-P
_____
(Clerk will assign the number)

v.

Michael Carr, FMC Carswell, Warden P.O. BOX 27137, Fort Worth, TX 76127
_____
Defendant's Name and Address

Michael Carvajal, FBOP Director, 320 First street NW, Washington, D.C. 20534
_____
Defendant's Name and Address

Charles Langham, FMC Carswell, Medical Director, P.O. BOX 27137, Fort Worth, TX 76127
_____
Defendant's Name and Address
( DO NOT USE "ET AL.")

_____

### INSTRUCTIONS - READ CAREFULLY

**NOTICE:**

**Your complaint is subject to dismissal unless it conforms to these instructions and this form.**

1.  To start an action you must file an original and one copy of your complaint with the court. You should keep a copy of the complaint for your own records.

2.  Your complaint must be <u>legibly</u> handwritten, in ink, or typewritten. You, the plaintiff, must sign and declare under penalty of perjury that the facts are correct. If you need additional space, **DO NOT USE THE REVERSE SIDE OR BACK SIDE OF ANY PAGE.** ATTACH AN ADDITIONAL BLANK PAGE AND WRITE ON IT.

3.  You must file a separate complaint for each claim you have unless the various claims are all related to the same incident or issue or are all against the same defendant, Rule 18, Federal Rules of Civil Procedure. Make a short and plain statement of your claim, Rule 8, Federal Rules of Civil Procedure.

4.  When these forms are completed, mail the original and one copy to the clerk of the United States district court for the appropriate district of Texas in the division where one or more named defendants are located, or where the incident giving rise to your claim for relief occurred. If you are confined in the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID), the list labeled as "VENUE LIST" is posted in your unit law library. It is a list of the Texas prison units indicating the appropriate district court, the division and an address list of the divisional clerks.

1

**FILING FEE AND *IN FORMA PAUPERIS* (IFP)**

1. In order for your complaint to be filed, it must be accompanied by the statutory filing fee of $350.00 plus an administrative fee of $50.00 for a total fee of **$400.00**.

2. If you do not have the necessary funds to pay the fee in full at this time, you may request permission to proceed *in forma pauperis*. In this event you must complete the application to proceed *in forma pauperis*, setting forth information to establish your inability to prepay the fees and costs or give security therefor. You must also include a current six-month history of your inmate trust account. If you are an inmate in TDCJ-CID, you can acquire the application to proceed *in forma pauperis* and the certificate of inmate trust account, also known as *in forma pauperis* data sheet, from the law library at your prison unit.

3. The Prison Litigation Reform Act of 1995 (PLRA) provides "... if a prisoner brings a civil action or files an appeal *in forma pauperis,* the prisoner shall be required to pay the full amount of a filing fee." *See* 28 U.S.C. § 1915. Thus, the court is required to assess and, when funds exist, collect, the entire filing fee or an initial partial filing fee and monthly installments until the entire amount of the filing fee has been paid by the prisoner. If you submit the application to proceed *in forma pauperis*, the court will apply 28 U.S.C. § 1915 and, if appropriate, assess and collect the entire filing fee or an initial partial filing fee, then monthly installments from your inmate trust account, until the entire $350.00 statutory filing fee has been paid. (The $50.00 administrative fee does not apply to cases proceeding *in forma pauperis*.)

4. If you intend to seek *in forma pauperis* status, do not send your complaint without an application to proceed *in forma pauperis* and the certificate of inmate trust account. Complete all essential paperwork before submitting it to the court.

**CHANGE OF ADDRESS**

It is your responsibility to inform the court of any change of address and its effective date. Such notice should be marked **"NOTICE TO THE COURT OF CHANGE OF ADDRESS"** and shall not include any motion for any other relief. Failure to file a NOTICE TO THE COURT OF CHANGE OF ADDRESS may result in the dismissal of your complaint pursuant to Rule 41(b), Federal Rules of Civil Procedure.

I. PREVIOUS LAWSUITS:

   A. Have you filed *any* other lawsuit in state or federal court relating to your imprisonment? ✓ YES ___ NO

   B. If your answer to "A" is "yes," describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, giving the same information.)

      1. Approximate date of filing lawsuit: 5/28/21

      2. Parties to previous lawsuit:
         Plaintiff(s) Alexis C. Norman
         Defendant(s) Michael Carr, Warden FMC Carswell

      3. Court: (If federal, name the district; if state, name the county.) N.D. Tex - Fort Worth

      4. Cause number: 4:21-CV-00630-0

      5. Name of judge to whom case was assigned: Reed O'Connor

      6. Disposition: (Was the case dismissed, appealed, still pending?) Still pending

      7. Approximate date of disposition: n/a

2

II.    PLACE OF PRESENT CONFINEMENT: _FMC Carswell_____

III.   EXHAUSTION OF GRIEVANCE PROCEDURES:

Have you exhausted all steps of the institutional grievance procedure?     ✓YES ___NO

Attach a copy of your final step of the grievance procedure with the response supplied by the institution.

IV.    PARTIES TO THIS SUIT:

A. Name and address of plaintiff: _Alexis C. Norman, BOP No. 49210-177_
_FMC Carswell P.O. BOX 27137 Fort Worth, TX 76127_

B. Full name of each defendant, his official position, his place of employment, and his full <u>mailing</u> address.

Defendant #1: _Michael Carr, Warden, FMC Carswell_
_FMC Carswell P.O. BOX 27137 Fort Worth, TX 76127_

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_see attached_

Defendant #2: _Michael Carvajal, Director, Federal Bureau of Prisons_
_FBOP 320 First Street NW Washington, D.C. 20534_

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_See attached_

Defendant #3: _Charles Langham, Medical Director, FMC Carswell_
_FMC Carswell P.O. BOX 27137 Fort Worth, TX 76127_

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_See attached_

Defendant #4: _FBOP COVID-19 Review Team_
_FBOP 320 First Street NW Washington, D.C. 20534_

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_See attached_

Defendant #5: _FBOP Medical Director_
_FBOP 320 First Street NW Washington, D.C. 20534_

Briefly describe the act(s) or omission(s) of this defendant which you claimed harmed you.
_See attached_

3

V.    STATEMENT OF CLAIM:

State here in a short and plain statement the facts of your case, that is, what happened, where did it happen, when did it happen, and who was involved.  Describe how each defendant is involved.  You need not give any legal arguments or cite any cases or statutes.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach extra pages if necessary, but remember the complaint must be stated briefly and concisely.  IF YOU VIOLATE THIS RULE, THE COURT MAY STRIKE YOUR COMPLAINT.

see attached

This complaint includes a request for a Jury pursuant to the Seventh Amendment to the United States Constitution.

The Amount of damages requested in this case is as follows
1.) Payment of all Court Fees
2.) Payment of all attorney Fees

VI.    RELIEF:

State briefly exactly what you want the court to do for you.   Make no legal arguments.  Cite no cases or statutes.

see attached

VII.    GENERAL BACKGROUND INFORMATION:

A.  State, in complete form, all names you have ever used or been known by including any and all aliases.

Alexis Carlette Norman , Alexis Carlette Whetsell

B.  List all TDCJ-CID identification numbers you have ever been assigned and all other state or federal prison or FBI numbers ever assigned to you.

BOP No. 49210-177

VIII.    SANCTIONS:

A.  Have you been sanctioned by any court as a result of any lawsuit you have filed?  ____YES  ✓ NO

B.  If your answer is "yes," give the following  information for every lawsuit in which sanctions  were imposed. (If more than one, use another piece of paper and answer the same questions.)

1.  Court that imposed sanctions (if federal, give the district and division):_____

2.  Case number:_____

3.  Approximate date sanctions were imposed:_____

4.  Have the sanctions been lifted or otherwise satisfied?                    ____YES ____NO

4

C.  Has any court ever warned or notified you that sanctions could be imposed?        _____ YES __✓ NO

D.  If your answer is "yes," give the following information for every lawsuit in which a warning was issued. (If more than one, use another piece of paper and answer the same questions.)

    1.  Court that issued warning (if federal, give the district and division):_____

    2.  Case number:_____

    3.  Approximate date warning was issued:_____

Executed on: _6-28-2021_
           DATE

                                                          _Alexis C.___
                                                 (Signature of Plaintiff)

## PLAINTIFF'S DECLARATIONS

1.  I declare under penalty of perjury all facts presented in this complaint and attachments thereto are true and correct.
2.  I understand, if I am released or transferred, it is my responsibility to keep the court informed of my current mailing address and failure to do so may result in the dismissal of this lawsuit.
3.  I understand I must exhaust all available administrative remedies prior to filing this lawsuit.
4.  I understand I am prohibited from bringing an *in forma pauperis* lawsuit if I have brought three or more civil actions or appeals (from a judgment in a civil action) in a court of the United States while incarcerated or detained in any facility, which lawsuits were dismissed on the ground they were frivolous, malicious, or failed to state a claim upon which relief may be granted, unless I am under imminent danger of serious physical injury.
5.  I understand even if I am allowed to proceed without prepayment of costs, I am responsible for the entire filing fee and costs assessed by the court, which shall be deducted in accordance with the law from my inmate trust account by my custodian until the filing fee is paid.

Signed this ____28TH____ day of ___June___, 20 _21_ .
               (Day)               (month)         (year)

                                           _Alexis C.___
                                 _Alexis C. Norman___
                                  (Signature of Plaintiff)

**WARNING: Plaintiff is advised any false or deliberately misleading information provided in response to the above questions may result in the imposition of sanctions. The sanctions the court may impose include, but are not limited to, monetary sanctions and the dismissal of this action with prejudice.**

## Introduction

I. The Federal Bureau of Prisons ("BOP") is the largest correctional agency in the United States. Presently roughly 165,000 inmates are in the custody of the BOP and _____ correctional staff members are employed. As of May 10, 2021 the BOP has reported a total of 6,500 staff members tested positive for COVID-19, and a total of 3 staff deaths. A total of 50,000 inmates have tested positive for COVID-19, and a total of 255 inmates have died from COVID-19 infection while in BOP custody. The BOP claims to have taken extraordinary steps to help keep staff, inmates, and communities safe. But the facts demonstrate that the BOP is mismanaging the COVID-19 Pandemic. The BOP has had more prisoners infected than any other correctional system in the United States. At FMC (Federal Medical Center Carswell) "Carswell", 732 inmates have tested positive for COVID-19 and seven inmates have died. With a population of roughly 1300 inmates, Carswell's COVID infection rate is roughly 60% of the inmate population and the virus is still not contained.

The Director of the BOP, Michael Carvajal, FMC Carswell Warden Michael Carr, FMC Carswell Medical Director Charles Langham, The BOP Medical Director and The BOP COVID-19 Compliance Review Team, as well as others known and unknown, have knowingly and willingly created, implemented and directed staff to attempt to execute and enforce policies, plans and procedures that were not and can not be feasible within minimum and low security facilities. Particulary facilities with open dorm style units with open bays. The deliberate indifference exhibited through the creation, attempted implementation and enforcement of these policies, plans and procedures have resulted in multiple violations of the Section 504 Rehabilitation Act, unconstitutional

pg. 2

confinement conditions, irreparable harm to the present and future health of inmates and the unnecessary deaths of 8 women confined at FMC Carswell.

Plaintiff is forced to bring this complaint seeking court intervention to prevent the unconstitutional conditions of confinement from continuing, reduce the risk of repeated exposure to COVID-19 infection, reduce the irreparable harm to inmates, specifically, Norman's present and future health, provide the relief requested to ensure that violations to section 504 Rehabilitation Act will cease, properly treat and monitor Norman, who suffers from symptoms associated with contracting COVID-19, known as "long COVID", require mandatory monthly testing of staff in order to prevent and/or limit Norman's exposure to COVID-19, and require quarterly mass testing of the entire inmate population, not just mass testing of specific units. The failure to implement monthly mandatory testing of BOP staff, and quarterly mass testing of the inmate population at the same time, has exacerbated the spread of COVID-19 at FMC Carswell

Complaint - Section 504 of the Rehabilitation Act

1. FMC Carswell is the only medical center for females incarcerated in the BOP. Carswell is located in Tarrant County, Texas. Carswell operates a minimum security satellite camp, a secured low securi: facility that houses sick inmates (Care levels 3 and 4) in units with a hospital building, a four level high rise building that is divided into four seperate two level open dorm style units, and a secured

pg. 3

maximum security facility. The secured low security facility is the central facility on the Carswell compound and houses the majority of the inmates, roughly twelve hundred (1200). The satellite camp is located across from the street from the secured low security building, and the secured maximum security building is located behind the high rise building of the secured low security facility.

2. Complainant, Alexis C. Norman, BOP No. 49210-177, is a 50 year old woman, who at all times relevant here in, has been in the custody of the Federal Bureau of Prisons (BOP) doused at Federal Medical Center Carswell (FMC Carswell), and is currently housed in the low security facility within the four story high rise building, in Unit 2 South, an open dorm style unit with open bays that houses roughly two hundred and fifty (250) women assigned to a 60 square foot cell, shared by four women.

3. As a Federal Correctional Facility managed and operated by the Federal Bureau of Prisons, a division of the Department of Justice, all funding received for programming, Health Care, Housing, food service and correctional services are obviously federal funds.

4. Federal Prisons are subject to the Rehabilitation Act

pg. 4

5. Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States, shall, soley by reason of her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive Agency.

6. Persons with infectious diseases are considered "handicapped" under the Rehabilitation Act, and to have an impairment under the American Disability Act as well.

7. The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as obesity, cardiovascular disease, respiratory disease, diabetes, and immunocomprised. If contracted, COVID-19 can cause severe complications or death. Currently three vaccines are "authorized" by the FDA for emergency use. All three vaccines are 95% - 75% effective against "symptomatic" COVID-19, hospitilization and death from contracting COVID-19. But there is no vaccine that prevents Norman from contracting COVID-19, whether asymptomatic or symptomatic. Studies conducted by the Mayo clinic show that natural immunity is for 3 to 6 months and immunity from the vaccines are 6 to 9 months.

8. Studies conducted by the World Health Organization (WHO) show that COVID-19 mutates and can be contrated again after the

pg. 5

period of immunity has expired.

9. There is currently no FDA approved vaccine for COVID-19. Therefore, the Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission of COVID-19. These measures are physical distancing (social distancing), mask wearing, and increasing focus on personal hygiene such as additional hand washing.

10. On July 28, 2020 Norman tested positive for COVID-19 after testing negative on three previous occasions

11. On March 28, 2020 Andrea Circle-Bear, a pregnant inmate, died at FMC Carswell as a result of contracting COVID-19

12. On June 30, 2020, Norman's Unit, Unit 2 North was quarantined after multiple inmates tested positive for COVID-19.

13. During quarantine Norman was restricted to a 60 square foot cell that she shared with three additional women for 24 hours. She was denied access to commissary services, religious services, educational services, outside recreation, inside recreation, programming, hair grooming services, law library services, legal mail services and psychiatric services. These services were completely denied for a period of 90 days. No out of cell activity was offered soley because Norman had been exposed to COVID-19

pg. 6

14. While quarantined Norman was restricted to (1) one five minute phone call once a day, email service was restricted to (1) one five minute session once a day, laundry service was restricted to one wash per week, the ability to shower was restricted to one 10 minute shower per day, meal service was reduced to three cold sack meals for 19 days, and later one hot meal was provided (lunch), breakfast and dinner continued to be cold sack meals for over 90 days.

15. After testing Positive for COVID-19, Norman was reassigned to "medical isolation" in unit M2. Unit M2 is a medical "Keep lock" unit. The rooms do NOT comply with current CDC recommendation to isolate and treat inmates with airborne diseases in Negative Pressure Isolation Rooms (NPIR). Norman was locked in the room 24 hours a day, and she shared the room with three other inmates.

16. While in Unit M-2 Norman was denied all access to laundry service. One change of clothes was provided for the entire isolation period. No cleaning supplies or hygiene products were provided. Phone service and email service was restricted to 10 minutes per use and the services was not provided on a daily basis. Video Visit services was completely denied along with programming, outside + inside recreation, psychiatric services, psychology services, religious services, legal mail services, law library services, Administrative Remedy Services and educational services.

17. Norman was housed on Unit M-2 during the months of July and August. Central Air conditioning does not work in the M-2 Unit. No attemp was made to provide fans and/or other cooling equipment. Norma

pg. 7

was provided bottles of gatorade and propel to help keep her hydrated. The inability to stay cool exacerbated Norman's COVID-19 symptoms

18. Norman's COVID-19 symptoms were low oxygen, coughing, headache and chest pains. Although Norman received medication for those symptoms she was still documented as an "asymptomatic" patient.

19. Norman was released from medical isolation on August 11, 2020 and reassigned to her Unit, Unit 2 North. Although Norman was NOT tested again, her BOP medical records state that she tested negative for COVID-19 on August 20, 2020. Norman filed an Administrative Remedy to request that this error be corrected.

20. Norman's friend, Marie Nebo was assigned to Unit SA, a medical "isolation" Unit for COVID-19 patients with "Severe" symptoms. Unit SA is a medical "keep lock" unit. Doors remain locked at all times. If patients are too sick to get out of bed, Medical Care is denied. All medical Care is provided at the door via an opening in the door referred to as a "bean shoot". Showers are provided on Mondays, Wednesdays, and Fridays. Six and/or Eight inmates share a single cell and one toilet that flushes only twice in one hour for security reasons. Access to cleaning supplies and hygiene products is denied and only one change of clothes is provided for the entire isolation period. Access to basic amenities (hot water, ice, pencils, paper, envelopes, stamps) is denied. Access to laundry service is denied. Basic right to not be view naked is denied. Access to

pg. 8

psychiatric services is denied. Access to religious services is denied, Access to video visit services, Administrative Remedy services, legal mail services, law library services, programming services, and educational services are all denied. Access to outside and inside recreation is denied. Inmates are left in a locked cell to provide care for each other. Inmates are still assigned to top bunk beds although unable to get down for medical service, shower and restroom due to being too sick. Medical staff does not enter the cell to provide service, medical care, to bedridden inmates. Nor do medical staff have keys or access to the locked cell door in case of emergency. Diarehea is a major symptom of COVID-19, and due to the number of people housed in one cell and the toilet restriction for only two flushes in one hour. Inmate are needlessly exposed to human waste for an extended period of time. Six women have died at FMC Carswell and all were housed in Unit 5A. Norman fears being housed in Unit 5A while sick with COVID-19 and possibly being left to die, as her friend Marie Neba was. Medical isolation lasted until symptoms were resolved.

21. Unit m2, where Norman was housed, as a medical "keep lock" unit did not provide access to the room for medical staff that documented inmate vitals, (temperature, oxygen level). If an inmate was too sick to come to the door to have their vitals taken and/or to receive needed medication, the medical staff would not enter the room to provide medical care to the bedridden inmate, and medical service was denied. Only a Doctor, who visited once a day, entered the room in Unit m2. That Doctor was unable to provide medication

pg. 9

22. Norman has been intentionally discriminated against and treated in a hostile manner solely because she contracted COVID-19

23. The Mayo Clinic and the CDC are now reporting that a large percentage of people that contract COVID-19 test positive for months and continue to have lingering symptoms for an unknown length of time. People that experience these long term effects of being infected by COVID-19 are called "COVID-19 Long Haulers."

24. Post Acute Sequelae of SARS-CoV-2 (PASC), is what the scientific community officially calls "long COVID", prolonged symptoms from contracting COVID-19. Despite no longer testing positive for COVID-19, patients with PASC can experience a wide range of physical and mental symptoms, including headaches, body aches, extreme Fatigue, and depression. "Shortness of breath" is a big symptom, along with chest tightness or chest pain, and coughing, says Lauren Powell, an Atlanta based, board certified family medicine physician.

25. Norman has been suffering from prolonged symptoms from contracting COVID-19. Specifically, shortness of breath, headaches, fatigue, depression and chest pains. She was told to visit sick call for Post COVID Treatment. No medication has been provided. Norman has requested to see a Doctor since October 2020. She is currently schedule to see a Doctor in July 2021.

26. Norman has requested documentation granting her access to use the elevator and to have a bottom bunk due to having shortness of breath and chest pains while walking. Norman's

pg. 10

request to have access to the elevator was denied, and her request for a bottom bunk was also denied.

27. Norman has also requested to be tested again for COVID-19, and on both occasions, September 23, 2020 and November 10, 2020, her request to be tested was denied. On September 23, 2020 she was told that she could test positive for up to 90 days, so I had to wait. On November 10, 2020 I was told that Unit 2 South was not being tested at this time.

28. Per FBOP Program Statement PS 6190.03, "The Bureau limits testing to no more than (1) test per 12 month period, unless the Bureau determines additional testing is warranted. The failure of the BOP to update it's "Infectious Disease Management" Policy (PS 6190.03) to address the reality of a virus that is present in facilities during all 12 months of the year shows deliberate indifference to the health and safety of Norman. At a minimum the Bureau should test Norman no more than (1) test per 6 month period, and as a "best practice" testing for COVID-19 should not be limited at all.

29. Officials at FMC Carswell have applied facially neutral standards that continue to have an unlawful discriminatory effect upon Norman, a qualified handicapped individual. The policy of housing Norman, while positive for COVID-19, an infectious disease, in a manner tantamount to a housing status classified soley for disciplinary measures is an unlawful and discriminatory practice that has resulted in multiple inmate deaths

pg. 11

30. FMC Carswell's isolation and/or lockdown policy makes no distinction between an inmate isolated soley due to contracting an infectious disease, COVID-19 and an inmate isolated for disciplinary measures. Soley because Norman was positive for COVID-19 her access to program participation and correctional services and activities was denied.

31. During the COVID-19 Pandemic Norman, while sick with COVID-19, was housed in a manner worse than inmates assigned to isolation for ~~discipline~~ disciplinary reasons. The disparate treatment resulted in a denial of laundry services, outside recreation, video visit, meaningful access to phone and email services, religious services, law library services, and legal mail services.

32. The impact of this disparate treatment has resulted in a fear of being sent to "medical isolation", which results in inmates not reporting that they are sick. Which creates a continuous cycle of infection and reinfection as well as continuous exposure to COVID-19 for Norman.

33. Norman has been denied the basic right to keep herself safe from harm by practicing social distancing as required by the CDC.

34. While housed in quarantine, isolation and medical isolation, Norman was housed in a 60 square foot cell shared with (3) three additional women, with a maximum of 2½ feet of space between each inmate, for a period of 24 hours a day.

pg.12

35. While in the Unit, an open dorm with open bays, no attempt is made to enforce social distancing. While in line to use the phone, email service, shower and while sitting in the atrium to watch T.V. as well as standing line to get ice, Norman is denied the basic right to protect herself from harm by practicing social distancing. Social distancing is not feasible in open dorm units

36. While in line for meal service and during meal service Norman is forced to sit shoulder to shoulder at a table that seats four people, surrounded by multiple tables that are less than two feet apart. This policy denies Norman the right to practice social distancing and forces her to choose between eating meals provided by the BOP and/or exposing herself to the highest risk of exposure to COVID-19. This practice denies Norman meaningful access to meal service.

37. Norman is First Step Act eligible, which allows her to earn time credits for classes and evidence based programming completed. Prior to FMC Carswell's modified operations, Norman completed over 50 classes and programs within 7 months. Currently limited classes and programs are available. No attempt is made to practice social distancing in classroom. Inmates from all units are mixed together sitting less than three feet apart. Classes are restricted to 10 to 30 participants and offered once a quater. This policy denies Norman the right to receive meaningful access to programming and forces her to choose between earning time credits and exposing herself to COVID-19.

pg. 13

38. Norman has to report to sick call to receive medical care for her lingering COVID-19 symptoms. No attempt is made to enforce social distancing in the clinic that offers sick call. The clinic is completely full with inmates standing against the wall and wheelchair users take up the hallway and walkways. Norman is forced to sit shoulder to shoulder with other sick inmates while waiting to be seen. In order to reduce her exposure to COVID-19, Norman avoids sick call and self medicates via over the counter medication. This policy denies Norman meaningful access to medical care. Effectively forcing Norman to choose the lesser of two evils (medicate in the Unit or risk exposure to COVID-19 by going to the clinic

39. Norman is routinely placed in high risk of exposure situations. Multiple inmates tested positive for COVID-19 in Norman's unit, Unit 2 South in January 2021. The positive inmates were removed from the unit. The Unit was placed on quarantine for 48 hours instead of the 14 days that the CDC requires. Norman asked to be tested, her request was denied. She was told that only people that have never tested positive for COVID-19 are being tested at this time. The practice and/or policy of refusing to test Norman when she has knowingly been exposed to COVID-19, denies her the basic right to know if she is infected with an infectious disease, and places her in a position to unknowing infect others.

40. Norman's medical records are not properly maintained and/or documented. After testing positive for COVID-19 on July 28, 2020, Norman's BOP Medical Records state that she tested negative for COVID-19 on

pg. 14

August 11, 2020. Norman was released from medical isolation on 8-11-20, but she has NEVER tested negative for COVID-19 after testing positive on 7-28-20. Norman filed an Administrative Remedy to resolve this issue, but she received no response. On June 11, 2021 Norman went to sick call, her visit to sick call was not documented and she was not charged for the visit. Again Norman filed an Administrative Remedy to resolve the issue. On June 21st and 23rd Norman was charged for sick call, the 21st she visited sick call, the 23rd is the charge for June 11, 2021, after Norman's Administrative Remedy, but documentation for the visit is still not available. Norman is concerned that due to her COVID-19 infection her medical records are not being documented properly, which denies her the right to proper medical care.

41. Norman's BOP Medical Records indicate that after being exposed to and contracting COVID-19, Norman has been diagnosed with a Respiratory Disorder, gastric reflux disease and continues to suffer from fatigue, shortness of breath, chest pains, headaches, sleeping problems, unexplained numbness in her right hand and right leg and chronic stomach issues. These continuous symptoms in addition to Norman's severe obesity (BMI 46.6) substantially limits Norman's daily life activities.

42. The Rehabilitation Act requires "reasonable accommodations for handicapped/disabled persons. Qualified individuals with a handicap meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

pg. 15

43. Norman is currently not vaccinated. FMC Carswell refuses to test inmates for COVID-19 when requested. FMC Carswell refuses to enforce the practice of social distancing inside of Norman's unit. Per BOP Policy, the rated capacity for a cell smaller than 65 square feet in a low security facility, requires single occupancy. Per CDC Guidance for Correctional facilities, social distancing inside units requires one person per cell. Norman filed Administrative Remedies requesting to be housed in a cell within her unit, Unit 2 South, by herself to allow her an opportunity to practice social distancing. Norman's request was denied.

44. Currently half of the inmate population at FMC Carswell has received the vaccine, and less than half of staff members have received the vaccine. CDC Guidance for Correctional facilities requires social distancing in dinning facilities. FMC Carswell has reported that inmates are receiving meals via a "Grab-N-Go" process. But inmates are forced to sit shoulder to shoulder at tables seated 4 to a table to eat Breakfast, lunch and dinner. In order to reduce her exposure to COVID-19, Norman requested to be allowed to pick her meals up and return to her unit to eat, just as "essential inmate workers" and "staff members" are allowed to do. Norman's request was denied.

45. Norman's requests for meaningful access to outside recreation, classes, programming, law library services and mail service have also been denied. Resulting in a loss of earned time credits for Norman.

46. Norman is 50 years old suffering from a Respiratory disorder and shortness of breath as a result of contracting COVID-19. Inmates are

pg. 16

not allowed to use the elevators in the high rise building unless permission has been given. Norman has to walk up six (6) flights of stairs to enter her unit, and the elevator used by inmates has been broken since March 2020, over an year. Norman has request an elevator pass due to her health. Norman's request was denied.

47. The BOP has reported to Congress and the public that the Bureau is releasing inmates that qualify for the CARES Act. The Bureau provides specific criteria needed to qualify in addition to the inmates COVID-19 risk factors. Norman qualifies for the CARES Act. As a result of a history of adverse reactions to vaccinations, that is confirmed by her Mothers death from a blood clot, 14 days after receiving the first dose of the Pfizer vaccine, Norman is currently not vaccinated. She suffers from CDC Tier I COVID-19 risk factors (Obesity (BMI 46.6 and Respiratory Disorder and age 50), she is minimum custody with a MINIMUM Pattern Score. Norman requested home confinement via the CARES Act. Norman's request was denied.

48. Norman does not have meaningful access to programming. Due to FMC Carswell's modified operations the number of evidence based programming and Productive Activities are severely limited. Evidence Based Programming offered once a quarter from each department with limited space available (10-20 spaces) and the same restrictions apply for Productive Activity Classes. Norman was enrolled in an Adult Continuing Education (ACE) class with 12 other inmates from various units. Inmates from Unit 5 had inmates test positive for COVID-19. Members of Unit 5 were enrolled in the ACE class

pg. 17

with Norman. Two of the Unit 5 inmates were sent to unit 5A, but Norman was told that everything was fine. The following week the Education staff member, Mr. Ross, who was responsible for supervising the evening ACE class was not at work for 21 days. ACE classes were cancelled for three weeks as a result of Mr. Ross' absence. During that time period, Norman was also ill and felt that she had contracted COVID-19 again, but her request to be tested was denied. Norman was denied her right to know if she was exposed to COVID-19. Norman has no way to keep her safe at FMC Carswell. The officials are not honest with staff or inmates in reference to their exposure to COVID-19

49. Norman is continuously exposed to COVID-19 through daily contact with staff. Although FMC Carswell knows that the primary source for COVID-19 entering the facility is via the staff. No attempt has been made to routinely test the staff. The screening process used for employees checks for elevated temperatures and symptoms. However, CDC has reported that a large number of people positive with COVID-19 are asymptomatic. Therefore, the failure to routinely test the staff and implement a mandatory testing for staff members exhibits a deliberate indifference for Norman's safety and present and future health.

50. Norman is routinely denied access to hot water for proper hygiene and sanitation. Since May 31, 2019 the hot water in the high rise is not available from Saturday until the following Monday morning. The failure to fix and/or replace the water system resulted in a complete water loss in February 2021 during the Texas Snow Storm. The loss

pg. 18

of water resulted in the toilets in the restrooms to over flow with human waste and blood. Norman was exposed to this waste for a period of nearly 24 hours.

51. The heating system in the high rise building does not work properly. Norman's unit, 2 South and 2 North were without heat during the winters of 2019-2020 and 2020-2021. Due to the weather in Texas no heat is usually not a major problem. But in February for nearly two weeks heat was not available and Norman had to wear several layers of clothes, hat, scarf and gloves and remain in Bed under a blanket in an attempt to keep warm. The denial of heat during freezing temperature during a pandemic while Norman was still suffering from lingering symptoms from contracting COVID-19 exacerbated Norman's mental health

52. Norman is currently housed in a building that does not have an operating fire alarm and sprinkler system in violation of the National Fire Code, Life Safety Code and the American Correctional Association Fire Protection Standards. The fire and sprinkler system malfunctioned during the Texas Snow Storm in February and continued to be nonoperational. The Fire Alarm was activated on February 15, 2021, due to a malfunction involving the water flow in the sprinkler system. The malfunction released fire retardent chemicals and fumes into Norman's Unit 2 South. The Unit is located on the 3rd and 4th floor of the high rise build. The elevator was broken, so inmates the have wheelchairs and walkers were not able to evacuate the building. Due to the staff shortage Norman and others were told that the unit could not be evacuated. Simultaneously inmates were having seizures. Norman was locked in the Unit, forced to breath in the fumes and fearing for her safety. Because of the lack of medical staff available Norman and others tried to help

pg. 19

inmates that were having serzures and were afraid. The fire alarm was activated for nearly 30 minutes. None of the staff had been trained to turn the system off. Staff members called for inmate Martin, who worked in that department to turn the system off. Norman has no means to keep herself safe from harm, continiously exacerbating her mental health.

Eigth Amendment Violation

1. Housing Norman in a "Keep lock" medical unit soley because she has contracted an infectious disease, specifically, COVID-19 is a violation of her constitutional rights. Norman, a minimum custody inmate, housed in a low custody facility, FMC Carswell, that doesn't have doors to the cells in Unit 2South, tested positive for COVID-19 and locked into a room with other inmates that were sick with COVID-19, Inmates, to sick to get out of bed was denied medical care, Norman, while sick herself was housed with a mentally ill "suspected terrorist". Forced to assist other sick inmates that were bedridden and couldn't get off top bunks. When Norman's roommate passed out Norman banged and knocked on the door calling for help for over an hour. No, nurse call button is available. No cleaning supplies were provided to clean the filthy room. No change of clothes was provided. No hygiene products were provided. And Norman was denied the right to use the laundry facility. Norman had done nothing wrong, she had not violated BOP Policy. She was just positive for COVID-19 FMC Carswell still houses inmates positive for COVID-19 in the same manner.

pg. 21

throughout the pandemic to conduct a thorough review, evaluating compliance measures, monitoring response techniques, and developing further COVID-19 mitigation strategies. Recommendations and best practices are shared with and implemented at all BOP facilities as deemed appropriate. Such a team visited FMC Carswell in August 2020.

2. The BOP states within it's Pandemic and Action Plan that "it is recognized that if there is widespread transmission within a facility, isolation as a strategy may not be feasible" (Module 1, Pg. 5). The further states that, "once the institution is locked down" social distancing and isolation is no longer feasible" (Module 1, Pg. 6). BOP's Plan requires inmates to wear an appropriate face mask when social distancing cannot be achieved" (Module , Pg. ). Norman is required to wear a mask at all times, unless inside of her cell. Therefore, as BOP Policy states, social distancing can not be achieved at FMC Carswell. Furthermore, the Director of BOP, Michael Carvajal, when speaking to members of congress, stated "that prisons are not made for social distancing but rather the opposite. This is even more acute with Terminal Island as it has open dorms and open bays." FMC Carswell has similar construction, with units that have open dorms and open bays, which is not unusual in BOP low security facilities,

3. FMC Carswell's capacity exceeds the rated capacity for the high rise building. Although BOP Policy requires a single occupancy in each cell in Norman's unit, Carswell continues to house four women to each cell. Norman requested a single occupancy cell in an attempt to practice social distancing and keep herself safe, but her request was denied.

pg. 22

4. FMC Carswell reports that inmate's meal service is grab-n-go. But in reality Norman is forced to consume her breakfast and lunch in the cafeteria. Which forces her to sit shoulder to shoulder with other inmates while not wearing a mask. FMC Carswell's staff dining has removed all tables and chairs and only allows grab-n-go meals. "Essential inmate workers" are allowed to participate in grab-n-go service too. Norman requested to participate in grab-n-go meal service for breakfast, lunch and dinner until the pandemic is over.

5. Officials at FMC Carswell and BOP are completely aware that due to the configuration of FMC Carswell, social distancing is not possible. Therefore, FMC Carswell is unable to fulfill it's legal obligation to keep Norman safe from contracting an infectious disease

6. Although Carswell has failed to keep Norman safe from contracting COVID-19. Instead of reducing the inmate population. The inmate population has increased, and no attempt is currently made to enforce social distancing inside of Norman's Unit, at the health clinic, at work details, in education classes, at commissary, or at any place within the facility with the exception of the visitation room,

7. Although Carswell has a legal obligation to keep Norman safe from contracting COVID-19. No attempt has been made to implement a monthly mandatory testing of all Carswell staff. Only half the staff at FMC Carswell has received a vaccine, and officials are well aware that COVID-19's primary entrance into the facility is through the staff, as stated by the CDC in guidance for Correctional facilities

pg. 23

8. It has been 18 months, nearly two years that FMC Carswell has been operating under a "modified" protocol due to COVID-19. Carswell has had two COVID-19 outbreaks resulting in 60% of the inmate population testing positive for COVID-19. Eight Inmates have died at FMC Carswell. All deaths were witnessed by inmates and staff, and although all of these women died do to being housed in a "medical Keep lock unit". No attempt has been made to discontinue this policy. As BOP has stated, the process and policy off housing minimum and low security inmates that are positive with COVID-19 in this manner is approved by the BOP Covid Compliance Team. Exhibiting Deliberate Indifference to the health, safety and lives of people that the BOP is charged with protecting and providing health care.

9. After nearly two years of operating Post COVID-19, the BOP has made no attempt to update it's defunct infectious disease policy. The policy does not address the current reality of a year round airborne contagious virus like COVID-19. The Policy only requires testing the inmate population once every 12 months, and instead of updating the policy consistent with the characteristics of COVID-19. The BOP continues to operate using the same policy. Strategically testing inmates in specific groups that result in inmates being tested for COVID-19 once every 12 months. This policy "down plays" the number of times Norman is and/or has been infected with COVID-19, which places her present and future health at risk, and consequently results in her requests to be tested for COVID-19 consistently being denied.

pg. 24

10. Although FMC Carswell's Medical Director is aware of the damage to the lungs, heart, respiratory system and other organs that could be caused by contracting COVID-19, the only medical care offered to Norman is via sick call. Norman has been waiting to see a doctor since October 2020. Need diagnostic tests like MRI and stress test have not been offered despite her requests and multiple visits to sick call.

11. Visits to sick call are not properly documented. Norman's June 11, 2021 visit to sick call was not documented, which also means that her medical symptoms were not documented, and she was not charged for the visit. This is a routine practice used for inmates that continiously visit sick call, as instructed, because of their lingering COVID-19 symptoms.

12. Medical Records are not properly documented. Lingering COVID-19 symptoms are not always documented. Norman's medical records falsely state that she tested ~~positive~~ negative for COVID-19 on August 11, 2020 and her June 11, 2021 visit to sick call was not documented at all.

13. During quarantine medical equipment used to monitor temperature and oxygen levels were not properly calibrated, which caused the device to yield body temperatures of 94° and below and oxygen levels above 100%, which resulted in incorrect medical records documentation.

pg.25

All compliants in this civil suit has been authorized, planned and implemented by Michael Carr, Warden of FMC Carswell and Charles Langham, FMC Carswell, Medical Director, as guidance, instruction and training required as directed by the BOP Medical Director and Michael Carvajal, Director of the Federal Bureau of Prisons required.

Norman submitted her RA Complaint to the Department of Justice, as required by BOP Administrative Remedies Policy. As of todays date, June 28, 2021, no response has been received. Norman submitted the complaint on April 13, 2021.

The relief requested

1. Order FMC Carswell to immediately stop placing inmates sick with COVID-19 in "medical Keep lock units" without nurse call buttons. Inmates sick with COVID-19 should not be locked into a cell a left without medical care.

2. Order FMC Carswell to provide medical care to bedridden inmates sick with COVID-19

3. Order FMC Carswell to provide all access to laundry services and cleaning supplies for inmates sick with COVID-19.

pg.26

4. Order FMC Carswell to implement monthly mandatory testing of all staff for COVID-19, to mitigate the spread of COVID-19.

5. Order FMC Carswell to beginning quarterly testing of the entire inmate population during the same week in order to mitigate the spread of COVID-19 throughout the inmate population

6. Order FMC Carswell to operate according to the rated capacity for each building, specifically, the high rise building.

7. Order FMC Carswell to immediately repair and/or replace the fire and sprinkler system in the high rise building

8. Order FMC Carswell to immediately replace the system operating the hot water in the high rise building.

9. Order FMC Carswell to replace the inmate elevator in the high rise building and make all elevators accessable to all inmates.

10. Order FMC Carswell to allow Norman to participate in grab-n-go for all meal services

11. Order FMC Carswell to allow Norman to be housed in her assigned cell by herself

12. Order FMC Carswell to document and/or correct all errors on Norman's medical records.

pg. 27

13. Make all programs and services available to Norman while quarantined and/or in medical isolation due to COVID-19.

14. Order FMC Carswell to operate in full compliance with the Rehabilitation Act

15. Order FMC Carswell to allow First Step Act earned time credits for correspondence classes.

16. Order FMC Carswell to immediately begin to release qualified inmates for the CARES Act in a manner that is consistent with BOP's settlement in Whitted v. Diane Easter (2021 U.S. Dist. LEXIS 9347, No. 3:20-cv-00569 (Jan. 19, 2021)

17. Order FMC Carswell to immediately calculated Norman's earned time credits, pursuant to the First Step Act, and apply those earned time credits to Norman's sentence.

18. Order FMC Carswell to determine if Norman qualifies for home confinement via the CARES Act, and if Norman does qualify, to release Norman to home confinement as required for the medically vulnerable inmate population confined in the BOP.

Exhibits

1. Exhibit A
List of Administrative Remedies filed by Norman

2. Exhibit B
Letter to Senator Cornyn from FMC Carswell Correctional Union President
Regina Warren

3. Exhibit C
DOJ Freedom of Information Request from Norman
Regarding FMC Carswell's Rated Capacity

4. Exhibit D
Letters from Congressman Marc A. Veasey
in response to complaints submitted to his office by Norman

5. Exhibit E
Picture of Cells in Norman's Unit 2 South and throughout
the High Rise building

6. Exhibit F
Administrative Remedy Regarding falsification of Norman's
medical Records

EXHIBIT A

List of Administrative Remedies

Administrative Remedies filed by Norman

1. #1034341- Social Distancing
2. #1048200- Request for COVID-19 Health Care Plan
3. #1046288- Request for Psychiatric Services
4. #1034326- Request for First Step Act Earned Time Credits
5. #1040525- Request for Home Confinement
6. #1064507- Request for Grab-N-Go Food Service
7. #1061756- Request for Single occupancy table during food Service
8. #1034320- Social Distancing
9. #1061416- Falsification of Medical Records
10. #1072260- Social Distancing
11. #1072234- Request for Compassionate Release
12. #1072220- Request for Single Occupancy Cell
13. #1072510- Request for info Regarding BOP Testing Policy
14. #          - Outside Recreation Request - No Response
15. #1074570- Request for assignment of Correspondence Classes.
16. #1074795- Request for water System Replacement/Repair- No Respons

EXHIBIT B

Letter To Senator Cornyn
from Regina Warren, Fmc Carswell Officer's Union President

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
COUNCIL OF PRISON LOCALS - 33
FMC CARSWELL LOCAL 1006
Regina Warren, President
AMERICA* IIIII AtION * * * *.t* * * * IMAMS ** ******

Date: April 7, 2020
The Honorable John Cornyn
Senior Unit States Senator of Texas
5001 Spring Valley Road
Suite 1125 East
Dallas TX. 75244
Dear Senator Cornyn,
A.F.G.E. Local 1006, is the sole and exclusive representative of the bargaining unit staff at FMC Carswell, in accordance with the Master Agreement Article 6 Section o. Any employee covered by this Agreement may, without fear of penalty or reprisal, exercise their rights under the Whistleblower Protection Act, which includes the right to disclose gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. This act is codified in 5 USC, Section 1213. As the President of Local 1006, I am exercising this right.
Now that FMC Carswell has had its first positive case of COVID19 there is a growing concern amongst staff in regard to health and safety amongst staff, the public, as well as the inmates. According to the Master Agreement Article 27 Health and Safety Section a. There are essentially two (2) distinct areas of concern

regarding the safety and health of employees in the Federal Bureau of Prisons:
1. The first, which affects the safety and well-being of employees, involves the inherent hazards of a correctional environment; and
2. The second, which affects the safety and health of employees, involves the inherent hazards associated with the normal industrial operations found throughout the Federal Bureau of Prisons.
With respect to the first, the Employer agrees to lower those inherent hazards to the lowest possible level, without relinquishing its rights under 5 USC 7106. The Union recognizes that by the very nature of the duties associated with supervising and controlling inmates, these hazards can never be completely eliminated.
With respect to the second, the Employer agrees to furnish to employees places and conditions of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm, in accordance with all applicable federal laws, standards, codes, regulations, and executive orders
On March 31, 2020, the Bureau of Prison issued a public statement informing the public the following "for a 14-day period, inmates in every institution will be secured in their assigned cells/ quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior." On the same day, a Memorandum for all CEO was sent from the Correctional Programs Division and Health Services Vision out of Central office directing the CEO's the following: "Effective Wednesday, April 1, 2020, the Bureau will enact a fourteen-day (140 nationwide actions to minimize movement to decrease the spread of the virus". The Agency issued a nationwide (public statement) meant to assure the public that the agency was taking every necessary precaution to protect the staff, inmates, and public from the further spreading of the global pandemic.
The Union believes the Agency was providing a false perception to the American people by stating all institutions will lockdown while sending internal memorandum suggesting CEO's enact minimize movement.
The agency knowing misleads the American public particularly at FMC Carswell.
All Warden's has the vicarious responsibility to carry out the Bureau of Prisons' mission and provide public safety. According to the CDC individuals with underlying health issues are highly susceptible to contracting this virus. With FMC Carswell being the only female medical facility this institution would experience a catastrophic catastrophe by not taking extraordinary measures in this extraordinary situation.
( 2 )
There has not been any guidance given to all staff as far as processes and procedures in maintaining health and safety. The last guidance given to all staff within the institution was on April 1, 2020, with an attached modified operation schedule. Because we work in a line of work of confine space and close quarters there is no such thing of social distancing which makes it imperative to communicate with all staff in what PPE is available, the process of getting them, and when/how to use them. In correctional facility we are subject to work in various units at various times each area has had different procedures that have

------------------------------------------------------------------------------------------------

caused staff and inmates to be at risk.

As of now, FMC Carswell has not issued a complete lockdown we are still operating on a modified operation. In "THE CReW" weekly updates the Warden informed staff of the changes that have been implemented thus far. The Executive Assistant D. Lux, Camp administrator stated the Camp inmates will be restricted to their rooms the majority of the day. Inmates were still allowed to move around the compound for various reasons to include pill line, commissary, TV rooms, and food service. After Phase V was enacted Camp inmates were seen playing volleyball on the compound as well as congregating in small confine TV rooms.

Also, the Newsletter indicated Foodservice will do a partial satellite feeding system. Meaning some of the inmates will be fed on the unit while others would be allowed to do grab and go feeding. Grab and go feeding consist of calling each unit one at of time to go to the foodservice area to pick up their food.

Saturday, April 4, 2020, we received the results of our first positive case. The Agency was aware of this inmate being a suspected symptomatic case on Saturday, March 28th when she went out to the local hospital. She was sent back to the institution to be placed in isolation. The inmate symptoms progress which caused her to go back to the hospital for admission on Tuesday, March 31st. Wednesday staff who had direct contact with this inmate began having concerns and started emailing and calling the Agency on guidance regarding the suspected symptomatic case who has now been admitted to the hospital. The response the Agency was given to the staff was to continue to come to work because she has not tested positive as of yet. There were a total number of 6 officers and 1 Nurse who treated this inmate during that time and they continued to come to work daily until the inmate test result came back positive on April 4th. Since then all staff mentioned has been sent home to self-quarantine with the exception of the nurse. According to the CDC guidelines, those staff should have self-quarantine at the time they were exposed the first time with the symptomatic inmate.

As of today, Carswell has isolated 7 inmates, 3 of the inmates worked on a sanitarian detail which allowed them excess to numerous areas throughout the

3 )

institution to clean. The sanitarian workers lived in a unit that houses over 300 inmates. Because of the potential exposure that unit is the only unit that has been completely locked down.

In closing, the fact that a lockdown has not accrued and as a result seven inmates have been placed in isolation awaiting test results due to symptoms after phase V was enacted. The agencies cavalier approach led to these presumptive cases by refusing to practice social distancing as recommended by the CDC.

Sadly, FMC Carswell knowingly and willingly misled the public placing the staff, inmates, and community at risk to the most lethal pandemic since 1920.

As the representative of more than 400 correctional workers, we are requesting your assistance in this matter.

Signed by Regina Warren

EXHIBIT C

Freedom of Information Request
Regarding FMC Carswell's Rated Capacity



**U.S. Department of Justice**
**Federal Bureau of Prisons**

_South Central Regional Office_
_U.S. Armed Forces Reserve Complex_
_344 Marine Forces Drive_
_Grand Prairie, TX  75051_

MAR 2 2 2021

Alexis Norman
Reg. No. 49210-177
FMC Carswell
P.O. Box 27137
Fort Worth, TX  76127

Dear Alexis Norman:

The Federal Bureau of Prisons (BOP) received your Freedom of Information Act/Privacy Act (FOIA/PA) request. Your request has been assigned a number and forwarded to the processing office noted below. Please make a note of the request number and processing office as you will need to include it in any correspondence or inquiry regarding your request. A copy of the first page of your request is attached to help you more easily keep track of your request.

FOIA/PA Request Number:      2021-03272
Processing Office:           SCR

The time needed to complete our processing of your request depends on the complexity of our records search and the volume and complexity of any records located. Each request is assigned to one of three tracks: simple, complex, or expedited. Due to the large number of FOIA/PA requests received by BOP and the limited resources available to process such requests, BOP handles each request on a first-in, first-out basis in relation to other requests in the same track. Your request was assigned to the complex track and placed in chronological order based on the date of receipt.

We determined unusual circumstances exist as the documents responsive to your request must be searched for and collected from a field office, and/or the documents responsive to your request are expected to be voluminous and will require significant time to review, and/or your request requires consultation with at least one other agency with a substantial interest in your request. Because of these unusual circumstances, we are extending the time limit to respond to your request for the ten additional days provided by the statute. Processing complex requests may take up to nine months. Pursuant to 28 C.F.R. § 16.5(b) and (c), you may narrow or modify your request in an effort to reduce the processing time.

Pursuant to 28 C.F.R. § 16.10, in certain circumstances we are required to charge fees for time spent searching for or duplicating responsive documents. If we anticipate your fees will be in excess of $25.00 or the amount you have indicated you are willing to pay, we will notify you of the estimated amount. At that time, you will have the option to reformulate your request to reduce the fees. If you requested a fee waiver, we will make a decision whether to grant your request after we determine whether fees will be assessed for this request.

If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, please feel free to contact the SCR or the Federal Bureau of Prisons' (BOP) FOIA Public Liaison, Mr. C. Darnell Stroble at 320 First Street NW, Suite 936, Washington DC 20534.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information, Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001.

Please be advised that due to necessary operational changes as a result of the national emergency concerning the novel coronavirus disease (COVID-19) outbreak, there may be some delay in the processing of your request.

Sincerely,

*S. Emberton*

S. Emberton
Paralegal Specialist

PRIVACY ACT REQUEST
AND
FREEDOM OF INFORMATION ACT REQUEST

Freedom of Information Officer                    Date: _January 12, 2021_

Central Office
Bureau of Prisons
320 First Street N.W.
Washington, D.C. 20534

_____

_____

Pursuant to Title 5 U.S.C.A. § 552 Freedom Of Information Act; and the Privacy Act; I hereby request access to and copies of the following information, documentation and all related materials. _The FBOP Rated Capacity for FMC Carswell including Non-medical housing and camp. A copy of the Rated Capacity Computation form (EMS-36), including predominant inmate security level, size of cells (i.e. 65 sqft, 75 sqft etc.) and the rated occupancy of the cells based on the current size and BOP Design Standard_

Pursuant to the Freedom of Information Act and the Privacy Act, I hereby request waiver of fees and costs if any. Pursuant to the Freedom of Information Act, unless an extension of time to respond is timely requested, a response is due within ten (10) days from the date of this request.

Submitted By: _Alexis Carlette Norman_, Requestor
                    (Written Name)

_Alexis Carlette Norman_
(Typed or Printed Name)
Reg. No.: _49210-177_
UNIT: _2 South_

Received

FEB  4 2021

FOIA/PA Section
Federal Bureau of Prisons

STATE OF _Texas_ )
                              ) SS:
COUNTY OF _Tarrant_ )

## SUPPORTING CERTIFICATION OF REQUESTOR

I, _Alexis C. Norman_, pursuant to Title 28 U.S.C.A. § 1746, upon my oath before God and under the penalty of perjury of the laws of the United States of America, do hereby certify and State that:

I am the requestor and the signer of this Privacy Act request and Freedom of Information Act Request: and

Further I sayeth not.
This _12TH_ day of _January_, _2021_, A.D.
By: _Alexis Carlette Norman_, Certifier / Requestor
         (Written Name)
_Alexis Carlette Norman_, Certifier/Requestor
    (Printed or Typed Name)

(CW/1197                              *PLEASE RETURN COPY WITH RESPONSE**

EXHIBIT D

Letters from Congressman
Marc A. Veasey

**MARC A. VEASEY**
33RD DISTRICT, TEXAS

SUBCOMMITTEE ON COMMUNICATIONS
AND TECHNOLOGY

SUBCOMMITTEE ON DIGITAL COMMERCE AND
CONSUMER PROTECTION

SUBCOMMITTEE ON ENERGY

COMMITTEE ON SMALL BUSINESS

SUBCOMMITTEE ON INNOVATION AND
WORKFORCE DEVELOPMENT

SUBCOMMITTEE ON CONTRACTING AND
INFRASTRUCTURE

## Congress of the United States
### House of Representatives
#### Washington, DC 20515-4333

March 22, 2021

Ms. Alexis Norman, 49210-177
PO Box 27137
Federal Medical Center, Carswell
Fort Worth, TX 76127-0137

Dear Ms. Norman,

Enclosed please find a copy of the e-mail my staff assistant received from the Federal Bureau
of Prisons in response to my inquiry on your behalf. I believe you will find this letter self-
explanatory.

Sincerely,

Marc A. Veasey
Member of Congress

MV/qc

2348 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-9897

6707 BRENTWOOD STAIR ROAD, SUITE 200
FORT WORTH, TX 76112
(817) 920-9086

1881 SYLVAN AVENUE, SUITE 108
DALLAS, TX 75208
(214) 741-1387

PRINTED ON RECYCLED PAPER

**Ward, Jennifer**

---

| | |
|---|---|
| **Subject:** | FW: RESPONSE - CONGRESSIONAL INQUIRY - NORMAN, Alexis 49210-177 (Congressman Marc Veasey) |

Ms. Norman,

Please see the below reply received from the Federal Bureau of Prisons in response to the Congressman's inquiry on your behalf.

Jennifer L. Ward
Director of Constituent Services
Office of Congressman Marc Veasey-33CD-TX
6707 Brentwood Stair Rd., Suite 200
Fort Worth, Texas 76112
817-920-9086
817-920-9324 fax

**From:** BOP-CONG
**Sent:** Friday, March 19, 2021 1:26 PM
**To:** Ward, Jennifer <Jennifer.Ward@mail.house.gov>
**Subject:** RESPONSE - CONGRESSIONAL INQUIRY - NORMAN, Alexis 49210-177 (Congressman Marc Veasey)

Good Afternoon Ms. Ward,

We received the congressional inquiry from your office concerning Ms. Alexis Norman, dated March 9, 2021. In her supporting letter dated February 14, 2021, Ms. Norman states that the institution was without heat or water. She also expresses her concerns about the institution's COVID-19 protocols, and requests a congressional investigation and assistance concerning the institution. Ms. Norman writes in part: "Please use your authority to request that representatives from the CDC come to FMC Carswell and assist prison officials with correctly implementing a plan to decrease inmate exposure to repeated exposure to COVID-19 reinfection."

A review has been conducted of this inquiry. Due to adverse weather and freezing temperatures beginning on Friday, February 12, 2021, FMC Carswell experienced minor issues with heat and hot water. Institution's Facilities Department staff, who are responsible for all building maintenance and construction matters, were able to fix the minor issues within two hours, without prolonged interruption. Later, on February 15, 2021, a water pipe burst in one of the housing units, which was immediately repaired within two hours. During repairs, inmates had access to running water and were able to flush toilets. At no time were inmates without running water or the ability to flush toilets.
Currently, the heat is being sustained by boilers, and adjustments to equipment have been made to meet the demand of usage. The institution's heat and hot water are fully functional.
In regards to the COVID-19 issues, all inmates entering and releasing from the institution are placed in quarantine for a minimum of 14 days. All new intakes to an institution are screened by medical staff. Inmates are tested utilizing the PCR test (either an Abbott ID NOW point-of-care [POC] test or a commercial PCR test) when placed in and removed from quarantine. All PCR tests are sent to Quest Diagnostic for resolve. Additionally, we continue surveillance testing of 10% of our population per unit. For more information on our modified operations, please view our public website at https://www.bop.gov/coronavirus/covid19 status.jsp.
To ensure that all institutions were in compliance with Centers for Disease Control and Prevention (CDC) and Bureau of Prisons (BOP) guidance and directives related to the management of COVID-19 and the mitigation of disease transmission, the BOP's COVID-19 Compliance Review Teams were established in August, 2020, as a component of our Program Review Division. These teams have reviewed institutions throughout the pandemic to conduct a thorough review, evaluating compliance measures, monitoring response techniques, and developing further COVID-19 mitigation

1

strategies. Recommendations and best practices are shared with and implemented at all of our facilities as deemed appropriate. Such a team also visited FMC Carswell in August 2020, and the COVID-19 Compliance Review Board conducted a review of all of the institution's mitigation practices for preventing and reducing COVID-19 transmission. Since the pandemic, weekly reviews are held as indicated with the BOP's COVID-19 Task Force to discuss mitigations and strategies. In addition, FMC Carswell shares that a partnership with the local medical community has also been accomplished in this matter. The institution advises that the Tarrant County Health Department is also a local stakeholder, and it is involved in the COVID-19 collaboration efforts at the institution.

We are carefully monitoring the spread of the COVID-19 virus. As with any type of emergency situation, we carefully assess how to best ensure the safety of staff, inmates and the public. In accordance with COVID-19 guidance and protocols, all BOP institutions have modified operations in order to mitigate the spread of COVID-19. Likewise, FMC Carswell has also followed this guidance, and the institution will continue to strictly adhere to guidelines rendered from the BOP and CDC.

The COVID-19 pandemic that is impacting our entire country has had a significant impact on our BOP operations. The Bureau has been very transparent in our COVID policies and plans, and consistent with CDC guidance makes them publicly available on our website at www.bop.gov. This site is updated daily and is readily available to anyone in the public. We invite you to view our public website for additional information on our COVID-19 policies and plans at https://www.bop.gov/coronavirus/.

Additionally, Ms. Norman has the right to use the Administrative Remedy Procedures to challenge any decision(s) regarding her period of incarceration under Program Statement 1330.18, Administrative Remedy Program, in accordance with 28 C.F.R. §542, Administrative Remedy.

I trust this response addresses your concerns.

Office of Legislative Affairs
Federal Bureau of Prisons
320 First Street, NW
Washington, DC 20534

2

MARC A. VEASEY
33RD DISTRICT, TEXAS

COMMITTEE ON ENERGY
AND COMMERCE
SUBCOMMITTEE ON COMMUNICATIONS
AND TECHNOLOGY

SUBCOMMITTEE ON ENERGY

COMMITTEE ON ARMED SERVICES
SUBCOMMITTEE ON TACTICAL AIR
AND LAND FORCES

SUBCOMMITTEE ON MILITARY PERSONNEL

## Congress of the United States
### House of Representatives
#### Washington, DC 20515-4333

June 15, 2021

Ms. Alexis Norman, 49210-177
PO Box 27137
Federal Medical Center, Carswell
Fort Worth, TX 76127-0137

Dear Ms. Norman,

My Fort Worth District Office received your packet of information including your explanation of your grievances with the Federal Bureau of Prisons (BoP), Federal Medical Center-Carswell. I sincerely regret that you experienced the difficulties mentioned. As you stated, you filed your complaint with the U.S. Department of Justice for "violations of the Rehabilitation Act". Since I am a member of the legislative branch of the federal government I do not have any authority over judicial proceedings. Therefore, it would be in your best interest to speak with a legal representative to further pursue this matter.

Additionally, I will keep your concerns in mind whenever Congress discusses the BoP's current rules and regulations.

Sincerely,

Marc A. Veasey
Member of Congress

MV/qc

2348 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-9897

6707 BRENTWOOD STAIR ROAD, SUITE 200
FORT WORTH, TX 76112
(817) 920-9086

1881 SYLVAN AVENUE, SUITE 108
DALLAS, TX 75208
(214) 741-1387

PRINTED ON RECYCLED PAPER

EXHIBIT E

Picture of Cell in Norman's Unit

Case 4:21-cv-00669-P    Document 12    Filed 06/30/21    Page 48 of 54    PageID 342

# Inmate's
# Proper Room Appearan
## *CELLS*



*Sheets or blankets that are folded, will be at the foot of the bed.
*They should be no wider than 15" and go from edge to edge of the mattress.
*Shoes will be lined up neatly under the bed against the wall.
*One water jug and a laundry bag with dirty clothes may also be under the bed where it is
*Nothing is to be taped or nailed to walls or furnishings.
*All pictures on the bulletin board will be appropriate and within the boarders of the b

EXHIBIT F

Administrative Remedy
Regarding Falsification of Norman's
Medical Records

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: DECEMBER 17, 2020

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CARSWELL FMC

TO  : ALEXIS C NORMAN, 49210-177
      CARSWELL FMC    UNT: UNT 2 LCP    QTR: I03-111L
      P.O. BOX 27066
      FORT WORTH,  TX 76127


FOR THE REASONS LISTED BELOW, THIS ADMINISTRATIVE REMEDY REQUEST
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.


REMEDY ID        : 1061416-F1      ADMINISTRATIVE REMEDY REQUEST
DATE RECEIVED    : DECEMBER 17, 2020
SUBJECT 1        : MEDICAL RECORDS
SUBJECT 2        :
INCIDENT RPT NO:

REJECT REASON 1: YOU DID NOT ATTEMPT INFORMAL RESOLUTION PRIOR TO SUBMISSION
                 OF ADMINISTRATIVE REMEDY, OR YOU DID NOT PROVIDE THE
                 NECESSARY EVIDENCE OF YOUR ATTEMPT AT INFORMAL RESOLUTION.

REJECT REASON 2: YOU RAISE MORE THAN ONE ISSUE/RELATED ISSUE OR APPEAL MORE
                 THAN ONE INCIDENT REPORT (INCIDENT NUMBER).   YOU MUST
                 FILE A SEPARATE REQUEST/APPEAL FOR EACH UNRELATED ISSUE
                 OR INCIDENT REPORT YOU WANT ADDRESSED.

Received on 12/21/2020
J. Reza

TMENT OF JUSTICE **REQUEST FOR ADMINISTRATIVE REMEDY**
ureau of Prisons

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: **NORMAN, Alexis C.**     **49210-177**     **2 South**     **FMC Carswell**
LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A- INMATE REQUEST**

I received a copy of my medical records, and I was alarmed to see that my records state that on August 11, 2020 I tested negative for COVID-19. I tested positive for COVID-19 on July 28, 2020, and was moved to isolation of August 1, 2020. I was NEVER tested again. On August 11, 2020 I was "deemed negative" and released to my unit. I would like to have my medical records updated by removing this erroneous information, specifically - "Coronavirus COVID-19 test negative, Z03818-c19-Resolved" - Encounter Date 08/11/2020 14:44  Provider: Rios, Matthew MD  Unit E02.
I would also like to request confirmation of the removal of the information and date of medical record correction.

**November 13, 2020**
DATE

SIGNATURE OF REQUESTER

**Part B- RESPONSE**




DATE     WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE     CASE NUMBER: 1061416-F1

CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

_____     ✪     RECIPIENT'S SIGNATURE (STAFF MEMBER)     BP-229(13)
DATE     PRINTED ON RECYCLED PAPER     APRIL 1982
USP LVN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

Fort Worth Division

Alexis C. Norman

Plaintiff

vs.

Michael Carr, Warden
FMC Carswell    Defendant

§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. 4:21-CV-669

## MOTION FOR THE APPOINTMENT OF COUNSEL

I request that the Court appoint an attorney to represent me in the matter cited above. In support of this motion I have attached the following:

1.    An affidavit relating to my ability to pay costs and fees.

2.    Other material, if any.

_Declaration attached_

I have made the following efforts to obtain counsel from legal aid or legal services organizations or individual attorneys without payment of a fee or on a contingent fee basis, and have been unable to obtain the services of counsel:

Date: June 28, 2021

Signature
Type or print your address
and telephone number.



FMC Carswell
P.O. Box 27066
Fort Worth, TX 76127
Mailed: _6·29·21_
The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification.   (4)